**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DIGOIL,

*Petitioner*,

*v.*

Democratic Republic of Congo,

*Respondent*.

Civil Action No. ________________

**Petition to Confirm Arbitral Award**

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DIGOIL,

*Petitioner*,

*v.*

Democratic Republic of Congo,

*Respondent*.

Civil Action No. ___________________

**Declaration of Matthew S. Rozen in Support of Petition to Confirm Arbitral Award**

Pursuant to 28 U.S.C. § 1746, I, Matthew S. Rozen, declare as follows:

1. I am an attorney and am admitted to practice law in the District of Columbia and Virginia. I represent Petitioner DIGOIL in this matter.

2. I am over the age of eighteen and make this declaration from personal knowledge based on information reviewed and/or referenced herein.

3. This declaration is submitted in support of the Petition to Confirm Arbitral Award filed today by DIGOIL.

4. Attached hereto as Exhibit A is a certified copy of the arbitral award rendered on November 7, 2018 in International Chamber of Commerce ("ICC") Arbitration No. 22370/DDA in the arbitration proceeding between DIGOIL and Respondent, Democratic Republic of Congo ("DRC"), together with a certified translation from French into English, prepared from a courtesy copy of thereof.

5. Attached hereto as Exhibit B is a true and correct copy of the Production Sharing Agreement executed between DIGOIL and DRC on December 14, 2007, together with a translation thereof from French into English.

6. Attached hereto as Exhibit C is a true and correct copy of the Production Sharing Agreement executed between DIGOIL and DRC on January 21, 2008, together with a translation thereof from French into English.

7. Attached hereto as Exhibit D is a true and correct copy of the Paris Court of Appeals decision, dated January 7, 2020, affirming the arbitral award rendered on November 7, 2018, together with a certified translation thereof from French into English.

I declare under penalty of perjury that the following is true and correct.

Executed on April 30, 2020
Washington D.C.

Matthew S. Rozen

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DIGOIL,

*Petitioner*,

*v.*

Democratic Republic of Congo,

*Respondent*.

Civil Action No. ___________________

**Declaration of Matthew S. Rozen in Support of Petition to Confirm Arbitral Award**

# EXHIBIT A

International Chamber of Commerce
International Court of Arbitration

**ARBITRATION No. 22370 / DDA**

**DIVINE INSPIRATION GROUP (PTY) (South Africa)**

Applicant

vs/

**THE DEMOCRATIC REPUBLIC OF CONGO (Dem. Rep. of Congo)**

Respondent

# FINAL AWARD

**TABLE OF CONTENTS**

**I. THE PARTIES ........ 4**

A. THE APPLICANT ........ 4
B. THE RESPONDENT ........ 4

**II. THE COURT OF ARBITRATION ........ 6**
**III. THE ARBITRATION AGREEMENT AND APPLICABLE LAW ........ 6**

A. THE BACKGROUND TO THE DISPUTE AND THE ARBITRATION AGREEMENT ........ 6
B. APPLICABLE LAW ........ 7

**IV. HISTORY OF THE PROCEDURE ........ 8**

A. INITIATION OF ARBITRATION ........ 8
B. THE CONSTITUTION OF THE COURT OF ARBITRATION ........ 8
C. SIGNATURE OF THE TERMS OF REFERENCE ........ 9
D. THE CONFERENCE ON THE MANAGEMENT OF THE PROCEDURE AND THE CALENDAR OF THE PROCEDURE ........ 10
E. APPLICATION OF ARTICLE 36 (6) OF THE REGULATION ........ 10
F. CHANGES TO THE CALENDAR OF THE PROCEDURE ........ 11
G. THE BRIEFS OF THE PARTIES ........ 12
I. THE DEADLINE FOR MAKING THE AWARD ........ 14

**V. SUMMARY OF THE FACTS OF THE DISPUTE ........ 14**

A. THE 2007 CONTRACT AND THE 2008 CONTRACT ........ 14
B. AWARD OF THE 2008 CONTRACT ........ 15
C. THE PROPOSED AMICABLE SOLUTION OF THE RESPONDENT ........ 15
D. THE EXECUTION OF THE 2007 CONTRACT ........ 17

**VI. THE RESPECTIVE POSITIONS AND REQUESTS OF THE PARTIES ........ 18**

A. THE POSITIONS OF THE PARTIES ........ 18
B. THE PARTIES' REQUESTS ........ 20

**VII. ANALYSIS OF THE COURT ........ 22**

A. PRELIMINARY QUESTIONS ........ 22

1. The competence ratione personae of the Court of Arbitration and the standing of the Applicant
2. The applicable law

B. THE CONSEQUENCES OF NOT ISSUING THE PRESIDENTIAL ORDER ........ 25

1. The scope and nature of the presidential order
2. The conditions for issuing the presidential order

C. EXECUTION OF THE DISPUTED CONTRACTS ........ 30

1. The rights arising from the Contracts
2. The 2008 Contract
3. The 2007 Agreement

D. CONSEQUENCES OF NON-COMPLIANCE ........ 38

1. Termination of Disputed Contracts with damages
2. The assessment of damages

ICC ARB. No. 22370 / DDA
*FINAL AWARD*

E. COSTS OF ARBITRATION .......... 47

1. Rules applicable to arbitration fees
2. The distribution of the expenses of the arbitration

F. INTEREST .......... 52

**VIII. RECITAL .......... 53**

1. This final award (the "**Final Award**") is made in accordance with the arbitration rules of the International Chamber of Commerce ("ICC") in force on 1 January 2012 (the "**Regulations**" in case No. 22370 / DDA (the "**Arbitration**").

# I. THE PARTIES

## A. THE APPLICANT

2. The applicant in Arbitration is the company DIVINE INSPIRATION GROUP (PTY) (the "**Applicant**" or "**DIGOIL**", created and organised under the law of South Africa, whose registered office is at:

c/o Ian Levitt Attorneys
19th Floor
Sandton City Office Tower
2196 Sandton City, Gauteng
South Africa

3. It is represented by its counsel:

Maître Bernard Remiche
Maître Vincent Cassiers
SYBARIUS
Chaussée de Waterloo 880
B-1000 Bruxelles
Belgium
Phone: +32 2 379 00 50
Fax: +32 2 375 82 56
Email: b.remiche@svbarius.net
v.cassiers@sybarius.net

4. The following joined the representation of the Applicant as of 13 June 2018:

Mr John Evans
Mrs Steffi Spitznagel
Ms. Maria Dogaru
Kerman & Co LLP
200 Strand
London
WC2R 1DJ
United Kingdom
Phone: +44 20 7539 7272
Email: john.evans@kermanco.com
Steffi.Spitznagel@kermanco.com
Maria. Dogaru@kermanco.com

Mrs Stacey Kivel
Attorney at law
Email: Stacey.kivel@gmail.com

## B. THE RESPONDENT

5. The Respondent is the DEMOCRATIC REPUBLIC OF CONGO (the "***Respondent***" or the "***DRC***") in the person of the Minister of Justice, keeper of the seals and minister for Human Rights, Mr Alexis Thambwe-Mwamba:

Palais de justice, 3eme Niveau,
Place de l'Indépendance
Gombe, Kinshasa
Democratic Republic of Congo
Telephone: + 243 99 99 43 284
Email: cabkalengaka@vahoo.fr
with copy to: miniustdh@gmail.com
otshingal976@gmail.com

6. It is represented by:

Maître André Kalenga-ka-Ngoyi
Assistant Director of the Minister of Justice, Keeper of the Seals and Minister for Human Rights
Maître Valencia Bolebe Ekosso 'Gombe
Counsel in charge of the National and International Litigation
Palais de justice, 3eme Niveau,
Place de l'Indépendance
Gombe, Kinshasa
Democratic Republic of Congo

and by its counsels:

Maître Michel Pombia-Wa-Ngoloko
91 rue Faubourg Saint-Denis
75010 Paris
ID D 2069
FRANCE
Email: michelpombia@hotmail.fr

Maître Josephe Nzau Matuta
3835 Avenue de la Douane
Gombe, Kinshasha
DEM. REP. of CONGO
email: nzau2009@yahoo.fr

7. The following are also concerned by this arbitration:

Minister of Hydrocarbons
Immeuble Cohydro, Niveau 2
1, avenue du Comité Urbain
Gombe, Kinshasha
Democratic Republic of Congo
and

The Minister of Finance
Boulevard Tshatshi, en face de la Banque Centrale du Congo,
BP 7907 Gombe, Kinshasa
Democratic Republic of Congo

8. The Applicant and the Respondent are hereinafter referred to separately as the "***Party***" and together as the "***Parties***".

# II. THE COURT OF ARBITRATION

9. The Court of Arbitration (the "***Court of Arbitration***") is composed of three arbitrators, Mr Grégoire Bakandeja Wa Mpungu, as co-arbitrator on appointment of the Applicant, Mrs Ghizlane El Idrissi, as co-arbitrator on appointment of the Respondent, and Mrs Christine Lécuyer-Thieffry, as president by joint designation of the Parties.

10. The arbitrators' contact details are as follows:

Christine Lécuyer-Thieffry
66, rue de Monceau,
75008 Paris, France,
Phone: +33 9 72 50 43 25
Email: christine.lecuyer-thieffry@thieffry.com

Professor Gregoire Bakandeja Wa Mpungu
PR GREGOIRE BAKANDEJA & VINCENT DE PAUL ALUMBA Associés
12 Avenue Tabu Ley (formerly Tombalbaye),
Immeuble Wassim, 2eme étage, Appartement 2
(Référence: Croisement des Avenues Kasai et Tabu Ley)
Commune de la Gombe
Kinshasa, Congo
Telephone: +243 815 093 816
Fax: +243 815 093 816
Email: gbakandeia2002@yahoo.fr

Mrs Ghizlane El Idrissi
EL IDRISSI
Walili Street
42, Boulevard Abdelmoumen
7eme étage no. 52
Casablanca
Morocco
Tel.: +212 6 38 85 68 03
+33 6 21 24 31 02
Email: ghizlane.elidrissi@juridiscom.fr

# III. THE ARBITRATION AGREEMENT AND APPLICABLE LAW

## A. THE BACKGROUND TO THE DISPUTE AND THE ARBITRATION AGREEMENT

11. The dispute relates to two hydrocarbon resource sharing contracts that the Respondent concluded, the first on 14 December 2007, with the association formed between the Applicant and la Congolaise des Hydrocarbures ("***COHYDRO***"), jointly designated in said contract as the "Contractor" ("***the 2007 Contract***") [1] And, the second, in January 2008 with the consortium consisting of the association between the Applicant and Petro SA and H-Oil Congo Limited, COHYDRO, Congo Petroleum and Gas Sprl and Sud Oil Sprl , together also referred to in this second contract as the "Contractor"

[1] Production Sharing Agreement between the Democratic Republic of Congo and the Divine Inspiration Group (PTY) Ltd and la Congolaise des Hydrocarbures, Blocks 8, 23 and 24 of the Central Basin, December 2007, hereinafter "2007 Contract", **Exhibit DM-VIII**.

(the "***2008 Contract*** ").[2] The 2007 Contract and the 2008 Contract are also referred to hereafter as the "***Disputed Contracts*** ".

12. The Arbitration Agreement (the "***Arbitration Agreement***") is contained in Article 30 "*Arbitration*" of each of the disputed Contracts which, in identical terms, provides:

30.1 *All disputes arising out of the Contract, with the exception of those referred to in paragraphs 30.5 and 30.6 below, that will arise between "DRC" on the one hand, and "Contractor" entities on the other hand, which cannot be resolved amicably, will be settled definitively by arbitration in accordance with the Arbitration Rules of the International Chamber of Commerce of Paris.*

30.2 *"The DRC" on the one hand and the "Contractor" on the other hand will appoint an arbitrator and endeavour to agree on the appointment of a third arbitrator who will be the president of the court. In the absence of an arbitrator or an agreement on the third arbitrator, the provisions of the International Chamber of Commerce of Paris shall apply.*

30.3 *The arbitration will take place in Paris, in France, or in any other place decided by the "Contractor" and "DRC". The procedure will be in French. The arbitrator's interpretation of this Agreement must correspond to the customs and practices generally accepted in the international petroleum industry.*

30.4 *"The DRC" hereby irrevocably waives any immunity in proceedings relating to the execution of any arbitral award rendered by a Court of Arbitration constituted in accordance with this Article 27 (sic), including without limitation, any immunity relating to service, immunity from jurisdiction and immunity from enforcement with respect to its property, except public property of the Democratic Republic of the Congo.*

30.5 *If "DRC" and one of the "Contractor" entities disagree on the determination of Liquid Oil prices under Article 16, "DRC" or said entity may ask the President of the Institute of Petroleum in London, Great Britain, to appoint a qualified International Expert, to whom the dispute will be submitted. If the President of the Institute of Petroleum does not appoint a qualified Expert, each of the parties to the dispute may ask the International Centre of Expertise of the International Chamber of Commerce of Paris to make such designation. "The DRC" and said entity will provide the latter with any information they deem necessary or which the expert may reasonably request.*

30.6 *Within thirty (30) days of the date of his appointment, the expert shall provide "The DRC" and said Party with the price which, in his opinion, shall be used in accordance with Article 14. This price will be binding on the parties and will be deemed to have been agreed upon between them. The fees and costs of the Institute of Petroleum in London or the International Chamber of Commerce of Paris, as well as the experts will be shared equally between "the DRC" and said entity. The Expert will not be an Arbitrator, and arbitration will not be applicable in such a case.*

## B. APPLICABLE LAW

13. Pursuant to Article 21 (1) of the Regulations, the Court of Arbitration shall apply the rules of law chosen by the Parties, in particular, to Article 27 of each of the Disputed Contracts which, in identical terms, states:

[2] Production Sharing Agreement between the Democratic Republic of Congo and the Consortium Divine Inspiration Group (PTY) Ltd and Petro SA, H-Oil Congo Limited, Congolese Hydrocarbons, Congo Petroleum and Gas BVBA, Sud Oil BVBA , Bloc 1 Graben Albertine, January 2008, hereinafter the "2008 Contract", **Exhibit DM-IX**.

*The interpretation and performance of this Agreement shall be subject to the laws of the Democratic Republic of Congo.*

14. In addition, Article 30.3 of the disputed Contracts provides in particular that:

*The Arbitrator's interpretation of this Contract must be in accordance with generally accepted practices and customs of the international oil industry.*

15. Finally, pursuant to Article 21 (2) of the Regulations, the Court of Arbitration *"shall take into account the provisions of the contract between the parties, as the case may be, and all relevant commercial practice ".*

# IV. HISTORY OF THE PROCEDURE

## A. INITIATION OF ARBITRATION

16. On 31 October 2016, the Applicant filed a Request for Arbitration with the Secretariat dated 19 October 2016 (the "***Request***") and forty-two exhibits numbered from DM-I to DM-XLII, according to the attached schedule, which the Secretariat acknowledged on 2 November 2016.

17. On 16 November 2016, the Secretariat first notified the Request to the Respondent who, inter alia, was invited to submit its response by appointing a co-arbitrator and, on the other hand, invited the Applicant to appoint a co-arbitrator pursuant to section 12.4 of the Regulations.

18. On 22 November 2016, the Applicant appointed Professor Grégoire Bakandeja wa Mpungu as arbitrator.

19. On 25 November 2016, the Secretary General of the Court (the "***Secretary-General***") set the amount of the advance against the provision for arbitration costs in accordance with Article 36 (1) and Article 1 (2) of Annex III of the Regulation and, on 16 December 2016, the Applicant requested an extension of the deadline for the payment of this advance until the end of January 2017.

20. By letter of 2 December 2016, received by the Secretariat on 4 January 2017, the Respondent indicated that the Minister of Justice and Human Rights is the only person entitled to represent the Congolese State in a court of law and should be intimately involved in the procedure for drafting and signing the Terms of Reference, reserving the right to proceed with the appointment of an arbitrator of his choice.

21. By letter of 27 December 2016, the Respondent requested the extension until 31 January 2017 of the deadline for filing its response and, on 7 January 2017, it indicated that it was represented by Maître Michel Pombia and Maître Joseph Nzau Matuta, which the Secretariat acknowledged on 13 January 2017.

22. Following the agreement of the Parties, the Secretariat has extended until 31 January 2017 the deadline for the Respondent to submit its response ("***Response***") in which it acknowledged receipt of the digital version on 1 February 2017 and the hard copy on 10 February 2017.

## B. THE CONSTITUTION OF THE COURT OF ARBITRATION

23. On 1 February 2017, the Respondent objected to the appointment of Professor Grégoire Bakandeja wa Mpungu as the Applicant arbitrator because of his appointment in a similar case still pending, his alleged links with the applicant represented by the same counsel and the application for recusal it lodged against him in that case.

24. Also on 7 February 2017, the Respondent nominated Mr Declerc Mavinga Ndangi as co-arbitrator whose declaration of acceptance, availability, impartiality and independence and *curriculum vitae* were forwarded to the Parties by the Secretariat on 2 March 2017. On 3 March 2017, the Applicant expressed doubts about the independence and impartiality of Mr Declerc Mavinga Ndangi because of his links with oil companies active in the Democratic Republic of Congo and competitors of the Applicant, which should have been disclosed and, after several exchanges between the Parties, by letter of 7 April 2017, Mr Declerc Mavinga Ndangi renounced his appointment.

25. On 25 April 2017, within the time allotted to it by the Secretariat, the Respondent nominated as co-arbitrator Mrs Ghizlane El Idrissi, whose declaration of acceptance, availability, impartiality and independence and *curriculum vitae* were forwarded to the Parties by the Secretariat on 5 May 2017.

26. On May 24, 2017, pursuant to article 13 (1) of the Rules, the Court (i) confirmed Mr Grégoire Bakandeja wa Mpungu as co-arbitrator on the nomination of the Applicant, (ii) confirmed Ms. Ghizlane El Idrissi as (iii) fixed the amount of the provision, and (iv) invited the Parties to appoint the Chairperson of the Court of Arbitration in accordance with the Arbitration Agreement.

27. On 22 June 2017, in the absence of any objection by the Parties to the disclosures contained in the declaration of acceptance, availability, impartiality and independence of Mrs Christine Lécuyer-Thieffry, jointly appointed by the Parties, the Secretary General confirmed her as President of the Court of Arbitration and informed the Court in accordance with Rule 13 (2) of the Regulations. On the same day, the Secretariat forwarded the file of this Arbitration to the Court of Arbitration in accordance with Article 16 of the Regulations.

## C. SIGNATURE OF THE TERMS OF REFERENCE

28. The draft Articles of the Term s of Reference and Procedural Order No. 1 for the Conference on the Management of the Procedure under Rule 24 ("***Conference No. 1***") "Were submitted to the Parties on 29 June 2017.

29. The Parties proposed amendments to the Terms of Reference on 7 and 10 July 2017, and a second draft of the Terms of Reference was submitted to them on 12 July 2017. Following further amendments to the draft Terms of Reference by the Respondent, a final version was sent to the Parties on 18 July 2017.

30. After discussions between the Court of Arbitration and the Parties, on 19 July 2017, Conference No. 1 was set for 29 August 2017 in the presence of representatives of the Parties at the ICC Hearing Centre in Paris, France.

31. On 10 August 2017, the Court extended the deadline for issuing the Terms of Reference until 31 October 2017 in accordance with section 23 (2) of the Regulations.

32. On 31 July 2017, the President of the Court of Arbitration acknowledged receipt of seven copies of the terms signed by Mrs Andréa Brown, CEO of the Applicant, which were sent on 2 August 2017 to the Respondent's counsel in Kinshasa so that he could collect the signature of the authorised person in the name of the Respondent and then forward it to the co-arbitrator Mr Grégoire Bakandeja wa Mpungu for his signature.

33. The seven copies of the Terms of Reference signed by Maître Nzau Matuta for the Respondent and by Professor Grégoire Bakandeja wa Mpungu, Co-Arbitrator, were deposited in the Office of the President of the Court of Arbitration on 28 August 2017 and signed before the Conference No 1 by the other members of the Court of Arbitration. They were sent to the Secretariat for forwarding to the Court pursuant to Rule 23 (2) of the Rules of Procedure on 31 August 2017. As set out in the Terms of

Reference, the quantified claims of the Applicants amounted to USD 5 billion and USD 50 million for the Respondent.

## D. THE CONFERENCE ON THE MANAGEMENT OF THE PROCEDURE AND THE CALENDAR OF THE PROCEDURE

34. Conference No. 1, the subject of which was specified in the letter from the Court of Arbitration of 29 June 2017, concerned (i) the handing over to the Parties of their copy of the Terms of Reference, (ii) organisation of the procedure and the adoption of procedural measures complementary to those of the Rules in procedural Order No. 1 submitted to the Parties for adoption (ii) the adoption of the procedural timetable (the "***Calendar of Proceedings***") and (iv) any other possible questions from the Parties.

35. Procedural measures complementary to those of the Rules and the Calendar of Proceedings, adopted at Conference No. 1, were confirmed by Procedural Order No. 1 of 31 August 2017 of the Court of Arbitration and forwarded to the Secretariat by letter of the same day.

## E. APPLICATION OF ARTICLE 36 (6) OF THE REGULATION

36. On 4 December 2017, the Applicant requested an extension until 28 February 2018, of the deadline for the filing of its Reply Brief fixed according to the Calendar of Proceedings as 30 December 2017 and a reorganisation of said Calendar, stating in particular that it had consulted a firm of experts to obtain a technical report and a financial report to establish the amount of damage that would only be completed on 15 February 2018 and emphasising that these reports would (i) achieve appreciable savings in time throughout the arbitration process, (ii) provide the Respondent with the information requested by it and (iii) provide the Respondent all the required elements and documents at the time of preparing its rejoinder.

37. On 5 December 2017, the Respondent objected to this request, considering it to be manifestly dilatory and seeking to delay the time allowed to the Applicant for the payment of the arbitration provision in respect of which she has repeatedly, since 22 June 2017, requested its postponement before making a partial payment on 13 October 2017 and on 19 October 2017 and 1 December 2017, requesting a new payment deadline. It further questioned the reality of this expert appraisal and asked the Court of Arbitration to refer the matter to the Secretary-General for the purposes of Rule 36 (6).

38. By letter of 7 December 2017, pursuant to Rule 36 (6), the Secretary-General (i) granted the Parties a final deadline for the payment of the balance of the arbitration provision, failing which the claims would be considered as withdrawn and (ii) invited the Court of Arbitration to suspend its proceedings.

39. On 21 December 2017, pursuant to Standing Order 36 (6), the Applicant objected to the Secretary-General's action, referring, in particular, to the fact that it had paid, on 19 December 2017, the balance of its share of the provision for arbitration costs, which the Respondent certified on the same day, and the Applicant asked the Court (i) to decide whether it was appropriate to consider applications withdrawn and (ii) set separate provisions for the main claim and the counterclaim. On the same day the Respondent announced its intention to pay its share of the provision.

40. On 28 December 2017, the Secretariat took note of the Applicant's objection to the application of Rule 36 (6), noting that the Respondent had requested a deadline for the payment of the share of the provision for arbitration costs incumbent in it, submitting a financial table corresponding to the setting of separate provisions and acknowledgment of payment by the Applicant of the balance of its share of the provision for arbitration costs.

41. On 4 January 2018, the Applicant withdrew its request to fix separate provisions, noting that the Respondent had announced payment of its share of the Arbitration Fee and, in the event of default, agreed to stand in for the Respondent for this payment in two instalments of substantially equal amounts on 30 January and 20 February 2018.

42. On 18 January 2018, the Court decided not to apply Rule 36 (6) so that it did not consider the applications withdrawn and set a new deadline for the Respondent's payment of the balance of the provision.

43. The Respondent did not make the payment announced and ultimately it was the Applicant which paid the entire provision for the costs of the arbitration in two instalments. The Court reassessed the arbitration provision on 17 May 2018 and the Respondent again failed to pay; again, it was the Applicant which proceeded with the payment of the additional provision, the amount of which had been fixed by the Court.

## F. CHANGES TO THE CALENDAR OF THE PROCEDURE

44. By Procedural Order No. 2 of 31 January 2018, taking into account the decision of the Court under Article 36 (6) and the status of the proceedings, the Court of Arbitration: (i) authorised the Applicant to file a technical and financial report to establish the amount of its loss, (ii) ruled that the Schedule of Proceedings should be amended to allow the Respondent to analyse this report and comment on it before the hearing, (iii) ruled that the Case Management Conference (the "***Conference No. 2***") scheduled in the form of a conference call on 20 February 2018 at 15 hours, Paris time would in particular discuss the Calendar of the procedure, and (iv) invited the Parties to submit to the Court of Arbitration, no later than 15 February 2018, their respective proposals for adjusting the Calendar of the procedure.

45. On February 15, 2018, the Applicant submitted its proposals for adjusting the Calendar for Conference No. 2.

46. Since the Respondent has neither submitted to the Court of Arbitration its proposed reorganisation of the Calendar of Proceedings, nor has it responded to the Applicant's proposal, and did not join the scheduled conference call, it was agreed to adjourn Conference No. 2 and to again convene a Conference on the Management of the Procedure (" ***Conference No. 3***" for 22 February 2018 at 10 am Paris time.

47. Following Conference No. 3, by Procedural Order No. 3 of 26 February 2018, the Court of Arbitration adopted the Calendar of the Procedure including the filing of the technical and financial report of the Applicant's expert (the "***Deloitte Report***") on 30 March 2018, the simultaneous exchange of a supplementary brief by each Party (the "***Supplementary Brief*** ") on 30 April 2018 and a response to the other party's supplementary brief ("***Response to the Supplementary Brief***") on 30 May 2018, the hearing being set for 28 and 29 June 2018.

48. On 26 May 2018, the Applicant requested the extension to 12 June 2018 of the deadline for the filing of its Response to the Applicant's Supplementary Brief and confirmed that the hearing date remained unchanged. The Applicant did not object to this, provided that the deadline for the filing of its own Response to the Respondent's Supplementary Brief was extended accordingly; by letter of 28 May 2018, the Court of Arbitration accordingly modified, in the Calendar of the proceedings, the date scheduled for the simultaneous filing of said Replies to the Supplementary Brief of the other Party, fixing it for 12 June 2018.

## G. THE BRIEFS OF THE PARTIES

49. In accordance with the Calendar of Proceedings then applicable, on 30 October 2017, the Parties submitted, for the Respondent, a defence brief (the "***Defence Brief*** ") accompanied by a document referenced according to the attached schedule as number DF-I and, for the Applicant, a reply brief (the "***Reply Brief***") accompanied by factual exhibits DM-XLIII to DM-LIV and legal documents LEX DM-I to LEXDM-VI acknowledged by the Court of Arbitration on 2 January 2018 pending the decision of the Court on the application of Rule 36 (6) of the Regulations .The Applicant's financial claims were then reduced to USD 2 billion and USD 50 million.

50. On 30 January 2018, the Respondent filed its rejoinder (the "***Rejoinder***"), which is not accompanied by any exhibits.

51. Pursuant to the Calendar of Proceedings, on 30 April 2018, following the filing of the Deloitte Report, including the report of Mr Anthony Charlton and its attachments and the report of Mr Robin Bertram filed in the proceedings as DM-LV to DM-LVII , the Complementary Briefs of the Parties were filed, titled, for the Applicant, "Brief on the Deloitte Report" and accompanied by DM-LVIII and DM-LIX, and, for the Respondent, a "Brief on the nullity of the 2008 Contract". The Applicant's financial claims in the context of its Supplementary Brief now amount to USD 617,400,878.

52. On 12 June 2018, the Parties filed their Response to the Supplementary Brief of the other Party, accompanied for the Applicant by DM-XL to DM-LXXVIII and LEX DM-III and LEX DM-VII to LEX DM-IX, the Respondent's Response to the Applicant's Supplementary Brief not being accompanied by any exhibit, the Respondent stating that even if it does not agree with the conclusions of the Deloitte Report, it nevertheless finds it inopportune to produce another expert report.[3]

## H. THE HEARING AND THE CLOSING OF THE DEBATES

53. Following the fourth Conference on Management of the procedure of 6 June 2018, ("***Conference No. 4***"), convened to discuss the organisation of the hearing, the Calendar of the hearing and in particular the rules applicable to the interviewing of the expert (s) known to the Parties was adopted by Procedural Order No. 4 of 11 June 2018.

54. In accordance with Rule 26 of the Rules of Court and the Calendar of Proceedings, the hearing was held on 28 and 29 June 2018 (the "***Hearing***"), with the agenda of (i) the introductory pleadings of the Parties, (ii) the presentation by the expert, Mr Anthony Charlton, of his report communicated on 30 March 2018 (the "***Deloitte Report***") and the questions of the Parties and the Court of Arbitration on this report, (iv) the closing arguments of the Parties and (v) any questions of the Court of Arbitration and the organisation of further proceedings.

55. The Hearing took place at the ICC Hearing Centre, with the Parties being represented by: (i) for the Applicant, Vincent Cassiers, Attorney, SYBARIUS, Andrea Brown, DIGOil CEO Mrs Stacey Kivel , Counsel, DIGOil's usual counsel, Mrs Steffi Spitznagel, Lawyer, Kerman & Co LLP, Mrs Maria Dogaru, Paralegal, Kerman & Co LLP and (ii) for the Respondent, Maître Michel Pombia, Counsel, the other counsel of the Respondent, Master Nzau Matuta and Master Valencia Bolebe Ekosso 'Gombe were unable to get visas in time. As agreed with the Parties, the Expert's presentation of the Deloitte Report and the interviews at the Hearing were audio-recorded and handed over to the representatives of the Parties after the hearing.

56. At the beginning of the Hearing, on 28 June 2018, reference was made (i) to the request submitted the day before by the Applicant requesting the authorisation to attach to its schedule of exhibits the

---

[3] Response to the Supplementary Brief, 12 June 2018, para.23.

consultation of Master Alex Kabinda Ngoy, Professor at the faculty of Lubumbashi University and Lubumbashi Bar, on the impact of the Presidential Order of Approval of the Petroleum Agreements on the latter, to which the Respondent objected and (ii) the claim of inadmissibility, based on Article 23 of the Regulations, of the Respondent's Application to Declare the Applicant's claims inadmissible on the grounds that the Disputed Contracts were concluded between the Respondent on the one hand and, on the other hand, two "associations" of which the Applicant was only one of the entities, such that It would have been necessary for the Applicant to subpoena the other entities of the association.

57. Following the proceedings, by Procedural Order No. 5 of 2 July 2018, the Court of Arbitration:

(a) INVITED the Respondent (i) to confirm in writing to the Court of Arbitration the withdrawal of its claim of inadmissibility referred to in paragraph 56 above and its counterclaim and (ii) to produce the doctrinal elements referred to in the footnotes of pages 5 and 7 of its Response to the Supplementary Brief of 12 June 2018;

(b) AUTHORISES (i) the Applicant to produce, at its earliest convenience, the consultation of Maître Alex Kabinda Ngoy and, (ii) within fifteen days of the production of this consultation, the Respondent to submit all elements of Congolese law in support of its arguments that the approval of an oil convention falls within the discretion of the President of the Republic, and the 2008 Contract was obsolete;

(c) INSTRUCTS the Parties to submit to the Court of Arbitration their quantified claims for reimbursement of the costs and expenses incurred by them in their defence and all supporting documents by 31 August 2018;

(d) RULES that the Calendar of Procedure is amended in accordance with the provisions of paragraph (b) above.

58. On 4 July 2018, the Applicant submitted as Exhibit DM-LXXIX the consultation of Maître Alex Kabinda Ngoy and corrected a spelling error appearing in the recital of its Response to the Supplementary Brief of 12 June 2018. On 16 July 2018, the Respondent (i) confirmed the withdrawal of its claim of inadmissibility under paragraph 57 (a) above and its counterclaim and (ii) on the question of the impact of the absence of a Presidential Order concerning Approval of Oil and Gas Contracts, produced a judgment of the High Court of Justice of the British Virgin Islands of 19 November 2010 as Exhibit DEP II, and announced the forthcoming production of the judgment of the Supreme Court of Justice of the Democratic Republic of Congo of 10 December 2010 as Exhibit DEF III, decisions it had raised in the Hearing.

59. By letter of 25 July 2018, the Court of Arbitration authorised the Applicant and the Respondent to provide written submissions solely on the three documents filed by the Parties in accordance with Procedural Order No. 5 of 2 July 2018, as soon as possible and no later than 31 July 2018 at midnight.

60. Following the communication by the Parties of their comments within the time allowed, by email of 1 August 2018, (i) the Respondent applied for approval of the Court of Arbitration to comment on the documents accompanying the observations of the Applicant (ii) the Applicant objected to an additional exchange of observations in this case; and (iii) the Respondent maintained its position by requesting that any refusal decision by a Court of Arbitration be subject to an order.

61. By reasoned Procedural Order No. 6 of 2 August 2018 the Court of Arbitration:

(t) AUTHORISED the Respondent to communicate its comments on the Tullow Contract of 2006 and the Ministerial Order of 17 October 2007 and only on these two documents, without it being able to rely on any material or facts which have not already been submitted to the debate;

(b) RULES that the Respondent's comments will be submitted no later than 6 August 2018.

62. The Respondent's latest submissions regarding, among other things, the 2006 Tullow Contract and Ministerial Order of 17 October 2007 were submitted on 6 August 2018.

63. By Procedural Order No. 7 of 10 August 2018, in accordance with Rule 27 of the Rules, the Court of Arbitration:

(a) ORDERED the closing of the debates;

(b) REMINDED the Parties that no arguments or pleadings may be presented, nor any additional evidence produced except at the request or with the authorisation of the Court of Arbitration.

64. On 31 August 2018, in accordance with Procedural Order No. 5, the Applicant submitted a note of observations on the reimbursement of the costs and expenses it incurred in its defence and the supporting documents relating thereto, and after extension of the deadline by the Court of Arbitration the Respondent submitted its own cost elements on 15 September 2018.

### I. THE DEADLINE FOR MAKING THE AWARD

65. The **deadline** within which the Court of Arbitration must **make the Final Award** that the Court originally set according to the Calendar of Proceedings at its session on 14 September 2017 to 29 June 2018, was extended by the Court in accordance with Rule 30 (2), at its session of 14 June 2018, until 28 September 2018 and at its meeting of 13 September 2018, until 30 November 2018.

66. In accordance with Article 27 of the Rules, on 10 August 2018, the Court of Arbitration informed the Parties that it intended to submit the draft Final Award to the Court for approval by the end of October or the beginning of the month of November 2018.

67. In accordance with Rule 33 of the Regulations, the draft Final Award was approved by the Court at its meeting of 25 October 2018.

## V. SUMMARY OF THE FACTS OF THE DISPUTE

### A. THE 2007 CONTRACT AND THE 2008 CONTRACT

68. The 2007 Contract[4] was concluded on 14 December 2007 between, on the one hand, the Respondent and the association constituted between, secondly, the Applicant and, thirdly, the Congolaise des Hydrocarbures ("***COHYDRO***"), the second and third parties being referred to as the "Contractor".

69. This is a production sharing contract for hydrocarbon resources in blocks 8, 23 and 24 of the Central Basin whose purpose, according to its article 2, is *"the awarding to the Contractor" by the Democratic Republic of the Congo, of exclusive rights of recognition and exploration of hydrocarbons as well as the right to obtain Exploitation Permits within the limits of ZERE*"[5] (the "***Exclusive Zone of Recognition and Exploration***").Under the 2007 Contract, the Applicant was to carry out various oil works aimed at discovering and exploiting hydrocarbon deposits.[6], the revenue from this exploitation to be shared with the Democratic Republic of Congo[7]

---

[4] 2007 Contract, **Exhibit DM-VIII.**
[5] 2007 Contract, Section 2, **Exhibit DM-VIII.**
[6] 2007 Contract, Article 10, **Exhibit DM-VIII.**
[7] 2007 Contract, Clauses 14 and 15, **Exhibit DM-VIII.**

70. The 2008 Contract[8] was concluded in January 2008 between, on the one hand, the Respondent and, on the other hand, the consortium consisting of the association between the Applicant and Petro SA and H-Oil Congo Limited, COHYDRO, Congo Petroleum and Gas Sprl and Sud Oil Sprl. It is also a production sharing contract the purpose of which is similar to that of the 2007 Contract except for the ZERE concerned which concerns block 1 of the Albertine Graben. The 2008 Contract further provides for the payment (i) of a "*signing bonus*" for the amount of $ 2,500,000.[9] and (ii) USD 1,500,000 upon signature of the Quality, Health, Safety, and Environment ("***QHSE*** ") contract.[10] These two payments totalling US $ 4,000,000 were made by the Applicant to the Respondent, [11]following which, by letter of 25 April 2008[12], the Ministry of Hydrocarbons of the Democratic Republic of Congo authorised the Applicant to start the installation of works for block 1 of the Albertine Graben.

## B. AWARD OF THE 2008 CONTRACT

71. While the oil work was being carried out under the 2008 Contract, by letter of 5 July 2010,[13] the Respondent informed the Applicant that Caprikat Ltd and Foxwhelp Ltd had been awarded the production sharing contract on blocks I and II of the Albertine Graben (the "***Caprikat Contract***"), said contract being approved by Ordinance No. 10/041 of 18 June 2010 in accordance with Article 79 of Ordinance-Law No. 81-013 of 2 April 1981 on general legislation on mines and hydrocarbons.

72. After denouncing this unilateral termination of the 2008 Contract and unsuccessfully requesting a hearing with the Prime Minister of the Democratic Republic of Congo, by letters of 12 August 201[14], 7 September 2010[15] and 17 September 2010[16] , the Applicant, by letter of 21 September 21, 2010[17] , contacted the President of the Republic, referring to its letter of 14 July 2010 (not produced) in which it explained that the approval of the Caprikat Contract infringed its rights under the 2008 Contract, having met all its contractual obligations and, in particular, paid various amounts for a total of US $ 4,000,000 excluding interest and spent US $ 12,550,000 on petroleum works over the past two years following the authorisation issued in April 2008. It therefore requested the cancellation of Ordinance No. 10/041 approving the Caprikat Contract.

## C. THE PROPOSED AMICABLE SOLUTION OF THE RESPONDENT

73. In its aforementioned letter of 21 September 2010, the Applicant also proposed an amicable solution to the dispute including (i) the issuance by the Respondent and the publication of the

[8] 2008 Contract, **Exhibit DM-IX**.

[9] 2008 Contract , Article 12.9**, Exhibit DM-IX.**

[10] 2008 Contract , Article 5.6, **Exhibit DM-IX.**

[11] Debit Slip No. / E-H/SGH/DLN/059/2008 of the General Secretariat of the Ministry of Hydrocarbons of the Democratic Republic of Congo dated 25 February 2008, Exhibit DM X ; Encashment slip No. 320551 for an amount of $ 2,500,000 from 21 March 2008, **Exhibit DM XI** ; Certificate of payment of $ 2,500,000 established by Rawbank SARL dated 31 March, 2008, **Exhibit DM XII**.

[12] Letter from the Minister of Hydrocarbons to DIGOIL dated 25 April 2008, **Exhibit DM-XIII**.

[13] Letter of 5 July 2010 from the Minister of Hydrocarbons of the Democratic Republic of Congo to DIGOIL, **Exhibit DM-XV**.

[14] Letter of 12 August 2010 from DIGOIL to the Prime Minister of the Democratic Republic of Congo, **Exhibit DM-XVI**.

[15] Letter of 7 September 7, 2010 from DIGOIL to the Prime Minister of the Democratic Republic of Congo, **Exhibit DM-XVII**.

[16] Letter of 17 September 2010 from DIGOIL to the Prime Minister of the Democratic Republic of Congo, **Exhibit DM-XVIII**.

[17] Letter of 21 September 2010 from DIGOIL to the President of the Democratic Republic of Congo, **Exhibit DM-XIX**.

Presidential Ordinance referred to in Article 34 of the 2007 Contract, (ii) the grant to the Applicant of a new block 9 in the central basin and / or a new block, "Fosse de Borna" and (iii) the refund to the Applicant of the sums collected in respect of block 1 of the Albertine Graben in the framework of the 2008 Contract[18]. It requested the conclusion of a settlement agreement. On 23 October 2010, the Minister of Hydrocarbons told the Applicant that he considered that the principle of compensation suggested could be adopted. [19]

74. Following a hearing granted by the Prime Minister to the Applicant's CEO, during which the latter informed him of the amount of its claim, on 16 November 2010, the Prime Minister of the Democratic Republic of Congo confirmed his agreement to the reimbursement of the sums owed by the Respondent to the Applicant by way of offsetting with the other financial obligations of the Applicant in accordance with the 2007 Contract and gave instructions to "*resolve this case amicably*". [20]

75. A conciliation meeting was therefore organised from 9 to 17 December 2010 in the Ministry of Hydrocarbons in the presence of representatives of the President of the Republic, the Prime Minister, the Ministry of Hydrocarbons, the Ministry of Finance and the Applicant. The minutes of this meeting[21] show that "*the claims of the Applicant are legitimate*" and that:

(i) the Respondent's debt in respect of the Applicant amounted on that date to 4,450,000 USD, or: 2,500,000 USD signing bonus, 1,500,000 USD for QHSE and 450,000 USD interest on the QHSE amount (30% of 1,500,000 USD);

(ii) the reimbursement of the signing bonus of 2,500,000 USD by the Respondent to the Applicant would be made in the form of a tax credit to deduct this amount from future tax obligations of the same nature owed by the Applicant including the signing bonus of the 2007 Contract,

(iii) the balance of US $ 1,950,000 would be repaid by the Respondent to the Applicant to offset the Applicant's other financial obligations arising from the execution of the 2007 Contract, and

(iv) the Respondent would take the necessary steps for the execution of the 2007 Contract, which should give rise to the Applicant's financial obligations which would make it possible to offset the Respondent's debts to it.

76. The Minister of Hydrocarbons not having implemented this amicable settlement, reminders were sent to him on 7 February 2011, by the Minister of Finance[22] and on 22 March 2011, by the Applicant[23] which further indicated that the amount of the Respondent's debt now amounted to 4,800,000 USD.

[18] This is the signature bonus ($ 2,500,000) and the execution of financial obligations relating to HQSE ($1,500,000) with interest.

[19] Letter of 23 October 2010 from the Minister of Hydrocarbons of the Democratic Republic of Congo to DIGOIL **Exhibit DM-XX.**

[20] Letter of 16 November 2010 from the Prime Minister of the Democratic Republic of Congo to the Minister of Hydrocarbons and the Minister of Finance of the Democratic Republic of Congo **Exhibit DM-XXI.**

[21] Minutes of the Democratic Republic of Congo (Ministry of Hydrocarbons) on the compensation to be operated by the Congolese State in favour of Divine Inspiration Group from 9 to 17 December 2010, **Exhibit DM-XXII.**

[22] Letter of 7 February 2011 from the Minister of Finance of the Democratic Republic of Congo to the Minister of Hydrocarbons, **Exhibit DM-XXIII.**

[23] Letter of 22 March 2011 from DIGOIL to the Minister of Hydrocarbons and the Minister of Finance of the Democratic Republic of Congo, **Exhibit DM-XXIV.**

## D. THE EXECUTION OF THE 2007 CONTRACT

77. On 19 October 2011, the Director General of the General Directorate of Administrative, Judiciary, National, and Participation Revenue (" ***DGRAD*** ") of the Democratic Republic of Congo confirmed the establishment of the proposed offsetting mechanism[24] and, on November 17, 2011, acknowledged receipt of payment by the Applicant of the sum of 2.500.0 USD, in accordance with the 2007 Agreement.[25]

78. The signing bonus for the three blocks of the Central Basin amounting to $ 1,000,000 per block, or $ 3,000,000 in total, and the offsetting mechanism applying only to debts of the same nature, it was capped at 2,500,000 USD so that the Applicant paid an additional sum of 500,000 USD to the Respondent on 16 March 2012[26], the corresponding debit slip having been cleared on 21 March 2012.[27]

79. On 23 March 2012, DGRAD confirmed the allocation of $ 2,500,000 paid on 22 March 2008 by the Applicant to the signing bonus of the 2007 Contract.[28]

80. The authorisation to start the aeromagnetic and gravimetric acquisition of blocks 23 and 24 of the central basin was given by the Minister of Hydrocarbons on 23 June 2012[29] and, following the solicitation of the Applicant by letter of July 18, 2012,[30] and 30 July 2012,[31] The Minister of Hydrocarbons confirmed to the Applicant that he instructed the Secretary General to appoint two experts to assist him in the overhead work scheduled for August 15, 2012.

81. The Respondent then delayed the execution of the 2007 Contract because of the preparation of a new law on the general hydrocarbons regime.[32] Then, after the promulgation thereof on 1 April 2015[33], pending the Prime Minister's Decree on Hydrocarbons Regulation.[34]

82. On 6 April 2016, [35]the Applicant put the Respondent on notice to execute the 2007 Agreement. On 6 May 2016, the Minister of Hydrocarbons informed the Applicant that Decree No. 16/010 on the

---

[24] Letter from the Director General of the General Directorate of Administrative, Judicial, National and Participatory Revenue (abbreviated "DGRAD") of 19 October 2011 to the Minister of Finance of the Democratic Republic of Congo, **Exhibit DM-XXVII.**

[25] Letter from the General Directorate of Administrative, Judicial, Public and Participatory Revenue (abbreviated "DGRAD") of 17 November 2011 to DIGOIL, **Exhibit DM-XXIX.**

[26] Debit slip No. 322569 in the amount of 500,000 .- USD of 16 March 2012, **Exhibit DM-XXX.**

[27] Certificate of payment in the amount of 500,000 USD issued by Rawbank SARL on 16 March 2012, **Exhibit DM-XXXI.**

[28] Letter from the General Directorate of Administrative, Judicial, Public and Participatory Revenue (abbreviated "DGRAD") of 23 March 2012 to DIGOIL, **Exhibit DM-XXXII.**

[29] Letter from the Minister of Hydrocarbons of the Democratic Republic of Congo dated 23 June 2012 to DIGOIL, **Exhibit DM-XXXIII.**

[30] Letter from DIGOIL dated 18 July 2012 to the Director General of the Civil Aviation Authority, **Exhibit DM-XXXIV.**

[31] Letter from the Minister of Hydrocarbons of the Democratic Republic of Congo of 30 July 2012 to DIGOIL, Exhibit **DM-XXXV.**

[32] Letter from the Minister of Hydrocarbons of the Democratic Republic of Congo dated 9 May 2015 to DIGOIL Letter, 9 May 2015, **Exhibit DM-XXVI.**

[33] Law No. 15/012 on the general hydrocarbons regime, 1 August 2015, **exhibit LEX DM-V.**

[34] Letter from the Minister of Hydrocarbons of the Democratic Republic of Congo of 5 December 2015 to DIGOIL, **Exhibit DM-XXXVII.**

[35] DIGOIL letter of 6 April 2016 to the Minister of Hydrocarbons of the Democratic Republic of Congo and the Prime Minister, **Exhibit DM-XXVIII.**

Hydrocarbons Regulations had been issued by the Prime Minister on 19 April 2016 and invited it to a meeting to draw up an inventory of the case. [36]

83. A first meeting was held between the Applicant and the Minister of Hydrocarbons on May 14, 2016, during which the Applicant presented the reasons that led it to serve notice on the Respondent given the failure by the latter, 9 years after the signature of the 2007 Contract, to have issued its order of approval. The Ministry of Hydrocarbons justified this failure by the necessity to draft the implementing texts of the law of 1 April 2015, and indicated that the new mapping of the central basin shows that blocks 8, 23 and 24 were allotted to the Applicant and will return to it, each block to be the object of production sharing Contract, and that the terms of offsetting the sums already perceived or the moratorium to be granted will be the subject of negotiations between experts. The Applicant, for its part, claimed the approval of the 2007 Contract by presidential decree, especially since it received a commencement of execution authorised by the Minister of Hydrocarbons.

84. During a second meeting held between the Applicant and the counsels of the Minister of Hydrocarbons on 18 May 2016, the Applicant maintained its request for the issuance of the 2007 Contract Approval Order and reiterated the terms of its formal notice, reserving the right of recourse to arbitration for any losses.[37]

85. On May 19, 2016, the Minister of Hydrocarbons acknowledged receipt of a *feasibility study for the construction of a pipeline / Albertine Graben* sent by the Applicant which, according to the Respondent, "*comes at just the right time to provide solutions to the problem of the disposal of Congolese crude to be produced in the Albertine Graben*", underlining that the report expected by the Ministry is the responsibility of the latter.[38]

86. All amicable proceedings yet to produce concrete effects on the execution of the 2007 Contract, the Applicant filed the Application on 19 October 2016.

# VI. THE RESPECTIVE POSITIONS AND REQUESTS OF THE PARTIES

## A. THE POSITIONS OF THE PARTIES

87. The Applicant claims that the Respondent was guilty of two shortcomings. The first consisted of deciding to allocate block 1 of the Albertine Graben to another consortium, Caprikat Ltd and Foxwhelp Ltd, thereby unilaterally terminating, in an inadvertent and unlawful way, the 2008 Contract which had been concluded on an exclusive basis with the Applicant for an exploration period of 5 years and renewable twice, and which provided for the issue, if applicable, of an Exploration License for an initial period of 20 years.[39] The second consisted of failing to issue the Presidential Order approving of the 2007 Contract.

88. According to the Applicant, the breach of its contractual obligations by the State constitutes serious breaches of its contractual obligations, justifying the termination of the 2007 Contract and the 2008 Contract at the cost of the Respondent pursuant to Article 82 of the Decree of July 30, 1888, and full compensation for the Applicant's loss in accordance with Articles 45 and 47 of the Decree of 20 July 1888.

[36] Letter from the Minister of Hydrocarbons of the Democratic Republic of Congo dated May 6, 2016 to DIGOIL, **Exhibit DM-XL.**

[37] Minutes of the meeting of the experts of the Ministry of Hydrocarbons and the company Divine Inspiration, DIGOIL on the production sharing contract for blocks 8, 23 and 24 of the Central Basin, **Exhibit DM-XLI.**

[38] Letter from the Minister of Hydrocarbons of the Democratic Republic of Congo dated 19 May 2016 to DIGOIL, **Exhibit DM-XLII**.

[39] 2008 Contract, Clauses 9 and 10.4, **Exhibit DM-IX.**

89. Based on the Deloitte Report, the Applicant quantified the loss as $ 617,400,878, consisting of $ 597,847,994 in lost revenue calculated using the discounted cash flow method and $ 19,552,884 for expenditure incurred. It further claims compensation for all the costs and expenses relating to the expert report that gave rise to the Deloitte Report and asks the Court of Arbitration to attach reasonably calculated interest to any award.

90. The Respondent submits that the 2008 Contract was not terminated, that it was not in force when the Caprikat Contract was approved and, assuming it were in force, that the offsetting mechanism, the principle of which was accepted by mutual agreement of the Parties at the meeting from 9 to 17 December 2010 and was effective on 23 March 2012, when "*DGRAD confirmed the allocation of 2.5 million USD paid on March 22, 2008 by the plaintiff to the signing bonus of the 2007 contract*"[40] , extinguished the reciprocal obligations of the Parties under the 2008 Agreement. In the alternative, it submits that the fact that the 2008 Contract was ignored by the Parties for several years rendered the latter inoperative. It points out that, as a result of the amicable settlement that began on 17 December 2010 and was executed on 23 March 2012, the 2008 Contract was no longer executed and that any execution became impossible, the bonus of $ 2,500,000 paid under this contract having been allocated to the 2007 Contract.[41] As a result, the Respondent did not commit any breach, so that no compensation could be awarded under the 2008 Contract.

91. With regard to the 2007 Contract, it contends that it was from the confirmation of the compensation by the Minister of Finance on 26 August 2011 that the Respondent was bound by an obligation to issue the Presidential Order. It alleges that "*the approval of an oil convention is within the discretionary power of the President of the Republic [and that] the oil production sharing contract is a convention concluded on a condition precedent*".[42] According to the Respondent, since no deadline is fixed by a legal or regulatory provision for the issue of the presidential order, no fault can be attributed to it.

92. If the Court of Arbitration were nevertheless to find there had been a breach attributable to it, the Respondent concedes that the damage suffered by the Applicant is direct but contests its certainty. According to the Respondent, the Applicant's loss must be regarded as a loss of opportunity in not having obtained the expected profits, for the assessment of which the Court of Arbitration must take into account (i) the existence of a serious chance of success on the one hand, and (ii) the seriousness and permanent nature of the loss of opportunity on the other. On this last point, it emphasises that the opportunity of making a profit is not irretrievably lost, as the President of the Republic can at any time approve the Contract of 2007 by order, unless the Applicant, by maintaining its request for termination, makes this loss of opportunity permanent. It is therefore up to the Court of Arbitration to appraise the merits of the calculation of the experts made on the basis of probable reserves that may change as a result of drilling and to determine the fraction corresponding to the loss of opportunity.

93. The Respondent opposes the reimbursement of expenses for an appraisal that has not been ordered by the Court of Arbitration and the payment of interest that was not provided for in the 2007 Contract and / or the 2008 Contract.

---

[40] Letter from the General Directorate of Administrative, Judicial, National and Participatory Revenue (abbreviated "DGRAD") of 23 March 2012 to DIGOIL, Exhibit DM-XXXII.
[41] Supplementary Brief, 26 April 2018, p. 4.

[42] Response to the Supplementary Brief , 12 June 2018, para. 17.

## B. THE PARTIES' REQUESTS

94. In its Response to the Supplementary Brief, the Applicant seeks an award by which the Court of Arbitration:

- HEREBY DECLARES *that the Democratic Republic of Congo has committed a mistake in failing to execute the Production Sharing Agreement concluded between the Democratic Republic of Congo and the Divine Inspiration Group (PTY) Ltd and la Congolaise des Hydrocarbures Association, Blocks 8, 23 and 24 of the Central Basin (14 December 2007) and the Production Sharing Agreement between the Democratic Republic of Congo and the Divine Inspiration Group Consortium (PTY) Ltd and Petro SA, H-Oil Congo Limited, Congolaise des Hydrocarbures, Congo Petroleum and Gas BVBA, Sud Oil BVBA, Bloc 1 Graben Albertine (21 January 2008) by failing to issue to DIGOil within a reasonable time the presidential order approving said Contracts.*

- HEREBY DECLARES *that the Democratic Republic of the Congo has committed a breach by purporting to terminate unilaterally, or in the alternative claiming to render null and void by causing the disappearance of its purpose, the Production Sharing Contract concluded between the Democratic Republic of Congo and the Divine Inspiration Group Consortium (PTY) Ltd and Petro SA, H-Oil Congo Limited, La Congolaise des Hydrocarbons, Congo Petroleum and Gas BVBA, Sud Oil BVBA, Bloc 1 Graben Albertine (21 January 2008) on 5 July 2010 after reassigning Albertine Block 1 Graben to Caprikat Ltd and Foxwhelp Ltd.*

- ORDERS *the termination, at the exclusive cost of the Democratic Republic of Congo, of the Production Sharing Agreement concluded between the Democratic Republic of Congo and the Divine Inspiration Group (PTY) Ltd and la Congolaise des Hydrocarbures, Blocks 8, 23 and 24 of the Central Basin (14 December 2007) and the Production Sharing Agreement between the Democratic Republic of Congo and the Consortium Divine Inspiration Group (PTY) Ltd and Petro SA, H-Oil Congo Limited, la Congolaise des Hydrocarbures, Congo Petroleum and Gas BVBA, Sud Oil BVBA, Bloc 1 Graben Albertine (21 January 2008), or alternatively UPHOLDS the impossibility of executing these contracts because of the wrongful conduct of the Democratic Republic of Congo;*

- ORDERS, *the Democratic Republic of Congo to fully indemnify DIGOIL for all the damages that DIGOIL suffered as a result of the non-execution and the termination of the aforementioned production sharing agreements, concluded on 14 December 2007 and on 21 January 2008, or in the alternative, the impossibility of executing them, including, but not limited to, all the expenses incurred by DIGOIL under said contracts valued at 19,552,884, - USD (nineteen million five hundred and fifty-two thousand, eight hundred and eighty-four US dollars) and for the loss of earnings of DIGOIL, valued at 597,800,000 .- USD (five hundred and ninety-seven million eight hundred thousand US dollars).*

- ORDERS *the Democratic Republic of the Congo to pay compensation to DIGOIL in the amount of USD 617,400,878 (six hundred and seventeen million, four hundred thousand, eight hundred and seventy-eight US dollars) to compensate for the loss it has, by its fault, caused DIGOil, plus interest at the rate calculated at the rate of return of US Treasury bonds over a 20-year period, plus two percent from the date of the award until the date of full payment*;

- ORDERS *the Democratic Republic of Congo to pay full costs and expenses of the arbitration, provisionally estimated at 1,900,000 .- USD (one million nine hundred thousand US dollars), and accordingly, as of the first award to be handed down, orders the Democratic Republic of Congo to pay to DIGOil (i) the sum of 600,0000 (sic) USD (six hundred thousand US dollars) assessed provisionally corresponding to the provision for arbitration fees paid by DIGOil and (ii) ) $ 300,000 (five hundred*

*thousand dollars)*[43] *assessed on a provisional basis corresponding to the experts' fees incurred by DIGOil and (iii) the amount of USD 1,000,000 assessed provisionally corresponding to the defence costs incurred by DIGOil in the arbitration proceedings, all plus interest at the rate calculated on the rate of return of US Treasury bonds 20 years, plus two percent from the date of the award until the date of full payment,*

- DECLARES *all requests from the Democratic Republic of Congo inadmissible or at least unfounded.*

95. On 4 July 2018, the Applicant confirmed the correction, made to the Hearing, of the drafting error appearing under the fourth indent of the recital of its Response to the Supplementary Brief of 12 June 2018 and indicated that the amount of $ 597,800,000 USD (five hundred and ninety-seven million eight hundred thousand US dollars) should read 597,847,994 USD (five hundred and ninety-seven million eight hundred and forty-seven thousand nine hundred and ninety-four dollars) in accordance with the Deloitte Report[44], so the total sum claimed is $ 617,400,878.

96. The Respondent asks the Court of Arbitration to:

**1. PRINCIPLE CLAIM**

- DECLARE AS INADMISSIBLE *the claims of the company DIG OIL*
- RULE THAT *that the Democratic Republic of Congo did not commit any fault in the context of the execution of the Production Sharing Contract concluded with the Divine Inspiration Group (PTY) Ltd and la Congolaise des Hydrocarbures on Blocks 8 , 23 and 24 of the Central Basin on 14 December 2007 and of the Production Sharing Agreement concluded between the Democratic Republic of Congo and the Consortium Divine Inspiration Group (PTY) Ltd, Petro SA, H-Oil Congo Limited, la Congolaise des Hydrocarbures, Congo Petroleum and Gas Co., Ltd., South Oil Sprl, Block I, Albertine Graben, on 21 January 2008.*
- RULE THAT *the Production Sharing Agreement between the Democratic Republic of Congo and the Consortium Divine Inspiration Group (PTY) Ltd and Petro SA, H-Oil Congo Limited, la Congolaise des Hydrocarbures, Congo Petroleum and Gas Co., Ltd., Sud Oil Sprl on block I of the Albertine Graben became obsolete as a result of the conciliation and offsetting of accounts concerning the signing bonus between parties in favour of the signing bonuses of blocks 8.23 and 24 of the Central Cuvette.*
- NOTE *the waiver by the plaintiff DIG OIL of its hydrocarbon rights to Block I Albertine Graben by accepting the reconciliation of the accounts on the signing bonus as of 17 November 2011.*
- RULE *that the parties are still within the deadline to meet their obligations related to the Production Sharing Agreement of 14 December 2007 on blocks 8, 23 and 24 of the Central Basin.*
- NOTE *of the will of the Respondent Democratic Republic of Congo to issue the Presidential Order approving the Production Sharing Contract with the Divine Inspiration Association (PTY) and la Congolaise des Hydrocarbures on blocks 8, 23 and 24 of the Central Basin.*
- HOLD ALL SUBSEQUENT CLAIMS TO BE UNFOUNDED.
- ACKNOWLEDGE *to the Respondent DRC that it renews in full, mutais (sic) mutandis, all other previous applications as summarised in the Terms of Reference and the various briefs.*

**2. IN THE ALTERNATIVE AND UNLIKELY SCENARIO**

- *In the event that the court nevertheless finds there was a breach by the DRC in the execution of these two contracts:*

[43] The amount in figures and the amount in words of the provision claimed by the Claimant are taken from the recital on page 83 of its Response to the Supplementary Brief.
[44] Letter from Maître Cassiers to the Court of Arbitration, 4 July 2018.

- *Partially receive the technical and financial expert reports prepared by DELOITTE*
- *Re-assess the amount of damage calculated by the experts as a loss of profit*
- *After reassessment, apply a reasonable fraction to the determination of the damage to be compensated in respect of loss of opportunity to make a profit*
- *Independently assess the damage related to DIGOIL's level 1 expenses*
- *Reject level 2 expenses*
- *Not resort to any other expert appraisals*

97. The Court of Arbitration notes, on the one hand, that the Respondent has raised two pleas of inadmissibility, claiming, in the first place, that because the Disputed Contracts were between, on the one hand, the Respondent and two "associations" of which the Applicant was one of the entities so that it would have been necessary for the Applicant to subpoena the other entities members of these associations[45] (the "***First plea of inadmissibility***") and, secondly, the allegedly premature nature of the claims against it, so that the parties should be sent back to continue negotiations according to a timetable to be defined by the Court of Arbitration.[46] (the "***Second plea of inadmissibility***").

98. Moreover, in its Response to the Supplementary Brief, the Respondent indicates that it extends in full, mutatis mutandis, all of its other previous requests as summarised in the Terms of Reference and its various pleadings, which includes (i) the counterclaim for damages compensating the financial, moral and image damage that the Applicant had caused it by prematurely seizing the Court of Arbitration which it provisionally fixed at the sum of 50,000,000 USD[47] and (ii) its request concerning the costs and the costs of the arbitration for which it specifies that it relies on the wisdom of the Court of Arbitration.[48]

99. However, as noted in paragraph 58 above, on 16 July 2018, the Respondent confirmed the withdrawal announced at the Hearing (i) of its first plea of inadmissibility and (ii) its counter-claim, and requested that it be acknowledged.

# VII. ANALYSIS OF THE COURT

100. The Court of Arbitration will successively examine two preliminary questions (A), the consequences of the non-issuance of the Presidential Order for the approval of petroleum contracts (B), the execution of the disputed Contracts (C), the consequences of possible non-performance, (D) the costs of Arbitration (E) and interest (F).

## A. PRELIMINARY QUESTIONS

101. The pleas of inadmissibility raised by the Respondent are likely to have an impact on the ratione personae jurisdiction of the Court of Arbitration (1) and on the content of the applicable law (2) which must be examined beforehand.

### 1. The ratione personae jurisdiction of the Court of Arbitration and the Applicant's standing

102. The validity of the Arbitration Convention and the ratione materiae jurisdiction of the Court of Arbitration are not in dispute. On the other hand, the Respondent requests that it be given notice of the withdrawal of its first plea of inadmissibility which concerns the standing of the Applicant and the

[45] Response brief p. 4.
[46] Terms of Reference, 29 August 2017, para. 70.
[47] Terms of reference, 29 August 2017, paras. 71, 75 and 76.
[48] Response to the Supplementary Brief 12 June 2018, paras. 56-58.

identification of the parties to the Arbitration Agreement[49], so that it concerns the ratione personae jurisdiction of the Court of Arbitration which it is up to the Court of Arbitration to verify.

103. The Respondent abandoned this first plea of inadmissibility after the Applicant rightly argued (i) that the "associations" mentioned in the Disputed Contracts are de facto associations without legal personality which as such, do not have rights or obligations and do not have the capacity to take legal action, and (ii) each entity comprising each association has personally signed the 2007 and / or the 2008 Agreement as the case may be, and is directly and personally vested with the rights and obligations arising for each of them in each of the Contracts in question. In addition, pursuant to Article 100 of the Decree of 30 July 1888[50], the joint and several liability of the entities concerned cannot be presumed, so that the common law regime of obligations in Congolese law is that of the joint obligation and not that of the joint and several obligation, and none of the disputed Contracts expressly stipulates joint and several liability with regard to the obligations it contains. The Court of Arbitration considers that the Applicant therefore has standing, and standing to act alone in Arbitration to assert its rights resulting from the disputed Contracts.

104. The Court of Arbitration acknowledges the Respondent's withdrawal of its first plea of inadmissibility.

**2. Applicable law**

105. The Respondent's second plea of inadmissibility, alleging that the Claim was premature, essentially bears on the 2007 Contract. The Respondent argues that further negotiations between the Parties would be required to determine the consequences of the adoption of Law No. 15/012 of 1 August 2015 on the general hydrocarbons regime (the "***2015 Act***")[51] on the 2007 Contract,[52] and that the approval of this contract by order of the President of the Republic may still take place, or Ordinance-Law No. 081-013 of 2 April 1981 on General Legislation on Mines and Hydrocarbons (the "Law of 1981")[53] nor the 2015 Law imposing a time limit for its issuance. The Court is therefore required to review the transitional provisions of the 2015 Act.

106. The Applicant submits that the 2015 Law does not apply to the Disputed Contracts. It submits its own documents against the Respondent, in particular the "*Note to the Government*" from the Ministry of Hydrocarbons dated 18 October 2017[54] and avails itself of the legal stability clause in Article 28 of each of the Disputed Contracts and the transitional provisions of the 2015 Law.[55]

107. The Court of Arbitration notes that the Parties have expressly chosen the law applicable to each of the Disputed Contracts, Article 27 of which states that "*the interpretation and performance of this Contract shall be subject to the laws of the Democratic Republic of Congo*". The Applicant further argues that the Respondent was represented in each of the Disputed Contracts by the Minister of

---

[49] In support of the first plea of inadmissibility, the Respondent stated that "*even if the opposition of interests between the Claimant and the other member companies of the consortium is not duly characterised, it is still appropriate to state that the proceedings brought to their attention are in the foreground*." The Respondent has therefore challenged the ability of the Claimant to act alone in the Arbitration.

[50] Article 100 of the Decree of 30 July 1888 states that "joint and several liability cannot be presumed; it must be expressly stipulated ".

[51] Law No. 15/012 on the general hydrocarbons regime, 1 August 2015, **Exhibit LEX DM-V.**

[52] Response, 30 January 2017, p. 3.

[53] Ordinance-Law No. 081-013 on General Legislation on Mines and Hydrocarbons, 2 April 1981, **Exhibit LEX DM-I.**

[54] "Note to the Government" from the Ministry of Petroleum, 18 October 2017, **Exhibit DF-I**

[55] Response to the Supplementary Brief, 12 June 2018, paras. 317-326.

Hydrocarbons and the Minister of Finance "*acting under the statutory powers as they result from the Ordinance-Law No. 081-013 of 2 April 1981 on General Legislation on Mines and Hydrocarbons*."

108. In addition, the explanatory memorandum of the 2015 Law affirms the "*principle according to which the hydrocarbon rights regularly acquired before the entry into force of this law retain their validity and until their expiry. Upon their renewal they will be governed by the provisions of this law.*" [56] This principle has been translated extensively into Article 189 of the 2015 Law "*subject only to compliance with the provisions relating to environmental protection, safety and hygiene which are of immediate application*."[57] However, pursuant to section 79 of the Act of 1981[58] , the Disputed Contracts are indeed agreements granting mineral rights for hydrocarbons. Their handover was initiated by the Ministry of Hydrocarbons and signed by the Minister of Hydrocarbons and the Minister of Finance, and it is not alleged that the Applicant's rights under the disputed contract were improperly acquired.

109. The Applicant also relies on the legal stability clause in Article 28 of each of the Disputed Contracts[59] worded as follows:

*Without prejudice to article 84 of the Law, throughout the duration of the Contract, "the DRC" guarantees to the "Contractor" the stability of the general legal, financial, petroleum, customs and economic tax conditions in which each entity carries out its activities, as its conditions result from the legislation and regulations in force on the date of signature of the contract.*

*Consequently, the rights of each of the entities making up the 'Contractor' will in no way be subject in any area to an aggravating measure in relation to the regime defined in the above paragraph.*

*However, it is understood that each entity composing the 'Contractor' may benefit from any measure that would be favourable to it in relation to the regime defined above.*

110. The "*Law*" is defined in Article 1.17 of the 2007 Contract as "*Ordinance-Law No. 081-013 of 2 April 1981 on General Legislation on Mines and Hydrocarbon* " and Article 1.18 of the 2008 Contract as "*Ordinance-Law No. 081-013 of 2 April 1981 on General Legislation on Mines and Hydrocarbons and Ordinance No. 67-416 concerning Mining Regulations*."

111. As a result, the Parties have contractually departed from the transitional provisions of the 2015 Act only on the assumption that it has a favourable impact on the situation of an entity of the Contractor.

112. However, if the Respondent claims that the adoption of the 2015 Law could have an impact on the Disputed Contracts and more particularly on the 2007 Contract, which, in its view, would justify the delay in issuing the order for approved by the President of the Republic, it does not specify what these consequences would be, except to indicate, on the contrary, that the 2015 Law, like the 1981 Law, provides that the oil or hydrocarbon agreements only take effect after approval by order of the President of the Republic which may take place at any time. As for the Applicant, it did not avail itself

---

[56] Law No. 15/012 on the general hydrocarbons regime, 1 August 2015, Explanatory Memorandum, paragraph 6, subparagraph 16, **Exhibit LEX DM-V.**
[57] Law No. 15/012 on the general hydrocarbons regime, 1 August 2015, Article 189, **Exhibit LEX DM-V.**
[58] Section 79 of the 1981 Act provides that " Mineral rights for hydrocarbons are granted by agreement. The oil agreements are initiated [...] by the [Ministry of Hydrocarbons] They are signed by [Minister of Hydrocarbons and the Minister of Finance], [...] The oil agreements, although duly signed by the parties, have effect only after having been approved by the President of the Republic."
[59] Response to the Supplementary Brief, 12 June 2018, para. 232.

of an impact of the 2015 Act which would be more favourable compared to the regime of the 1981 Act.

113. The Court of Arbitration therefore considers that it emerges from the cumulative application of the provisions of Article 189 of the 2015 Law[60] and the stipulations of Article 28 of the Contracts in question that the Congolese law applicable to them is the 1981 Law and it is in light of the provisions of the 1981 Law that it is necessary to examine the respective claims of the Parties, firstly with regard to the consequences of the non-issuance of the Presidential Order of Approval of the Disputed Contracts.

## B. THE CONSEQUENCES OF NOT ISSUING THE PRESIDENTIAL ORDER

114. Article 79 (5) of the 1981 Act provides that *"[t] he petroleum agreements, although duly signed by the parties, shall have effect only after having been approved by an order of the President of the Republic*."[61] This provision is repeated in Article 34.1 of each of the Disputed Contracts which provides that *"[t] his Contract shall not enter into force until the date of signature of the order of the President of the Republic approving this Contract*."[62] Since the order of approval of the President of the Republic was not issued for any of the Disputed Contracts, it is necessary to examine the scope of the order of approval (1) and the conditions of its issue. (2).

### 1. **The scope and nature of the presidential order**

115. The Respondent alleges that, without having been approved by presidential order, the Disputed Contracts could not take effect. It states that the production sharing contract is of the nature of an agreement concluded under a condition precedent.[63] It argues that this analysis is confirmed by (i) the judgment of the Supreme Court of Justice of the Democratic Republic of Congo of 10 December 2010 which, according to it, specifies the legal regime of the presidential order approving a production sharing contract[64] and (ii) the judgment of the High Court of Justice of the British Virgin Islands of 19 November 2010 concerning the extension of an interim injunction enjoining the companies Caprikat and Foxwhelp to proceed with the exploitation of blocks 1 and 2 Albertine Graben which had been granted ex parte by the first judge.[65]

116. The Applicant, meanwhile, claims that the Contracts in question entered into force upon their signature to the extent that they impose payment obligations from that moment. According to the Applicant,[66] if the order of approval of the President of the Republic was to be considered as a condition precedent, which it contests, it not constituting a future and uncertain event[67], but dependent on the will of the State which is a party to the Disputed Contracts, it would be purely

[60] Law No. 15/012 on the General Hydrocarbons Regime, 1 August 2015, **Exhibit LEX DM-V.**

[61] Ordinance-Law No. 081-013 on General Legislation on Mines and Hydrocarbons, 2 April 1981, **Exhibit LEX DM-I.**

[62] 2007 Contract , Section 34.1**, Exhibit DM-VIII** and 2008 Contract , Section 34.1, **Exhibit DM-IX.**

[63] Response to the Supplementary Brief, 12 June 2018, para. 17.

[64] Judgment of the Supreme Court of Justice of the Democratic Republic of Congo, 10 December 2010, paras. 1 and 2**, Exhibit DF-III.**

[65] Judgment of the High Court of Justice of the British Virgin Islands, 19 November 2010, **Exhibit DF-II**. The Court of Arbitration considers that this decision, which rules on a precautionary measure, is not directly relevant for the determination of the questions submitted to it and will therefore take into account in its analysis below the, impact of the judgment of the Supreme Court of Justice of the Democratic Republic of Congo of 10 December 2010 mentioned above, **Exhibit DF-III.**

[66] Response to the Supplementary Brief, 12 June 2018, paras. 377-386.

[67] The obligation contracted under a condition precedent is one that depends on a future and uncertain element, or on an element that has now occurred but is still unknown to the parties. In the first case, the obligation can only be executed after the event. Decree of 30 July 1888, Article 79, **Exhibit LEX DM-II.**

potestative pursuant to Article 68 of the Decree of 30 July 1888 according to which: "*the potestative condition is that which makes the execution of the convention dependent on an event which is in the power of one or the other of the Contracting Parties to bring about or to prevent*"[68] and therefore void according to the provisions of Article 72 of the Decree of July 30, 1888 which provides that "*Every obligation is null when it has been contracted under a potestative condition on the part of the person who binds himself*. "[69]

117. The Court of Arbitration cannot support the Applicant's analysis that the Contracts entered into force upon their signature on the ground that they provide for the performance of obligations from that moment. It notes that it is always open to the parties to a contract to provide for certain obligations to be met before the entry into force of the contract and to contractually adjust the consequences of the failure to enter into force. This is the case, for example, where a contract provides for the payment of a deposit on signature and its entry into force at the time of issue, within the agreed deadline, of an administrative authorisation, the consequences of the failure to obtain administrative authorisation within the agreed period being penalised by the possibility of implementing the termination ex officio of the contract and to demand the refund of the deposit.

118. Moreover, the fact that, as the Applicant maintains, Article 34.1 of the disputed Contracts may be regarded as constituting a potestative condition leading to the nullity of that stipulation, has no effect on the legislative provision of Article 79, paragraph 5, of the 1981 Act, which nevertheless continues to have effect.

119. The Parties agree that under Article 79 (5) of the 1981 Law, "*oil agreements do not become fully effective until they have been approved*" by an order of the President of the Republic.[70] In fact, as will be discussed below with regard to the conditions for the issuance of the Presidential Order, the Disputed Contracts produced certain effects, the Respondent having authorised the Applicant to perform certain oil works which do not require the use of boreholes in the ground and do not lead to the extraction of hydrocarbon resources from the subsoil, and therefore the disputed Contracts have been started.

120. The Court of Arbitration also notes that in any event, the Parties agree that the absence of an order of approval does not have the effect of terminating the Disputed Contracts, but only of delaying the enforceable nature of some of their respective obligations. The Respondent states that the Presidential Ordinance "*could give [the contracts] an enforceable character, although in the field of civil law the signed contracts remain valid as to the rights and obligations attached thereto*."[71] This assessment is also that of the Applicant's counsel, Maître Kabinda, who indicates:

*From the signing of the production sharing contract by the Minister of Hydrocarbons and the Minister of Finance, the Democratic Republic of Congo is committed to the oil company and vice versa. The contract is formed […]*[72]

---

[68] Decree of 30 July 1888, Article 68, **Exhibit LEX DM-II.**

[69] Decree of 30 July 1888, Article 72, **Exhibit LEX DM-II.**

[70] For the Claimant, Response to the Supplementary Brief, 12 June 2018, para. 165; for the Respondent, Response to the Supplementary Brief, 12 June 2018, para. 16.

[71] Response to the Supplementary Brief, 12 June 2018, para. 2.

[72] Counsel Kabinda's Consultation, 15 June 2018, Section 1, last paragraph, page 2.

121. The Court of Arbitration therefore considers that the non-issuance of the Presidential Order has the effect of suspending certain effects of the Contracts in issue pursuant to Article 79, paragraph 5, of the 1981 Law, the Parties remaining bound by the obligations which they contain.

122. The Applicant further contends, however, that the Respondent was under an obligation to issue the Presidential Order approving the Disputed Contracts within a reasonable time in accordance with their Article 29 according to which:

*The "**DRC**" takes all necessary measures to facilitate the de-escalation of the activities of the "**Contractor**" and its Subcontractors. At the request of one or the other, the assistance referred to above will cover the following area, without this list being exhaustive:*

*- […]*

*- Obtaining the necessary approvals for the conduct of petroleum operations, insofar as the requests have been made in accordance with the legislation in force in "**DRC**";*

*- Any other subject that lends itself to the assistance of the DRC particularly in terms of security or operation within the framework of the legislation and regulations in force.*[73]

123. For the Applicant, the Respondent's obligation is still based on the provisions of Article 33, paragraph 3, of the Decree of 30 July 1888[74] establishing the principle of execution in good faith of contracts.[75]

124. The Respondent does not formally dispute these provisions.

125. The Tribunal notes that (i) the Parties agree that certain oil works that require drilling and extraction of hydrocarbon resources from the subsoil of the Democratic Republic of Congo are not likely to be carried out before the presidential decree of approval of the Contract has been issued, (ii) it is not alleged that the President of the Republic has, in the capacity in which he acts, a separate legal personality distinct from that of the State, party to the Disputed Contracts, and (iii) that under Article 29 of the disputed contracts, the State has the obligation to take all necessary measures to facilitate petroleum activities, in particular, to obtain the necessary approvals, including the order of approval of the President of the Republic.

126. Consequently, the issuance of the Presidential Order of Approval of the Disputed Contracts constitutes, under Article 29 of the Contracts in question, an undertaking by the State, guarantor of the application of its own legislation and from which it can only be released if the conditions laid down by it for its issuance are not met, which is now to be determined.

**2. The conditions for issuing the presidential order**

127. The Applicant alleges that the issue of the Presidential Order approving the Contracts in question was a mere formality, the President of the Republic lacking jurisdiction to negotiate or amend the oil conventions. It recognises that the President of the Republic may refuse to issue the order of approval, but only for a reason falling within his area of competence as "*guarantor of the Constitution, national independence, territorial integrity , national sovereignty, respect for international agreements and treaties as well as those of regulator and arbiter of the normal functioning of the Institutions of the Republic with the involvement of the Government and under the control of the Parliament* ",[76] said

[73] 2007 Contract, Section 29, Exhibit DM-VIII and 2008 Contract, Section 29, **Exhibit DM-IX.**

[74] Decree of 30 July 1888, Article 33, **Exhibit LEX DM-II.**

[75] Response to the Supplementary Brief, 12 June 2018, paras. 198-202.

[76] Constitution of the Democratic Republic of Congo, p. 5, **Exhibit LEX DM-IX**; Response to the Supplementary Brief, 12 June 2018, paras. 170-192, **Exhibit LEX DM-IX**.

powers listed and enshrined in Article 69 of the Constitution of the Democratic Republic of Congo which provides:

*The President of the Republic is the Head of State. He represents the nation and is the symbol of national unity.*

*He ensures respect for the Constitution.*

*He ensures by his arbitration the regular functioning of the public authorities and the Institutions as well as the continuity of the State. He is the guarantor of national independence, territorial integrity, national sovereignty and respect for international treaties and agreements.*[77]

128. The Respondent alleges that the issue of the Presidential Order is a discretionary power of the President of the Republic and that the law does not provide any deadline for this purpose. It bases this on the judgment of the Supreme Court of Justice of the Democratic Republic of Congo of 10 December 2010 according to which:

*[the President of the Republic] does not have a related competence in this matter which would absolutely oblige him to give his approval; on the other hand, it is a discretionary power implying his sovereign assessment in consideration of the elements of the case as well as the interests of the Congolese State and for which he is not bound by any deadline.*[78]

129. It is therefore necessary to consider (i) the substantive conditions and (ii) the time period within which the approval order must be issued.

130. On the conditions for issuing the presidential order, the Court of Arbitration notes that, according to Article 1 of the 1981 Law, "*the sub-soil [of the Democratic Republic of Congo] is and remains the property of the Nation. [...] ownership of mines and hydrocarbons constitute [ing] a distinct and separate law rights under a land concession.*" Accordingly, pursuant to the second paragraph of section 4, "*no one may engage in exploration, research and mining [including, according to section 2a), hydrocarbons] except by virtue of the rights granted or recognised by the State*". In addition, in accordance with Article 79 of the 1981 Law, hydrocarbon mining rights are granted by agreement, such oil agreements being initiated by the Ministry of Hydrocarbons, signed by the Minister of Hydrocarbons and the Minister of Finance and approved by the President of the Republic.[79] The 1981 Act therefore takes into account the distribution of competence between the Ministers concerned and the President of the Republic provided by the Constitution, the President of the Republic being the guarantor of the interests of the Nation as the owner of the subsoil of the Democratic Republic of Congo.

131. This analysis is supported by the undisputed fact that, in the context of the implementation of the disputed Contracts, the Applicant was able to legally carry out certain petroleum works, notwithstanding the non-issuance of the Presidential Order of Approval. Thus, during the reallocation of Block 1 of the Albertine Graben, the exploration work under the 2008 Contract was underway after having been authorised by the Ministry of Hydrocarbons and under the 2007 Contract, the Ministry of Hydrocarbons similarly issued on 23 June 2012 the authorisation to carry out the aeromagnetic and gravimetric acquisition works of blocks 23 and 24 of the Central basin and instructed its Secretariat to

[77] Constitution of the Democratic Republic of Congo, Article 69, **LEX DM-IX**.

[78] Judgment of the Supreme Court of Justice of the Democratic Republic of Congo, 10 December 2010, **Exhibit DF-**III.

[79] Ordinance-Law No. 081-013 on General Legislation on Mines and Hydrocarbons, 2 April 1981, **Exhibit LEX DM-I**.

appoint two experts to assist the Applicant in the aerial work scheduled for 15 August 2012.[80] In fact, such works did not require the drilling of soil in the Democratic Republic of the Congo and the removal of hydrocarbon resources from its subsoil, so that the non-issuance of the Presidential Ordinance was no obstacle. On the other hand, since the execution of the oil agreement leads to the integrity of the territory being affected by drilling or the extraction of hydrocarbon resources, the order of approval of the agreement by the President of the Republic is required.

132. The Supreme Court emphasises that the power of the President of the Republic is discretionary and specifies that this power implies "*his sovereign appreciation of the elements of the case as well as the interests of the Congolese State*."[81] The interests of the Congolese State are those derived from state rights over the subsoil of which the President of the Republic is the guarantor under the Constitution and the 1981 Act. It is therefore up to the President of the Republic to assess to what extent an oil convention is likely to undermine national independence, territorial integrity, national sovereignty and international treaties and agreements and, where appropriate, to refuse to issue the approval order if he is not satisfied that this is the case. This sovereign appraisal could only be challenged before the courts of the Democratic Republic of the Congo under the conditions provided for by law and the Constitution, for example, in the event of a loss of power or a manifest error of assessment. At most, the Court of Arbitration may consider, in the context of the situation submitted to it with respect to the 2008 Contract, on the one hand, and the 2007 Contract, on the other, that, in accordance with the judgment of the Supreme Court, the possible refusal to issue the order should be motivated by the interests of the State over which the President of the Republic enjoys sovereign power. However, not only has it not been issued, but there has been no decision of rejection by the President of the Republic with any reasoning whatsoever submitted the debate, or even its alleged existence.

133. The period in which the order of approval of the President of the Republic must be issued is not specified in the 1981 Act. The Supreme Court considers that for the exercise of his discretion the President of the Republic is not bound by any deadline. The Respondent acknowledges, however, that a reasonable period of time must be respected for an investment contract in which the State has committed itself.[82] It does not specify what should be regarded as a reasonable period of time, but the Applicant submits in this respect that a time frame of approximately two months from the date of signature is a reasonable deadline. In this respect, the Applicant relies on the Caprikat Contract signed on 5 May 2010, which was the subject of a presidential approval order of 18 June 2010 published in the Official Gazette on 22 June 2010. It also submits to the Court of Arbitration the elements of a more detailed analysis based on the seven oil agreements approved since 2006 which show that, on average, a period of 19 months is necessary for the Presidential Order of Approval of the agreement to be issued.[83]

134. The Court of Arbitration notes that, of these seven oil agreements, only two of them, the contract concluded with Surestream Petroleum Ltd. in November 2005 and the Caprikat Contract, for which the approval order was issued in under three months and one and a half months respectively, confirm

---

[80] Letter from the Minister of Hydrocarbons of the Democratic Republic of Congo to DIGOil, 23 June 2012, **Exhibit DM-XXXIII** ; letter from DIGOil to the Director General of the Civil Aviation Authority, 18 July 2012, **Exhibit DM-XXIV** ; Letter from the Ministry of Hydrocarbons of the Democratic Republic of Congo to DIGOil, 30 July 2012, **Exhibit DM-XXXV**.

[81] Judgment of the Supreme Court of Justice of the Democratic Republic of Congo, 10 December 2010, ninth sheet, **Exhibit DF-II.**

[82] Note from the Minister of Hydrocarbons of the Democratic Republic of Congo to the Government, 18 October 2017, **Exhibit DF-I and Exhibit DM-LIV.**

[83] Response to the Supplementary Brief, 12 June 2018, para. 345-349.

the two-month period advanced by the Applicant. The other five agreements were approved within one and five months to two years and seven months. The Applicant's counsel, Maître Kabinda, considers that: "*a reasonable period of time should not exceed six months from the signing of the production sharing contract. However, practice tells us that the deadline for publication of the presidential decree may be up to two years in the Democratic Republic of Congo*."[84] However, the six-month assessment of the reasonable period of time is not supported by any doctrine or case law, and the evidence provided by the Applicant indicates that the practice leads to a time frame that may exceed two years.

135. The Court of Arbitration will therefore consider the respective claims of the Parties taking into account the administrative practice in the Democratic Republic of Congo which shows that, at the time of signing the Contracts, the time for issuing the presidential order had turned out to be up to two years and four months.

136. From the above it follows that (i) the Respondent has the obligation to do everything possible to allow the issuance of the presidential order under the conditions provided for by law and (ii) this obligation must be met within a certain period of time that is in practice up to two years and four months.[85]

## C. EXECUTION OF THE DISPUTED CONTRACTS

### 1. Rights arising from the Disputed Contracts

137. The rights resulting from the disputed Contracts are identical. Their purpose, according to their article 2, is "*the attribution by the Democratic Republic of Congo to the "**Contractor**" of the exclusive rights of recognition and exploration of hydrocarbons as well as the right to obtain operating concessions"*[86] within the limits of an exclusive search and Exploration Area (EEZ) established under the 2008 Contract for Block 1 of the Albertine Graben and within the framework of the 2007 Contract for blocks 8, 23 and 24 of the Central Basin.

138. Each disputed Contract includes, on the one hand, an exploration phase of the ZERE consisting for the "*Contractor*", of executing a program of petroleum works intended to reveal commercially exploitable hydrocarbon resources. The duration of this exploration phase is five years renewable twice, the Applicant being able at its discretion at the end of each five-year period, to either seek the renewal of the Exploration License or terminate it.[87]

139. On the other hand, in the event of discovery of commercially exploitable resources, on the basis of a report establishing the area in which the deposit may be mined and the commercial character of that deposit, at the request of the Contractor, the Respondent shall issue an Exploitation license for a period of 20 years, renewable.[88]

---

[84] Counsel Kabinda's Consultation, 15 June 2018, Section 2, last paragraph.

[85] In this regard, the Court of Arbitration considers only contracts concluded prior to the signing of the Contracts in dispute, that is to say between November 2005 and October 2006 for which the approval order has been issued no later than 12 March 2008. Two other oil agreements of November 2007 were approved within two years and seven months, but the order was only published on 18 June 2010 at the same time as the Caprikat contract. When the rights of the Claimant under the 2008 Contract were reassigned to Caprikat Ltd and Foxwhelp Ltd, the administrative practice was thus two years and four months.

[86] Article 2 of the disputed contracts, underlining added. **Exhibit DM-VIII** and **DM-IX.**

[87] Articles 7 and 9 of the Contracts, **Exhibit DM-VIII** and **Exhibit DM-IX**.

[88] Articles 10.3 and 10.4 of the Contracts, **Exhibit DM-VIII** and **Exhibit DM-IX**.

140. The disputed Contracts are therefore long-term contracts that include a 15-year reconnaissance and exploration period and various operating concessions for at least 20 years each.[89]

141. The petroleum costs, and in particular the financing of the investments made necessary for the exploration and exploitation oil works are entirely borne by the Contractor and will be refunded to it only during the exploitation phase, by attribution of a share of the production of liquid hydrocarbons, the distribution key between the different entities making up the Contractor being fixed contractually[90]

142. The Applicant submits that the Respondent committed a breach in failing to issue the order approving the disputed Contracts and that it unilaterally and unlawfully breached the 2008 Agreement by reallocating the rights under this Agreement to a third party. There was a separate examination of the situation relating to the 2008 Contract (1) and the 2007 Contract (2).

**2. The 2008 Contract**

143. The 2008 Contract was concluded on 21 January 2008. While the exploration work was authorised and was in progress, on 5 July 2010, the Respondent informed the Applicant that, following the 2 June 2010 meeting of the Council of Ministers, the closing of the process of licensing. mineral rights to hydrocarbons on the Albertine Graben had led the Government to choose another association and that, by order of 18 June 2010, the President of the Republic had approved the Caprikat Contract for blocks I and II of the Albertin Graben.[91]

144. The Applicant submits that the Respondent committed misconduct by (i) failing to issue the 2008 Contract Approval Order within a reasonable period of time and (ii) by reallocating Block 1 of the Albertine Graben to another consortium under of the Caprikat Contract, unilaterally and unlawfully terminating the 2008 Contract which had been entered into exclusively with the Applicant for a period of more than 20 years.[92]

145. According to the Respondent, (i) the 2008 Contract could not produce effects because the Presidential Order of Approval had not been issued, (ii) the Applicant waived all of its rights under the 2008 Contract in the framework of a transaction and (iii) the 2008 Contract had lapsed "*because of the disappearance of one of the essential elements which conditioned the execution of the contract of 2008 namely the bonus of 2,500,000 USD*".[93]

146. The Court of Arbitration notes that at the time the 2008 Contract was reassigned in mid-2010, according to administrative practice (see paragraph 135), the Presidential Order of Approval of the contract should have been signed and published or at least in the process of being so. The Applicant had, moreover, carried out, with the authorisation of the administration, the oil works not requiring this approval. It should be noted in this regard that by inviting the Applicant to pay the signing bonus by letter of 14 February 2008, the Ministry of Hydrocarbons specified that, given the progress of work in the Ugandan part of the Graben Albertine, it was committed to activating the exploration-

[89] Response to the supplementary Brief, 12 June 2018, para 108.

[90] Articles 14 and 15 and 22 of the disputed Contracts, Exhibit DM-VIII and Exhibit DM-IX.
[91] Letter from the Minister of Hydrocarbons of the Democratic Republic of Congo to DIGOil, 5 July 2010, Exhibit DM-XV.
[92] Response to the Supplementary Brief, 12 June 2018, paras 20-21.
[93] Supplementary Brief of the DRC of 26 April 2018 p. 4.

production work in the area and called on the Applicant to take the appropriate measures,[94] following which, by letter of 25 April 2008, the Minister of Hydrocarbons formally authorised the Applicant to begin the work of installation of the site in block 1 of the Albertine Graben.[95]

147. In addition, the Court of Arbitration notes that the President of the Republic did not refuse to deliver the order approving the 2008 Contract but only refrained from doing so for a period of two years and three months. Although this period goes well beyond the six-month period considered reasonable by the Applicant's consultant, it nevertheless conforms to administrative practice in the Democratic Republic of Congo so that the non-issuance of the order at that stage would not be sufficient on its own to characterise a breach on the part of the Respondent. The Court of Arbitration notes, however, that no grounds of general interest likely to preclude the issue of the Presidential Order have been put forward by the Respondent.

148. The Respondent alleges that "*there is no fundamental difference between [the dispute with Tullow and this litigation] as they both bear on the same block 1 of the Albertine Graben, and that DIGOIL had been chosen over TULLOW, the company CAPRICAT had been chosen to replace DIGOIL*" and emphasises that "*the issue of all these disputes was the legal regime of the Presidential Order*" and that "*the circumstances in which the Supreme Court delivered its judgment are irrelevant.*"[96]

149. The Respondent appears to consider that, as a result of the non-issuance of the Presidential Order, the 2008 Contract had no effect, which would have left the award process open so that it could reallocate block 1 of the Albertine Graben to a third party.

150. The Court of Arbitration notes that the situation of the 2008 Contract considered here differs from the elements of the case submitted to the Supreme Court in the proceedings that gave rise to its judgment of 10 December 2010. In fact, the action brought before the Supreme Court is an action for "*annulment of Ministerial Order No. 012 / MIN-HYDRO / LMO / 2007 and No. 062 / MIN- FINANCE / AMK / 2007 of 17 October 2007 reopening to the exploitation of Block I of the Graben Albertine* ", which was decided jointly by the Minister of Hydrocarbons and the Minister of Finance considering (i)" *the need for the government to exploit the sedimentary basins especially in the Graben Albertine area, "(ii)" the Government's objectives of revenue maximization and clean-up of the hydrocarbon sector ; (Iii) " the irregularities found in the procedure for allocating blocks one and two and in the signing of the block sharing agreement between the Republic and TULLOW-HERITAGE-COHYDRO (CCP) of 21 July 2006;" and (iv) "urgency and necessity."*[97]

151. In fact, it appears from the documents annexed to the Deloitte Report that the Tullow Contract was terminated[98] and that, in light of the elements of the assessed sovereignly by the President of the Republic, the continuation of this contract could to be contrary to the interests of the State, the Albertine Graben being located in the North-East of the territory of the Democratic Republic of Congo and extending beyond the border into the territory of Uganda. While discoveries were announced during the years 2006 and 2007 on the Ugandan side and Tullow Oil became the first oil company in Uganda, at the time of tensions with the Uganda, the termination of the Tullow Contract for block 1

[94] Letter from the Minister of Hydrocarbons of the Democratic Republic of Congo to DIGOil, 14 February 2008, Exhibit **DM-LX**.

[95] Letter from the Minister of Hydrocarbons of the Democratic Republic of Congo to DIGOil, 25 April 2008, Exhibit **DM-XIII**.

[96] Post Hearing Remarks, 6 August 2018, p. 7.

[97] Letter from the Minister of Hydrocarbons of the Democratic Republic of Congo to DIGOil, 14 February 2008, **Exhibit DM-LX**.

[98] Judgment of the Supreme Court of Justice of the Democratic Republic of Congo, 10 December 2010, **Exhibit DF-III**.

of Albertine Graben was announced.[99] This is confirmed by the above-mentioned letter from the Ministry of Hydrocarbons dated 14 February 2008, which shows that the latter is keen to advance work in the Ugandan part of the Albertine Graben.[100]

152. However, as regards the 2008 Contract no order to reopen the exploration of block 1 Albertine Graben was issued and no reason of general interest was alleged. None of the elements in the debate therefore allow us to consider that the conditions for the issue of the presidential order under the law of the Democratic Republic of Congo have not been met for the 2008 Contract.

153. The fact, as decided by the Supreme Court of Justice of the Democratic Republic of Congo in its judgment, that the President of the Republic has a discretionary power, does not mean that this power can be exercised arbitrarily, and it is not for the Court of Arbitration to rule on the validity of the decision taken by the State to attribute the exclusive rights under the 2008 Contract to another consortium, but only to seek, in contract law, the effects of that decision on the respective obligations of the Parties.

154. However, as has been determined in paragraphs 120 and 121 above, the non-issuance of the Presidential Order of Approval of the 2008 Contract has the effect of suspending its execution pursuant to Article 79, paragraph 5, of the 1981 Act, but does not have the effect of releasing the Parties from the obligations arising therefrom. Consequently, the Parties must be considered to have been still bound by the 2008 Contract when the State reassigned the exclusive rights resulting from that contract to a third party, unless there was a cause to terminate the 2008 Contract.

155. The Applicant submits that the termination of the 2008 Contract was only possible with the mutual agreement of the Parties, basing this on Article 33 of the Decree of 30 July 1888[101] which provides that:

*Legally formed agreements have legal force on those who concluded them.*

*They may be revoked only by mutual consent or for the causes permitted by law.*

*They must be performed in good faith.*

156. It avails itself of the provisions of Article 25 of the 2008 Contract which exhaustively enumerates the causes of termination as follows:

The Contract may end upon occurrence of one of the following events:

*(i) when the Exploration License expires and will not be renewed under DRC law;*

*(ii) when the Exploitation License has expired or has not been renewed in accordance with legal provisions;*

*(iii) for each entity of the "**Contractor**" in case of voluntary or involuntary withdrawal in accordance with the provisions of the Consortium Contract;*

[99] Deloitte Report, Exhibits in Annex 7, Exhibit 7.1, Hydrocarbons in the Albertine Rift: Opportunities for Development or Risks of Instability? pp. 29-30, **Exhibit DM-LVI**.

[100] Deloitte Report, exhibits in Annex 7, Exhibit 7.1, Hydrocarbons in the Albertine Rift: Opportunities for Development or Risks of Instability? p. 30, **Exhibit DM-LVI.**

[101] Decree of 30 July 1888, Contracts for Conventional Obligations, (BO, 1888, p. 109), Article 33, **Exhibit LEX DM-II.**

*(iv) the termination of the contract: the State shall have the right to terminate this contract in the following cases:*

> *• If the "**Contractor**" has seriously breached the execution of the minimum works schedule voted for in the Operations Committee under terms of the sub-period considered;*
>
> *• If the "**Contractor**" seriously contravenes the provisions of the contract*
>
> *• If the "**Contractor**" does not comply with legislation and regulations in force*
>
> *• If the "**Contractor**" goes bankrupt or into receivership.*

*However, this termination can only take place after formal notice to the "**Contractor**" by the "**DRC**". Following this formal notice, the parties must meet in order to find a solution to the dispute within one month. If, after this phase of negotiations and explanations, the "**Contractor**" has not taken measures to overcome the problem giving rise to the formal notice within three months of the consultation, the "**DRC** "will then begin a Contract termination procedure.*[102]

157. The reason given by the Respondent that it chose another candidate is not covered by that stipulation.

158. In addition, the last paragraph of Article 29 of the disputed Contracts specifies that

*The "**RDC**" guarantees to the "**Contractor**", to each entity constituting the "**Contractor**" as well as to the assignees of the "**Contractor**" non-discrimination against them in the application of the laws or regulations in relation to any other company conducting oil operations in the Democratic Republic of Congo.*[103]

159. In the absence of any allegation by the Respondent of a public interest ground justifying a refusal to issue the presidential order, the Applicant thus argues in a relevant manner that the Respondent's unilateral decision to award the rights it held under the 2008 Contract to a third party constitutes an "*assault*" which contravenes the provisions of Article 33 of the Decree of 30 July 1888 and rightly relies on the case-law according to which "*the judgment which approves the attitude of the buyer resorting to assault to terminate the agreement which bound it to the seller has misunderstood the nature of the contractual relations to which article 33 [of the Decree of 30 July 1888] grants legal force, (L' shi , 21.4.1972, RJZ, 1973, No. 1, p. 70).*"[104]

160. The Respondent submits, however, that the 2008 Contract lapsed on the ground that it was rendered ineffective by the Parties for several years. In its supplementary brief, it claims that the 2008 Contract was terminated when the Parties agreed to the principle of offsetting the financial obligations of the 2008 Contract with those resulting from the 2007 Contract and that such offsetting became effective on 23 March 2012, when "*the DGDRAD confirmed the allocation of the amount of $ 2,500,000 paid on 22 March 2008*" by the Applicant to the signing bonus of the 2007 Contract. The 2008 Contract was thus deprived of one of its essential elements.[105]

---

[102] 2008 Contract, Section 25, **Exhibit DM-IX.**

[103] Disputed Contracts, Article 25, **Exhibits DM-VIII** and **DM-IX.** The Court of Arbitration notes in this regard the speed with which the order for approval of the Caprikat Contract was issued (approximately 1.5 months) while the Claimant had to wait several years in vain, which constitutes a breach of the guarantee granted by the State.

[104] Katuala Kaba Kashala, annotated Congolese Civil Code. First part. Contracts or conventional obligations. Editions Batena Ntambua, second edition, Kinshasa, 2009, pp. 58-60, **Exhibit LEX DM-IV**, p. 28, Reply to the Supplementary Brief, 12 June 2018, para. 134.

[105] Supplementary Brief, 26 April 2018, p.

161. The Applicant acknowledges that lapse is a method of dissolving of the contract. It stresses, however, that this is based not on law but on case law and that the Respondent provides no evidence that the lapse of the contract is one of the methods of extinguishing obligations recognised by Congolese law.[106]

162. The plaintiff also points out that "*in Belgian law the case-law of the Belgian Court of cassation of Belgium teaches that 'the lapse of an obligation by the disappearance of its purpose presupposes that it has become definitively impossible to perform its object in kind ' (Lex DM-VII). The lapse of a contract due to the 'disappearance of one of these essential elements' is, however, not recognised by Belgian law.*"[107] The Applicant also notes that the performance in-kind of an obligation to pay a sum of money is never definitively impossible and that it was sufficient for the Respondent to establish a new debit slip for the payment of the signing bonus of the 2008 contract to allow the Applicant to meet this obligation, so that, according to Belgian law, the 2008 Contract would not lapse due to the attribution to the 2007 Contract of the signing bonus signature paid by the Applicant for the 2008 Contract.[108] The Applicant further claims that it is the Respondent's decision to reassign the rights resulting from the 2008 Contract to a third party that led to the disappearance of its purpose, on the basis of current Belgian law, the In fact, the disappearance of the purpose of the 2008 contract was deliberately caused by the Democratic Republic of Congo which, in so doing, committed a breach incurring its liability. [109]

163. The Court of Arbitration notes that, despite its invitations,[110] The Respondent has not provided the evidence, the burden of which falls upon it, of the content of Congolese law with respect to the lapse. The plea alleging the alleged lapse of the 2008 Contract must therefore be rejected.

164. Nor can the Respondent rely on the fact that a settlement was reached with the Respondent in which the Respondent waived all rights under the 2008 Contract. It invokes the minutes of 27 December 2010 of the meeting held in the office of the Minister of Hydrocarbons from 9 to 17 December 2010.[111] This meeting follows the letter of 21 September 2010 in which the Applicant (i) declared the unlawful reassignment of Block 1 of the Albertine Graben to a third party and (ii) requested the cancellation of the Caprikat Contract and the continuation of the 2008 Contract, noting that it had already invested at least USD 12,550,000 in the execution thereof, and reserved the right to assert its rights before all the competent authorities. In the same letter, however, it proposed to negotiate and conclude a settlement agreement under which it would obtain (i) the presidential order approving the 2007 Contract, (ii) the allocation of a new block 9 in the central and / or another new

---

[106] Response to the Supplementary Brief, 12 June 2018, paras 453-456.

[107] Response to the Supplementary Brief, 12 June 2018, para. 458.
[108] Response to the Supplementary Brief, 12 June 2018, paras. 457-463.
[109] Response to the supplementary Brief, 12 June 2008, paras. 469-479.
[110] In its communication of 16 July 2018, pursuant to Procedural Order No. 5 of the Court of Arbitration, the Respondent states that "*on the lapse of [the 2008 Contract], the DRC lacked sufficient time to back it up with documented case law and thus repeated its previous pleas in this respect*." The Court of Arbitration notes that the Respondent did not seek an extension of the time limit imposed on it by Procedural Order No. 5 and that this plea was raised by the Respondent at the beginning of the proceedings (response Brief, para 18) and was the subject of a specific submission, the Supplementary Brief, dated 26 April 2018. The invitation made to the Respondent, by Procedure Order No. 5 of Court of Arbitration, to provide elements of doctrine and case law on this issue was therefore only an additional opportunity that was offered to the Respondent to support its argumentation on doctrine and case in Congolese law so that the Respondent was thus fully able to argue its case on this issue.

[111] Ministry of Hydrocarbons, Minutes of works on offsetting by the Congolese State in favour of the Divine Inspiration Group from 9 to 17 December 2010**, Exhibit DM-XXII.**

Block, Fossé de Borna, and (iii) the return of the sums received by the Respondent for signing bonuses and HQSE with interest.[112]

165. The Applicant rightly argues that the meeting of 9-17 December 2010 focused solely on the mechanism of "*offsetting carried out by the Congolese State*" in favour of the Applicant, understood as a way of extinguishing debts, that is to say to enable the reallocation of sums paid under the signing bonus (2,500,000 USD) and HQSE (1,500,000 USD) by the Applicant in execution of the 2008 Contract to the 2007 Contract, only the offsetting between debts of the same nature being possible under Congolese law. In addition, the minutes are not a contract and a fortiori not a settlement agreement entailing waiver of its rights by the Applicant. Moreover, it is not signed by the authorised representatives of the Parties, namely Mrs Brown for the Applicant and the Minister of Hydrocarbons and the Minister of Finance for the Respondent.[113] And if, as the Respondent rightly points out, the offsetting mechanism became effective on 23 March 2012, resulting in the Applicant meeting its obligations relating to the payment of the signing bonus of the 2007 Contract,[114] the other claims of the Applicant concerning in particular the investment of 12,550,000 USD granted in petroleum works under the 2008 Contract or the allocation of a new block in the Central Basin were not discussed and the order approving the 2007 Contract has not been issued.

166. The Court of Arbitration notes that the evidence before the court effectively shows that the discussions after the meeting of December 9 to 17, 2010, focused on the implementation of the 2007 Contract and the attribution to that contract of amounts paid under the signing bonus of the 2008 Contract. However, the Respondent provides no evidence that during these discussions the Applicant relinquished, in a definite and unambiguous manner, its other claims for compensation for the violation of her rights under the 2008 Contract that she was deprived of. In any event, the Court notes that one of the essential conditions posed by the Applicant in relation to the issue of the order approving the 2007 contract was not satisfied while, on 16 March 2012, the Applicant had paid an amount of 500,000 USD in addition to the compensation set up by the DGRAD.[115]

167. The Court of Arbitration therefore considers that the Respondent has committed a breach (i) by failing to issue the Presidential Order approving the Disputed Contracts and (ii) by attributing block 1 of the Albertine Graben to a third party in breach of the stipulations of the 2008 Contract, dispossessing the Applicant of its exclusive rights under the 2008 Contract without compensation.

**3. The 2007 Contract**

168. The 2007 Contract was signed on 14 December 2007, conferring on the "*Contractor*" exclusive rights of recognition and exploitation of hydrocarbons as well as the right to obtain operating licenses within the limits of the ZERE, consisting of blocks 8, 23 and 24 of the Central Basin. As noted above, the signing bonus for these three blocks (US $ 1,000,000 per block) was paid by allocating the sum of US $ 2,500,000 paid by the Applicant pursuant to the 2008 Contract[116] and an additional $500,000 paid on 16 March 2012 by the Applicant.[117] Upon the signing of the 2007 Contract, the Applicant performed the analysis of the technical data for which to access, prior to said signature, the Applicant

[112] DIGOil's letter to the President of the Democratic Republic of Congo, 21 September 2010, **Exhibit DM-XIX.**
[113] Response to Supplementary Brief, 12 June 2018, para. 412.
[114] Letter from the General Directorate of Administrative, Judiciary, National, and Participation Revenue (DGRAD), 23 March 2012, **Exhibit DM-XXXII.**
[115] Debit slip No. 322569 for an amount of $ 500,000, 16 March 2012, **Exhibit DM-XXX**; Certificate of payment in the amount of 500 000 USD established by Rawbank SARL, 16 March 2012, **Exhibit DM-XXXI.**
[116] Certificate of payment of $ 2,500,000 drawn up by Rawbank SARL 21 March 2008, **Exhibit DM-XII.**
[117] Letter from the General Directorate of Administrative, Judiciary, National, and Participation Revenue (DGRAD), 17 November 2011, Exhibits **DM-XXIX** and **DM-XXX.**

had paid two "*compensatory taxes*" in the amount of 50,000 USD each.[118] The Ministry of Hydrocarbons invited the Applicant to execute the oil works as of 23 June 2012.[119] The Applicant was then authorized to perform the aeromagnetic and gravimetric acquisition work in August 2012,[120] the analyses corresponding to the end of 2012 and in 2013, thus allowing the updating of existing data from 1987. This data was presented to experts appointed by the Democratic Republic of Congo in 2013 and 2014.[121] However, the President of the Republic did not issue the order approving the 2007 Contract and, on 6 April 2016, nine years after the signature of the contract, the Applicant served notice on the Respondent to execute the 2007 Contract within 30 days, under pain of commencing arbitration.[122] Following the filing of the Request, the Respondent filed a letter of 18 October 2017 in which the Minister of Hydrocarbons again asks the Prime Minister to implement the procedure for issuing the 2007 Contract Approval Order.

169. The Applicant submits that by failing to issue the 2007 Contract Approval Order within a reasonable time, the Respondent breached its obligations under the 2007 Agreement.[123]

170. The Respondent claims that the Applicant's action is premature, the President of the Republic being able at any time to issue the order for the approval of the 2007 Contract. It relies on the decision of the Supreme Court of the Democratic Republic of Congo of 10 December 2010 which considered in connection with the Tullow Contract that "*the contract raised not yet having begun to produce its effects, the action of the Applicant is premature and therefore inadmissible."*[124] The Applicant observes that "*the Supreme Court does not give reasons for the premature action brought by Tullow to bring an action for annulment and it is not clear why this action to annul the act terminating its contract was premature.*"[125] The Respondent takes from this that "*the condition [of the approval of the contract by the President of the Republic] has not yet been fulfilled and the action of the Company Tullow is inadmissible*" and that "*The Ministry of Hydrocarbons and the Ministry of Finance have no means of putting pressure on the President of the Republic."*[126]

171. The Court of Arbitration notes that the action underlying the claim brought before the Supreme Court was an action for annulment of an administrative act (the order cancelling the Tullow Contract) based on an excess of power of the author of this act. As it stands, it cannot draw any lessons from it

---

[118] Debit slip No. 312850 for an amount of $ 50,000 of 31 August 2007, **Exhibit DM II**; Debit Slip for the amount of $ 50,000 drafted by Rawbank LLC on 20 September 2007, **Exhibit DM III** ; Debit Slip No. 319291 for an amount of $ 50,000 from 16 October 2007, **Exhibit DM IV**; Debit Slip for the amount of $ 50,000 drafted by Rawbank SARL on 16 October 2007, Exhibit DM V; Certificate of payment of $ 50,000 drafted by Rawbank Ltd. dated 16 October 2007, **Exhibit DM VI.**

[119] Letter from the Minister of Hydrocarbons of the Democratic Republic of Congo to DIGOil, 23 June 2012, **Exhibit DM XXXIII.**

[120] DIGOil's letter to the Director General of the Civil Aviation Authority, 18 July 2012, Exhibit DM XXXIV ; Letter from the Minister of Hydrocarbons of the Democratic Republic of Congo to DIGOil, 30 July 2012, **Exhibit DM-XXXV.**

[121] Letter from DIGOil to the Minister of Hydrocarbons of the Democratic Republic of Congo, 4 December 2012, **Exhibit DM LXVIII** ; Letter from DIGOil to the Minister of Hydrocarbons of the Democratic Republic of Congo, 31 January 2014, **Exhibit DM LXX**, Letter from DIGOil to the President of the Democratic Republic of Congo, 8 May 2014, **Exhibit DM LXII** ; Letter from DIGOil to the Minister of Hydrocarbons of the Democratic Republic of Congo, 10 September 2014, **Exhibit DM LXXII**.

[122] Letter from DIGOil to the Minister of Hydrocarbons of the Democratic Republic of Congo and to the Prime Minister, 6 April 2016, Exhibit **DM-XXXVIII.**

[123] Note from the Ministry of Hydrocarbons to the Government of the Democratic Republic of Congo, 18 October 2017, **Parts DF I** and **DM-LIV.**

[124]Judgment of the Supreme Court of Justice of the Democratic Republic of Congo, 10 December 2010, Exhibit DF-III.

[125] Post Hearing Submissions, 30 July 2018, Section 3, page 8.

[126] Post Hearing Submissions, 30 July 2018, Section 2, Fourth Page.

in the context of the situation before it, since, as already noted above, unlike the case before the Supreme Court, the 2007 Contract has not been cancelled and, notwithstanding the failure to issue the presidential order, the Parties remain bound by the obligations it contains.

172. It should be recalled that, according to the Respondent itself, the oil agreement approval order should be issued within "*reasonable period of time for an investment contract in which the State has made a commitment*". [127]It cannot seriously claim that a period of ten years can constitute the "*reasonable period of time*" during which the order of the President of the Republic may be issued. This period is not in accordance with administrative practice in the Democratic Republic of Congo that the Court of Arbitration has considered above to be around two years and four months.

173. The Court of Arbitration finally holds that the note of the Minister of Hydrocarbons of 18 October 2017[128] to the Prime Minister inviting the latter to implement the procedure for issuing the presidential order approving the 2007 Contract has remained ineffective and, in an attempt to justify the breach of its obligation under the 2007 Contract, the Respondent cannot rely on dysfunctions in the administration, because the Ministries of Hydrocarbons and Finance have no means of putting pressure on the President of the Republic.[129] As stated above, the issuance of the approval order is a state obligation that has not been met.

174. The Court of Arbitration therefore considers that the Respondent has committed a breach in not issuing the presidential order approving the 2007 Contract within a reasonable time.

## D. CONSEQUENCES OF NON-COMPLIANCE

175. The Applicant is seeking the termination of the disputed Contracts with damages (1) which it has had assessed by an independent expert (2).

### 1. Termination of Disputed Contracts with damages

176. The Applicant is requesting the termination of the Disputed Contracts on the basis of Article 82 of the Decree of 30 July 1888 which provides that:

*The termination condition is always implied in synallagmatic contracts, in the event that one of the two parties does not meet its commitment.*

*In this case, the contract is not automatically terminated. The party in respect of which the commitment has not been executed has the choice, either to compel the other party to execute the agreement where it is possible, or to demand termination with damages. The termination must be sought in court and the Respondent may be granted a time limit depending on the circumstances.*[130]

177. The latter provision therefore lays down the principle of judicial resolution for non-performance of contracts and it is not alleged that the Parties derogated from it, as the disputed Contract does not provide for an ex officio termination clause.

[127] Note from the Minister of Hydrocarbons to the Government of the Democratic Republic of Congo, 18 October 2017, **Exhibit DF I** and **Exhibit DM-LIV.**

[128] Note from the Minister of Hydrocarbons to the Government of the Democratic Republic of Congo, 18 October 2017, **Exhibit DF I** and Exhibit **DM-LIV.**

[129]Post Hearing Submission, 30 July 302018, Section 2, fourth page.

[130] Decree of 30 July 1888, Contracts and Conventional Obligations (BO 1888 PP 109), Article 82, **Exhibit LEX DM-II.**

178. The Respondent points out, however, that "*the Oil and Gas Contract is not an ordinary contract that would fully comply with the rules and principles of civil law. As a public service concession, it contains rules that fall under civil and administrative law*. "[131] However, it draws no consequences as to the termination of the Disputed Contracts and it is not alleged that the Respondent thus has the right to unilaterally terminate the Disputed Contracts for reasons of public interest, but only that the President of the Republic has a discretionary power for the issuance of the order of approval, so that the oil agreement would assume the character of an agreement concluded subject to a condition precedent.[132]

179. As the Court of Arbitration found that the Respondent had breached its obligations under each of the Disputed Contracts, the Applicant is entitled to seek termination at the cost of the Respondent with damages and interest.

180. The Applicant has made the choice, as authorised by Article 82 of the Decree of 30 July 1888, to request the termination of the disputed Contracts rather than to demand their execution. The Respondent, meanwhile, wants the Court of Arbitration to take note of its willingness to issue the presidential order for approval of the 2007 Contract and set a deadline for the performance of the obligations of the 2007 contract.[133] It relies in particular on the letter from the Minister of Hydrocarbons to the Prime Minister dated 18 October 2017, in which he is asked to implement the procedure for issuing the presidential order approving the 2007 Contract.

181. The Court of Arbitration notes that the Applicant is rightly availing itself of the fact that the execution of the 2008 Contract has become impossible given the progress of work in block 1 of the Albertine Graben.[134]In addition, concerning the 2007 Contract, it notes that the letter from the Ministry of Hydrocarbons of 18 October 2017 has had no effect, so that the will of the Respondent to issue the presidential order of approval of the contract does not translate into reality. The Applicant cannot therefore be kept indefinitely in the contractual relationship and bear in particular the resulting structural costs pending the issuance of an order that should have been made several years ago, and could have been made since the beginning of the Arbitration.

182. It is therefore appropriate to grant the request for termination of the Disputed Contracts at the cost of the Respondent.

183. The Applicant's claim for damages in addition to the termination of the Disputed Contracts also appears to be well founded in application of the provisions of Article 82 of the Decree of July 30, 1888 quoted above, as well as those of Article 45 which provide that:

*The debtor is ordered, if necessary, to pay damages, either because of the breach of the obligation, or because of the delay in execution, whenever it fails to show that the execution comes from a foreign cause which cannot be attributed to it, and that there is no bad faith on his part.* [135]

184. It is therefore appropriate to grant the Respondent's claim for compensation to the Applicant for all the damages it suffered, which must therefore be assessed.

**2. The right to compensation and the assessment of damages**

---

[131] Response to the Supplementary Brief, 12 June 2018, para. 16
[132] Response to the Supplementary Brief, 12 June 2018, para. 16.

[133] Response to the Supplementary Brief, 12 June 2018, p. 12.
[134] Response to the Supplementary Brief, 12 June 2018, paras. 138-141.
[135] Decree of 30 July 1888, Contracts or Conventional Obligations, (BO 1888 p. 109), Article 47, **Exhibit LEX DM-II.**

185. According to Article 47 of the Decree of 30 July 1888:

*The damages and interest due to the creditor are, in general, the loss it has suffered and the gain it has been deprived of, with the following exceptions and modifications.*[136]

186. Pursuant to this provision, the Plaintiff seeks compensation for the damage it has suffered as a result of the non-performance and termination of the disputed Contracts including, on the one hand, the loss suffered by the Plaintiff including all the expenses it incurred in the Disputed Contracts for a total amount of USD 19,552,884 and, on the other hand, the loss of profit resulting from the operating loss for the disputed Contracts in question, assessed at the sum of 597,847,994 USD.

187. The amounts claimed are those calculated by the two independent experts[137] of the Deloitte Group, Mr Robin G. Bertram and Mr Anthony Charlton, who have conducted out two studies leading to the filing, on the one hand, of a technical report (the "***Bertram Report*** ")[138] in which the petroleum resources of blocks 8, 23 and 24 of the Central Basin and block 1 of the Albertine Graben were evaluated and, secondly, a financial report (the "***Charlton Report***").[139] to estimate the economic loss suffered by the Applicant by determining the market value of each of the projects relating respectively to block 1 of the Albertine Graben and to blocks 8, 23 and 24 of the central basin of which the Plaintiff was deprived, and the expenses incurred and the payments made by the Plaintiff under the 2008 Contract and the 2007 Contract, distinguishing between those which would have been incurred as part of a normal conduct of the activities and those incurred in practice due to a breach by the Respondent of its contractual obligations.[140]

188. The causal link between the fault upheld by the Court of Arbitration and the alleged damage is sufficiently characterised, the non-issuance of the presidential order while the conditions required by Congolese law had been met having the direct effect of causing the Applicant a loss resulting from the expenses incurred for the performance of the Contracts in question and from depriving it of the expected gains from this execution. This direct causal link is, moreover, not contested by the Respondent, which, on the other hand, denies the certainty of the loss of profit.

189. For the reasons set out below, the Court of Arbitration considers that the loss suffered by the Applicant is a definite loss, current with respect to the loss suffered, and future with respect to the loss of profit, and it must ensure that the realisation of the latter is sufficiently probable and not hypothetical, if it is to be compensated.

(a) *The loss of earnings*

---

[136] Decree of 30 July 1888, Contracts or Conventional Obligations, (BO 1888 p. 109), Article 47, **Exhibit LEX DM-II.**

[137] Although hired by the Applicant, Messrs Bertram and Charlton each intervened as independent expert: Expert report of Robin G. Bertram (Deloitte), 29 March 2018 and its translation into French; Expert Report by Robin G. Bertram (Deloitte), 29 March 2018, para. 1.2, **Exhibit DM-LVII**; Anthony Charlton (Deloitte) Expert Report, 30 March 2018, para. 1.2, **Exhibit DM-LV.** At the beginning of his examination at the Hearing, Mr Charlton further confirmed to the Court of Arbitration that (i) his duty as an expert was to inform the Court of Arbitration on the technical aspects of the dispute in his area of jurisdiction and that this duty exceeded any obligation he may have towards the Claimant and (ii) although, according to the law of the place of arbitration and Article 1467 of the French Code of Civil Procedure - which provides: "The Court of Arbitration may hear any person. This hearing takes place without taking an oath"- he is not obliged to take an oath, and his expert testimony must be independent and impartial.

[138] Expert report of Robin G. Bertram (Deloitte), 29 March 2018 and its translation into French, Robin G. Bertram's Expert Report (Deloitte), 29 March 2018, **Exhibit DM-LVII**

[139] Anthony Charlton Expert Report (Deloitte), 30 March 2018, Exhibit DM-LV; attachments to the Anthony Charlton Expert Report (Deloitte), **Exhibit DM-LVI**

[140] Anthony Charlton (Deloitte) expert report, 30 March 2018, para. 1.13, **Exhibit DM-LVI.**

190. The Respondent concedes that the damage suffered by the Applicant is direct but contests its certain character, considering that it was only possible and alleging that what is to be compensated is not the profit that the Applicant could have gained but rather the loss of opportunity to earn it. It would thus be up to the Court of Arbitration to determine the fraction of the damage corresponding to the loss of opportunity on the basis of two elements: (i) the existence of a serious chance of success and (ii) the seriousness and irreparable nature of the opportunity lost. On the first point, it points out that the reserves identified by the Bertram Report were only probable reserves and not recoverable reserves, which led it to express reservations as to the economic value of those reserves. On the second point, it takes advantage of the fact that the President of the Republic may at any time approve the 2007 Contract by ordinance, so that the chance of making a gain would not be irretrievably lost.[141]

191. The Respondent thus disputes the definite nature of the loss of profit and considers that the Court of Arbitration should take into consideration only the lost opportunity to make that profit. It is therefore up to the Court of Arbitration to determine the nature of the loss suffered by the Applicant.

192. A loss must be regarded as simply contingent, able to be compensated for the loss of opportunity, when its occurrence is subject to an event that is not certain, in which case the damage would be compensable as long as the probability that the expected event occurs is high.

193. In the case at hand, the Court considers that the event likely to trigger operations, and thus to allow profits to be made, is the issue of operating permits. As the Court of Arbitration noted in paragraph 139 above, in accordance with the provisions of Articles 10.3 and 10.4 of the Disputed Contracts, the Respondent was under an obligation to issue operating permits in the event of discovery of commercially exploitable resources. The issuing of such permits is therefore not possible, but constitutes a definite and direct extension of a current state of affairs that can be observed immediately, and thus constitutes a certain loss that could be compensated provided that the future favourable event is not just virtual or hypothetical.

194. The Court of Arbitration must thus ensure that the discovery of commercially exploitable resources likely to permit exploitation is of a non-hypothetical nature and sufficiently probable to justify compensation for this loss.

195. First, it notes that the Applicant has demonstrated its ability to carry out oil operations as part of the work that it has carried out in execution of the disputed Contracts. Responding to the questions of the Court of Arbitration at the hearing, the Applicant further indicated that it had retained a 5.87% interest in Block III of the Albertine Graben, the exploration of which was conducted by the oil giant Total[142] and was active as a petroleum block operator, particularly in the Central African Republic. The likelihood that the Applicant will be able to carry out the oil prospecting operations and, if necessary, to mobilise a "giant" in the sector for the exploitation if necessary, seems thus sufficiently proven and has not challenged by the Respondent. The Court of Arbitration notes that the preamble of the Disputed Contracts states, as applicable, that the Applicant or the consortium of which it is one of the entities has demonstrated its technical and financial capacity in oil exploration and production.[143]

---

[141] Response to the Supplementary Brief, 12 June 2018, paras. 46-50. In this regard, the Court of Arbitration first notes that it granted the request for termination of the 2007 Contract at the exclusive cost of the Respondent and that it follows that the Claimant has seriously and irretrievably lost the opportunity to make the expected gains under the 2007 Contract. In addition, the same applies to the 2008 Contract for which the exclusive rights of the Respondent have been reassigned to a third party.
[142] See also, Deloitte Report, Exhibits in Annex 7, Exhibit 7.1, Hydrocarbons in the Albertine Rift: Opportunities for Development or Risks of Instability? p. 32, **Exhibit DM-LVI.**
[143] 2007 Contract, p. 3, **Exhibit DM-VIII**; 2008 Contract, p. 4, **Exhibit DM-IX**.

196. Regarding the probable and non-hypothetical nature of discoveries of exploitable resources in view of the probable and unproven nature of the reservations highlighted by the Bertram Report alleged by the Respondent, the Court of Arbitration notes that Mr Bertram has:

(i) adopted a probabilistic approach described in appendix 10 of the Bertram Report leading it, as is the custom in the oil industry, to evaluate on the basis of scientific data the petroleum potential of the blocks concerned according to three scenarios: the low scenario (P90), the best scenario (P50) and the high scenario (P 10), which correspond respectively to 10%, 50% and 90% probabilities that the volumes of oil extracted will be equal to or higher than estimates, so that the estimates are thus minimum estimates;[144]

(ii) applied the success factors to each of the three scenarios taking into account, on the one hand, the geological success chances of 0.23 for blocks 8, 23 and 24 of the Central Basin and 0.40 for the block 1 Albertine Graben based on an estimate of the hydrocarbon source rock quality, the capacity of hydrocarbon to migrate to the appropriate rock reservoir and relative trapping and containment properties of the reservoir rock[145] and, on the other hand, chances of commercial success of 0.72 for blocks 8, 23 and 24 of the Central Cuvette and 0.76 for block 1 of the Albertine Graben based on the economic viability, technology and quality of the development scenario, the multiplication of the factors of chance of geological success and chance of economic success resulting in an overall chance of success of 0.16 (i.e. a rate of 16%) for blocks 8, 23 and 24 of the central basin and 0.30 (a rate of 30%) for block 1 of the Albertine Graben;[146]

(iii) took into account the economic parameters of the oil industry that were attributed to the estimated oil revenues, namely, operating costs, the cost of shifting oil on the market, capital investment oilfield and reclamation costs;[147]

(iv) adopted, on the basis of the best scenario, <u>potential "not risky" resources</u> from projected crude oil resource volumes of 477 MMbbl for blocks 8, 23 and 24 of the central basin and 159 MMbbl for block 1 of the Albertine Graben representing respectively a gross revenue of $ 44,694,000,000 ($ 44,694 billion) and $ 14,240,000,000 ($ 14,240 billion) of which $ 25,719,000,000 ($ 25,719 billion) and $ 4,713,000,000 ($ 4.713 billion) and <u>potential "risky" resources</u> taking into account success rates of 16% and 30% previously estimated, leading it to estimate the Applicant's share of 44.5 MMbbl and 15.4 MMbbl respectively representing, for the Applicant, a net income of 4.115.000.000 USD (4.115 billion) and 1.414 .000.000 USD (1.414 billion).[148]

197. Regarding the Central Basin, the Respondent, " *while recognising, the geological and geophysical nature of the work undertaken in blocks 8, 23 and 24 of the Central Basin, and 1 of the Albertine Graben is likely to allow the identification of oil resources, reserves as to their quantity, and their recovery rate, in the absence of appraisal drilling and development.* "[149]

---

[144] Anthony Charlton Expert Report (Deloitte), 30 March 2018, para. 4.38, **Exhibit DM-LV;** Expert report by Robin G. Bertram (Deloitte), 29 March 2018, tables under paragraph 2.2, **Exhibit DM-LVII**.

[145] The Court of Arbitration notes that this rate of geological success makes it possible to take into account, in particular, the possibility raised by the Respondent in the Hearing that the possibility of drilling leading to a dry well could not be ruled out. The possibility of a dry well does not preclude the possibility that during the ZERE exploration period other drilling could lead to the discovery of commercially exploitable resources leading to the issuance of an exploitation permit.

[146] Expert Report by Robin G. Bertram (Deloitte), 29 March 2018, paras. 5.1 to 5.38, **Exhibit DM-LVII**.

[147] Expert Report by Robin G. Bertram (Deloitte), 29 March 2018, Section 7, paras. 7.1 to 7.26, **Exhibit DM-LVII**.

[148] Expert Report by Robin G. Bertram (Deloitte), 29 March 2018, Section 5, para. 2.5, **Exhibit DM-LVII.**

[149] Supplementary Brief, 12 June 2018, para 2 5. The Respondent states that "after a first exploratory drill which gives indications on the area and presents geologically and commercially interesting data (sic), several other

198. It emphasises that, in view of the oil work undertaken in the Central Basin which did not go beyond the stratigraphic drilling intended to proceed with the geological reconnaissance of a basin by the identification of the underlying formations, " *it must be concluded that the hydrocarbon reserves are [...] still at the resource stage, the quantity of which remains to be confirmed.*"[150] The Court of Arbitration notes that the Respondent does not dispute the volume of probable reserves adopted by Mr Bertram or the success rate of 16% that he applied to them, considering instead that this expert was careful "*in not adopting the higher assumption to reflect the fact that some of the oil is not likely to be recovered.*"[151] The likelihood that hydrocarbon resources in the Central Basin are exploitable is thus established and cannot be considered hypothetical.

199. Concerning Block 1 of the Albertine Graben, the Respondent indicates that the company *Oil of DRC*, a new operator on behalf of the companies Caprikat and Foxwhelp, undertook the seismic work and declared in the press that it had discovered probable reserves of 3,000 billion barrels.[152] The minutes of the meeting held on 15 August 2014, between the representatives of the Ministry of Hydrocarbons and Oil of DRC, state that:

*During the [Combined Operating Committee of 8 April 2014, Oil of DRC ("* ***OofDRC*** *")] had submitted to the Ministry of Hydrocarbons a detailed report on the results of two (2) seismic acquisition campaigns carried out on Block I and II. On this occasion, OofDRC also informed the Ministry of Hydrocarbons of the findings indicating the identification of seven Prospects and three Leads with an estimated value of 1.609.58 Mldbbl for the Prospects and of 1.284.43 Mldbbl for the Leads, which makes an approximate total of 2,900 Mldbbl (OIIP), precisely reported by Reuters.*[153]

200. The Court of Arbitration notes that, although this estimate of the "probable reserves" which constitute "non-risky data" relates to blocks 1 and 2 of the Albertine Graben, they are at a much higher level than that adopted by the Bertram Report which for block 1 alone is 159 billion barrels under the assumption of the best scenario and 451 billion barrels under the assumption of the high scenario. It also notes that the Respondent itself acknowledges that Mr Bertram was cautious in not adopting the highest assumption.[154] The probability that the hydrocarbon resources of block 1 of the Albertine Graben are exploitable is thus established and has a non-hypothetical character.

201. More generally, the Bertram Report notes that "*risk is a subjective measure and may vary depending on the evaluator of the qualified reserves. For this reason, non-risky data is commonly presented in reserve reports.*"[155]

202. The Court of Arbitration notes that the Respondent finds "*the production of another expert report inappropriate, as the parties and the court may indeed draw their own conclusions from the technical elements contained in the Deloitte report."*[156] It also notes that the Respondent has chosen not to hear

appraisal drillings are carried out to circumscribe the extent of the reinforced deposit. Only then is the effect of the appraisal drilling encashed, that is to say the extraction of the hydrocarbons from the subsoil. (Supplementary brief, June 12, 2018, para 28).

[150] Response to the Supplementary Brief, 12 June 2018, paras. 24 to 26.

[151] Response to the Supplementary Brief, 12 June 2018, para. 27.

[152] Response to the Supplementary Brief, 12 June 2018, paras. 31 to 34.

[153] Minutes of the Eighth Extraordinary Meeting of the Operations Committee of the Albertine Graben Blocks I and II CPP, 15 August 2014, **Exhibit DM-L**.

[154] Response to the Supplementary Brief, 12 June, 2018, para.23.

[155] Expert Report by Robin G. Bertram (Deloitte), 29 March 2018, para .2.6, **Exhibit** DM-LVII

[156] Response to the Supplementary Brief, 12 June 2018, para. 23.

from its own experts and, in particular, from the experts of the Ministry of Hydrocarbons who have all the technical elements and analytical resources that enable them to contradict or nuance the analyses of the Bertram Report and provide the Court of Arbitration with their own estimate of the risk of success. The Respondent therefore does not submit to the Court of Arbitration any concrete assessment element enabling it to question the success rates of 16% for the Central Basin blocks and 30% for the Albertine Graben block 1 adopted by the Bertram report which, undisputed by the Respondent, on the other hand appear to be based on scientific and technical elements and a serious analysis consistent with practices in the oil industry.

203. The Court of Arbitration therefore finds that the uncertainty of the probable nature of the reserves does not seem under- estimated and has been largely taken into account by the Bertram Report. The probable and non-hypothetical nature of exploitable resources has thus been established and, therefore, the Bertram Report has been able to provide a sound technical basis for the long-term evaluation of the Charlton Report.

204. The Charlton Report estimates the economic loss suffered by the Applicant by determining, on the one hand, the market value of each of the projects relating respectively to block 1 of the Albertine Graben (the "***Albertine Project***") and to blocks 8, 23 and 24 de la Central Basin (the "***Basin Project***"), which the Applicant was deprived of because of the Respondent's breach of its contractual obligations, and, on the other hand, the expenses incurred and the payments made by the Applicant in connection with the 2008 Contract and the 2007 Contract, distinguishing between those that would have been incurred as part of normal business conduct and those incurred as a result of the Respondent's non-compliance with its contractual obligations.[157]

205. It has applied the discounted cash flow method ("DCF"), which is a recognised and commonly used method in the world of finance for the evaluation of projects and companies, excluding, on the one hand, the analogous approach based on the substitution principle that a prudent investor would not pay more for an asset than the cost of an equivalent asset with the same utility because of the lack of public information available on such transactions and, on the other hand, the asset approach which amounts to separately estimating the various assets, divisions or subsidiaries of the company and subtracting the value of the net debt which is more suitable for the valuation of a holding company or a property company but does not make it possible to take intangibles (*goodwill*) into account. It reiterates in this respect that it does not seek to estimate the value of the Applicant as such but the value of the Albertine Project and the Basin Project. The DCF method estimates the value of an asset based on the cash flows generated over the life of the project, discounted at the average rate of return to bring the net value of the project back to the valuation date selected, 31 December 2017.[158] The application of this method is not criticised by the Respondent which points out that "*the reports are structured in accordance with international standards*"[159] In this case, with respect to the assessment of future losses and a long-term project, it appears to be the most appropriate method.

206. Mr Charlton then conducted his analysis in four main stages, summarised in paragraph 4.49 of the Charlton Report as follows:

(i) determination of income (volume of oil extracted in MMbbl x average annual price of BRENT on the basis of discounted price forecasts as at 31 December 2017) to be taken into account from the elements corresponding to the three "no risk" scenarios of the Bertram report;

(ii) deduction of Royalty and Profit Oil as provided for in the Disputed Contracts;

---

[157] Anthony Charlton (Deloitte) Expert Report, 30 March 2018, para. 1.13, **Exhibit DM-LV.**

[158] Anthony Charlton (Deloitte) Expert Report, 30 March 2018, paras. 4.20 to 4.24, **Exhibit DM-LV.**

[159] Reply to the Supplementary Brief , 12 June 2018, para. 23.

(iii) deduction of costs including the economic parameters related to the oil industry taken into account by the Bertram Report, contractual payments to be made by the Applicant (bonuses and contributions) and fixed and structural costs that were not taken into account by Mr Bertram;

(iv) 16% for the Basin Project and 30% for the Albertine Project included in the Bertram Report and a discount factor of 18.8%.

207. The Applicant's loss of earnings corresponds to its share in the value of each of the projects and was evaluated on the basis of the weighted average of the values determined under the high, best and low scenarios in a proportion of 30%, 40 % and 30% respectively (Swanson average).The Applicant's share calculated by Mr Charlton amounts to $ 230.2 million as at December 31, 2017 for the Basin Project and $ 361.5 million for the Albertine project individually. The combined value of the Albertine Project and the Basin Project estimated at US $ 597.8 million is nevertheless greater than the sum of the individual values above because of the economies of scale which make it possible to allocate half of the fixed or structural costs to each project.[160] This approach is consistent with practice in the oil sector, and is not disputed by the Respondent.

208. The Applicant points out that Mr Charlton compared the price of the barrel adopted for his assessment of the loss of earnings - USD 1.27 per barrel - with the price per barrel adopted for the recent sale by Tullow Oil to Total E & P Uganda BV of its interest in blocks 1, 1 A, 2 and 3A on the Ugandan side of the Albertine Graben basin, the price of this transaction having been calculated on the basis of a barrel at 3.48 USD,[161] so that the calculation of the loss of earnings on the basis of a price of $ 1.27 is quite prudent and reasonable. It also relies on the opinion of Philip Dimmock, who specializes in oil valuation[162], who considers that the Charlton Report (i) takes negative values for the three blocks of the Central Basin, which lowers the averages, whereas negative values do not usually appear in the calculation of averages,[163] (ii) adopts a 40% success rate for block 1 of the Albertine Graben while it is already established that the percentage of success varies between 86 and 87% for the blocks of the Albertine Graben located in Uganda[164] and (iii) uses a discount rate of 18.8% while the usual rate in the oil industry is 15%.

209. The Respondent, on the other hand, reiterates with respect to the calculation of the loss of profits the comments it made concerning the probable nature of the reservations and underlines that "*the expert was rightly cautious*" concerning the costs because "*they must be estimated taking into account the fact that there was no exploration and exploitation except the aeromagnetic and gravimetric campaigns.*"[165] It argues:

*Ultimately, the figure of 597.8 million USD is subject (sic) to change **down upwards**, following other evaluation drilling and development work to be carried out and expenses, costs and expected operational risks.*[166]

210. The Court of Arbitration notes, moreover, that the three points raised by Mr Dimmock and reported in paragraph 209 above may explain why the initial claims of the Applicant were much higher

[160] Anthony Charlton (Deloitte) Expert Report, 30 March 2018, paras. 4.69 to 4.77, **Exhibit DM-LV.**

[161] Letter from Mr Philip Dimmock, 30 April 2018 **Exhibit DM-LVIII** and its free translation in French, **Exhibit DM-LIX.**

[162] Letter from Mr Philip Dimmock, 30 April 2018 **Exhibit DM-LVIII** and its free translation in French, **Exhibit DM-LIX.**

[163] The calculation of the Swanson mean for the three blocks of the Central Basin does show negative values (Charlton Report , para. 4.73).

[164] Although not stated, the Court of Arbitration notes that this is the percentage of geological success and not the percentage of success that is 30%.

[165] Response to the Supplementary Brief, 12 June 2018, paras. 36 to 45.

[166] Response to the supplementary brief, 12 June 2018, para. 47.

than those adopted by Mr Charlton. The quantification of its request was reduced by the Applicant after it was able to see the first analyses of its consultant and then during the communication by the Applicant of the Charlton Report. The Court of Arbitration has thus found no concrete evidence to allow it to criticise and deviate from Mr Charlton's evaluation by justifying it in any way other than arbitrarily.

(b) *The loss suffered*

211. Mr Charlton has assessed the expenses incurred by the Applicant under the Disputed Contracts at $ 19,552,884, the list of each expense borne by the Applicant being contained in Annex 13 to the Charlton Report. These expenses include all the contractual and operational expenses taken into account in the calculation of the loss of earnings, so that they could be maintained in the calculation of the loss without risk of double compensation and the expenses incurred in the framework of the dispute.[167] The expert was provided, for each expense, with (i) proof that the expense is related to the disputed Contracts, (ii) the invoice and (iii) the proof of payment, listed in Annex 2 of the Charlton Report. He then classified the expenses into two categories: (i) so-called "Level I" expenditures, for which he obtained an invoice and proof of payment, and was able to establish that the expenditure incurred under the Albertine Project of the Basin Project, amounted to 18,690,786 USD and (ii) the so-called "Level II" expenses, for which he received an invoice <u>or</u> proof of payment <u>and</u> was able to establish a link with the disputed Contracts, come to 862.098 USD.[168] This latter category takes into account the time elapsed, the economic environment and the legal environment in which the Applicant operated at the launch of the projects.[169] He applied a conversion rate in USD when the expense was denominated in another currency[170] and an interest rate based on an annual interest mix to determine the value of the expenses incurred by the Applicant as of 31 December 2017.[171]

212. The Respondent relies on the wisdom of the Court of Arbitration for the assessment and authenticity of Level I expenditure evidence, and on the other hand considers that Level II expenses should be rejected, any expense that is not documented on the basis that the payment method in the DRC is in cash, without trace of payment, not able to be taken into account and to be discarded.[172]

213. The Applicant emphasises that "*if Level II expenditures do not meet the applicable standards within the Deloitte Group to adopt them in Level I, it is apparent from Annexe 13.12 of the report by the expert Charlton (DMLV) that the reality of such expenditure is sufficiently established in relation to applicable law by the production for each of these expenses of an invoice or proof of payment in connection with the 2007 and 2008 contracts"* and that *"numerous expenses for a total amount of greater than US $ 6 million, are not documented by an invoice or proof of payment because of the economic reality in the Democratic Republic of Congo"* and *"were rejected by the expert Charlton "* so that *"the actual amount of the loss suffered by [*the Applicant is*] well above the amount calculated by the expert Charlton*".[173]

214. The Court of Arbitration notes, first, that Mr Charlton rejected numerous expenses as not sufficiently related to the Disputed Contracts, the Applicant's claims in this regard having been initially

---

167 Report by Anthony Charlton (Deloitte), 30 March 2018, para. 5.2, **Exhibit DM-LV.**

168 Report by Anthony Charlton (Deloitte), 30 March 2018, Table 5.5 under paragraph 5.87, page 59, **Exhibit DM-LV.**

169 Report by Anthony Charlton (Deloitte), 30 March 2018, paras. 5.4 to 5.9, **Exhibit DM-LV.**

170 Report by Anthony Charlton (Deloitte), 30 March 2018, para 5.10, **Exhibit DM-LV.**

171 Report by Anthony Charlton (Deloitte), 30 March 2018, paras. 5.10, **DM-LV Part.**

172 Response to the Supplementary Brief, 12 June 2018, paras. 52 to 54.

173 Response to the Supplementary Brief, 12 June 2018, para. 266-271.

quantified at US $ 23,882,537.[174] In addition, the Respondent does not deny being liable for the loss incurred in respect of Level I expenses. Having examined the relevant expenses and questioned Mr Charlton at the hearing, who confirmed that he had received and verified all the invoices, the evidence of payment and the contracts relating to the expenses incurred detailed in appendices 13.1 to 13.12 to his report, the Court of Arbitration considers that all these Level I expenses are clearly established as being actually borne by the Applicant in connection with the Contracts in question, so that they must be included in the loss suffered.

215. With respect to Level II expenses, the Respondent was able to challenge each of the expense items selected by the Expert in Annex 13.12. These expenses relate to certain geoscience studies, consulting fees, marketing expenses, travel expenses, accommodation expenses and legal expenses related to the litigation. Mr Charlton described the evidence available to him which showed that in each case he had either an invoice or proof of payment and was able to establish a link with the Disputed Contracts. The Respondent was thus in a position to criticise each expense, item by item, and refrained from doing so, limiting itself to a critique of principle without any real evidence.

216. The Court of Arbitration therefore considers that Level II expenditures are sufficiently documented and should be included in the loss incurred.

217. Accordingly, the Respondent must pay the Applicant the sum of USD 597,847,994 in compensation for the loss of profit resulting from the operating loss for the Disputed Contracts and USD 19,552,884 for the expenses incurred by the Applicant in the context of the Disputed Contracts.

## E. COSTS OF ARBITRATION

218. The Applicant considers that the Respondent should be ordered to pay the full costs and expenses of the Arbitration amounting to US $ 2,043,972.21 plus interest at the calculated rate of return on 20 year Treasury bonds plus 2% from the date of the award until the full payment date.[175] The Respondent, for its part, relies on the wisdom of the Court of Arbitration stating that it "*can only bear the costs for which it is actually accountable*."[176]

219. In accordance with Procedural Order No. 5 of 2 July 2018, the Parties submitted their quantified claims for the reimbursement of the costs incurred in their defence and the supporting documentation of these costs.

220. The Court of Arbitration will determine below the rules applicable to the issue of the costs of the arbitration (1) before deciding to which Party the payment is due or in what proportion it is shared between them (2).

### 1. The rules applicable to the costs of the arbitration

221. In accordance with Rule 37.4 of the Regulations,

*The final award of the Court of Arbitration shall settle the costs of the arbitration and decide to which part the payment is due or in what proportion it is shared between them.*

222. According to section 37.1 of the Regulations,

[174] Terms of Reference, 29 August 2017, para. 74
[175] Comment Note on Refund of Fees and Cost of Arbitration, 31 August 2018, page 10.

[176] Response to the Supplementary Brief, 12 June 2018, para 58.

*The costs of the arbitration include the fees and expenses of the arbitrators and the administrative costs of the ICC determined by the Court, in accordance with the calculation tables in force at the time of the commencement of the arbitration, the fees and expenses of the Experts appointed by the Court of Arbitration and the reasonable awards made by the Parties for their defence in the course of the arbitration.*

223. Article 37.5 of the Regulations further specifies that:

*When ruling on costs, the Court of Arbitration may take into account the circumstances that it considers relevant including the extent to which each party has conducted the arbitration expeditiously and effectively in terms of costs.*

224. It follows from the above-mentioned provisions of Articles 37.4 and 37.5 of the Regulations that the Court of Arbitration has a wide margin of assessment as to the apportionment of the expenses of the arbitration.

225. This margin of assessment is not governed by any mandatory legislative provision of the place of arbitration that the Court of Arbitration is required to apply, or by any contractual stipulation that would modify or derogate from the aforementioned provisions of the Regulations.

226. In exercising its discretion, the Court of Arbitration may take into account, in particular, two generally accepted approaches in this respect, one allocating costs according to how each Party prevailed upon it in its claims, the other considering that each Party should bear the burden of its own costs. In addition, the Court of Arbitration may have a different approach to the costs set by the Court, on the one hand, and for defence costs, on the other. In fact, while the former are determined by the Court regardless of the Parties according to the table of calculation, the latter depend on the plea they submit for their defence, and only those which are reasonable are covered by 37.1 of the Regulations as being eligible for recovery. That distinction may, moreover, be compared, in French proceedings of the place of arbitration, with the difference between costs, on the one hand, and irrecoverable costs, on the other.

**2 The distribution of the costs of the arbitration**

227. The Court of Arbitration shall successively consider the costs fixed by the Court (a) and the reasonable costs incurred by the Parties in their defence in the arbitration.

*(a) Costs set by the Court.*

228. By agreeing to comply with the ICC Arbitration Rules in the Disputed Contracts, the Parties have agreed to bear the risk of the Court's provision for arbitration costs, i.e. the fees and expenses of the Court of Arbitration as well as the administrative costs of the ICC that can be estimated on the basis of the total amount of the applications and the calculation table applicable at the time of the commencement of the Arbitration. The Court of Arbitration therefore considers that the costs fixed by the Court should be apportioned according to the manner prevailed upon by each party in its claims.

229. In this case, the arbitration provision was calculated on the basis of a disputed amount of USD 617,400,878[177] and its amount was set by the Court at USD 760,000 which was paid in full by the Applicant.[178]

230. The Court of Arbitration holds that the Applicant has prevailed in all its claims, including the amount of the damages sought on the basis of which the provision for arbitration was calculated, even though its initial claims were at a much higher level of 5 billion US dollars, so the decrease in claims did not affect the calculation of the provision.

231. The fees and expenses of the members of the Court of Arbitration and the administrative expenses of the ICC were fixed by the Court at its session of 25 October 2018 at the sum of 691,437 EUR.[179]

232. As these costs were borne in full by the Applicant, the Respondent must reimburse the Applicant the amount of USD 760,000 which it has advanced.

*(b) The costs incurred by the Parties in their defence*

233. In its Observation Note on costs sent to the Court of Arbitration on 31 August 2018, the Applicant submits fees for a total amount of USD **2,043,972.21**, broken down as follows:

| | | |
|---|---|---|
| (a) | provision for arbitration costs | $ 760,000.00 |
| (b) | room booking fees | $ 5,238.68 |
| (c) | interpreting fees | $ 9,911.96 |
| (d) | legal counsel fees | $ 648,272.71 |
| (e) | technical advisory fees | $ 620,548.86 |

234. The Respondent's letter of 15 September 2018 shows fees for a total amount of USD **160,500** broken down as follows:

| | |
|---|---|
| (a) lawyers' fees | 150,000 USD |
| (b) travel and living expenses (Conference No. l) | 7.500 USD |
| (c) entertainment and subsistence costs (Hearing) | 3.000 USD |

235. The Court of Arbitration will consider whether the categories of costs for which reimbursement is claimed are recoverable before determining those that may be considered reasonable and allocate them among the Parties.

236. *The costs that can be claimed*. In addition to the costs fixed by the Court, i.e. the fees and expenses of the arbitrators and the administrative costs of the ICC, pursuant to Article 37 of the Rules, the Parties are obliged to claim under the Rules any reasonable costs incurred in their defence "*on the occasion of the arbitration*". It is generally considered that the costs incurred by the parties in their

---

[177] The financial table of 16 July 2018 shows that the arbitrage provision has been revalued on the basis of a disputed amount of USD 617,400,878. The fact that the claim was initially quantified at USD 5 billion and then at USD 2 billion before being reduced to USD 617,400,878 after the disclosure by the Plaintiff of the Charlton Report, therefore had no impact on the amount of the provision.
[178] Financial Table of 14 September 2018.
[179] Financial Table of 29 October 2018.

defence include counsel's costs and outgoings of the parties and their counsel for hearings and meetings, the cost of experts hired by the parties, witnesses, translators and interpreters, including their travel and subsistence expenses for hearings or meetings with counsel. In addition, the costs of arbitration also cover the costs incurred for the organisation of the hearing, including stenotyping and room booking fees for the hearing and related services.

237. The Court of Arbitration notes that the costs submitted by the Parties fall within the above-mentioned cost categories and may be considered recoverable.

238. The Court of Arbitration notes, however, that the Applicant's legal fees include, among others, the fees of two specialised oil law and oil industry advisors in Africa, Stacey Kivel and Ian Levit, for respective amounts of USD 189,486,71 and USD 19,129.09.[180]

239. Mrs Stacey Kivel, the Applicant's usual counsel, was present at the hearing, and her services are the subject of three invoices for respective amounts of 59,336.71 USD, 85,825.00 USD and 44,325.00 USD.[181] However, the first two invoices have been taken into account by the Deloitte Report as Level II expenditure which the Court of Arbitration has included in the calculation of the loss incurred. The Applicant therefore has no grounds to request the reimbursement of these two invoices for the costs of the arbitration and, consequently, only the sum of 44,325.00 USD will be taken into account.

240. Mr Ian Levit did not appear in the procedure and the Applicant gives his address as address of service. [182]The Court of Arbitration notes that invoices from this counsel between 28 April 2017 and 28 February 2018 are included in Level II expenses for a total amount of $ 19,242 and that the 28 March 2018 invoice for an amount equivalent to 19,129,09 USD is a pro forma invoice for "*work done - legal advice ICC Arbitration Divine Inspiration Group (Pty) Ltd. vs the Democratic Republic of Congo with (ref. 22370 / DDA) - monthly retainer*." The Court of Arbitration considers that this pro forma invoice is not accompanied by any information enabling it to assess the merits of the payments made, so that this amount will not be retained.

241. As a result, legal fees that can be recovered are reduced to USD 483,981.91 (USD 648,272.71 - USD 164,290.80).

242. In addition, the Respondent opposes the reimbursement of the costs of an expert report that was not ordered by the Court of Arbitration.[183] These costs amount to $ 570,000 in respect of Deloitte, plus the costs of various technical consultants.

243. The Court of Arbitration notes that Rule 25 of the Regulations, called " *Investigation of the Case*", provides the Court of Arbitration with two non-exclusive possibilities which may lead it to decide (i) to hear experts appointed by parties in their presence or those duly convened[184] and / or (ii) after consulting the parties, to appoint one or more experts, giving the parties, where appropriate, the opportunity to question the expert at the hearing.[185] In this case, Mr Charbon was heard at the hearing on the Deloitte Report which provided the Court of Arbitration with serious and useful analysis that did not make it necessary to use an expert appointed by the Court of Arbitration. It would thus seem unfair to leave the Respondent to bear this expense on the sole ground that it was not ordered by the Court of Arbitration. It should be pointed out that, as formulated in the Terms of Reference, the requests referred to the appointment of an expert by the Court of Arbitration for the purpose of

---

[180] Cost Observation Note, 31 August 2018, para. 10.
[181] Cost Observation Note, 31 August 2018, Annexes No. 9, 10 and 11.
[182] Certificates of registration of the company DIGOil, **Exhibit DM-I.**
[183] Response to the Supplementary Brief, 12 June 2018, para. 57.
[184] ICC Arbitration Rule 23.3
[185] ICC Arbitration Rule 23.4

assessing the Applicant's loss.[186] The use of an expert hired by the Applicant, whose request was set out in the Terms of Reference of 30 December 2017, has led to efficiency gains since the procedure was able to make progress by avoiding splitting it into two phases and by keeping the hearing on the date originally set.

244. The Court of Arbitration therefore considers that the expert's fees are recoverable by the Applicant in view of the seriousness of the Deloitte Report and its usefulness in determining the dispute, which are not disputed.

245. Technical consulting fees also include:

(i) an invoice from Ackermann Exploration on 18 December 2017 for an amount of GBP 2,500 or USD 3,329.[187] However, this invoice was taken into account by the Deloitte Report for Level I expenses for the paid portion of GBP 793.83 and for Level II expenses for the balance of USD 2,286. Since the Court of Arbitration has included the expenses of Part II in its assessment of the loss suffered, the Applicant is therefore not entitled to seek reimbursement for the costs of the arbitration. As a result, this invoice will not be taken into account here.

(ii) A bill from London Security Group of 13 March, 2018[188] for the amount of GBP 5,000, or USD 6,418.79. This bill was taken into account by the Deloitte Report as Level I expenditure for the paid portion of GBP 1,250 and level II expenditure for the balance of USD 5,246. Since the Court of Arbitration has included the Level II expenses in the calculation of the loss suffered, the Applicant therefore has no grounds to seek reimbursement for the costs of the arbitration. As a result, this invoice will not be taken into account here.

246. The technical advisory fee is therefore $ 610,801.07 ($ 620,548.86 - $ 9747.79);

247. The total costs that may be recovered by the Applicant in respect of the costs incurred in its defence on the occasion of the arbitration amount to $ 1,109,933.62.

248. *The reasonableness of the costs*. There is a great disparity between the cost categories claimed by the Parties and a large difference in their amount. This disparity, however, reflects their respective behaviour in the conduct of the arbitration, and the high costs incurred by the Applicant compared to those of the Respondent can be explained, in particular, by the fact that the latter had to bear the entire costs of the arbitration provision and having an expert establish a report, the seriousness of which has been acknowledged by the Respondent itself.

249. The costs thus borne by the Applicant do not appear disproportionate to the provision for arbitration costs and the disputed amount, and the Court of Arbitration considers that they are reasonable, as are the fees of counsel and outgoings advanced by the Respondent.

250. *The distribution of costs incurred by the Parties in their defence*. The Court of Arbitration considers that all the costs incurred by the Applicant in its defence that the Court of Arbitration considered recoverable and reasonable must be borne by the Respondent.

251. It should be noted that the Applicant did everything possible to avoid resorting to the arbitration procedure which alone allowed it to assert its rights. From the beginning of the dispute with the Respondent, it adopted an approach seeking amicable resolution of the dispute and made an economically advantageous proposal for the Respondent in that, through a mechanism for offsetting

[186] Terms of reference, 29 August 2017, para. 50.
[187] Cost Observation Note, 31 August 2018, Annex No. 29.

[188] Cost Observation Note, 31 August 2018, Annex No. 30.

in kind, it avoided burdening the state budget with large sums. The Applicant has maintained this process of amicable resolution of the dispute for six years during which the Respondent has only partially implemented the mechanism for offsetting in kind, relying, successively, on the introduction of the 2015 Law and then its implementing decrees, and finally the fact that the issuing of the Presidential Order of Approval of the 2007 Contract could still occur and was imminent. These circumstances appear relevant to the Court of Arbitration for its decision on the allocation of costs incurred by the Parties in their defence.

252. It would thus appear unfair for the Applicant to bear the reasonable costs it has incurred in its defence and which will therefore be borne by the Respondent, which, on the other hand, must cover its own defence costs.

253. As a result, the Respondent is ordered to pay the plaintiff the amounts of USD 760,000 and USD 1,109,933.62, for a total of USD 1,869,933.62.

## F. INTEREST

254. The Applicant asks the Court of Arbitration to award any interest penalty calculated on the rate of return on 20-year US Treasury bonds, plus 2%, from the date of the award to full payment of the sums owed by the Respondent to the Applicant. It emphasises that a ruling accompanied by the payment of such interest for late payment is part of the full compensation for its loss and cannot be prejudicial to the Respondent, which will not be liable for any of them if it executes the sentence promptly, so late interest is not a penalty but is only intended to maintain the value of money as time goes by.[189]

255. The Respondent considers that it "*cannot pay late interest that was not provided for*" in the disputed Contracts.[190]

256. The Court of Arbitration notes that the Respondent does not claim that such interest for late payment was prohibited under Congolese law. In addition, the demand for late payment interest does not relate to contractual late payments but to the amount of compensation assessed by the Court of Arbitration and aims to preserve the value of money over time. It is therefore compensatory in nature and participates in the full reparation of damages, the principle of which is well established in Congolese law.

257. The Court of Arbitration thus holds that, as made by the Applicant, the claim for payment of arrears is an ancillary measure to compensation for damages. Indeed, as was discussed at the hearing, the Court of Arbitration notes that the minutes of the meeting from December 9 to 17, 2018 indicate an interest on the HQSE of 30%[191] over two years, which corresponds to a rate of 15% a year. In addition, the rate of return on 20-year US Treasury bonds requested is a risk-free rate[192] much lower and consistent with the US dollar, which is the expected deviation from the disputed Contracts and that of the awards handed down. The increase of two points also makes it possible to get closer to rates applied in South Africa and to a lesser extent in the Democratic Republic of Congo. This rate plus two points has been taken into account by the Expert for the estimate at 31 December 2017 of the

[189] Response to the Supplementary Brief, 12 June 2018, paras. 280 to 282.
[190] Response to the Supplementary Brief, 12 June 2018, para. 57.
[191] Report of the Democratic Republic of Congo (Ministry of Hydrocarbons) on work on the compensation to be paid by the Congolese State in favour of Divine Inspiration Group from 9 to 17 December 2010, conclusions, page 3, second paragraph **DM-XXII.**
[192] At 31 December 2017, this rate stood at 2.6%. Report by Anthony Charlton (Deloitte), 30 March 2018, Annex 11, paras 1.19 to 1.21, **Exhibit DM-LV.**

net value of the expenses incurred and has not been criticised as such by the Respondent. It can thus be adopted by the Court of Arbitration.

258. The late interest is therefore due by the Respondent at the rate requested. It will commence from the date of the Final Award and will remain due until full payment.

259. As a result, the Court of Arbitration decides that the pecuniary decisions made in the context of this Final Award will be increased by the interest calculated on the rate of return on 20-year US Treasury bonds, plus 2% from the date of the Final award and until full payment.

## VIII. RECITAL

260. For the reasons set out above, the Court of Arbitration:

(a) ACKNOWLEDGES the Respondent's withdrawal of its plea of inadmissibility based on the Divine Inspiration Group's (PTY) standing to bring proceedings and the withdrawal of its counterclaim;

(b) HOLDS that the Democratic Republic of Congo has committed a breach in not delivering to the Divine Inspiration Group (PTY) Ltd., the Presidential Order of Approval (i) of the Production Sharing Contract concluded between the Democratic Republic of Congo, on the one hand, and the Divine Inspiration Group (PTY) Ltd., and on the other la Congolaise des Hydrocarbures, Blocks 8, 23 and 24 of the Central Basin of 14 December 2007 and (ii) of the Production Sharing Contract concluded between the Democratic Republic Congo, on the one hand, and, on the other hand The Consortium Divine Inspiration Group (PTY) Ltd. Petro SA, H-Oil Congo Limited, la Congolaise des Hydrocarbures, Congo Petroleum and Gas BVBA, Sud Oil BVBA, Block 1 of the Albertine Graben, 21 January 2008;

(c) HOLDS that the Democratic Republic of the Congo has committed a breach in seeking unilateral termination of the Production Sharing Agreement concluded between the Democratic Republic of Congo, on the one hand, and on the other the Consortium Divine Inspiration Group (PTY) Ltd. Petro SA, H-Oil Congo Limited, la Congolaise des Hydrocarbures, Congo Petroleum and Gas BVBA, Sud Oil BVBA, Block 1 of the Albertine Graben, 21 January 2008;

(d) ORDERS the termination at the exclusive cost of the Democratic Republic of Congo (i) of the Production Sharing Agreement concluded between the Democratic Republic of Congo, on the one hand, and the Divine Inspiration Group Association (PTY), on the other hand Ltd. and la Congolaise des Hydrocarbures, for Blocks 8, 23 and 24 of the Central Basin of 14 December 2007 and (ii) the Production Sharing Contract concluded between the Democratic Republic of Congo, on the one hand, and, on the other hand, the Consortium Divine Inspiration Group (PTY) Ltd. Petro SA, H-Oil Congo Limited, la Congolaise des Hydrocarbures, Congo Petroleum and Gas BVBA, Sud Oil BVBA, Block 1 of the Albertine Graben, 21 January 2008;

(e) HOLDS that the Democratic Republic of Congo must fully compensate Divine Inspiration Group (PTY) Ltd. for all damages suffered as a result of the non-performance and termination of the aforementioned contract of 14 December 2007 and of 21 January 2008;

(f) HOLDS that the Democratic Republic of Congo must pay to Divine Inspiration Group (PTY) Ltd. the sum of USD 617,400,178 plus interest calculated at the rate of return on 20-year US Treasury bonds plus 2% from the date of the final award until full payment;

(g) HOLDS that the Democratic Republic of Congo shall bear the full costs of the Arbitration fixed by the Court at the sum of EUR 691,437, and the costs incurred by the Applicant in its defence for the amount of USD 1,109,933.62.;

(h) HOLDS that the Democratic Republic of Congo must pay to Divine Inspiration Group (PTY) Ltd. amounts of USD 760,000 and USD 1,109,933.62 plus interest calculated at the rate of return on 20-year US Treasury bonds plus 2% from the date of the final award until full payment;

(i) REJECTS all other requests from the Parties

Issued in 10 copies

Place of Arbitration: Paris, France

7 November 2018

Professor Grégoire Balcandeja wa Mpungu
Co-arbitrator
Signature

Mrs Ghizlane El Idrissi
Co-arbitrator
Signature

Christine Lécuyer-Thieffry
President of the Court of Arbitration
Signature



HL TRaD
Legal & Financial Translation

TRANSLATION AND INTERPRETING
FOR LEGAL AND FINANCIAL PROFESSIONALS

# CERTIFICATE OF TRANSLATION

I hereby certify that I, Paul Morris, LLB Law/French Hons, am a professional translator to HL TRAD of 20 Little Britain, London EC1A 7DH, a legal and financial translation agency. I hereby declare that I, Paul Morris am fully conversant with the French and the English translation languages and that the attached document in English:

- 22370 DDA Copie de courtoisie de la sentence finale_EN_FINAL

is to the best of my knowledge and belief, a true and faithful rendering of the original French document and is translated to the best of my ability as a professional translator.

Executed on………………23/11/2018………… in……Brighton…………………………..

[ [signature] ]

**London I** 20 Little Britain – London EC1A 7DH **I +44 (0)207 629 72 58**
**Paris I** 38, rue de Berri, 75008 Paris, France **I +33 (0)1 30 09 41 90**
**Brussels I** Avenue Louise, 65 – 1050 Brüssel **I +32 (0)2 536 86 14**
**Geneva I** Avenue Industrielle 4 – 6, 1227 Genf **I +41 (0)22 342 38 87**
**Amsterdam I** Strawinskylaan 3051 – 1077 ZX Amsterdam **I +31 (0)20 301 2207**
**Milan I** Via G. Mengoni, 4 – 20121 Mailand **I + 39 (0)2 303 15 323**
**Frankfurt I** Herriotstraße 1 – 60528 Frankfurt/Main **I +49 (0)69 6773 3220**
**www.hltrad.com - london@hltrad.com**

**COUR INTERNATIONALE D'ARBITRAGE DE LA CCI**

**AFFAIRE No. 22370/DDA**

DIVINE INSPIRATION GROUP (PTY)

(Afrique du Sud)

**c/**

LA REPUBLIQUE DEMOCRATIQUE DU CONGO

(Rép. Dém. du Congo)

Ce document est une copie certifiée conforme à l'original de la Sentence Finale rendue conformément au Règlement d'arbitrage de la Cour internationale d'arbitrage de la CCI.



CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

Chambre de Commerce Internationale
Cour internationale d'arbitrage

**ARBITRAGE N° 22370/DDA**

---

**DIVINE INSPIRATION GROUP (PTY) (Afrique du Sud)**

Demanderesse

c/

**LA REPUBLIQUE DEMOCRATIQUE DU CONGO (Rép. Dém. Du Congo)**

Défenderesse

---

**SENTENCE FINALE**

---

COPIE CERTIFIÉE CONFORME A L'ORIGINAL
PARIS, le 24 avril 2020
Alexander G. FESSAS
Secrétaire Général
Cour Internationale d'arbitrage de la CCI

ICC ARB. N° 22370/DDA
*SENTENCE FINALE*

2

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

## TABLE DES MATIERES

**I. LES PARTIES** ..... 5
- A. La Demanderesse ..... 5
- B. La Defenderesse ..... 6

**II. LE TRIBUNAL ARBITRAL** ..... 7

**III. LA CONVENTION D'ARBITRAGE ET LE DROIT APPLICABLE** ..... 7
- A. Le Contexte du Litige et la Convention d'Arbitrage ..... 7
- B. Le Droit Applicable ..... 9

**IV. HISTORIQUE DE LA PROCEDURE** ..... 9
- A. L'Introduction de l'Arbitrage ..... 9
- B. La Constitution du Tribunal Arbitral ..... 10
- C. La Signature de l'Acte de Mission ..... 11
- D. La Conference sur la Gestion de la Procedure et le Calendrier de la Procedure ..... 12
- E. L'Application de l'Article 36(6) du Reglement ..... 12
- F. Les Modifications du Calendrier de la Procedure ..... 14
- G. Les Memoires des Parties ..... 15
- H. L'Audience et la Cloture des Debats ..... 16
- I. Le Delai pour Rendre la Sentence ..... 18

**V. RESUME DES FAITS DU LITIGE** ..... 19
- A. Le Contrat de 2007 et le Contrat de 2008 ..... 19
- B. La Reattribution du Contrat de 2008 ..... 20
- C. La Proposition de Solution Amiable de la Defenderesse ..... 21
- D. L'Execution du Contrat de 2007 ..... 22

**VI. LES POSITIONS ET LES DEMANDES RESPECTIVES DES PARTIES** ..... 25
- A. Les Positions des Parties ..... 25
- B. Les Demandes des Parties ..... 27

**VII. ANALYSE DU TRIBUNAL** ..... 30
- A. Les Questions Preliminaires ..... 31
  - **1. La compétence *ratione personae* du Tribunal arbitral et la capacité à agir de la Demanderesse** ..... 31
  - **2. Le droit applicable** ..... 32
- B. Les Consequences de la Non-delivrance de l'Ordonnance Presdentielle ..... 34
  - **1. La portée et la nature de l'ordonnance présidentielle** ..... 35
  - **2. Les conditions de la délivrance de l'ordonnance présidentielle** ..... 38
- C. L'Execution Des Contrats Litigieux ..... 42
  - **1. Les droits issus des Contrats Litigieux** ..... 42
  - **2. Le Contrat de 2008** ..... 44
  - **3. Le Contrat de 2007** ..... 52
- D. Les Consequences des Inexecutions ..... 55
  - **1. La résiliation des Contrats litigieux avec dommages et intérêts** ..... 55
  - **2. L'évaluatiosn des dommages et intérêts** ..... 57

ICC ARB. N° 22370/DDA
*SENTENCE FINALE*

E. LES COUTS DE L'ARBITRAGE .......... 69
1. **Les règles applicables aux frais de l'arbitrage** .......... **70**
2 **La répartition des frais de l'arbitrage** .......... **71**
F. LES INTERETS .......... 76

**VIII. DISPOSITIF** .......... **78**

4

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

1. Cette sentence finale (la « ***Sentence finale*** ») est rendue conformément au règlement d'arbitrage de la Chambre de Commerce Internationale (la « ***CCI*** ») en vigueur au 1er janvier 2012 (le « ***Règlement*** ») dans l'affaire No. 22370/DDA (l'« ***Arbitrage*** »).

# I. LES PARTIES

## A. LA DEMANDERESSE

2. La demanderesse à l'Arbitrage est la société DIVINE INSPIRATION GROUP (PTY) (la « ***Demanderesse*** » ou « ***DIGOIL*** »), créée et organisée selon le droit de l'Afrique du Sud, dont le siège social est situé :

c/o Ian Levitt Attorneys
19th Floor
Sandton City Office Tower
2196 Sandton City, Gauteng
Afrique du Sud

3. Elle est représentée par ses conseils :

Maître Bernard Remiche
Maître Vincent Cassiers
SYBARIUS
Chaussée de Waterloo 880
B-1000 Bruxelles
Belgique
Téléphone : +32 2 379 00 50
Télécopie : +32 2 375 82 56
Courriel : b.remiche@sybarius.net
v.cassiers@sybarius.net

4. Se sont joints à la représentation de la Demanderesse à compter du 13 juin 2018:

Monsieur John Evans
Madame Steffi Spitznagel
Madame Maria Dogaru
Kerman & Co LLP
200 Strand
London
WC2R 1DJ
United Kingdom
Téléphone: +44 20 7539 7272
Courriel: john.evans@kermanco.com
Steffi.Spitznagel@kermanco.com
Maria.Dogaru@kermanco.com

Madame Stacey Kivel
Attorney at law
Courriel : Stacey.kivel@gmail.com

### B. La Défenderesse

5. La défenderesse est la REPUBLIQUE DEMOCRATIQUE DU CONGO (la « ***Défenderesse*** » ou la « ***RDC*** ») prise en la personne de Monsieur le Ministre de la Justice, Garde des Sceaux et des Droits Humains, Monsieur Alexis Thambwe-Mwamba :

Palais de justice, 3ème niveau,
Place de l'Indépendance
Gombe, Kinshasa
République Démocratique du Congo
Téléphone: + 243 99 99 43 284
Courriel: cabkalengaka@yahoo.fr
avec copie à: minjustdh@gmail.com
otshinga1976@gmail.com

6. Elle est représentée par :

Maître André Kalenga-ka-Ngoyi
Directeur de Cabinet Adjoint du Ministre de la Justice, Garde des Sceaux et des Droits Humains
Maître Valence Bolebe Ekosso' Gombe
Conseiller Chargé du Contentieux National & International
Palais de justice, 3ème niveau,
Place de l'indépendance
Gombe, Kinshasa
République Démocratique du Congo

et par ses conseils :

Maître Michel Pombia-Wa-Ngoloko
91 rue Faubourg Saint-Denis
75010 Paris
Toque D 2069
FRANCE
Courriel : michelpombia@hotmail.fr

Maître Joseph Nzau Matuta
3835 Avenue de la Douane
Gombe, Kinshasa
REP. DEM. DU CONGO
Courriel : nzau2009@yahoo.fr

7. Sont également concernés par cet Arbitrage :

Monsieur le Ministre des Hydrocarbures
Immeuble Cohydro, Niveau 2
1, avenue du Comité Urbain
Gombe, Kinshasa
République Démocratique du Congo

et

Monsieur le Ministre des Finances
Boulevard Tshatshi, en face de la Banque Centrale du Congo,
B.P. 7907 Gombe, Kinshasa
République Démocratique du Congo

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

8. La Demanderesse et la Défenderesse sont désignées ci-après séparément comme la « ***Partie*** » et ensemble comme les « ***Parties*** ».

## II. LE TRIBUNAL ARBITRAL

9. Le tribunal arbitral (le « ***Tribunal arbitral*** ») est compose de trois arbitres, Monsieur Grégoire Bakandeja Wa Mpungu, en qualité de coarbitre sur désignation de la Demanderesse, Madame Ghizlane El Idrissi, en qualité de coarbitre sur désignation de la Défenderesse, et Madame Christine Lécuyer-Thieffry, en qualité de présidente sur désignation conjointe des Parties.

10. Les coordonnées des arbitres sont les suivantes :

Madame Christine Lécuyer-Thieffry
66, rue de Monceau,
75008 Paris, France,
Téléphone : +33 9 72 50 43 25
Courriel : christine.lecuyer-thieffry@thieffry.com

Monsieur le Professeur Grégoire Bakandeja Wa Mpungu
PR GREGOIRE BAKANDEJA & VINCENT DE PAUL ALUMBA Associés
12, avenue Tabu Ley (ex-Tombalbaye),
Immeuble Wassim, 2ème étage, Appartement 2
(Référence : Croisement des avenues Kasaï et Tabu Ley)
Commune de la Gombe
Kinshasa, Congo
Téléphone : +243 815 093 816
Télécopie : +243 815 093 816
Courriel : gbakandeja2002@yahoo.fr

Madame Ghizlane El Idrissi
EL IDRISSI
Walili Street
42, Boulevard Abdelmoumen
7ème étage n° 52
Casablanca
Maroc
Tél. : +212 6 38 85 68 03
+33 6 21 24 31 02
Courriel : ghizlane.elidrissi@juridiscom.fr

## III. LA CONVENTION D'ARBITRAGE ET LE DROIT APPLICABLE

### A. Le Contexte du Litige et la Convention d'Arbitrage

11. Le litige se rapporte à deux contrats de partage de production de ressources en hydrocarbures que la Défenderesse a conclu, le premier, le 14 décembre 2007, avec l'association formée

entre la Demanderesse et la Congolaise des Hydrocarbures (« ***COHYDRO*** »), ensemble désignées dans ledit contrat comme le « Contractant » (le « ***Contrat de 2007*** »)[1] et, le second, en janvier 2008 avec l'association constituée du consortium entre la Demanderesse et Petro SA et H-Oil Congo Limited, COHYDRO, Congo Petroleum and Gas Sprl et Sud Oil Sprl ensemble également désignées dans ce second contrat comme le « Contractant » (le « ***Contrat de 2008*** »).[2] Le Contrat de 2007 et le Contrat de 2008 sont également visés ci-après comme les « ***Contrats litigieux*** ».

12. La convention d'arbitrage (la « ***Convention d'arbitrage*** ») est contenue à l'article 30 « *Arbitrage* » de chacun des Contrats litigieux qui, en des termes identiques, prévoit :

> *30.1 Tous les différends découlant du Contrat, à l'exception de ceux visés aux paragraphes 30.5 et 30.6 ci-dessous, qui surgiront entre « La RDC » d'une part, et les entités du « Contractant » d'autre part, qui ne pourront pas être résolus à l'amiable, seront tranchés définitivement par arbitrage conformément aux Règlements d'Arbitrage de la Chambre de Commerce Internationale de Paris.*
>
> *30.2 « La RDC » d'une part et le « Contractant » d'autre part nommeront un arbitre et s'efforceront de se mettre d'accord sur la désignation d'un tiers arbitre qui sera le président du tribunal. A défaut de désignation d'un arbitre ou d'un accord sur le tiers arbitre, les dispositions de la Chambre de Commerce Internationale de Paris s'appliqueront.*
>
> *30.3 L'arbitrage aura lieu à Paris, en France, ou en tout autre endroit décidé par le « Contractant » et « La RDC ». La procédure se découlera en langue française. L'interprétation de ce Contrat par l'arbitre doit correspondre aux us et coutumes acceptés en général dans l'industrie pétrolière internationale.*
>
> *30.4 « La RDC » renonce irrévocablement par les présentes à se prévaloir de toute immunité lors de la procédure relative à l'exécution de toute sentence arbitrale rendue par un Tribunal Arbitral constitué conformément au présent Article 27* (sic), *y compris sans limitation toute immunité concernant les significations, toute immunité de juridiction et toute immunité d'exécution quant à ses biens, sauf les biens d'ordre public de la République Démocratique du Congo.*
>
> *30.5 Si « La RDC » et une des entités du « Contractant » sont en désaccord sur la détermination du prix des Hydrocarbures Liquides dans le cadre de l'Article 16, « La RDC » ou ladite entité pourra demander au Président de l'Institute of Petroleum à Londres, Grande Bretagne, de désigner un Expert international*

---

[1] Contrat de Partage de Production entre la République Démocratique du Congo et l'Association Divine Inspiration Group (PTY) Ltd et la Congolaise des Hydrocarbures, Blocs 8, 23 et 24 de la cuvette centrale, Décembre 2007, ci-après le « Contrat de 2007 », **Pièce DM-VIII**.

[2] Contrat de Partage de Production entre la République Démocratique du Congo et l'Association Consortium Divine Inspiration Group (PTY) Ltd et Petro SA, H-Oil Congo Limited, la Congolaise des Hydrocarbures, Congo Petroleum and Gas SPRL, Sud Oil SPRL, Bloc 1 Graben Albertine, janvier 2008, ci-après le « Contrat de 2008 », **Pièce DM-IX**.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

*qualifié, à qui le différend sera soumis. Si le Président de l'Institute of Petroleum ne désigne pas d'Expert qualifié, chacune des parties au différend pourra demander au Centre International d'Expertise de la Chambre de Commerce Internationale de Paris de procéder à cette désignation. « La RDC » et ladite entité fourniront à celui-ci toutes les informations qu'ils jugeront nécessaires ou que l'expert pourra raisonnablement demander.*

*30.6 Dans les trente (30) jours de la date de sa désignation, l'expert communiquera à « La RDC » et à ladite Partie le prix qui à son avis, doit être utilisé en application de l'Article 14. Ce prix liera les parties et sera réputé avoir été arrêté d'un commun accord entre celles-ci. Les frais et honoraires de l'Institute of Petroleum à Londres ou de la Chambre de Commerce Internationale de Paris, ainsi que les experts seront partagés également entre « La RDC » et ladite entité. L'Expert ne sera pas un arbitre, et l'arbitrage ne sera pas applicable en pareil cas.*

### B. Le Droit Applicable

13. Conformément à l'article 21(1) du Règlement, le Tribunal arbitral appliquera les règles de droit choisies par les Parties, notamment, à l'article 27 de chacun des Contrats litigieux qui, en des termes identiques, stipule :

> *L'interprétation et l'exécution de ce Contrat seront soumises au droit de la République Démocratique du Congo.*

14. Par ailleurs, l'article 30.3 des Contrats litigieux prévoit notamment que :

> *L'interprétation de ce Contrat par l'arbitre doit correspondre aux us et coutumes acceptés en général dans l'industrie pétrolière internationale.*

15. Enfin, en application de l'article 21(2) du Règlement, le Tribunal arbitral « [tiendra] *compte des dispositions du contrat entre les parties, le cas échéant, et de tous les usages du commerce pertinents* ».

## IV. HISTORIQUE DE LA PROCEDURE

### A. L'Introduction de l'Arbitrage

16. Le 31 octobre 2016, la Demanderesse a déposé au Secrétariat une demande d'arbitrage en date du 19 octobre 2016 (la « ***Demande*** ») et quarante-deux pièces numérotées de DM-I à DM-XLII, selon le bordereau joint, dont le Secrétariat a accusé réception le 2 novembre 2016.

17. Le 16 novembre 2016, le Secrétariat a, d'une part, notifié la Demande à la Défenderesse qui, *inter alia*, a été invitée à soumettre sa réponse en désignant un coarbitre et, d'autre part, invité la Demanderesse à désigner un coarbitre conformément à l'article 12.4 du Règlement.

18. Le 22 novembre 2016, la Demanderesse a désigné le Professeur Grégoire Bakandeja wa Mpungu comme arbitre.

19. Le 25 novembre 2016, le Secrétaire Général de la Cour (le « ***Secrétaire général*** ») a fixé le montant de l'avance sur la provision pour frais d'arbitrage conformément à l'article 36(1) et à l'article 1(2) de l'appendice III du Règlement et, le 16 décembre 2016, la Demanderesse a sollicité une prolongation du délai pour le paiement de cette avance jusqu'à fin janvier 2017.

20. Par lettre du 2 décembre 2016, reçue par le Secrétariat le 4 janvier 2017, la Défenderesse a indiqué que le Ministre de la Justice et des Droits Humains est seul habilité à représenter l'Etat congolais en justice et devait être associé intimement à la procédure d'établissement et de signature de l'Acte de mission, se réservant le droit de procéder à la désignation d'un arbitre de son choix.

21. Par courrier du 27 décembre 2016, la Défenderesse a sollicité la prorogation jusqu'au 31 janvier 2017 du délai pour déposer sa réponse et, le 7 janvier 2017, elle a indiqué qu'elle était représentée par Maître Michel Pombia et Maître Joseph Nzau Matuta, ce dont le Secrétariat a accusé réception le 13 janvier 2017.

22. Suite à l'accord des Parties, le Secrétariat a prolongé jusqu'au 31 janvier 2017 le délai accordé à la Défenderesse pour soumettre sa réponse (la « ***Réponse*** ») dont il a accusé réception de la version numérique le 1er février 2017 et de la version papier le 10 février 2017.

### B. La Constitution du Tribunal Arbitral

23. Le 1er février 2017, la Défenderesse a objecté à la désignation du Professeur Grégoire Bakandeja wa Mpungu comme arbitre de la Demanderesse en raison de sa nomination dans une autre affaire similaire encore pendante, de ses liens allégués avec la Demanderesse représentée par le même conseil et de la demande de récusation qu'elle a introduite à son encontre dans ladite affaire.

24. Le 7 février 2017 également, la Défenderesse a désigné comme coarbitre Monsieur Declerc Mavinga Ndangi dont la déclaration d'acceptation, de disponibilité, d'impartialité et d'indépendance et le *curriculum vitae* ont été transmis aux Parties par le Secrétariat le 2 mars 2017. Le 3 mars 2017, la Demanderesse a émis des doutes sur l'indépendance et l'impartialité de Monsieur Declerc Mavinga Ndangi en raison de ses liens avec des sociétés pétrolières actives en République Démocratique du Congo et concurrentes de la Demanderesse qui auraient dû être divulgués et, après plusieurs échanges entre les Parties, par lettre du 7 avril 2017, Monsieur Declerc Mavinga Ndangi a renoncé à sa désignation.

25. Le 25 avril 2017, dans le délai qui lui avait été imparti par le Secrétariat, la Défenderesse a désigné comme coarbitre Madame Ghizlane El Idrissi dont la déclaration d'acceptation, de

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

disponibilité, d'impartialité et d'indépendance et le curriculum vitae ont été transmis aux Parties par le Secrétariat le 5 mai 2017.

26. Le 24 mai 2017, en application de l'article 13(1) du Règlement, la Cour a (i) confirmé Monsieur Grégoire Bakandeja wa Mpungu en qualité de coarbitre sur désignation de la Demanderesse, (ii) confirmé Madame Ghizlane El Idrissi en qualité de coarbitre sur désignation de la Défenderesse, (iii) fixé le montant de la provision, et (iv) invité les Parties à désigner le président du Tribunal arbitral conformément à la Convention d'arbitrage.

27. Le 22 juin 2017, en l'absence d'objection des Parties suite aux divulgations contenues dans la déclaration d'acceptation, de disponibilité, d'impartialité et d'indépendance de Madame Christine Lécuyer-Thieffry, désignée conjointement par les Parties, le Secrétaire général l'a confirmée en qualité de président du Tribunal arbitral et en a informé la Cour conformément à l'article 13(2) du Règlement. Le même jour, le Secrétariat a transmis le dossier de cet Arbitrage au Tribunal arbitral conformément à l'article 16 du Règlement.

### C. La Signature de l'Acte de Mission

28. Les projets de l'Acte de mission et de l'ordonnance de procédure No.1 en vue de la conférence sur la gestion de la procédure prévue par l'article 24 du Règlement (la « ***Conférence No. 1*** ») ont été soumis aux Parties le 29 juin 2017.

29. Les Parties ont proposé des modifications à l'Acte de mission les 7 et 10 juillet 2017, et une deuxième version du projet de l'Acte de mission leur a été soumise le 12 juillet 2017. Suite à de nouvelles modifications au projet d'Acte de mission par la Défenderesse, une version finale a été adressée aux Parties le 18 juillet 2017.

30. Après échanges entre le Tribunal arbitral et les Parties, le 19 juillet 2017, la Conférence No. 1 a été fixée au 29 août 2017 en présence des représentants des Parties au Centre d'audience de la CCI à Paris, France.

31. Le 10 août 2017, la Cour a prolongé le délai pour établir l'Acte de mission jusqu'au 31 octobre 2017 conformément à l'article 23(2) du Règlement.

32. Le 31 juillet 2017, la présidente du Tribunal arbitral a accusé réception de sept exemplaires de l'acte de mission signés par Madame Andréa Brown, directrice générale de la Demanderesse, qui ont été transmis le 2 août 2017 au conseil de la Défenderesse à Kinshasa afin qu'il recueille la signature de la personne habilitée au nom de la Défenderesse et les transmette ensuite au coarbitre Monsieur Grégoire Bakandeja wa Mpungu pour sa signature.

33. Les sept exemplaires de l'Acte de mission signés par Maître Nzau Matuta pour la Défenderesse et par le Professeur Grégoire Bakandeja wa Mpungu, coarbitre, ont été déposés au Cabinet de la Présidente du Tribunal arbitral le 28 août 2017 et signé avant la Conférence No. 1 par les autres membres du Tribunal arbitral. Ils ont été transmis au Secrétariat pour être communiqués à la Cour conformément à l'article 23(2) du Règlement le 31 août 2017. Telles que formulées dans l'Acte de mission, les demandes chiffrées des Parties s'élevaient à 5 milliards d'USD pour la Demanderesse et à 50 millions d'USD pour la Défenderesse.

### D. La Conférence sur la Gestion de la Procédure et le Calendrier de la Procédure

34. La Conférence No. 1, dont l'objet avait été précisé dans la lettre du Tribunal arbitral du 29 juin 2017, a concerné (i) la remise aux Parties de l'exemplaire leur revenant de l'Acte de mission, (ii) l'organisation de la procédure et l'adoption des mesures procédurales complémentaires de celles du Règlement dans l'ordonnance de procédure No. 1 dont le projet avait été soumis aux Parties (ii) l'adoption du calendrier de la procédure (le « ***Calendrier de la procédure*** »), et (iv) toutes autres questions éventuelles des Parties.

35. Les mesures procédurales complémentaires de celles du Règlement et le Calendrier de la procédure, adoptés lors de la Conférence No. 1, ont été confirmés par l'Ordonnance de Procédure No. 1 du 31 août 2017 du Tribunal arbitral et transmis au Secrétariat par lettre du même jour.

### E. L'Application de l'Article 36(6) du Règlement

36. Le 4 décembre 2017, la Demanderesse a sollicité une prolongation jusqu'au 28 février 2018 du délai pour le dépôt de son Mémoire en Réplique fixé selon le Calendrier de la procédure au 30 décembre 2017 et un réaménagement dudit Calendrier, indiquant notamment qu'elle avait consulté un cabinet d'expertise aux fins d'obtenir un rapport technique et un rapport financier permettant d'établir le montant de son préjudice qui ne pourraient être finalisés que pour le 15 févier 2018 et soulignant que ces rapports permettraient (i) de réaliser un gain de temps appréciable sur l'ensemble de la procédure d'arbitrage, (ii) de fournir à la Défenderesse les éléments d'information qu'elle avait demandés et (iii) de mettre à la disposition de la Défenderesse tous les éléments et pièces requises au moment de préparer son mémoire en duplique.

37. Le 5 décembre 2017, la Défenderesse s'est opposée à cette demande la considérant comme manifestement dilatoire et tendant à faire retarder le délai imparti à la Demanderesse pour le

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

paiement de la provision d'arbitrage dont elle a à plusieurs reprises depuis le 22 juin 2017 sollicité le report avant d'effectuer un paiement partiel le 13 octobre 2017 et de demander le 19 octobre 2017 et le 1er Décembre 2017 un nouveau délai pour le paiement du solde. Elle a en outre émis des doutes sur la réalité de cette mission d'expert et demandé au Tribunal arbitral de saisir le Secrétaire général aux fins d'application de l'article 36(6) du Règlement.

38. Par lettre du 7 décembre 2017, conformément à l'article 36(6) du Règlement, le Secrétaire général a (i) accordé aux Parties un dernier délai pour le paiement du solde de la provision d'arbitrage faute de quoi les demandes seraient considérées comme retirées et (ii) invité le Tribunal arbitral à suspendre ses travaux.

39. Le 21 décembre 2017, conformément à l'article 36(6) du Règlement, la Demanderesse s'est opposée à la mesure prise par le Secrétaire général et faisant état, notamment, de ce qu'elle avait payé, le 19 décembre 2017, le solde de sa quote-part de la provision pour frais d'arbitrage, ce dont la Défenderesse a pris acte le même jour, et la Demanderesse a demandé que la Cour (i) tranche la question de savoir s'il y a lieu de considérer les demandes comme retirées et (ii) fixe des provisions séparées pour la demande principale et la demande reconventionnelle. Le même jour la Défenderesse a annoncé son intention de payer sa part de la provision.

40. Le 28 décembre 2017, le Secrétariat a pris acte de l'objection de la Demanderesse à l'application de l'article 36(6) du Règlement, noté que la Défenderesse avait sollicité un délai pour le paiement de la quote-part de la provision pour frais d'arbitrage lui incombant, soumis un tableau financier correspondant à la fixation de provisions distinctes et accusé réception du paiement par la Demanderesse du solde de sa quote-part de la provision pour frais d'arbitrage.

41. Le 4 janvier 2018, la Demanderesse a retiré sa demande de fixation de provisions distinctes, pris acte de ce que la Défenderesse a annoncé le paiement de sa quote-part de la provision pour frais d'arbitrage et, en cas de défaillance de cette dernière, accepté de se substituer à la Défenderesse pour ce paiement en deux échéances de montants sensiblement égaux les 30 janvier et 20 février 2018.

42. Le 18 janvier 2018, la Cour a décidé de ne pas mettre en application l'article 36(6) du Règlement de sorte qu'elle n'a pas considéré les demandes comme retirées et a fixé un nouveau délai à la Défenderesse pour le paiement du solde de la provision.

43. La Défenderesse n'a pas effectué le paiement annoncé et c'est finalement la Demanderesse qui a réglé en deux paiements échelonnés l'intégralité de la provision pour frais de l'arbitrage alors appelée. La Cour a réévalué la provision d'arbitrage le 17 mai 2018 et la Défenderesse s'étant de nouveau abstenue de payer, c'est encore la Demanderesse qui a procédé au règlement du complément de provision dont le montant avait été fixé par la Cour.

### F. LES MODIFICATIONS DU CALENDRIER DE LA PROCÉDURE

44. Par Ordonnance de procédure No. 2 du 31 janvier 2018, compte tenu de la décision de la Cour en application de l'article 36(6) et de l'état de la procédure, le Tribunal arbitral a : (i) autorisé la Demanderesse à déposer un rapport technique et financier pour établir le montant de son préjudice, (ii) dit qu'il y avait lieu de modifier le Calendrier de la procédure pour permettre à la Défenderesse d'analyser ce rapport et de faire part de ses observations sur ce rapport avant l'audience, (iii) dit que la Conférence de gestion de la procédure (la « ***Conférence No. 2*** ») prévue par conférence téléphonique pour le 20 février 2018 à 15 heures, heure de Paris aurait notamment pour objet l'aménagement du Calendrier de la procédure, et (iv) invité les Parties à soumettre au Tribunal arbitral au plus tard le 15 février 2018 leurs propositions respectives d'aménagement du Calendrier de la procédure.

45. Le 15 février 2018, la Demanderesse a soumis ses propositions d'aménagement du Calendrier en vue de la Conférence No. 2.

46. La Défenderesse n'ayant, ni transmis au Tribunal arbitral ses propositions de réaménagement du Calendrier de la procédure, ni réagi à la proposition de la Demanderesse, et ne s'étant pas jointe à la conférence téléphonique prévue, il a été convenu d'ajourner la Conférence No. 2 et de convoquer à nouveau une Conférence de gestion de la procédure (la « ***Conférence No. 3*** ») pour le 22 février 2018 à 10 heures, heure de Paris.

47. Suite à la Conférence No. 3, par Ordonnance de procédure No. 3 du 26 février 2018, le Tribunal arbitral a adopté le Calendrier de la procédure prévoyant notamment le dépôt du rapport technique et financier de l'expert de la Demanderesse (le « ***Rapport Deloitte*** ») le 30 mars 2018, l'échange simultané d'un mémoire complémentaire de chaque Partie (le « ***Mémoire complémentaire*** ») le 30 avril 2018 et d'une réponse au mémoire complémentaire de l'autre Partie (la « ***Réponse au Mémoire complémentaire*** ») le 30 mai 2018 et l'audience étant maintenue pour les 28 et 29 juin 2018.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

48. Le 26 mai 2018, la Défenderesse a sollicité la prolongation au 12 juin 2018 du délai pour le dépôt de sa Réponse au Mémoire complémentaire de la Demanderesse et confirmé que la date d'audience restait inchangée. La Demanderesse ne s'y étant pas opposée à condition que le délai pour le dépôt de sa propre Réponse au Mémoire complémentaire de la Défenderesse soit prorogé d'autant, par lettre du 28 mai 2018, le Tribunal arbitral a modifié en conséquence, dans le Calendrier de la procédure, la date prévue pour le dépôt simultané desdites Réponses au Mémoire complémentaire de l'autre Partie la fixant au 12 juin 2018.

### G. Les Mémoires des Parties

49. Conformément au Calendrier de la procédure alors en cours, les Parties ont soumis, le 30 octobre 2017, pour la Défenderesse un mémoire en défense (le « ***Mémoire en défense*** ») accompagné d'une pièce référencée selon bordereau joint sous le numéro DF-I et, pour la Demanderesse, un mémoire en réplique (le « ***Mémoire en réplique*** ») accompagné des pièces factuelles DM-XLIII à DM-LIV et des pièces juridiques LEXDM-I à LEXDM-VI dont le Tribunal arbitral a accusé réception le 2 janvier 2018 dans l'attente de la décision de la Cour sur l'application de l'article 36(6) du Règlement. Les prétentions financières de la Demanderesse ont alors été rabaissées à 2 milliards et 50 millions d'USD.

50. Le 30 janvier 2018, la Défenderesse a déposé son mémoire en duplique (le « ***Mémoire en duplique*** ») qui n'est accompagné d'aucune pièce.

51. Conformément au Calendrier de la procédure, le 30 avril 2018, suite au dépôt du Rapport Deloitte, comprenant le rapport de Monsieur Anthony Charlton et ses pièces jointes et le rapport de Monsieur Robin Bertram versés à la procédure comme pièces DM-LV à DM-LVII, ont été soumis les Mémoires complémentaires des Parties intitulés, pour la Demanderesse, « Mémoire sur le Rapport Deloitte » et accompagné des pièces DM-LVIII et DM-LIX, et, pour la Défenderesse, un « Mémoire sur la caducité du Contrat de 2008 ». Les prétentions financières de la Demanderesse dans le cadre de son Mémoire complémentaire s'élevant désormais à 617.400.878 USD.

52. Le 12 juin 2018, les Parties ont déposé leurs Réponses au Mémoire complémentaire de l'autre Partie, accompagné pour la Demanderesse des pièces factuelles DM-XL à DM-LXXVIII et des pièces juridiques LEX DM-III et LEX DM-VII à LEX DM-IX, la Réponse au Mémoire complémentaire de la Demanderesse soumis par la Défenderesse n'étant accompagné d'aucune pièce, la Défenderesse y précisant que même si elle ne souscrit pas

aux conclusions du Rapport Deloitte, elle trouve néanmoins inopportune la production d'un autre rapport d'expertise.[3]

### H. L'AUDIENCE ET LA CLÔTURE DES DÉBATS

53. Suite à la quatrième Conférence de Gestion de la procédure du 6 juin 2018, (la « ***Conférence No. 4*** »), ayant pour objet l'organisation de l'audience, l'Agenda de l'audience et les règles applicables notamment pour l'audition du ou des experts connus par les Parties ont été adoptées par Ordonnance de Procédure No. 4 du 11 juin 2018.

54. Conformément à l'article 26 du Règlement et au Calendrier de la procédure, l'audience s'est tenue les 28 et 29 juin 2018 (*l'*« ***Audience*** »), ayant pour ordre du jour (i) les plaidoiries introductives des Parties, (ii) la présentation par l'expert, Monsieur Anthony Charlton, de son rapport communiqué le 30 mars 2018 (le « ***Rapport Deloitte*** ») et les questions des Parties et du Tribunal arbitral sur ce rapport, (iv) les plaidoiries de clôture des Parties et (v) les questions éventuelles du Tribunal arbitral et l'organisation de la suite de la procédure.

55. L'Audience s'est déroulée au Centre d'audience de la CCI, les Parties y étant représentées par : (i) pour la Demanderesse, Maître Vincent Cassiers, Avocat, SYBARIUS, Madame Andrea Brown, Directeur général de DIGOil, Madame Stacey Kivel, Avocat, Conseil habituel de DIGOil, Madame Steffi Spitznagel, Avocat, Kerman & Co LLP, Madame Maria Dogaru, Paralegal, Kerman & Co LLP et (ii) pour la Défenderesse, Maître Michel Pombia, Avocat, les autres conseils de la Défenderesse, Maître Nzau Matuta et Maître Valence Bolebe Ekosso' Gombe n'ayant pas pu obtenir à temps leur visa. Comme convenu avec les Parties, la présentation du Rapport Deloitte par l'Expert et les débats à l'Audience ont fait l'objet d'un enregistrement audio qui a été remis aux représentants des Parties après l'audience.

56. Ont été évoqués au début de l'Audience, le 28 juin 2018, (i) la demande présentée la veille par la Demanderesse sollicitant l'autorisation de joindre à son dossier de pièces la consultation de Maître Alex Kabinda Ngoy, Professeur à la faculté de droit à l'Université de Lubumbashi et Avocat au barreau de Lubumbashi, sur l'incidence de l'ordonnance présidentielle d'approbation des conventions pétrolières sur ces dernières à laquelle la Défenderesse s'est opposée et (ii) la demande d'irrecevabilité fondée sur l'article 23 du Règlement de la demande de la Défenderesse tendant à voir déclarer irrecevables les

[3] Réponse au Mémoire complémentaire, 12 juin 2018, para. 23.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

demandes de la Demanderesse au motif que les Contrats litigieux auraient été conclus entre, d'une part, la Défenderesse et, d'autre part, deux « associations » dont la Demanderesse ne serait que l'une des entités de sorte qu'il aurait fallu que la Demanderesse appelle en intervention forcée les autres entités de l'association.

57. A la suite des débats, par Ordonnance de procédure No. 5 du 2 juillet 2018, le Tribunal arbitral a :

(a) INVIT(É) la Défenderesse (i) à confirmer par écrit au Tribunal arbitral le retrait de sa demande d'irrecevabilité visée au paragraphe 56 ci-dessus et de sa demande reconventionnelle et (ii) à produire les éléments de doctrine visés en note de bas de pages 5 et 7 de sa Réponse au Mémoire complémentaire du 12 juin 2018 ;

(b) AUTORIS(É) (i) la Demanderesse à produire, à sa plus prompte convenance, la consultation de Maître Alex Kabinda Ngoy et, (ii) dans un délai de quinze jours à compter de la production de cette consultation, la Défenderesse à soumettre tous éléments de droit congolais à l'appui de ses arguments selon lesquels l'approbation d'une convention pétrolière ressort du pouvoir discrétionnaire du Président de la République et le Contrat de 2008 serait caduc ;

(c) DIT que les Parties soumettront au Tribunal arbitral leurs demandes chiffrées sur le remboursement des frais et coûts qu'elles ont exposés pour leur défense et tous les justificatifs y relatifs au plus tard le 31 août 2018 ;

(d) DIT que le Calendrier de la procédure est modifié conformément aux dispositions du paragraphe b) ci-dessus.

58. Le 4 juillet 2018, la Demanderesse a soumis comme pièce DM-LXXIX la consultation de Maître Alex Kabinda Ngoy et corrigé une erreur de plume figurant au dispositif de sa Réponse au Mémoire complémentaire du 12 juin 2018. Le 16 juillet 2018, la Défenderesse a (i) confirmé le retrait de sa demande d'irrecevabilité visée au paragraphe 57(a) ci-dessus et de sa demande reconventionnelle et (ii) sur la question de l'incidence de l'absence d'ordonnance présidentielle d'approbation des contrats d'hydrocarbures, produit un jugement rendu par la Haute Cour de justice des Iles Vierges Britanniques du 19 novembre 2010 comme pièce DEF II et annoncé la production prochaine de l'arrêt de la Cour Suprême de Justice de la République Démocratique du Congo du 10 décembre 2010 comme pièce DEF III, décisions qu'elle avait évoquées à l'Audience.

59. Par lettre du 25 juillet 2018, le Tribunal arbitral a autorisé la Demanderesse et la Défenderesse à communiquer leurs observations écrites uniquement sur les trois documents produits par les Parties conformément à l'Ordonnance de procédure No. 5 du 2 juillet 2018, et ce dans les plus brefs délais et au plus tard le 31 juillet 2018 à minuit.

60. Suite à la communication par les Parties de leurs observations dans le délai accordé, par courriers électroniques du 1er août 2018, (i) la Défenderesse a sollicité l'autorisation du Tribunal arbitral de présenter des observations sur les pièces accompagnant les observations de la Demanderesse, (ii) la Demanderesse s'est opposée à un échange supplémentaire d'observations dans cette affaire et (iii) la Défenderesse a maintenu sa position en demandant que la décision éventuelle de refus du Tribunal arbitral fasse l'objet d'une ordonnance.

61. Par Ordonnance de procédure No. 6 motivée du 2 août 2018 le Tribunal arbitral a :

(a) AUTORIS(E) la Défenderesse à communiquer ses commentaires sur le Contrat Tullow de 2006 et l'arrêté ministériel 17 octobre 2007 et seulement sur ces deux documents, sans qu'elle ne puisse se prévaloir de pièces ou d'éléments de fait qui ne soient déjà versés au débat ;

(b) DIT que les commentaires de la Défenderesse seront soumis au plus tard le 6 août 2018.

62. Les dernières observations de la Défenderesse concernant, notamment, le Contrat Tullow de 2006 et l'arrêté ministériel 17 octobre 2007 ont été soumises le 6 août 2018.

63. Par Ordonnance de procédure No. 7 du 10 août 2018, conformément à l'article 27 du Règlement, le Tribunal arbitral a :

(a) PRONONC(É) la clôture des débats ;

(b) RAPPEL(É) aux Parties qu'aucun argument ni aucunes écritures ne peuvent être présentées, ni aucune preuve supplémentaire produite sauf à la demande ou avec l'autorisation du Tribunal arbitral.

64. Le 31 août 2018, conformément à l'Ordonnance de procédure No. 5, la Demanderesse a soumis une note d'observations sur le remboursement des frais et coûts qu'elle a exposés pour sa défense et les justificatifs y relatifs, et après prolongation du délai par la Tribunal arbitral la Défenderesse a soumis ses propres éléments de coûts le 15 septembre 2018.

### I. LE DELAI POUR RENDRE LA SENTENCE

65. Le **délai** dans lequel le Tribunal arbitral doit **rendre la Sentence finale** que la Cour a initialement fixé en fonction du Calendrier de la procédure lors de sa session du

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

14 septembre 2017 au 29 juin 2018, a été prorogé par la Cour conformément à l'article 30(2) du Règlement, lors de sa session du 14 juin 2018, jusqu'au 28 septembre 2018 et lors de sa session du 13 septembre 2018 jusqu'au 30 novembre 2018.

66. Conformément à l'article 27 du Règlement, le 10 août 2018, le Tribunal arbitral a informé les Parties de ce qu'il pensait soumettre le projet de la Sentence finale à la Cour pour approbation vers la fin du mois d'octobre ou le début du mois de novembre 2018.

67. Conformément à l'article 33 du Règlement, le projet de la Sentence finale a été approuvé par la Cour lors de sa session du 25 octobre 2018.

## V. RESUME DES FAITS DU LITIGE

### A. LE CONTRAT DE 2007 ET LE CONTRAT DE 2008

68. Le Contrat de 2007[4], a été conclu le 14 décembre 2007 entre, d'une part, la Défenderesse et l'association constituée entre, de deuxième part, la Demanderesse et, de troisième part, la Congolaise des Hydrocarbures (« ***COHYDRO*** »), les parties de deuxième et troisième part y étant désignées comme le « Contractant ».

69. Il s'agit d'un contrat de partage de production de ressources en hydrocarbures portant sur les blocs 8, 23 et 24 de la Cuvette Centrale ayant pour objet, selon son article 2, « *l'attribution au 'Contractant' par la République Démocratique du Congo, des droits exclusifs de reconnaissance et d'exploration des hydrocarbures ainsi que le droit d'obtention des Permis d'Exploitation dans les limites des ZERE* »[5] (la « ***Zone Exclusive de Reconnaissance et d'Exploration*** »). Dans le cadre du Contrat de 2007, la Demanderesse devait réaliser divers travaux pétroliers visant à découvrir et à exploiter des gisements d'hydrocarbures[6], cette exploitation devant donner lieu à un partage avec la République Démocratique du Congo des revenus en découlant.[7]

70. Le Contrat de 2008[8] a été conclu en janvier 2008 entre, d'une part, la Défenderesse et, d'autre part, l'association constituée du consortium entre la Demanderesse et Petro SA et H-Oil Congo Limited, COHYDRO, Congo Petroleum and Gas Sprl et Sud Oil Sprl. Il s'agit

---

[4] Contrat de 2007, **Pièce DM-VIII**.

[5] Contrat de 2007, article 2, **Pièce DM-VIII**.

[6] Contrat de 2007, article 10, **Pièce DM-VIII**.

[7] Contrat de 2007, articles 14 et 15, **Pièce DM-VIII**.

également d'un contrat de partage de production dont l'objet est similaire à celui du Contrat de 2007 sauf en ce qui concerne la ZERE concernée qui porte sur le bloc 1 du Graben Albertine. Le Contrat de 2008 prévoit en outre le paiement (i) d'un « *bonus de signature* » d'un montant de 2.500.000 USD[9] et (ii) d'une somme de 1.500.000 USD à la signature du contrat portant sur le système « *Health, Safety, Environment and Quality* » (« ***HSEQ*** »).[10] Ces deux paiements d'un montant total de 4.000.000 USD ont été effectués par la Demanderesse à la Défenderesse[11] en suite de quoi, par courrier du 25 avril 2008,[12] le Ministère des Hydrocarbures de la République Démocratique du Congo a autorisé la Demanderesse à commencer les travaux d'installation du chantier du bloc 1 du Graben Albertine.

## B. La Reattribution du Contrat de 2008

71. Alors que les travaux pétroliers étaient en cours de réalisation dans le cadre du Contrat de 2008, par lettre du 5 juillet 2010,[13] la Défenderesse a informé la Demanderesse que l'association Caprikat Ltd et Foxwhelp Ltd s'était vue attribuer le contrat de partage de production sur les blocs I et II du Graben Albertine (le « ***Contrat Caprikat*** »), lequel contrat a été approuvé par Ordonnance n° 10/041 du 18 juin 2010 conformément avec l'article 79 de l'Ordonnance-loi n° 81-013 du 2 avril 1981 portant législation générale sur les mines et les hydrocarbures.

72. Après avoir dénoncé cette rupture unilatérale du Contrat de 2008 et vainement sollicité une audience auprès du Premier Ministre de la République Démocratique du Congo, par lettres des 12 août 2010[14], 7 septembre 2010[15] et 17 septembre 2010[16], la Demanderesse, par courrier

---

[8] Contrat de 2008, **Pièce DM-IX**.

[9] Contrat de 2008, article 12.9, **Pièce DM-IX**.

[10] Contrat de 2008, article 5.6, **Pièce DM-IX**.

[11] Note de débit n° / E-H/SGH/DLN/059/2008 du Secrétariat Général du Ministère des Hydrocarbures de la République Démocratique du Congo en date du 25 février 2008, **Pièce DM X** ; Note de perception n° 320551 pour un montant de 2.500.000 USD du 21 mars 2008, **Pièce DM XI** ; Attestation de paiement d'un montant de 2.500.000 USD établie par Rawbank SARL en date du 21 mars 2008, **Pièce DM XII**.

[12] Courrier du Ministre des Hydrocarbures à DIGOIL en date du 25 avril 2008, **Pièce DM-XIII**.

[13] Courrier du 5 juillet 2010 du Ministre des Hydrocarbures de la République Démocratique du Congo à DIGOIL, **Pièce DM-XV**.

[14] Courrier du 12 août 2010 de DIGOIL au Premier Ministre de la République Démocratique du Congo, **Pièce DM-XVI**.

[15] Courrier du 7 septembre 2010 de DIGOIL au Premier Ministre de la République Démocratique du Congo, **Pièce DM-XVII**.

[16] Courrier du 17 septembre 2010 de DIGOIL au Premier Ministre de la République Démocratique du Congo, **Pièce DM-XVIII**.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

du 21 septembre 2010[17], s'est tournée vers le Président de la République, rappelant sa lettre du 14 juillet 2010 (non produite) dans laquelle elle avait expliqué que l'approbation du Contrat Caprikat faisait grief à ses droits au titre du Contrat de 2008, ayant exécuté toutes ses obligations contractuelles et, notamment, payé divers montants pour un total de 4.000.000 USD hors intérêts et dépensé 12.550.000 USD en travaux pétroliers au cours des deux années écoulées suite à l'autorisation délivrée en avril 2008. Elle demandait donc l'annulation de l'Ordonnance n° 10/041 approuvant le Contrat Caprikat.

### C. La Proposition de Solution Amiable de la Defenderesse

73. Dans sa lettre susmentionnée du 21 septembre 2010, la Demanderesse proposait en outre une solution amiable au litige comprenant (i) la délivrance par la Défenderesse et la publication de l'Ordonnance présidentielle visée à l'article 34 du Contrat de 2007, (ii) l'octroi à la Demanderesse d'un nouveau bloc 9 dans la cuvette centrale et/ou d'un nouveau bloc « Fosse de Boma » et (iii) la restitution à la Demanderesse des sommes perçues sur le bloc 1 du Graben Albertine dans le cadre du Contrat de 2008.[18] Elle demandait la conclusion d'un accord transactionnel. Le 23 octobre 2010, le Ministre des Hydrocarbures indiqua à la Demanderesse qu'il estimait que le principe de la compensation suggéré pouvait être retenu.[19]

74. Suite à une audience accordée par le Premier Ministre à la Directrice générale de la Demanderesse au cours de laquelle celle-ci l'a informé du montant de sa créance, le 16 novembre 2010, le Premier Ministre de la République Démocratique du Congo confirma son accord pour le remboursement des sommes dues par la Défenderesse à la Demanderesse par compensation avec les autres obligations financières de la Demanderesse conformément au Contrat de 2007 et donna instructions de « *clôturer ce dossier à l'amiable* ».[20]

75. Une réunion de conciliation a donc été organisée du 9 au 17 décembre 2010 au sein du Ministère des Hydrocarbures en présence de représentants du Président de la République, du Premier Ministre, du Ministère des Hydrocarbures, du Ministère des Finances et de la

---

[17] Courrier du 21 septembre 2010 de DIGOIL au Président de la République Démocratique du Congo, **Pièce DM-XIX**.

[18] Il s'agit du bonus de signature (2.500.000 USD) et de l'exécution des obligations financières au titre du HSEQ (1.500.000 USD) avec intérêts.

[19] Courrier du 23 octobre 2010 du Ministre des Hydrocarbures de la République Démocratique du Congo à DIGOIL **Pièce DM-XX**.

Demanderesse. Le procès-verbal de cette réunion[21] fait ressortir que « *les prétentions de la Demanderesse sont légitimes* » et que :

(i) la dette de la Défenderesse à l'égard de la Demanderesse s'élevait à cette date à 4.450.000 USD, soit : 2.500.000 USD de bonus de signature, 1.500.000 USD d'HSEQ et 450.000 USD d'intérêts sur le montant HSEQ (30% de 1.500.000 USD) ;

(ii) le remboursement du bonus de signature de 2.500.000 USD par la Défenderesse à la Demanderesse serait effectué sous forme de crédit d'impôt permettant de déduire ce montant des obligations fiscales futures de même nature de la Demanderesse en ce compris le bonus de signature du Contrat de 2007,

(iii) le solde de 1.950.000 USD serait remboursé par la Défenderesse à la Demanderesse en compensation avec les autres obligations financières de la Demanderesse naissant de l'exécution du Contrat de 2007, et

(iv) la Défenderesse entreprendrait les démarches utiles pour l'exécution du Contrat de 2007, ce qui devrait faire naître les obligations financières de la Demanderesse qui permettraient de compenser les dettes de la Défenderesse à son égard.

76. Le Ministre des Hydrocarbures n'ayant pas mis en œuvre cette solution amiable, des rappels lui ont été adressés, le 7 février 2011, par le Ministre des Finances[22] et, le 22 mars 2011, par la Demanderesse[23] qui indiquait en outre que le montant de la dette de la Défenderesse s'élevait désormais à 4.800.000 USD.

### D. L'EXECUTION DU CONTRAT DE 2007

77. Le 19 octobre 2011, le Directeur Général de la Direction Générale des Recettes Administratives, Judiciaires, Domaniales, et de Participation (« ***DGRAD*** ») de la République

---

[20] Courrier du 16 novembre 2010 du Premier Ministre de la République Démocratique du Congo au Ministre des Hydrocarbures et au Ministre des Finances de la République Démocratique du Congo **Pièce DM-XXI**.

[21] Procès-verbal de la République Démocratique du Congo (Ministère des Hydrocarbures) des travaux sur la compensation à opérer par l'Etat Congolais en faveur de Divine Inspiration Group du 9 au 17 décembre 2010 **Pièce DM-XXII**.

[22] Courrier du 7 février 2011 du Ministre des Finances de la République Démocratique du Congo au Ministre des Hydrocarbures, **Pièce DM-XXIII**.

[23] Courrier du 22 mars 2011 de DIGOIL au Ministre des Hydrocarbures et au Ministre des Finances de la République Démocratique du Congo, **Pièce DM-XXIV**.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

Démocratique du Congo confirma la mise en place du mécanisme de compensation envisagé[24] et, le 17 novembre 2011, accusa réception du paiement par la Demanderesse de la somme de 2.500.000 USD, conformément au Contrat de 2007.[25]

78. Le bonus de signature pour les trois blocs de la cuvette centrale s'élevant à 1.000.000 USD par bloc, soit 3.000.000 USD au total, et le mécanisme de compensation ne s'appliquant qu'aux dettes de même nature, il était plafonné à 2.500.000 USD de sorte que la Demanderesse a versé une somme complémentaire de 500.000 USD à la Défenderesse le 16 mars 2012,[26] la note de perception correspondante ayant été apurée le 21 mars 2012.[27]

79. Le 23 mars 2012, la DGRAD a confirmé l'imputation du montant de 2.500.000 USD payé le 22 mars 2008 par la Demanderesse au bonus de signature du Contrat de 2007.[28]

80. L'autorisation de démarrer les travaux d'acquisition aéromagnétiques et gravimétriques des blocs 23 et 24 de la cuvette centrale a été donnée par le Ministre des Hydrocarbures le 23 juin 2012[29] et, suite à la sollicitation de la Demanderesse par lettre du 18 juillet 2012,[30] le 30 juillet 2012,[31] le Ministre des Hydrocarbures a confirmé à la Demanderesse qu'il avait instruit le Secrétaire Général de désigner deux experts afin de l'assister dans les travaux aériens prévus pour le 15 août 2012.

81. La Défenderesse a ensuite retardé l'exécution du Contrat de 2007 motif pris de la préparation d'une nouvelle loi portant régime général des hydrocarbures[32] puis, après promulgation de

---

[24] Courrier du Directeur Général de la Direction Générale des Recettes Administratives, Judiciaires, Domaniales, et de Participations (en abrégé « DGRAD ») du 19 octobre 2011 au Ministre des Finances de la République Démocratique du Congo, **Pièce DM-XXVII**.

[25] Courrier de la Direction Générale des Recettes Administratives, Judiciaires, Domaniales, et de Participations (en abrégé « DGRAD ») du 17 novembre 2011 à DIGOIL, **Pièce DM-XXIX**.

[26] Note de perception n° 322569 pour un montant de 500.000,- USD du 16 mars 2012, **Pièce DM-XXX**.

[27] Attestation de paiement d'un montant de 500.000 USD établie par Rawbank SARL en date du 16 mars 2012, **Pièce DM-XXXI**.

[28] Courrier de la Direction Générale des Recettes Administratives, Judiciaires, Domaniales, et de Participations (en abrégé « DGRAD ») du 23 mars 2012 à DIGOIL, **Pièce DM-XXXII**.

[29] Courrier du Ministre des Hydrocarbures de la République Démocratique du Congo du 23 juin 2012 à DIGOIL, **Pièce DM-XXXIII**.

[30] Courrier de DIGOIL du 18 juillet 2012 au Directeur Général de l'Autorité de l'Aviation Civile, **Pièce DM-XXXIV**.

[31] Courrier du Ministre des Hydrocarbures de la République Démocratique du Congo du 30 juillet 2012 à DIGOIL, **Pièce DM-XXXV**.

[32] Courrier du Ministre des Hydrocarbures de la République Démocratique du Congo du 9 mai 2015 à DIGOIL Lettre, 9 mai 2015, **Pièce DM-XXVI**.

celle-ci le 1er avril 2015[33], de l'attente du Décret du Premier Ministre portant règlement d'hydrocarbures.[34]

82. Le 6 avril 2016, la Demanderesse a mis la Défenderesse en demeure d'exécuter le Contrat de 2007.[35] Le 6 mai 2016, le Ministre des Hydrocarbures a informé la Demanderesse de ce que le décret n° 16/010 portant Règlement des Hydrocarbures avait été pris par le Premier Ministre le 19 avril 2016 et l'a conviée à une réunion pour dresser un état des lieux du dossier.[36]

83. Une première réunion s'est tenue entre la Demanderesse et le Ministre des Hydrocarbures le 14 mai 2016 au cours de laquelle la Demanderesse a exposé les motifs qui l'avaient amenée à mettre la Défenderesse en demeure faute pour cette dernière, 9 ans après la signature du Contrat de 2007, d'avoir délivré l'ordonnance d'approbation de celui-ci. Le Ministère des Hydrocarbures a justifié le blocage par la nécessité de prendre les textes d'application de la loi du 1er avril 2015 et indiqué que la nouvelle cartographie de la cuvette centrale renseigne que les blocs 8, 23 et 24 ont été attribués à la Demanderesse et vont lui revenir, chaque bloc devant faire l'objet d'un Contrat de partage de production, et que les modalités de compensation des sommes déjà perçues ou le moratoire à accorder feront l'objet de négociations entre experts. La Demanderesse quant à elle a revendiqué l'approbation du Contrat de 2007 par ordonnance présidentielle, d'autant plus qu'il a reçu un commencement d'exécution autorisé par le Ministre des Hydrocarbures.

84. Au cours d'une deuxième réunion qui s'est tenue entre la Demanderesse et les conseillers du Ministère des Hydrocarbures le 18 mai 2016, la Demanderesse a maintenu sa demande de délivrance de l'ordonnance d'approbation du Contrat de 2007 et a réitéré les termes de sa mise en demeure, se réservant un recours éventuel à l'arbitrage pour tout préjudice.[37]

85. Le 19 mai 2016, le Ministre des hydrocarbures a accusé réception d'une *Etude de faisabilité de construction d'un pipeline / Graben Albertine* transmise par la Demanderesse qui, selon la

---

[33] Loi n° 15/012 portant régime général des hydrocarbures, 1er août 2015, **Pièce LEX DM-V**.

[34] Courrier du Ministre des Hydrocarbures de la République Démocratique du Congo du 5 décembre 2015 à DIGOIL, **Pièce DM-XXXVII**.

[35] Courrier de DIGOIL du 6 avril 2016 au Ministre des Hydrocarbures de la République Démocratique du Congo et au Premier Ministre, **Pièce DM-XXVIII**.

[36] Courrier du Ministre des Hydrocarbures de la République Démocratique du Congo du 6 mai 2016 à DIGOIL, **Pièce DM-XL**.

[37] Compte rendu de la réunion des experts du Ministère des Hydrocarbures et de la société Divine Inspiration, DIGOIL sur le contrat de partage de production portant sur les blocs 8, 23 et 24 de la Cuvette centrale, **Pièce DM-XLI**.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

Défenderesse, « *vient à point nommé apporter des pistes de solution à la problématique de l'évacuation du brut congolais à produire dans le Graben Albertine* », soulignant que le rapport attendu par le Ministère est à charge de cette dernière.[38]

86. Toutes démarches amiables demeurant sans effets concrets sur l'exécution du Contrat de 2007, la Demanderesse a introduit la Demande le 19 octobre 2016.

## VI. LES POSITIONS ET LES DEMANDES RESPECTIVES DES PARTIES

### A. Les Positions des Parties

87. La Demanderesse prétend que la Défenderesse s'est rendue coupable de deux manquements, le premier, en décidant d'attribuer le bloc 1 du Graben Albertine à un autre consortium, l'association Caprikat Ltd et Foxwhelp Ltd, rompant de ce fait unilatéralement de manière intempestive et illicite le Contrat de 2008 qui avait été conclu à titre exclusif avec la Demanderesse pour une durée d'exploration de 5 ans renouvelable 2 fois, et prévoyait la délivrance le cas échéant de Permis d'exploitation d'une période initiale de 20 ans[39] et le second, en s'abstenant de délivrer l'ordonnance présidentielle d'approbation du Contrat de 2007.

88. Selon la Demanderesse, les inexécutions de ses obligations contractuelles par l'Etat constituent des manquements graves à ses obligations contractuelles, justifiant la résolution du Contrat de 2007 et celle du Contrat de 2008 aux torts de la Défenderesse en application de l'article 82 du Décret du 30 juillet 1888, et l'indemnisation intégrale du préjudice de la Demanderesse conformément aux articles 45 et 47 du Décret du 30 juillet 1888.

89. Se fondant sur le Rapport Deloitte, la Demanderesse a chiffré son préjudice à la somme totale de 617.400.878 USD se décomposant en 597.847.994 USD au titre du manque à gagner calculé selon la méthode des flux de trésorerie actualisés et 19.552.884 USD au titre des dépenses engagées. Elle réclame en outre à être indemnisée de tous les frais et coûts relatifs à l'expertise ayant donné lieu au Rapport Deloitte et demande au Tribunal arbitral d'assortir toute condamnation d'un intérêt raisonnablement calculé.

---

[38] Courrier du Ministre des Hydrocarbures de la République Démocratique du Congo du 19 mai 2016 à DIGOIL, **Pièce DM-XLII**.

[39] Contrat de 2008, articles 9 et 10.4, **Pièce DM-IX**.

90. La Défenderesse, quant à elle, soutient que le Contrat de 2008 n'a pas été résilié, qu'il n'était pas en vigueur lorsque le Contrat Caprikat a été approuvé et, à le supposer en vigueur, que le mécanisme de compensation, dont le principe a été accepté d'un commun accord des Parties lors de la réunion du 9 au 17 décembre 2010 et qui a été rendu effectif le 23 mars 2012, date à laquelle « *DGRAD a confirmé l'imputation du montant de 2.5000.000 USD payé le 22 mars 2008 par la demanderesse au bonus de signature du contrat de 2007* »[40], a éteint les obligations réciproques des Parties découlant du Contrat de 2008. Subsidiairement, elle soutient que le fait que le Contrat de 2008 ait été privé d'effet par les Parties pendant plusieurs années a rendu celui-ci caduc quant à son exécution. Elle souligne que, du fait de l'accord amiable intervenu à compter du 17 décembre 2010 et exécuté le 23 mars 2012, le Contrat de 2008 n'a plus été exécuté et que toute exécution est devenue impossible, le bonus de 2.500.000 USD payé au titre de ce contrat ayant été affecté au Contrat de 2007.[41] De ce fait la Défenderesse n'aurait commis aucune faute, de sorte qu'aucune indemnisation ne saurait intervenir au titre du Contrat de 2008.

91. Concernant le Contrat de 2007, elle soutient que c'est à partir de la confirmation de la compensation par le Ministre des Finances le 26 août 2011 que la Défenderesse s'est trouvée liée par une obligation de délivrer l'ordonnance présidentielle. Elle allègue que « *l'approbation d'une convention pétrolière ressort du pouvoir discrétionnaire du Président de la République* [et que] *le contrat de partage de production pétrolière revêt le caractère d'une convention conclue sous condition suspensive* ».[42] Selon la Défenderesse, aucun délai butoir n'étant fixé par une disposition légale ou règlementaire pour la délivrance de l'ordonnance présidentielle, aucune faute ne peut lui être imputée.

92. Si le Tribunal arbitral devait néanmoins retenir une faute de son fait, la Défenderesse concède que le dommage subi par la Demanderesse serait direct mais conteste son caractère certain. Selon la Défenderesse, le préjudice de la Demanderesse doit s'analyser en une perte de chance de n'avoir pas obtenu les gains espérés pour l'appréciation de laquelle le Tribunal arbitral devra prendre en compte (i) l'existence d'une chance sérieuse de succès, d'une part, et (ii) le caractère sérieux et irrémédiable de la chance perdue, d'autre part. Sur ce dernier

---

40 Courrier de la Direction Générale des Recettes Administratives, Judiciaires, Domaniales, et de Participations (en abrégé « DGRAD ») du 23 mars 2012 à DIGOIL, **Pièce DM-XXXII**.

41 Mémoire complémentaire, 26 avril 2018, p. 4.

42 Réponse au Mémoire complémentaire, 12 juin 2018, para. 17.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

point, elle souligne que la chance de réaliser un gain n'est pas irrémédiablement perdue, le Président de la République pouvant à tout moment approuver le Contrat de 2007 par ordonnance sauf à ce que la Demanderesse, en maintenant sa demande de résiliation, ne rende effectivement cette perte de chance irrémédiable. Il appartient donc au Tribunal arbitral d'apprécier le bien fondé du calcul des experts effectué sur la base de réserves probables qui peuvent être modifiées à la suite des travaux de forage et de déterminer la fraction correspondant à la perte de chance.

93. La Défenderesse s'oppose au remboursement des frais d'une expertise qui n'a pas été ordonnée par le Tribunal arbitral et au paiement d'intérêts qui ne seraient pas prévus par le Contrat de 2007 et/ou le Contrat de 2008.

## B. Les Demandes des Parties

94. Dans sa Réponse au Mémoire complémentaire, la Demanderesse sollicite une sentence par laquelle le Tribunal arbitral :

> - DIT POUR DROIT *que la République Démocratique du Congo a commis une faute en s'abstenant d'exécuter le Contrat de Partage de Production conclu entre la République Démocratique du Congo et l'Association Divine Inspiration Group (PTY) Ltd et la Congolaise des Hydrocarbures, Blocs 8, 23 et 24 de la cuvette centrale (14 décembre 2007) et le Contrat de Partage de Production conclu entre la République Démocratique du Congo et l'Association Consortium Divine Inspiration Group (PTY) Ltd et Petro SA, H-Oil Congo Limited, la Congolaise des Hydrocarbures, Congo Petroleum and Gas SPRL, Sud Oil SPRL, Bloc 1 Graben Albertine (21 janvier 2008) en ne délivrant pas dans un délai raisonnable à DIGOil l'ordonnance présidentielle d'approbation desdits Contrats.*
>
> - DIT POUR DROIT *que la République Démocratique du Congo a commis une faute en prétendant résilier unilatéralement, ou à titre subsidiaire en prétendant rendre caduc en provoquant la disparition de son objet, le Contrat de Partage de Production conclu entre la République Démocratique du Congo et l'Association Consortium Divine Inspiration Group (PTY) Ltd et Petro SA, H-Oil Congo Limited, la Congolaise des Hydrocarbures, Congo Petroleum and Gas SPRL, Sud Oil SPRL, Bloc 1 Graben Albertine (21 janvier 2008) le 5 juillet 2010 après avoir réattribué le Bloc 1 Graben Albertine à Caprikat Ltd et à Foxwhelp Ltd.*
>
> - PRONONCE *la résolution, aux torts exclusifs de la République Démocratique du Congo, du Contrat de Partage de Production conclu entre la République Démocratique du Congo et l'Association Divine Inspiration Group (PTY) Ltd et la Congolaise des Hydrocarbures, Blocs 8, 23 et 24 de la cuvette centrale (14 décembre 2007) et du Contrat de Partage de Production conclu entre la République Démocratique du Congo et l'Association Consortium Divine Inspiration Group (PTY) Ltd et Petro SA, H-Oil Congo Limited, la Congolaise des Hydrocarbures, Congo Petroleum and Gas SPRL, Sud Oil SPRL, Bloc 1 Graben Albertine (21 janvier 2008), ou à titre subsidiaire CONSTATE l'impossibilité d'exécuter ces contrats en raison du comportement fautif de la République Démocratique du Congo;*

- CONDAMNE, *la République Démocratique du Congo à indemniser intégralement DIGOIL pour tous les dommages que DIGOIL a subis en raison de la non-exécution et de la résolution des contrats de partage de production susmentionnés, conclus le 14 décembre 2007 et le 21 janvier 2008, , ou à titre subsidiaire de l'impossibilité de les exécuter, en ce compris, de manière non exhaustive, toutes les dépenses exposées par DIGOIL dans le cadre desdits contrats évaluées à 19.552.884,- USD (dix-neuf millions cinq cent cinquante-deux mille huit cent quatre-vingt-quatre dollars américains) et pour le manque à gagner de DIGOIL, évalué à 597.800.000,- USD (cinq cent quatre-vingt-dix-sept millions huit cent mille dollars américains).*

- ORDONNE, *à la République Démocratique du Congo de payer une indemnité à DIGOIL d'un montant de 617.400.878 USD (six cent dix-sept millions quatre cent mille huit cent soixante-dix-huit dollars américains) visant à réparer le préjudice qu'elle a, par sa faute, causé à DIGOil, à augmenter des intérêts au taux calculé au taux de rendement des obligations du Trésor américain à horizon de 20 ans, majoré de deux pourcent à compter de la date du prononcé de la sentence à intervenir jusqu'à la date du complet paiement;*

- CONDAMNE *la République Démocratique du Congo au paiement des entiers frais et coûts de l'arbitrage, estimés à titre provisionnel à la somme de 1.900.000,- USD (un million neuf cent mille dollars américains), et en conséquence, dès la première sentence à intervenir, condamne la République Démocratique du Congo à payer à DIGOil (i) la somme de 600.0000*(sic) *USD (six cent mille dollars américains) évaluée à titre provisionnel correspondant à la provision pour frais d'arbitrage payée par DIGOil et (ii) la somme de 300.000 USD (cinq cent mille dollars)*[43] *évaluée à titre provisionnel correspondant aux frais d'experts exposés par DIGOil et (iii) la somme de 1.000.000,- USD évaluée à titre provisionnel correspondant aux frais de défense exposés par DIGOil dans le cadre de la procédure d'arbitrage, le tout étant à augmenter des intérêts au taux calculé au taux de rendement des obligations du Trésor américain à horizon de 20 ans, majoré de deux pourcent à compter de la date du prononcé de la sentence à intervenir jusqu'à la date du complet paiement;*

- DECLARE *toutes les demandes de la République Démocratique du Congo irrecevables ou à tout le moins non fondées.*

95. Le 4 juillet 2018, la Demanderesse a confirmé la correction, faite à l'Audience, de l'erreur de plume figurant sous le quatrième tiret du dispositif de sa Réponse au Mémoire complémentaire du 12 juin 2018 et indiqué que le montant de 597.800.000 USD (cinq cent quatre-vingt-dix-sept millions huit cent mille dollars américains) doit se lire 597.847.994 USD (cinq cent quatre-vingt-dix-sept millions huit cent quarante-sept mille neuf cent quatre-vingt-quatorze dollars américains) conformément au Rapport Deloitte[44], de sorte que la somme totale réclamée est bien de 617.400.878 USD.

---

[43] Le montant en chiffres et le montant en lettres de la provision sollicitée par la Demanderesse sont repris du dispositif en page 83 de sa Réponse au Mémoire complémentaire.

[44] Lettre de Maître Cassiers au Tribunal arbitral, 4 juillet 2018.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

96. La Défenderesse demande au Tribunal arbitral de :

1. ***A TITRE PRINCIPAL***

- *DECLARER IRRECEVABLES les demandes de la société DIG OIL*

- *DIRE POUR DROIT que la République Démocratique du Congo n'a pas commis de faute dans le cadre de l'exécution du Contrat de Partage de Production conclu avec l'Association Divine Inspiration Group (PTY) Ltd et la Congolaise des Hydrocarbures sur les blocs 8,23 et 24 de la Cuvette Centrale le 14 décembre 2007 et du Contrat de Partage de Production conclu entre la République Démocratique du Congo et l'Association Consortium Divine Inspiration Group (PTY) Ltd, Petro SA, H-Oil Congo Limited, la Congolaise des Hydrocarbures, Congo Petroleum and Gas SARL, Sud Oil Sprl sur le bloc I du Graben Albertine du 21 janvier 2008.*

- *DIRE POUR DROIT que le Contrat de Partage de Production entre la République Démocratique du Congo et l'Association Consortium Divine Inspiration Group (PTY) Ltd et Petro SA, H-Oil Congo Limited, la Congolaise des Hydrocarbures, Congo Petroleum and Gas SARL, Sud Oil Sprl sur le bloc I du Graben Albertine est devenu caduc à la suite de la conciliation et compensation des comptes concernant le bonus de signature entre parties au profit des bonus de signature des blocs 8,23 et 24 de la Cuvette Centrale.*

- *PRENDRE ACTE de la renonciation par la demanderesse DIG OIL à ses droits d'hydrocarbures portant sur le bloc I du Graben Albertine en acceptant la conciliation des comptes sur le bonus de signature à dater du 17 novembre 2011.*

- *DIRE POUR DROIT que les parties sont encore dans le délai d'exécuter leurs obligations liées au Contrat de Partage de Production du 14 décembre 2007 sur les blocs 8,23 et 24 de la Cuvette Centrale.*

- *PRENDRE ACTE de la volonté de la défenderesse République Démocratique du Congo de délivrer l'Ordonnance présidentielle d'approbation du Contrat de Partage de Production avec l'Association Divine inspiration (PTY) et la Congolaise des Hydrocarbures sur les blocs 8,23 et 24 Cuvette Centrale.*

- *DIRE NON FONDEES toutes les autres demandes subséquentes.*

- *DONNER ACTE à la défenderesse RDC qu'elle reconduit intégralement mutais* (sic) *mutandis toutes les autres demandes antérieures telles que résumées dans l'acte de mission et les différents mémoires.*

2. ***A TITRE SUBSIDIAIRE ET PAR IMPOSSIBLE***

- *Dans l'hypothèse où le tribunal retiendrait néanmoins une faute de la R.D.C. dans l'exécution de ces deux contrats :*

- *Recevoir partiellement les rapports d'expertise technique et financier établis par DELOITTE*

- *Réévaluer le montant du préjudice retenu par les experts à titre de manquer à gagner*

- *Après réévaluation, appliquer une fraction raisonnable dans la détermination du préjudice à réparer à titre de perte de chance d'obtenir un gain*

- *Apprécier souverainement le préjudice relatif aux dépenses de DIGOIL de niveau 1*

- *Rejeter les dépenses de niveau 2*

- *Ne pas recourir à une autre expertise*

97. Le Tribunal arbitral note, d'une part, que la Défenderesse a soulevé deux moyens d'irrecevabilité tenant, en premier lieu, au fait que les Contrats litigieux auraient été conclus entre, d'une part, la Défenderesse et, d'autre part, deux « associations » dont la Demanderesse ne serait que l'une des entités de sorte qu'il aurait fallu que la Demanderesse appelle en intervention forcée les autres entités membres de ces associations[45] (le « ***Premier moyen d'irrecevabilité*** ») et, en second lieu, au caractère prétendument prématuré des demandes dirigées contre elle de sorte qu'il y aurait lieu de renvoyer les Parties à la poursuite des négociations selon un calendrier à définir par le Tribunal arbitral[46] (le « ***Second moyen d'irrecevabilité*** »).

98. Par ailleurs, dans sa Réponse au Mémoire complémentaire, la Défenderesse indique reconduire intégralement *mutatis mutandis* toutes ses autres demandes antérieures telles que résumées dans l'Acte de mission et ses différents mémoires ce qui inclut (i) la demande reconventionnelle en dommages et intérêts en réparation du préjudice financier, moral et d'image certain que lui aurait causé la Demanderesse en saisissant prématurément le Tribunal arbitral qu'elle a fixée provisoirement à la somme de 50.000.000 USD[47] et (ii) sa demande relative aux frais et coûts de l'arbitrage pour laquelle elle précise s'en remettre à la sagesse du Tribunal arbitral.[48]

99. Cependant, ainsi que cela a été relevé au paragraphe 58 ci-dessus, le 16 juillet 2018, la Défenderesse a confirmé le retrait annoncé à l'Audience (i) de son Premier moyen d'irrecevabilité et (ii) de sa demande reconventionnelle et demandé qu'il lui en soit donné acte.

## VII. ANALYSE DU TRIBUNAL

100. Le Tribunal arbitral examinera successivement deux questions préliminaires (A), les conséquences de la non-délivrance de l'ordonnance présidentielle d'approbation des contrats pétroliers (B), l'exécution des Contrats litigieux (C), les conséquences des inexécutions éventuelles, (D) les coûts de l'Arbitrage (E) et les intérêts (F).

---

[45] Mémoire en réponse p. 4.

[46] Acte de mission, 29 août 2017, para. 70.

[47] Acte de mission, 29 août 2017, paras. 71, 75 et 76.

[48] Réponse au Mémoire complémentaire, 12 juin 2018, paras. 56-58.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

## A. LES QUESTIONS PRÉLIMINAIRES

101. Les moyens d'irrecevabilité soulevés par la Défenderesse sont susceptibles d'avoir une incidence sur la compétence *rationne personae* du Tribunal arbitral (1) et sur la teneur du droit applicable (2) qu'il y a lieu d'examiner au préalable.

### 1. La compétence *ratione personae* du Tribunal arbitral et la capacité à agir de la Demanderesse

102. La validité de la Convention d'arbitrage et la compétence *ratione materiae* du Tribunal arbitral ne sont pas contestées. En revanche, la Défenderesse demande qu'il lui soit donné acte du retrait de son Premier moyen d'irrecevabilité qui touche à la qualité à agir de la Demanderesse et à l'identification des parties à la Convention d'arbitrage[49], de sorte qu'elle concerne la compétence *ratione personae* du Tribunal arbitral qu'il appartient au Tribunal arbitral de vérifier.

103. La Défenderesse a abandonné ce Premier moyen d'irrecevabilité après que la Demanderesse ait fait valoir, à juste titre, (i) d'une part, que les « associations » mentionnées dans les Contrats litigieux sont des associations de fait dépourvues de personnalité juridique qui, en tant que telle, ne sont pas titulaires de droits ou d'obligations et ne disposent pas de la capacité requise pour agir en justice, et (ii) d'autre part, que chaque entité composant chaque association a personnellement signé le Contrat de 2007 et/ou le Contrat de 2008 selon le cas, et est directement et personnellement investie des droits et des obligations découlant pour chacune d'elles de chacun des Contrats litigieux. En outre, en application de l'article 100 du Décret du 30 juillet 1888[50], la solidarité des entités concernées ne saurait être présumée de sorte que le régime de droit commun des obligations en droit congolais est celui de l'obligation conjointe et non pas celui de l'obligation solidaire et aucun des Contrats litigieux ne stipule expressément de solidarité en ce qui concerne les obligations qu'il contient. Le Tribunal arbitral considère que la Demanderesse a donc bien la capacité à agir et à agir seule dans l'Arbitrage pour faire valoir ses droits issus des Contrats litigieux.

---

[49] A l'appui du Premier moyen d'irrecevabilité la Défenderesse indiquait que « *même si l'opposition d'intérêts entre la Demanderesse et les autres entreprises membres du consortium, n'est pas dûment caractérisée, il convient tout de même de constater que la procédure engagée les concerne au premier plan.* » La Défenderesse a donc contesté la capacité de la Demanderesse à agir seule dans l'Arbitrage.

[50] L'article 100 du Décret du 30 juillet 1888 dispose que « *la solidarité ne se présume pas, il faut qu'elle soit expressément stipulée* ».

104. Le Tribunal arbitral donne acte à la Défenderesse du retrait de son Premier moyen d'irrecevabilité.

**2. Le droit applicable**

105. Le Second moyen d'irrecevabilité de la Défenderesse, tiré du caractère prématuré allégué de la Demande, porte essentiellement sur le Contrat de 2007. La Défenderesse soutient que des négociations supplémentaires entre les Parties seraient nécessaires pour déterminer les conséquences de l'adoption de la loi n° 15/012 du 1er août 2015 portant régime général des hydrocarbures (la « ***Loi de 2015*** »)[51] sur le Contrat de 2007,[52] et que l'approbation de ce contrat par ordonnance du Président de la République peut toujours intervenir, ni l'Ordonnance-Loi n° 081-013 du 2 avril 1981 portant Législation Générale sur les Mines et les Hydrocarbures (la « ***Loi de 1981*** »),[53] ni la Loi de 2015 n'imposant de délai pour sa délivrance. Le Tribunal est donc amené à examiner les dispositions transitoires de la Loi de 2015.

106. La Demanderesse soutient que la Loi de 2015 ne s'applique pas aux Contrats litigieux. Elle oppose ses propres pièces à la Défenderesse, notamment la « *Note au gouvernement* » du Ministère des Hydrocarbures en date du 18 octobre 2017[54] et se prévaut de la clause de stabilité juridique de l'article 28 de chacun des Contrats litigieux et des dispositions transitoires de la Loi de 2015.[55]

107. Le Tribunal arbitral relève que les Parties ont expressément choisi le droit applicable à chacun des Contrats litigieux dont l'article 27 stipule que « *l'interprétation et l'exécution de ce Contrat seront soumis au droit de la République Démocratique du Congo* ». La Demanderesse fait en outre valoir que la Défenderesse était représentée à chacun des Contrats litigieux par le Ministre des Hydrocarbures et le Ministre des Finances « *agissant en vertu des pouvoirs légaux tels qu'ils résultent de l'Ordonnance-Loi No. 081-013 du 2 avril 1981 portant Législation Générale sur les Mines et les Hydrocarbures.* »

---

[51] Loi n° 15/012 portant régime général des hydrocarbures, 1er août 2015, **Pièce LEX DM-V**.

[52] Réponse, 30 janvier 2017, p. 3.

[53] Ordonnance-Loi n° 081-013 portant Législation Générale sur les Mines et les Hydrocarbures, 2 avril 1981, **Pièce LEX DM-I**.

[54] « Note au gouvernement » du Ministère des hydrocarbures, 18 octobre 2017, **Pièce DF-I**

[55] Réponse au Mémoire complémentaire, 12 juin 2018, paras. 317-326.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

108. De plus, l'exposé des motifs de la Loi de 2015 affirme le « *principe selon lequel les droits d'hydrocarbures régulièrement acquis avant l'entrée en vigueur de la présente loi conservent leur validité et jusqu'à leur expiration. À leur renouvellement ils seront régis par les dispositions de la présente loi.* »[56] Ce principe a été traduit *in extenso* à l'article 189 de la Loi de 2015 « *sous la* [seule] *réserve du respect des dispositions relatives à la protection de l'environnement, à la sécurité et l'hygiène qui sont d'application immédiate.* »[57] Or, conformément à l'article 79 de la Loi de 1981[58], les Contrats litigieux sont bien des conventions accordant des droits miniers pour hydrocarbures. Leur passation a été initiée et par le Ministère des Hydrocarbures et ils ont été signés par le Ministre des Hydrocarbures et le Ministre des Finances et il n'est pas allégué que les droits de la Demanderesse au titre des Contrats litigieux aient été acquis irrégulièrement.

109. La Demanderesse se prévaut en outre de la clause de stabilité juridique de l'article 28 de chacun des Contrats litigieux[59] libellée comme suit :

> *Sans préjudice de l'article 84 de la Loi, pendant toute la durée du Contrat, « la RDC » garantit au « Contractant » la stabilité des conditions générales juridiques, financières, pétrolières, fiscales douanières et économiques dans lesquelles chaque entité exerce ses activités telles que ses conditions résultent de la législation et de la réglementation en vigueur à la date de signature du contrat.*
>
> *En conséquence les droits de chacune des entités composant le 'Contractant' ne seront en aucun cas soumis en quelque domaine que ce soit à une mesure aggravante par rapport au régime défini au paragraphe ci-dessus.*
>
> *Il est toutefois entendu que chaque entité composant le 'Contractant' pourra bénéficier de toute mesure qui lui serait favorable par rapport au régime défini ci-dessus.*

110. La « *Loi* » est définie, à l'article 1.17 du Contrat de 2007 comme « *l'Ordonnance-Loi No. 081-013 du 2 avril 1981 portant Législation Générale sur les Mines et les Hydrocarbures* » et à l'article 1.18 du Contrat de 2008 comme « *l'Ordonnance-Loi n° 081-013 du 2 avril*

---

[56] Loi n° 15/012 portant régime général des hydrocarbures, 1er août 2015, Exposé des motifs, paragraphe 6, alinéa 16, **Pièce LEX DM-V**.

[57] Loi n° 15/012 portant régime général des hydrocarbures, 1er août 2015, article 189, **Pièce LEX DM-V**.

[58] L'article 79 de la Loi de 1981 dispose que « *Les droits miniers pour hydrocarbures sont accordés par convention. Les conventions pétrolières sont initiées* […] *par le* [Ministère des Hydrocarbures]. *Elles sont signées par* [le Ministre des Hydrocarbures et le Ministre des Finances]. […] *Les conventions pétrolières quoique dûment signées par les parties, n'ont d'effet qu'après avoir été approuvées par le Président de la République.* »

[59] Réponse au Mémoire complémentaire, 12 juin 2018, para. 232.

*1981 portant Législation Générale sur les Mines et les Hydrocarbures ainsi que l'Ordonnance n° 67-416 portant Règlement Minier.* »

111. Il en résulte que les Parties n'ont contractuellement dérogé aux dispositions transitoires de la Loi de 2015 que dans la seule hypothèse d'une incidence favorable de celle-ci sur la situation d'une entité du Contractant.

112. Or, si la Défenderesse prétend que l'adoption de la Loi de 2015 pourrait avoir des conséquences sur les Contrats litigieux et plus particulièrement sur le Contrat de 2007 ce qui, selon elle, justifierait le retard apporté dans la délivrance de l'ordonnance d'approbation par le Président de la République, elle ne précise pas quelles seraient ces conséquences, sauf à indiquer au contraire que la Loi de 2015, comme la Loi de 1981, prévoit que les conventions pétrolières ou contrats d'hydrocarbures n'ont d'effet qu'après approbation par ordonnance du Président de la République qui peut intervenir à tout moment. La Demanderesse quant à elle, ne s'est pas prévalue d'une incidence de la Loi de 2015 qui serait plus favorable par rapport au régime de la Loi de 1981.

113. Le Tribunal arbitral considère donc qu'il résulte de l'application cumulée des dispositions de l'article 189 de la Loi de 2015[60] et des stipulations de l'article 28 des Contrats litigieux que la loi congolaise qui leur est applicable est la Loi de 1981 et c'est au regard des dispositions de la Loi de 1981 qu'il y a lieu d'examiner les prétentions respectives des Parties, en premier lieu relativement aux conséquences de la non-délivrance de l'ordonnance présidentielle d'approbation des Contrats litigieux.

### B. LES CONSÉQUENCES DE LA NON-DELIVRANCE DE L'ORDONNANCE PRÉSDENTIELLE

114. L'article 79, alinéa 5, de la Loi de 1981 prévoit que « [l]*es conventions pétrolières, quoique dûment signées par les parties, n'ont d'effet qu'après avoir été approuvées par une ordonnance du Président de la République.* »[61] Cette disposition est reprise à l'article 34.1 de chacun des Contrats litigieux qui prévoit que « [c]*e Contrat n'entrera en vigueur qu'à la date de la signature de l'ordonnance du Président de la République approuvant ce Contrat.* »[62] Or, l'ordonnance d'approbation du Président de la République n'ayant été

---

[60] Loi n° 15/012 portant régime général des hydrocarbures, 1er août 2015, **Pièce LEX DM-V**.

[61] Ordonnance-Loi No. 081-013 portant Législation Générale sur les Mines et les Hydrocarbures, 2 avril 1981, **Pièce LEX DM-I**.

[62] Contrat de 2007, article 34.1, **Pièce DM-VIII** et Contrat de 2008, article 34.1, **Pièce DM-IX**.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

délivrée pour aucun des Contrats litigieux, il convient d'examiner la portée de l'ordonnance d'approbation (1) et les conditions de sa délivrance (2).

**1. La portée et la nature de l'ordonnance présidentielle**

115. La Défenderesse allègue que, faute d'avoir été approuvés par ordonnance présidentielle, les Contrats litigieux ne pouvaient pas produire d'effets. Elle précise que le contrat de partage de production revêt le caractère d'une convention conclue sous condition suspensive.[63] Elle soutient que cette analyse est confirmée par (i) l'arrêt de la Cour Suprême de Justice de la République Démocratique du Congo du 10 décembre 2010 qui, selon elle, précise le régime juridique de l'ordonnance présidentielle portant approbation d'un contrat de partage de production[64] et (ii) le jugement de la Haute Cour de Justice des Iles Vierges Britanniques du 19 novembre 2010 relatif à la prolongation d'une mesure d'injonction provisoire ayant fait interdiction aux sociétés Caprikat et Foxhelp de procéder à l'exploitation des blocs 1 et 2 du Graben Albertine qui lui avait été accordée *ex parte* par le premier juge.[65]

116. La Demanderesse, quant à elle, prétend que les Contrats litigieux seraient entrés en vigueur dès leur signature dans la mesure où ils imposent des obligations de paiement dès ce moment. Selon la Demanderesse,[66] si l'ordonnance d'approbation du Président de la République devait s'analyser en une condition suspensive, ce qu'elle conteste, celle-ci ne constituant pas un événement futur et incertain,[67] mais dépendant de la volonté de l'Etat qui est une partie aux Contrats litigieux, elle serait purement potestative en application de l'article 68 du Décret du 30 juillet 1888 selon lequel : « *la condition potestative est celle qui fait dépendre l'exécution de la convention d'un évènement qu'il est au pouvoir de l'une ou*

---

63 Réponse au Mémoire complémentaire, 12 juin 2018, para. 17.

64 Arrêt de la Cour Suprême de Justice de la République Démocratique du Congo, 10 décembre 2010, paras. 1 et 2, **Pièce DF-III**.

65 Jugement de la Haute Cour de Justice des Iles Vierges Britanniques, 19 novembre 2010, **Pièce DF-II**. Le Tribunal arbitral considère que cette décision qui statue sur une mesure conservatoire n'est pas directement pertinente pour trancher les questions qui lui sont soumises et prendra donc en compte dans son analyse ci-dessous l'incidence de l'arrêt de la Cour Suprême de Justice de la République Démocratique du Congo du 10 décembre 2010 susmentionné, **Pièce DF-III**.

66 Réponse au Mémoire complémentaire, 12 juin 2018, paras. 377-386.

67 *L'obligation contractée sous une condition suspensive est celle qui dépend d'un élément futur et incertain, ou d'un élément actuellement arrivé, mais encore inconnu des parties. Dans le premier cas, l'obligation ne peut être exécutée qu'après l'évènement.* Décret du 30 juillet 1888, article 79, **Pièce LEX DM-II**.

*l'autre des Parties contractantes de faire arriver ou d'empêcher* »[68] et donc nulle selon les dispositions de l'article 72 du Décret du 30 juillet 1888 qui prévoit que « *Toute obligation est nulle lorsqu'elle a été contractée sous une condition potestative de la part de celui qui s'oblige.* »[69]

117. Le Tribunal arbitral ne peut pas suivre la Demanderesse dans son analyse selon laquelle les Contrats litigieux seraient entrés en vigueur dès leur signature au motif qu'ils prévoient l'exécution d'obligations dès ce moment. Il relève qu'il est toujours loisible aux parties à un contrat de prévoir que certaines obligations seront exécutées avant l'entrée en vigueur du contrat et d'aménager contractuellement les conséquences du défaut d'entrée en vigueur. Tel est le cas, par exemple, lorsqu'un contrat prévoit le paiement d'un acompte à la signature et une entrée en vigueur de celui-ci au moment de la délivrance, dans le délai qu'il fixe, d'une autorisation administrative, les conséquences de la non-obtention de l'autorisation administrative dans le délai convenu étant sanctionnées par la possibilité de mettre en œuvre la clause de résiliation de plein droit du contrat et de réclamer le remboursement de l'acompte.

118. Par ailleurs, le fait que, comme le soutient la Demanderesse, l'article 34.1 des Contrats litigieux puisse s'analyser comme constituant une condition suspensive potestative conduisant à la nullité de cette stipulation, est sans effet sur la disposition législative de l'article 79, alinéa 5, de la Loi de 1981, qui n'en continue pas moins à produire ses effets.

119. Les Parties s'accordent sur le fait que selon l'article 79, alinéa 5, de la Loi de 1981, « *les conventions pétrolières ne produisent leur plein effet qu'après avoir été approuvées* » par une ordonnance du Président de la République.[70] De fait, ainsi que cela sera examiné ci-dessous à propos des conditions de la délivrance de l'ordonnance présidentielle, les Contrats litigieux ont produit certains effets, la Défenderesse ayant autorisé la Demanderesse à effectuer certains travaux pétroliers qui ne requièrent pas d'avoir recours à des forages dans le sol et ne conduisent pas à extraire des ressources en hydrocarbures du sous-sol et donc les Contrats litigieux ont reçu un commencement d'exécution.

---

[68] Décret du 30 juillet 1888, article 68, **Pièce LEX DM-II**.

[69] Décret du 30 juillet 1888, article 72, **Pièce LEX DM-II**.

[70] Pour la Demanderesse, Réponse au Mémoire complémentaire, 12 juin 2018, para. 165 ; pour la Défenderesse, Réponse au Mémoire complémentaire, 12 juin 2018, para. 16.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

120. Le Tribunal arbitral relève par ailleurs qu'en tout état de cause, les Parties s'accordent pour considérer que l'absence d'ordonnance d'approbation n'a pas pour effet d'anéantir les Contrats litigieux mais seulement de retarder le caractère exécutoire de certaines de leurs obligations respectives. La Défenderesse précise que l'ordonnance présidentielle « *pouvait donner* [aux contrats] *un caractère exécutoire bien que sur le plan du droit civil les contrats signés demeurent valables quant aux droits et obligations qui y sont attachés.* »[71] Cette appréciation est également celle du consultant de la Demanderesse, Maître Kabinda, qui indique :

> *A compter de la signature du contrat de partage de production par le Ministre des hydrocarbures et le Ministre des Finances, la République Démocratique du Congo est engagée vis-à-vis de la compagnie pétrolière et réciproquement. Le contrat est formé* [...][72]

121. Le Tribunal arbitral considère donc que la non-délivrance de l'ordonnance présidentielle a pour effet de suspendre certains effets des Contrats litigieux en application de l'article 79, alinéa 5, de la Loi de 1981, les Parties restant liées par les obligations qu'ils contiennent.

122. La Demanderesse soutient cependant encore que la Défenderesse avait l'obligation de délivrer l'ordonnance présidentielle d'approbation des Contrats litigieux dans un délai raisonnable conformément à leur article 29 selon lequel :

> *La «**RDC**» prend toutes les mesures nécessaires destinées à faciliter le déroulement des activités du «**Contractant**» et de ses Sous-Traitants. Sur la demande de l'un ou l'autre, l'assistance dont il est question ci-dessus portera sur le domaine suivant, sans que cette liste soit limitative :*
>
> - [...] »
> - *L'obtention des approbations nécessaires à la conduite des opérations pétrolières, dans la mesure les demandes auront été formulées conformément à la législation en vigueur en «**RDC**» ;*
> - *Tout autre sujet qui se prête à l'assistance de la RDC notamment en matière de sécurité ou d'opération dans le cadre de la législation et de la réglementation en vigueur.*[73]

123. Pour la Demanderesse, l'obligation de la Défenderesse repose encore sur les dispositions de l'article 33, alinéa 3, du Décret du 30 juillet 1888[74] établissant le principe d'exécution de bonne foi des contrats.[75]

---

[71] Réponse au Mémoire complémentaire, 12 juin 2018, para. 2.

[72] Consultation de Maître Kabinda, 15 juin 2018, Section 1, dernier paragraphe, page 2.

[73] Contrat de 2007, article 29, **Pièce DM-VIII** et Contrat de 2008, article 29, **Pièce DM-IX**.

124. La Défenderesse ne conteste pas formellement ces dispositions.

125. Le Tribunal relève que (i) les Parties s'accordent sur le fait que certains travaux pétroliers qui nécessitent des forages et l'extraction de ressources en hydrocarbures du sous-sol de la République Démocratique du Congo ne sont pas susceptibles d'être effectués avant que l'ordonnance présidentielle d'approbation du Contrat ne soit délivrée, (ii) qu'il n'est pas allégué que le Président de la République ait, es qualités, une personnalité juridique propre distincte de celle de l'Etat, partie aux Contrats litigieux, et (iii) qu'aux termes de l'article 29 des Contrats litigieux, l'Etat à l'obligation de prendre toutes les mesures nécessaires destinées à faciliter les activités pétrolières, notamment, pour l'obtention des approbations nécessaires, en ce compris l'ordonnance d'approbation du Président de la République.

126. En conséquence, la délivrance de l'ordonnance présidentielle d'approbation des Contrats litigieux constitue bien, au titre de l'article 29 des Contrats litigieux, un engagement de l'Etat, garant de l'application de sa propre législation et dont il ne saurait être libéré que si les conditions prévues par celle-ci pour sa délivrance ne sont pas remplies, ce qu'il y a donc lieu maintenant de déterminer.

**2. Les conditions de la délivrance de l'ordonnance présidentielle**

127. La Demanderesse allègue que la délivrance de l'ordonnance présidentielle d'approbation des Contrats litigieux relevait de la simple formalité, le Président de la République étant sans compétence pour négocier ou amender les conventions pétrolières. Elle reconnaît que le Président de la République peut refuser de délivrer l'ordonnance d'approbation, mais seulement pour un motif relevant de son domaine de compétence en tant que « *garant de la Constitution, de l'indépendance nationale, de l'intégrité territoriale, de la souveraineté nationale, du respect des accords et traités internationaux ainsi que de celles de régulateur et d'arbitre du fonctionnement normal des Institutions de la République avec l'implication du Gouvernement et sous le contrôle du Parlement* »,[76] lesquelles compétences sont reprises et énumérées à l'article 69 de la Constitution de la République Démocratique du Congo qui dispose :

---

[74] Décret du 30 Juillet 1888, article 33, **Pièce LEX DM-II**.

[75] Réponse au Mémoire complémentaire, 12 juin 2018, paras. 198-202.

[76] Constitution de la République Démocratique du Congo, p.5, **Pièce LEX DM-IX** ; Réponse au Mémoire complémentaire, 12 juin 2018, paras. 170-192, **Pièce LEX DM-IX**.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

> *Le Président de la République est le chef de l'Etat. Il représente la nation et il est le symbole de l'unité nationale.*
>
> *Il veille au respect de la Constitution.*
>
> *Il assure par son arbitrage le fonctionnement régulier des pouvoirs publics et des Institutions ainsi que la continuité de l'Etat. Il est le garant de l'indépendance nationale, de l'intégrité du territoire, de la souveraineté nationale et du respect des traités et accords internationaux.*[77]

128. La Défenderesse allègue quant à elle que la délivrance de l'ordonnance présidentielle ressort du pouvoir discrétionnaire du Président de la République et que la loi ne prévoit aucun délai à cette fin. Elle se fonde sur l'arrêt de la Cour Suprême de Justice de la République Démocratique du Congo du 10 décembre 2010 selon lequel :

> [le Président de la République] *n'a pas en la matière, une compétence liée qui l'obligerait absolument à donner son approbation ; qu'il s'agit en revanche d'un pouvoir discrétionnaire impliquant sa souveraine appréciation en considération des éléments de l'espèce ainsi que des intérêts de l'Etat congolais et pour lequel il n'est tenu par aucun délai.*[78]

129. Il convient donc d'examiner (i) les conditions de fond et (ii) le délai selon lesquels l'ordonnance d'approbation doit être délivrée.

130. *Sur les conditions de la délivrance de l'ordonnance présidentielle*, le Tribunal arbitral relève que, selon l'article 1 de la Loi de 1981, « *le sous-sol* [de la République Démocratique du Congo] *est et demeure la propriété de la Nation,* […] *la propriété des mines et des hydrocarbures constitu*[ant] *un droit distinct et séparé des droits découlant d'une concession foncière* ». En conséquence, en application du deuxième paragraphe de l'article 4, « *nul ne peut se livrer à la prospection, à la recherche et à l'exploitation minière* [en ce compris, selon l'article 2 a), les hydrocarbures] *si ce n'est en vertu des droits accordés ou reconnus par l'Etat* ». De plus, conformément à l'article 79 de la Loi de 1981, les droits miniers pour hydrocarbures sont accordés par convention, de telles conventions pétrolières étant initiées par le Ministère des Hydrocarbures, signées par le Ministre des Hydrocarbures et le Ministre des Finances et approuvées par le Président de la République.[79] Il y a donc prise en compte dans la Loi de 1981 de la répartition des

---

77 Constitution de la République Démocratique du Congo, article 69, **LEX DM-IX**.

78 Arrêt de la Cour Suprême de Justice de la République Démocratique du Congo, 10 décembre 2010, **Pièce DF-III**.

79 Ordonnance-Loi n° 081-013 portant Législation Générale sur les Mines et les Hydrocarbures, 2 avril 1981, **Pièce LEX DM-I**.

compétences entre les Ministres concernés et le Président de la République prévue par la Constitution, le Président de la République étant le garant des intérêts de la Nation en tant que propriétaire du sous-sol de la République Démocratique du Congo.

131. Cette analyse est confortée par le fait non contesté que, dans le cadre de l'exécution des Contrats litigieux, la Demanderesse a pu effectuer légalement certains travaux pétroliers nonobstant la non-délivrance de l'ordonnance présidentielle d'approbation. C'est ainsi que, lors de la réattribution du bloc 1 du Graben Albertine, les travaux d'exploration au titre du Contrat de 2008 étaient en cours après avoir été autorisés par le Ministère des Hydrocarbures et que, dans le cadre du Contrat de 2007, le Ministère des Hydrocarbures a pareillement délivré le 23 juin 2012 l'autorisation de procéder aux travaux d'acquisition aéromagnétique et gravimétrique des blocs 23 et 24 de la Cuvette centrale et instruit son Secrétariat de désigner deux experts afin d'assister la Demanderesse dans les travaux aériens prévus pour le 15 août 2012.[80] En effet, de tels travaux ne nécessitaient pas d'effectuer des forages dans le sol de la République Démocratique du Congo et de prélever des ressources en hydrocarbures de son sous-sol, de sorte que la non-délivrance de l'ordonnance présidentielle n'y faisait pas obstacle. En revanche, dès lors que l'exécution de la convention pétrolière conduit à porter atteinte à l'intégrité du territoire par des forages ou l'extraction de ressources en hydrocarbures, l'ordonnance d'approbation de la convention par le Président de la République est requise.

132. La Cour Suprême souligne que le pouvoir du Président de la République est discrétionnaire et précise que ce pouvoir implique « *sa souveraine appréciation des éléments de l'espèce ainsi que <u>des intérêts de l'Etat congolais</u>.* »[81] Les intérêts de l'Etat congolais sont ceux tirés des droits de l'Etat sur le sous-sol dont le Président de la République est le garant aux termes de la Constitution et de la Loi de 1981. Il appartient donc au Président de la République d'apprécier souverainement dans quelle mesure une convention pétrolière est susceptible de porter atteinte à l'indépendance nationale, à l'intégrité du territoire, à la souveraineté nationale et aux traités et accords internationaux et, le cas échéant, de refuser

---

[80] Courrier du Ministre des Hydrocarbures de la République Démocratique du Congo à DIGOil, 23 juin 2012, **Pièce DM-XXXIII** ; courrier de DIGOil au Directeur Général de l'Autorité de l'Aviation Civile, 18 juillet 2012, **Pièce DM-XXIV** ; Courrier du Ministère des Hydrocarbures de la République Démocratique du Congo à DIGOil, 30 juillet 2012, **Pièce DM-XXXV**.

[81] Arrêt de la Cour Suprême de justice de la République Démocratique du Congo, 10 décembre 2010, neuvième feuillet, **Pièce DF-II**.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

de délivrer l'ordonnance d'approbation s'il n'est pas satisfait que tel soit le cas. Cette appréciation souveraine ne pourrait être remise en cause que devant les juridictions de la République Démocratique du Congo dans les conditions prévues par la loi et la Constitution, par exemple, en cas d'excès de pouvoir ou d'erreur manifeste d'appréciation. Tout au plus le Tribunal arbitral peut-il considérer dans le cadre de la situation qui lui est soumise relativement au Contrat de 2008, d'une part, et au Contrat de 2007, d'autre part, que, conformément à l'arrêt de la Cour Suprême, le refus éventuel de délivrance de l'ordonnance devait être motivé par les intérêts de l'Etat que le Président de la République apprécie souverainement. Or, non seulement n'a-t-elle pas été délivrée, mais encore aucune décision de rejet du Président de la République comportant une quelconque motivation n'a-t-elle été produite au débat, ni même son existence alléguée.

133. *Le délai dans lequel l'ordonnance d'approbation du Président de la République doit être délivrée* n'est pas précisé dans la Loi de 1981. La Cour Suprême considère que pour l'exercice de son pouvoir discrétionnaire le Président de la République n'est tenu par aucun délai. La Défenderesse reconnaît cependant qu'il faut qu'un délai raisonnable soit respecté pour un contrat d'investissement dans lequel l'État s'est engagé.[82] Elle ne précise pas ce qui doit être considéré comme un délai raisonnable, mais la Demanderesse soutient à cet égard qu'un délai d'environ deux mois à compter de la date de signature est un délai raisonnable. La Demanderesse s'appuie à cet égard sur le Contrat Caprikat signé le 5 mai 2010 et qui a fait l'objet d'une ordonnance présidentielle d'approbation du 18 juin 2010 publiée au Journal Officiel le 22 juin 2010. Elle soumet de plus au Tribunal arbitral les éléments d'une analyse plus fine sur la base des sept conventions pétrolières approuvées depuis 2006 qui montrent qu'en moyenne une durée de 19 mois est nécessaire pour que l'ordonnance présidentielle d'approbation de la convention soit délivrée.[83]

134. Le Tribunal arbitral relève que, parmi ces sept conventions pétrolières, seules deux d'entre elles, le contrat conclu avec la société *Surestream Petroleum Ltd.* en novembre 2005 et le Contrat Caprikat, pour lesquelles l'ordonnance d'approbation a été délivrée respectivement sous trois mois et un mois et demi, confortent la durée de deux mois avancée par la Demanderesse. Les cinq autres conventions ont fait l'objet d'une ordonnance d'approbation

---

[82] Note du Ministre des Hydrocarbures de la République Démocratique du Congo au Gouvernement, 18 octobre 2017, **Pièce DF-I** et **Pièce DM-LIV**.

[83] Réponse au Mémoire complémentaire, 12 juin 2018, para. 345-349.

dans un délai allant d'un an et cinq mois jusqu'à deux ans et sept mois. Le consultant de la Demanderesse, Maître Kabinda, considère quant à lui que : « *un délai raisonnable ne devrait pas dépasser six mois à compter de la signature du contrat de partage de production. Toutefois la pratique enseigne que le délai pour obtenir la publication de l'ordonnance présidentielle peut s'étendre jusqu'à deux ans en République Démocratique du Congo.* »[84] L'appréciation à six mois du délai raisonnable n'est cependant étayée par aucun élément de doctrine ou de jurisprudence et les éléments d'analyse fournis par la Demanderesse indiquent que la pratique conduit à un délai qui peut dépasser deux ans.

135. Le Tribunal arbitral examinera donc les prétentions respectives des Parties en tenant compte de la pratique administrative en République Démocratique du Congo qui montre que, au moment où étaient signés les Contrats litigieux, le délai pour la délivrance de l'ordonnance présidentielle s'était avéré aller jusqu'à deux ans et quatre mois.[85]

136. De ce qui précède il résulte que (i) la Défenderesse a bien l'obligation de tout mettre en œuvre pour permettre la délivrance de l'ordonnance présidentielle dans les conditions prévues par la loi et (ii) cette obligation doit être exécutée dans un délai pouvant en pratique aller jusqu'à deux ans et quatre mois.

## C. L'Execution Des Contrats Litigieux

### 1. Les droits issus des Contrats Litigieux

137. Les droits issus des Contrats litigieux sont identiques. Ils ont pour objet, selon leur article 2, « *l'attribution par la République Démocratique du Congo au «**Contractant**» des droits exclusifs de reconnaissance et d'exploration des hydrocarbures ainsi que le droit d'obtention de(s) concession(s) d'Exploitation* »[86] dans les limites d'une zone exclusive de recherche et d'exploration (ZERE), constituée au titre du Contrat de 2008 du bloc 1 du

[84] Consultation de Maître Kabinda, 15 juin 2018, section 2, dernier paragraphe.

[85] Le Tribunal arbitral prend en compte à cet égard uniquement les contrats conclus antérieurement à la signature à la signature des Contrats litigieux, c'est-à-dire entre novembre 2005 et octobre 2006 pour lesquels l'ordonnance d'approbation a été publiée au plus tard le 12 mars 2008. Deux autres conventions pétrolières de novembre 2007 ont été approuvées dans un délai de deux ans et sept mois mais l'ordonnance n'a été publiée que le 18 juin 2010 en même temps que celle du Contrat Caprikat. Lorsque les droits de la Demanderesse au titre du Contrat de 2008 ont été réattribués à l'association Caprikat Ltd et Foxwhelp Ltd, la pratique administrative était donc bien de deux ans et quatre mois.

[86] Article 2 des Contrats litigieux, soulignement ajouté, **Pièce DM-VIII** et **Pièce DM-IX**.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

Graben Albertine et dans le cadre du Contrat de 2007 des blocs 8, 23 et 24 de la Cuvette Centrale.

138. Chaque Contrat litigieux comporte, d'une part, une phase d'exploration de la ZERE consistant pour le « *Contractant* », à exécuter un programme de travaux pétroliers destinés à mettre en évidence des ressources en hydrocarbures commercialement exploitables. La durée de cette phase d'exploration est de cinq ans renouvelable deux fois, la Demanderesse pouvant à sa discrétion à l'expiration de chaque période de 5 ans, soit, solliciter le renouvellement du Permis d'Exploration, soit, renoncer à celui-ci.[87]

139. D'autre part, en cas de découverte de ressources commercialement exploitables, sur la base d'un rapport établissant la zone sur laquelle le gisement peut être exploité et le caractère commercial de ce gisement, à la demande du Contractant, la Défenderesse doit délivrer un Permis d'Exploitation pour une période de 20 ans renouvelable.[88]

140. Les Contrats litigieux sont donc des contrats de longue durée comprenant une période de reconnaissance et d'exploration pouvant se prolonger sur 15 ans et diverses concessions d'exploitation d'une durée de 20 ans minimum chacune.[89]

141. Les coûts pétroliers, et notamment le financement des investissements rendus nécessaires pour les travaux pétroliers d'exploration et d'exploitation sont entièrement à la charge du Contractant et ne lui seront remboursés qu'en phase d'exploitation, par attribution d'une part de la production d'hydrocarbures liquides, la clé de répartition entre les différentes entités composant le Contractant étant fixée contractuellement.[90]

142. La Demanderesse soutient que la Défenderesse a commis une faute en ne délivrant pas l'ordonnance d'approbation des Contrats litigieux et qu'elle a rompu unilatéralement et illicitement le Contrat de 2008 en réattribuant les droits issus de ce Contrat à un tiers. Il y a eu d'examiner de manière séparée la situation relative au Contrat de 2008 (1) et celle relative au Contrat de 2007 (2).

---

[87] Articles 7 et 9 des Contrats litigieux, **Pièce DM-VIII** et **Pièce DM-IX**.
[88] Articles 10.3 et 10. 4 des Contrats litigieux, **Pièce DM-VIII** et **Pièce DM-IX**.
[89] Réponses au mémoire complémentaire, le 12 juin 2018, para 108.
[90] Articles 14 et 15 et 22 des Contrats litigieux, **Pièce DM-VIII** et **Pièce DM-IX**.

**2. Le Contrat de 2008**

143. Le Contrat de 2008 a été conclu le 21 janvier 2008. Alors que les travaux d'exploration avaient été autorisés et étaient en cours, le 5 juillet 2010, la Défenderesse a indiqué à la Demanderesse que, suite à la réunion du Conseil des Ministres du 2 juin 2010, la clôture du processus d'octroi des droits miniers pour hydrocarbures sur le Graben Albertine avait conduit le Gouvernement à porter son choix sur une autre association et que, par ordonnance du 18 juin 2010, le Président de la République avait approuvé le Contrat Caprikat pour les blocs I et II du Graben Albertine.[91]

144. La Demanderesse soutient que la Défenderesse a commis des fautes (i) en ne délivrant pas l'ordonnance d'approbation du Contrat de 2008 dans un délai raisonnable et (ii) en réattribuant le bloc 1 du Graben Albertine à un autre consortium dans le cadre du Contrat Caprikat, rompant unilatéralement et illicitement le Contrat de 2008 qui avait été conclu à titre exclusif avec la Demanderesse pour une durée supérieure à 20 ans.[92]

145. Selon la Défenderesse, (i) le Contrat de 2008 ne pouvait pas produire d'effets car l'ordonnance présidentielle d'approbation n'avait pas été délivrée, (ii) la Demanderesse aurait renoncé à tous ses droits découlant du Contrat de 2008 dans le cadre d'une transaction et (iii) le Contrat de 2008 serait devenu caduc « *en raison de la disparition d'un des éléments essentiels qui condition*[n]*ait l'exécution du contrat de 2008 à savoir le bonus de 2.500.000 USD* ».[93]

146. Le Tribunal arbitral relève qu'au moment où le Contrat de 2008 a été réattribué mi-2010, selon la pratique administrative (cf. para. 135), l'ordonnance présidentielle d'approbation du contrat aurait dû être signée et publiée ou en passe de l'être. La Demanderesse avait d'ailleurs effectué, avec l'autorisation de l'administration, les travaux pétroliers ne nécessitant pas cette approbation. Il y a lieu de noter à cet égard qu'en invitant la Demanderesse à payer le bonus de signature par lettre du 14 février 2008, le Ministère des Hydrocarbures précisait que, compte tenu de l'avancée des travaux dans la partie ougandaise du Graben Albertine, il était engagé à activer les travaux d'exploration-

[91] Courrier du Ministre des Hydrocarbures de la République Démocratique du Congo à DIGOil, 5 juillet 2010, **Pièce DM-XV**.

[92] Réponse au Mémoire complémentaire, 12 juin 2018, paras 20-21.

[93] Mémoire complémentaire de la RDC du 26 avril 2018 p.4.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

production dans la zone et appelait la Demanderesse à faire diligence,[94] en suite de quoi, par courrier du 25 avril 2008, le Ministre des Hydrocarbures a formellement autorisé la Demanderesse à commencer les travaux d'installation du chantier dans le bloc 1 du Graben Albertine.[95]

147. De plus, le Tribunal arbitral constate que le Président de la République n'a pas refusé de délivrer l'ordonnance d'approbation du Contrat de 2008 mais s'est seulement abstenu de le faire pendant une période de deux ans et trois mois. Si ce délai va bien au delà du délai de six mois considéré comme raisonnable par le consultant de la Demanderesse, il s'avère cependant conforme à la pratique administrative en République Démocratique du Congo de sorte que la non-délivrance de l'ordonnance à ce stade ne serait pas un élément suffisant à lui seul pour caractériser une faute de la Défenderesse. Le Tribunal arbitral relève néanmoins qu'aucun motif d'intérêt général susceptible de s'opposer à la délivrance de l'ordonnance présidentielle n'a été avancé par la Défenderesse.

148. La Défenderesse allègue « *qu'il n'existe aucune différence fondamentale entre* [le litige qui l'a opposée à Tullow et le présent litige] *car ils portent tous les deux sur le même bloc 1 du Graben Albertine, et qu'autant DIGOIL avait été préférée à la société TULLOW, autant la société CAPRICAT avait été choisie en remplacement de DIGOIL* » et de souligner que « *l'enjeu de tous ces contentieux était bien le régime juridique de l'ordonnance présidentielle* » et que « *peu importe* (sic) *les circonstances dans lesquelles la Cour Suprême a rendu son arrêt.* »[96]

149. La Défenderesse semble considérer que, du fait de la non-délivrance de l'ordonnance présidentielle, le Contrat de 2008 n'aurait produit aucun effet, ce qui aurait laissé le processus d'attribution ouvert de sorte qu'elle pouvait réattribuer les droits sur le bloc 1 du Graben Albertine à un tiers.

150. Le Tribunal arbitral relève que la situation du Contrat de 2008 ici considérée se distingue des éléments de l'espèce soumise à la Cour Suprême dans l'instance qui a donné lieu à son arrêt du 10 décembre 2010. En effet, l'action portée devant la Cour Suprême est une action

---

[94] Courrier du Ministre des Hydrocarbures de la République Démocratique du Congo à DIGOil, 14 février 2008, **Pièce DM-LX**.

[95] Courrier du Ministre des Hydrocarbures de la République Démocratique du Congo à DIGOil, 25 avril 2008, **Pièce DM-XIII**.

[96] Observations après audience, 6 août 2018, p.7.

en « *annulation de l'arrêté ministériel n° 012/MIN-HYDRO/LMO/2007 et n° 062/MIN-FINANCE/AMK/2007 du 17 octobre 2007 portant réouverture à l'exploitation du Bloc I du Graben Albertine* », lequel arrêté a été pris conjointement par le Ministre des Hydrocarbures et le Ministre des Finances en considérant (i) « *la nécessité pour le gouvernement de valoriser les bassins sédimentaires notamment dans la zone du Graben Albertine,* » (ii) « *les objectifs du gouvernement de maximisation des recettes et d'assainissement du secteur des hydrocarbures* ; » (iii) « *les irrégularités constatées dans la procédure d'attribution des blocs un et deux ainsi que dans la signature du contrat de partage de production portant sur les blocs entre la république et l'association TULLOW-HERITAGE-COHYDRO (CCP) du 21 juillet 2006* ; » et (iv) « *l'urgence et la nécessité.* »[97]

151. De fait, il ressort des pièces annexées au Rapport Deloitte que le Contrat Tullow aurait fait l'objet d'une résiliation[98] et qu'au regard des éléments de l'espèce appréciés souverainement par le Président de la République, la poursuite de ce contrat pouvait s'avérer contraire aux intérêts de l'Etat, le Graben Albertine étant situé au Nord-est du territoire de la République Démocratique du Congo et s'étendant au-delà de la frontière sur le territoire de l'Ouganda. Alors que des découvertes étaient annoncées au cours des années 2006 et 2007 du côté ougandais et que Tullow Oil devenait la première firme pétrolière en Ouganda, à l'occasion de tensions avec l'Ouganda, la résiliation du Contrat Tullow pour le bloc 1 du Graben Albertine a été annoncée.[99] Ceci est conforté par la lettre du Ministère des Hydrocarbures du 14 février 2008 susmentionnée montrant que celui-ci est soucieux de l'avancée des travaux dans la partie ougandaise du Graben Albertine.[100]

152. Cependant, en ce qui concerne le Contrat de 2008 aucun arrêté de réouverture à l'exploration du bloc 1 du Graben Albertine n'a été pris et aucun motif d'intérêt général n'a été allégué. Rien parmi les éléments figurant au débat ne permet donc de considérer que les conditions de délivrance de l'ordonnance présidentielle selon le droit de la République Démocratique du Congo n'auraient pas été remplies pour le Contrat de 2008.

---

[97] Arrêt de la Cour Suprême de Justice de la République Démocratique du Congo, 10 décembre 2010, **Pièce DF-III**.

[98] Rapport Deloitte, Pièces à l'annexe 7, Pièce 7.1, *Hydrocarbures dans le Rift Albertine: opportunités de développement ou risques d'instabilité?* pp. 29-30, **Pièce DM-LVI**.

[99] Rapport Deloitte Pièces à l'annexe 7, Pièce 7.1, *Hydrocarbures dans le Rift Albertine: opportunités de développement ou risques d'instabilité?* p. 30, **Pièce DM-LVI**.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

153. Le fait, comme l'a décidé la Cour Suprême de Justice de la République Démocratique du Congo dans son arrêt, que le Président de la République dispose d'un pouvoir discrétionnaire, ne signifie pas que ce pouvoir puisse s'exercer de manière arbitraire et il n'appartient pas au Tribunal arbitral de se prononcer sur la validité de la décision prise par l'Etat d'attribuer les droits exclusifs issus du Contrat de 2008 à un autre consortium, mais seulement de rechercher en droit des contrats les effets de cette décision sur les obligations respectives des Parties.

154. Or, ainsi que cela a été déterminé aux paragraphes 120 et 121 ci-dessus, la non-délivrance de l'ordonnance présidentielle d'approbation du Contrat de 2008 a pour effet d'en suspendre l'exécution en application de l'article 79, alinéa 5, de la Loi de 1981, mais n'a pas pour effet de libérer les Parties des obligations en découlant. En conséquence, les Parties doivent être considérées comme ayant été encore liées par le Contrat de 2008 lorsque l'Etat a réattribué les droits exclusifs issus de ce contrat à un tiers, sauf à ce qu'il ait existé une cause permettant de mettre fin au Contrat de 2008.

155. La Demanderesse soutient que la rupture du Contrat de 2008 n'était possible que moyennant l'accord mutuel des Parties et se fonde sur l'article 33 du Décret du 30 juillet 1888[101] qui prévoit que :

> *Les conventions légalement formées tiennent lieu de loi à ceux qui les ont faites.*
>
> *Elles ne peuvent être révoquées que de leur consentement mutuel ou pour les causes que la loi autorise.*
>
> *Elles doivent être exécutées de bonne foi.*

156. Elle se prévaut des dispositions de l'article 25 du Contrat de 2008 qui énumère limitativement les causes de rupture comme suit :

> *Le Contrat pourra prendre fin à la survenance d'un des événements ci-après :*
> *(i) lorsque le Permis d'Exploration arrivera à terme et ne sera pas renouvelé en vertu de la législation en RDC ;*
> *(ii) lorsque le Permis d'Exploitation aura expiré ou n'aura pas été renouvelé conformément aux dispositions légales ;*
> *(iii) pour chaque entité du «**Contractant**» en cas de retrait volontaire ou involontaire conformément aux dispositions prévues par le Contrat d'Association ;*

---

[100] Courrier du Ministre des Hydrocarbures de la République Démocratique du Congo à DIGOil, 14 février 2008, **Pièce DM-LX**.

[101] Décret du 30 juillet 1888 des contrats des obligations conventionnelles, (B.O., 1888, p. 109), article 33, **Pièce LEX DM-II**.

> *(iv) la résiliation du contrat : l'Etat aura le droit de résilier le présent contrat dans les cas suivants :*
> - *Si le «**Contractant**» a failli gravement dans l'exécution du programme minimal des travaux votés au Comité d'Opérations aux termes de la sous-période considérée;*
> - *Si le «**Contractant**» contrevient gravement aux dispositions du contrat*
> - *Si le «**Contractant**» ne se conforme pas à la législation et à ses règlements en vigueur*
> - *Si le «**Contractant**» fait faillite passe en liquidation judiciaire.*
>
> *Toutefois cette résiliation ne pourra intervenir qu'après une mise en demeure du «**Contractant**» par la «**RDC**». Suite à cette mise en demeure les parties doivent se concerter pour trouver une solution au différend dans un délai d'un mois. Si après cette phase de négociations et d'explications, le «**Contractant**» n'a pas pris de mesures pour pallier au* [sic] *problème à l'origine de la mise en demeure dans un délai de trois mois après concertation, la «**RDC**» pourra alors commencer une procédure de résiliation du Contrat.*[102]

157. Or, le motif invoqué par la Défenderesse, à savoir qu'elle a porté son choix sur un autre candidat, n'est pas visé par cette stipulation.

158. De plus, le dernier paragraphe de l'article 29 des Contrats litigieux précise que

> *La «**RDC**» garantit au «**Contractant**», à chaque entité constituant le «**Contractant**» ainsi qu'aux cessionnaires du «**Contractant**» la non-discrimination à leur égard dans l'application des dispositions législatives ou règlementaires par rapport à toute autre société exerçant des opérations pétrolières en République Démocratique du Congo.*[103]

159. En l'absence d'allégation par la Défenderesse d'un motif d'intérêt général justifiant un refus de délivrance de l'ordonnance présidentielle, la Demanderesse soutient ainsi de manière pertinente que la décision unilatérale de la Défenderesse d'attribuer les droits qu'elle détenait au titre du Contrat de 2008 à un tiers constitue une « *voie de fait* » qui contrevient aux dispositions de l'article 33 du Décret du 30 juillet 1888 et se prévaut à juste titre de la jurisprudence selon laquelle « *a méconnu la nature des rapports contractuels auxquels l'article 33* [du Décret du 30 juillet 1888] *attribue force de loi, le jugement qui approuve*

---

[102] Contrat de 2008, article 25, **Pièce DM-IX**.

[103] Contrats litigieux, article 25, **Pièces DM-VIII** et **DM-IX**. Le Tribunal arbitral relève à cet égard la rapidité avec laquelle l'ordonnance d'approbation du Contrat Caprikat a été délivrée (environ 1,5 mois) alors que la Demanderesse a dû attendre plusieurs années en vain, ce qui constitue un manquement à la garantie consentie par l'Etat.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

*l'attitude de l'acheteur ayant recouru aux voies de fait pour résilier la convention qui le liait au vendeur (L'shi, 21.4.1972, RJZ, 1973, n°1, p. 70).»*[104]

160. La Défenderesse prétend cependant que le Contrat de 2008 serait devenu caduc au motif qu'il a été privé d'effet par les Parties pendant plusieurs années. Dans son mémoire complémentaire, elle soutient que le Contrat de 2008 s'est éteint lorsque les Parties ont accepté d'un commun accord le principe de la compensation des obligations financières du Contrat de 2008 avec celles issues du Contrat de 2007 et que cette compensation est devenue effective le 23 mars 2012, lorsque « *la DGDRAD a confirmé l'imputation du montant de 2.500.000 USD payé le 22 mars 2008* » par la Demanderesse au bonus de signature du Contrat de 2007. Le Contrat de 2008 aurait ainsi été privé d'un de ses éléments essentiels.[105]

161. La Demanderesse reconnait que la caducité est un mode de dissolution du contrat. Elle souligne cependant que celui-ci trouve son fondement non dans la loi mais dans la jurisprudence et que la Défenderesse ne rapporte pas la preuve de ce que la caducité du contrat est l'un des modes d'extinction des obligations reconnu par le droit congolais.[106]

162. La Demanderesse souligne, en outre, que « *en droit belge, la jurisprudence de la Cour de cassation de Belgique enseigne que 'la caducité d'une obligation par disparition de son objet suppose qu'il soit devenu définitivement impossible d'exécuter son objet en nature' (Lex DM-VII). La caducité d'un contrat pour cause de 'disparition d'un de ces éléments essentiels' est, en revanche, non reconnue par le Droit belge.* »[107] La Demanderesse relève également que l'exécution en nature d'une obligation de payer une somme d'argent n'est jamais définitivement impossible et qu'il suffisait à la Défenderesse d'établir une nouvelle note de perception pour le paiement du bonus de signature du contrat 2008 afin de permettre à la Demanderesse de satisfaire à cette obligation, de sorte que, à la lumière du droit belge, le Contrat de 2008 ne serait pas caduc en raison de l'imputation au Contrat de 2007 du bonus de signature payé par la Demanderesse pour le Contrat de 2008.[108] La Demanderesse

---

[104] Katuala Kaba Kashala, *Code civil congolais annoté. Première partie. Des contrats ou des obligations conventionnelles*. Editions Batena Ntambua, deuxièle édition, Kinshasa, 2009, p. 58-60, **Pièce LEX DM-IV**, p. 28, Réponse au Mémoire complémentaire, 12 juin 2018, para. 134.

[105] Mémoire complémentaire, 26 avril 2018, p.4.

[106] Réponse au Mémoire complémentaire, 12 juin 2018, paras 453-456.

[107] Réponse au Mémoire complémentaire, 12 juin 2018, para. 458.

[108] Réponse au Mémoire complémentaire, 12 juin 2018, paras. 457-463.

fait encore valoir que c'est la décision de la Défenderesse de réattribuer les droits issus du Contrat de 2008 à un tiers qui ont conduit à la disparition de son objet et que, sur la base de l'état du droit belge en la matière, la disparition de l'objet du contrat de 2008 a été délibérément causée par la République Démocratique du Congo qui, ce faisant, a commis une faute engageant sa responsabilité.[109]

163. Le Tribunal arbitral relève que, malgré ses invitations,[110] la Défenderesse ne rapporte pas la preuve, dont la charge lui incombe, de la teneur du droit congolais relativement à la caducité. Le moyen tiré de la caducité alléguée du Contrat de 2008 doit donc être rejeté.

164. La Défenderesse ne saurait non plus se prévaloir du fait qu'une transaction serait intervenue avec la Défenderesse par laquelle celle-ci aurait renoncé à tous ses droits au titre du Contrat de 2008. Elle se fonde sur le procès-verbal du 17 décembre 2010 de la réunion qui s'est tenue au cabinet du Ministre des Hydrocarbures du 9 au 17 décembre 2010.[111] Cette réunion fait suite au courrier du 21 septembre 2010 par lequel la Demanderesse a (i) dénoncé la réattribution illicite du bloc 1 du Graben Albertine à un tiers et (ii) demandé l'annulation du Contrat Caprikat et la poursuite du Contrat de 2008, soulignant avoir déjà investi au moins 12.550.000 USD dans l'exécution de celui-ci, et se réservant par ailleurs de faire valoir ses droits devant toutes les instances compétentes. Elle proposait toutefois dans cette même lettre de négocier et conclure un accord transactionnel dans le cadre duquel elle obtiendrait (i) l'ordonnance présidentielle d'approbation du Contrat de 2007, (ii) l'attribution d'un nouveau bloc 9 dans la cuvette centrale et/ou d'un autre nouveau bloc *Fossé de Boma*, et

---

[109] Réponse au mémoire complémentaire, 12 juin 2008, paras. 469-479.

[110] Dans sa communication du 16 juillet 2018, en application de l'Ordonnance de procédure No. 5 du Tribunal arbitral, la Défenderesse indique que « *sur la caducité du* [Contrat de 2008], *la RDC n'a pu disposer de suffisamment de temps pour l'appuyer par une jurisprudence documentée et reconduit donc ses moyens antérieurs quant à ce.* » Le Tribunal arbitral relève que la Défenderesse n'a pas sollicité la prolongation du délai qui lui avait été imparti par l'Ordonnance de procédure No. 5 et que ce moyen a été soulevé par la Défenderesse dès le début de la procédure (Mémoire en réponse para. 18) et a fait l'objet d'un mémoire spécifique, le Mémoire complémentaire, en date du 26 avril 2018. L'invitation faite à la Défenderesse, par Ordonnance de procédure No. 5 du Tribunal arbitral, de fournir des éléments de doctrine et jurisprudence sur cette question ne constituait donc qu'une opportunité supplémentaire qui a été offerte à la Défenderesse d'appuyer son argumentation sur de la doctrine et de la jurisprudence en droit congolais de sorte que la Défenderesse a ainsi été pleinement en mesure de faire valoir ses moyens sur cette question.

[111] Ministère des Hydrocarbures, Procès-verbal des travaux sur la compensation opérée par l'État congolais en faveur de Divine Inspiration Group du 9 au 17 décembre 2010, **Pièce DM-XXII**.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

(iii) la restitution des sommes reçues par la Défenderesse au titre des bonus de signature et du HSEQ avec intérêts.[112]

165. La Demanderesse fait valoir à juste titre que la réunion des 9-17 décembre 2010 a porté uniquement sur le mécanisme de « *compensation à opérer par l'Etat congolais* » en faveur de la Demanderesse, entendu comme mode d'extinction des dettes, c'est-à-dire pour permettre la réallocation des sommes payées au titre du bonus de signature (2.500.000 USD) et HSEQ (1.500.000 USD) par la Demanderesse en exécution du Contrat de 2008 sur le Contrat de 2007, seule la compensation entre dettes de même nature étant possible en droit congolais. De plus, le procès-verbal n'est pas un contrat et *a fortiori* pas un contrat de transaction emportant renonciation à ses droits par la Demanderesse. Il n'est d'ailleurs pas signé par les représentants habilités des Parties, à savoir, Madame Brown pour la Demanderesse et le Ministre des Hydrocarbures et le Ministre des Finances pour la Défenderesse.[113] Et si, comme le relève à juste titre la Défenderesse, le mécanisme de compensation est devenu effectif le 23 mars 2012, entrainant la satisfaction par la Demanderesse de ses obligations relatives au paiement du bonus de signature du Contrat de 2007,[114] les autres demandes de la Demanderesse concernant notamment l'investissement de 12.550.000 USD consenti en travaux pétroliers dans le cadre du Contrat de 2008 ou l'attribution d'un nouveau bloc dans la Cuvette Centrale n'ont pas été discutées et l'ordonnance d'approbation du Contrat de 2007 n'a pas été délivrée.

166. Le Tribunal arbitral relève que les pièces versées au débat montrent effectivement que les discussions postérieures à la réunion du 9 au 17 décembre 2010 ont porté essentiellement sur l'exécution du Contrat de 2007 et sur l'imputation à ce contrat des sommes payées au titre du bonus de signature du Contrat de 2008. Cependant, la Défenderesse ne rapporte pas la preuve qu'au cours de ces discussions la Demanderesse aurait renoncé de manière certaine et univoque à ses autres prétentions en réparation de la violation de ses droits issus du Contrat de 2008 dont elle a été privée. En tout état de cause le Tribunal relève qu'une des conditions essentielles posées par la Demanderesse tenant à la délivrance de l'ordonnance d'approbation du contrat de 2007 n'a pas été satisfaite alors que, le 16 mars 2012, la

---

[112] Courrier de DIGOil au Président de la République Démocratique du Congo, 21 septembre 2010, Pièce **DM-XIX**.

[113] Réponse au mémoire complémentaire, 12 juin 2018, para. 412.

Demanderesse avait versé un montant de 500.000 USD en complément de la compensation mise en place par la DGRAD.[115]

167. Le Tribunal arbitral considère donc que la Défenderesse a commis une faute (i) en ne délivrant pas l'ordonnance présidentielle d'approbation des Contrats litigieux et (ii) en réattribuant le bloc 1 du Graben Albertine à un tiers en violation des stipulations du Contrat 2008, dépossédant ainsi sans contrepartie la Demanderesse de ses droits exclusifs au titre du Contrat de 2008.

### 3. Le Contrat de 2007

168. Le Contrat de 2007 a été signé le 14 décembre 2007, attribuant au « *Contractant* » des droits exclusifs de reconnaissance et d'exploitation des hydrocarbures ainsi que le droit d'obtention des permis d'exploitation dans les limites de la ZERE constituée des blocs 8, 23 et 24 de la Cuvette Centrale. Ainsi que cela a été rappelé ci-dessus, les boni de signature relatifs à ces trois blocs (1.000.000 USD par bloc) ont été acquittés par imputation de la somme de 2.500.000 USD payée par la Demanderesse en exécution du Contrat de 2008[116] et d'une somme complémentaire de 500.000 USD payée le 16 mars 2012 par la Demanderesse.[117] Dès la signature du Contrat de 2007, la Demanderesse a effectué l'analyse des données techniques pour accéder auxquelles, préalablement à ladite signature, la Demanderesse avait payé deux « *taxes rémunératoires* » d'un montant de 50.000 USD chacune.[118] Le Ministère des Hydrocarbures a invité la Demanderesse à exécuter les travaux

---

[114] Courrier de la Direction Générale des Recettes Administratives Judiciaires Domaniales et des Participations (DGRAD), 23 mars 2012, **Pièce DM-XXXII**.

[115] Note de perception n° 322569 pour un montant de 500 000 USD, 16 mars 2012, **Pièce DM-XXX** ; Attestation de paiement d'un montant de 500 000 USD établie par Rawbank SARL, 16 mars 2012, **Pièce DM-XXXI**.

[116] Attestation de paiement d'un montant de 2.500.000 USD établie par Rawbank SARL 21 mars 2008, **Pièce DM-XII**.

[117] Courrier de la direction générale des recettes administratives, judiciaires domaniales et des participations à DIGOil (DGRAD), 17 novembre 2011, **Pièces DM-XXIX** et **DM-XXX**.

[118] Note de perception n° 312850 pour un montant de 50.000 USD du 31 août 2007, **Pièce DM II** ; Avis de débit d'un montant de 50.000 USD établi par Rawbank SARL en date du 20 septembre 2007, **Pièce DM III** ; Note de perception n° 319291 pour un montant de 50.000 USD du 16 octobre 2007, **Pièce DM IV** ; Avis de débit d'un montant de 50.000 USD établie par Rawbank SARL en date du 16 octobre 2007, **Pièce DM V** ; Attestation de paiement d'un montant de 50.000 USD établie par Rawbank SARL en date du 16 octobre 2007, **Pièce DM VI**.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

pétroliers dès le 23 juin 2012.[119] La Demanderesse a ensuite été autorisée à réaliser les travaux d'acquisition aéromagnétique et gravimétrique au mois d'août 2012,[120] les analyses correspondantes ayant été effectuées à la fin de l'année 2012 et en 2013, permettant ainsi la mise à jour des données existantes datant de 1987. Ces données ont été présentées aux experts désignés par la République Démocratique du Congo en 2013 et 2014.[121] La Président de la République n'a cependant pas délivré l'ordonnance d'approbation du Contrat de 2007 et, le 6 avril 2016, soit prêt de neuf ans après la signature du contrat, la Demanderesse a mis en demeure la Défenderesse d'exécuter le Contrat de 2007 dans un délai de 30 jours sous peine d'engager la procédure d'arbitrage.[122] Suite dépôt de la Demande, la Défenderesse a produit un courrier du 18 octobre 2017 dans lequel le Ministre des Hydrocarbures demande à nouveau au Premier Ministre de mettre en œuvre la procédure de délivrance de l'ordonnance d'approbation du Contrat de 2007.[123]

169. La Demanderesse soutient qu'en ne délivrant pas l'ordonnance d'approbation du Contrat de 2007 dans un délai raisonnable, la Défenderesse a manqué à ses obligations au titre du Contrat de 2007.

170. La Défenderesse prétend que l'action de la Demanderesse est prématurée, le Président de la République pouvant à tout moment délivrer l'ordonnance d'approbation du Contrat de 2007. Elle se fonde sur l'arrêt de la Cour Suprême de la République Démocratique du Congo du 10 décembre 2010 qui a considéré à propos du Contrat Tullow que « *le contrat suscité n'ayant pas encore commencé à produire ses effets, l'action de la Demanderesse est*

---

[119] Courrier du Ministre des Hydrocarbures de la République Démocratique du Congo à DIGOil, 23 juin 2012, **Pièce DM XXXIII**.

[120] Courrier de DIGOil au Directeur Général de l'Autorité de l'Aviation Civile, 18 juillet 2012, **Pièce DM XXXIV** ; Courrier du Ministre des Hydrocarbures de la République Démocratique du Congo à DIGOil, 30 juillet 2012, **Pièce DM-XXXV**.

[121] Courrier de DIGOil au Ministre des Hydrocarbures de la République Démocratique du Congo, 4 décembre 2012, **Pièce DM LXVIII** ; Courrier de DIGOil au Ministre des Hydrocarbures de la République Démocratique du Congo, 31 janvier 2014, **Pièce DM LXX**, Courrier de DIGOil au Président de la République Démocratique du Congo, 8 mai 2014, **Pièce DM LXII** ; Courrier de DIGOil au Ministre des Hydrocarbures de la République Démocratique du Congo, 10 septembre 2014, **Pièce DM LXXIII**.

[122] Courrier de DIGOil au Ministre des Hydrocarbures de la République Démocratique du Congo et au Premier Ministre, 6 avril 2016, **Pièce DM-XXXVIII**.

[123] Note du Ministère des Hydrocarbures au Gouvernement de la République Démocratique du Congo, 18 octobre 2017, **Pièces DF I et DM-LIV**.

*prématurée et partant irrecevable.* »[124] La Demanderesse fait observer que « *la Cour Suprême ne motive pas sa décision quant au caractère prématuré de l'action en annulation intentée par Tullow et l'on ne comprend pas pourquoi cette action visant à faire annuler l'acte qui porte annulation de son contrat aurait été prématurée.* »[125] La Défenderesse en retient l'enseignement que « *la condition* [de l'approbation du contrat par le Président de la République] *n'a pas encore été accomplie et l'action de la Société Tullow est irrecevable* » et que « *le ministère des hydrocarbures et celui des finances ne disposent d'aucun moyen de pression sur le Président de la République.* »[126]

171. Le Tribunal arbitral constate que l'action à la base du recours porté devant la Cour Suprême était une action en annulation d'un acte administratif (l'arrêté d'annulation du Contrat Tullow) fondée sur un excès de pouvoir de l'auteur de cet acte. En l'état, il ne peut en tirer aucun enseignement dans le cadre de la situation qui lui est soumise puisque, ainsi que cela a déjà été relevé ci-dessus, contrairement à l'espèce soumise à la Cour Suprême, le Contrat de 2007 n'a pas été annulé et que, nonobstant la non-délivrance de l'ordonnance présidentielle, les Parties restent liées par les obligations qu'il contient.

172. Il y a lieu de rappeler que, selon la Défenderesse elle-même, l'ordonnance d'approbation des conventions pétrolières devrait être délivrée dans « *un délai raisonnable pour un contrat d'investissement dans lequel l'État s'est engagé* ».[127] Elle ne saurait sérieusement soutenir qu'un délai de dix ans puisse constituer le « *délai raisonnable* » pendant lequel l'ordonnance du Président de la République peut être délivrée. Ce délai n'est d'ailleurs pas conforme à la pratique administrative en République Démocratique du Congo que le Tribunal arbitral a considérée ci-dessus comme étant de l'ordre de deux ans et quatre mois.

173. Le Tribunal arbitral relève enfin que la note du Ministre des Hydrocarbures du 18 octobre 2017[128] au Premier Ministre invitant celui-ci à mettre en œuvre la procédure de délivrance de l'ordonnance présidentielle d'approbation du Contrat de 2007 est demeurée

---

[124] Arrêt de la Cour Suprême de Justice de la République Démocratique du Congo, 10 décembre 2010, **Pièce DF-III**.

[125] Observations après audience, 30 juillet 2018, section 3, page 8.

[126] Observations après audience, 30 juillet 2018, section 2, quatrième page.

[127] Note du Ministre des Hydrocarbures au Gouvernement de la République Démocratique du Congo, 18 octobre 2017, **Pièce DF I** et **Pièce DM-LIV**.

[128] Note du Ministre des Hydrocarbures au Gouvernement de la République Démocratique du Congo, 18 octobre 2017, **Pièce DF I** et **Pièce DM-LIV**.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

sans effet et, pour tenter de justifier l'inexécution de son obligation au titre du Contrat de 2007, la Défenderesse ne saurait se prévaloir des dysfonctionnement au sein de l'administration tenant au fait que les Ministres des Hydrocarbures et des Finances ne disposent d'aucun moyen de pression sur le Président de la République.[129] Ainsi que cela a été déterminé ci-dessus, la délivrance de l'ordonnance d'approbation constitue une obligation de l'Etat qui n'a pas été exécutée.

174. Le Tribunal arbitral considère donc que la Défenderesse a commis une faute en ne délivrant pas l'ordonnance présidentielle d'approbation du Contrat de 2007 dans un délai raisonnable.

### D. Les Conséquences des Inexécutions

175. La Demanderesse sollicite la résiliation des Contrats litigieux avec dommages et intérêts (1) qu'elle a fait évaluer par un expert indépendant (2).

#### 1. La résiliation des Contrats litigieux avec dommages et intérêts

176. La Demanderesse sollicite la résiliation des Contrats litigieux sur la base de l'article 82 du Décret du 30 juillet 1888 qui dispose que :

> *La condition résolutoire est toujours sous-entendue dans les contrats synallagmatiques, pour le cas où l'une des deux parties ne satisfera point à son engagement.*
>
> *Dans ce cas, le contrat n'est point résolu de plein droit. La partie envers laquelle l'engagement n'a point été exécuté a le choix, ou de forcer l'autre à l'exécution de la convention lorsqu'elle est possible, ou d'en demander la résolution avec dommages et intérêts. La résolution doit être demandée en justice et il peut être accordé au défendeur un délai selon les circonstances.*[130]

177. Cette dernière disposition pose donc le principe de la résolution judiciaire pour inexécution des contrats et il n'est pas allégué que les Parties y auraient dérogé, les Contrat litigieux ne prévoyant pas de clause de résiliation de plein droit.

178. La Défenderesse souligne cependant que « *le Contrat Pétrolier n'est pas un contrat ordinaire qui obéirait totalement aux règles et principes du droit civil. Portant concession de service public, il renferme à* (sic) *des règles qui relèvent du droit civil et du droit administratif.* »[131] Elle n'en tire cependant aucune conséquence quant à la résiliation des Contrats litigieux et il n'est pas allégué que la Défenderesse disposerait ainsi du droit de

---

[129] Observations après audience, 30 juillet 2018, section 2, quatrième page.

[130] Décret du 30 juillet 1888, Des contrats et des obligations conventionnelles (B.O. 1888 PP. 109), article 82, **Pièce LEX DM-II.**

[131] Réponse au Mémoire complémentaire, 12 juin 2018, para. 16

résilier unilatéralement les Contrats litigieux pour un motif d'intérêt général mais seulement que le Président de la République dispose d'un pouvoir discrétionnaire pour la délivrance de l'ordonnance d'approbation, de sorte que la convention pétrolière revêtirait le caractère d'une convention conclue sous condition suspensive.[132]

179. Le Tribunal arbitral ayant considéré que la Défenderesse avait failli dans l'exécution de ses obligations au titre de chacun des Contrats litigieux, la Demanderesse est donc fondée à en demander la résiliation aux torts de la Défenderesse avec dommages et intérêts.

180. La Demanderesse a fait le choix, comme l'y autorise l'article 82 du décret du 30 juillet 1888, de solliciter la résiliation des Contrats litigieux plutôt que d'en demander l'exécution. La Défenderesse, quant à elle, souhaite que le Tribunal arbitral prenne acte de sa volonté de délivrer l'ordonnance présidentielle d'approbation du Contrat de 2007 et fixe un délai pour l'exécution des obligations du contrat de 2007 [133] Elle se prévaut notamment de la lettre du Ministre des Hydrocarbures au Premier Ministre du 18 octobre 2017, par laquelle il est demandé à ce dernier de mettre en œuvre la procédure de délivrance de l'ordonnance présidentielle d'approbation du Contrat de 2007.

181. Le Tribunal arbitral relève que la Demanderesse se prévaut à juste titre du fait que l'exécution du Contrat de 2008 est devenue impossible compte tenu de l'état d'avancement des travaux dans le bloc 1 du Graben Albertine.[134] Par ailleurs, concernant le Contrat de 2007, il constate que la lettre du Ministère des Hydrocarbures du 18 octobre 2017 est restée sans effet, de sorte que la volonté de la Défenderesse de délivrer l'ordonnance présidentielle d'approbation du contrat ne se traduit pas dans les faits. La Demanderesse ne saurait donc être maintenue indéfiniment dans les liens contractuels et supporter notamment les coûts de structure en résultant dans l'attente de la délivrance d'une ordonnance qui aurait du intervenir déjà depuis plusieurs années et aurait encore pu intervenir depuis le début de l'Arbitrage.

182. Il y a donc lieu de faire droit à la demande de résiliation des Contrats litigieux aux torts de la Défenderesse.

---

[132] Réponse au Mémoire complémentaire, 12 juin 2018, para. 16.
[133] Réponse au Mémoire complémentaire, 12 juin 2018, p. 12.
[134] Réponse au Mémoire complémentaire, 12 juin 2018, paras. 138-141.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

183. La prétention de la Demanderesse visant à obtenir des dommages et intérêts en sus de la résolution des Contrats litigieux apparaît également fondée en application des dispositions de l'article 82 du Décret du 30 juillet 1888 citées ci-dessus ainsi que de celles de son article 45 qui prévoient que :

> *Le débiteur est condamné, s'il y a lieu, au paiement de dommages et intérêts, soit à raison de l'inexécution de l'obligation, soit à raison du retard dans l'exécution, toutes les fois qu'il ne justifie pas que l'exécution provient d'une cause étrangère qui ne peut lui être imputée encore qu'il n'y ait aucune mauvaise foi de sa part.*[135]

184. Il y a donc lieu de faire droit à la demande de condamnation de la Défenderesse à indemniser la Demanderesse pour tous les dommages qu'elle a subis qu'il convient dès lors d'évaluer.

### 2. Le droit à réparation et l'évaluation des dommages et intérêts

185. Selon de l'article 47 du Décret du 30 juillet 1888 :

> *Les dommages et intérêts dus au créancier sont, en général, de la perte qu'il a faite et du gain dont il a été privé, sauf les exceptions et modifications ci-après.*[136]

186. En application de cette disposition, la Demanderesse sollicite des dommages et intérêts visant à réparer le préjudice qu'elle a subi du fait de la non-exécution et de la résiliation des Contrats litigieux comprenant, d'une part, la perte subie par la Demanderesse comprenant l'ensemble des dépenses qu'elle a exposées dans le cadre des Contrats litigieux pour un montant total de 19.552.884 USD et, d'autre part, le manque à gagner résultant de la perte d'exploitation au titre des Contrats litigieux évalué à la somme de 597.847.994 USD.

187. Les montants réclamés sont ceux qui ont été calculés par les deux experts indépendants[137] du groupe Deloitte, Monsieur Robin G. Bertram et Monsieur Anthony Charlton, qui ont

---

[135] Décret du 30 juillet 1888, Des contrats ou des obligations conventionnelles, (B.O. 1888 PP. 109), article 82, **Pièce LEX DM-II**.

[136] Décret du 30 juillet 1888, Des contrats ou des obligations conventionnelles, (B.O. 1888 p. 109), article 47, **Pièce LEX DM-II**.

[137] Bien que commis par la Demanderesse, Messieurs Bertram et Charlton sont intervenus chacun en tant qu'expert indépendant : Expert report of Robin G. Bertram (Deloitte), March 29, 2018 et sa traduction en français, ; Rapport d'expert de Robin G. Bertram (Deloitte), 29 mars 2018, para. 1.2, **Pièce DM-LVII** ; Rapport d'expert d'Anthony Charlton (Deloitte), 30 mars 2018, para. 1.2, **Pièce DM-LV**. Au début de son audition à l'Audience, Monsieur Charlton a en outre confirmé au Tribunal arbitral que (i) son devoir en tant d'expert était d'éclairer le Tribunal arbitral sur les aspects techniques du litige dans son domaine de compétence et que ce devoir outrepassait toute obligation qu'il pourrait avoir envers la Demanderesse et (ii) bien que, selon la loi du lieu de l'arbitrage et l'article 1467 du Code français de procédure civile – qui dispose « *Le tribunal arbitral peut entendre toute personne. Cette audition a lieu*

réalisé deux études ayant conduit au dépôt, d'une part, d'un rapport technique (le « ***Rapport Bertram*** »)[138] dans lequel les ressources pétrolières des blocs 8, 23 et 24 de la Cuvette Centrale et du bloc 1 du Graben Albertine ont été évaluées et, d'autre part, d'un rapport financier (le « ***Rapport Charlton*** »)[139] visant à estimer la perte économique subie par la Demanderesse en déterminant la valeur de marché de chacun des projets relatif respectivement au bloc 1 du Graben Albertine et aux blocs 8, 23 et 24 de la Cuvette Centrale dont la Demanderesse a été privée et les dépenses engagées et les paiements effectués par la Demanderesse dans le cadre du Contrat de 2008 et du Contrat de 2007, en distinguant celles qui aurait été engagées dans le cadre d'une conduite normale des activités de celles engagées en pratique du fait du non-respect par la Défenderesse de ses obligations contractuelles.[140]

188. Le lien de causalité entre la faute retenue par le Tribunal arbitral et le dommage allégué est suffisamment caractérisé, la non délivrance de l'ordonnance présidentielle alors que les conditions requises par la loi congolaise étaient satisfaites a eu pour effet direct de faire subir à la Demanderesse une perte résultant des dépenses exposées pour l'exécution des Contrats litigieux et de la priver des gains attendus de cette exécution. Ce lien de causalité direct n'est d'ailleurs pas contesté par la Défenderesse qui nie en revanche le caractère certain du préjudice de gain manqué.

189. Pour les raisons ci-dessous, le Tribunal arbitral considère que le préjudice subi par la Demanderesse est un préjudice certain, actuel en ce qui concerne la perte subie, et futur en ce qui concerne le gain manqué et il doit s'assurer que la réalisation de ce dernier est suffisamment probable et non hypothétique pour être réparé.

*(a) Le manque à gagner*

190. La Défenderesse concède que le dommage subi par la Demanderesse serait direct mais conteste son caractère certain, considérant qu'il serait seulement éventuel et alléguant que ce qui est à réparer n'est pas le bénéfice que la Demanderesse aurait pu gagner mais plutôt

---

*sans prestation de serment* » –, il ne soit pas obligé de prêter serment, son témoignage d'expert doit être indépendant et impartial.

[138] Expert report of Robin G. Bertram (Deloitte), March 29, 2018 et sa traduction en français, Rapport d'expert de Robin G. Bertram (Deloitte), 29 mars 2018, **Pièce DM-LVII**

[139] Rapport d'expert d'Anthony Charlton (Deloitte), 30 mars 2018, **Pièce DM-LV** ; pièces jointes au rapport d'expert d'Anthony Charlton (Deloitte), **Pièce DM-LVI**.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

la perte de chance de ne pas l'avoir gagné. Il appartiendrait ainsi au Tribunal arbitral de déterminer la fraction du dommage correspondant à la perte de chance en fonction de deux éléments : (i) l'existence d'une chance sérieuse de succès et (ii) le caractère sérieux et irrémédiable de la chance perdue. Sur le premier point, elle souligne que les réserves identifiées par le Rapport Bertram ne sont que des réserves probables et non des réserves récupérables, ce qui la conduit à émettre des réserves quant à la valeur économique de celles-ci. Sur le second point, elle se prévaut du fait que le Président de la République peut à tout moment approuver le Contrat de 2007 par ordonnance, de sorte que la chance de réaliser un gain ne serait pas irrémédiablement perdue.[141]

191. La Défenderesse conteste ainsi le caractère certain du préjudice au titre du gain manqué et considère que le Tribunal arbitral ne devrait prendre en considération que la chance perdue de réaliser ce gain. Il appartient donc au Tribunal arbitral de déterminer la nature du préjudice subi par la Demanderesse.

192. Un préjudice doit être considéré comme simplement éventuel, susceptible le cas échéant d'être réparé au titre de la perte de chance, lorsque sa survenance est subordonnée à un évènement dont rien ne dit qu'il se réalisera, auquel cas le préjudice ne serait indemnisable que pour autant que la probabilité que l'évènement attendu se réalise serait importante.

193. En l'espèce, le Tribunal considère que l'évènement susceptible de déclencher une exploitation, et donc de permettre la réalisation de gains, est la délivrance des permis d'exploitation. Ainsi que le Tribunal arbitral l'a relevé au paragraphe 139 ci-dessus, conformément aux stipulations des articles 10.3 et 10.4 des Contrats litigieux, la Défenderesse avait l'obligation de délivrer les permis d'exploitation en cas de découverte de ressources commercialement exploitables. La délivrance de tels permis n'est donc pas éventuelle mais constitue bien la prolongation certaine et directe d'un état de chose actuel susceptible d'estimation immédiate et constitue ainsi un préjudice certain futur susceptible

---

[140] Rapport d'expert d'Anthony Charlton (Deloitte), 30 mars 2018, para. 1.13, **Pièce DM-LV**.

[141] Réponse au Mémoire complémentaire, 12 juin 2018, paras. 46-50. Le Tribunal arbitral relève, à cet égard en premier lieu, qu'il a fait droit à la demande de résiliation du Contrat de 2007 aux torts exclusifs de la Défenderesse et qu'il en résulte que la Demanderesse a sérieusement et irrémédiablement perdu la chance de réaliser les gains espérés dans le cadre du Contrat de 2007. Par ailleurs, il en va de même dans le cadre du Contrat de 2008 pour lequel les droits exclusifs de la Défenderesse ont été réattribués à un tiers.

d'être indemnisé à condition que l'événement futur favorable ne soit pas simplement virtuel ou hypothétique.

194. Le Tribunal arbitral doit ainsi s'assurer que la découverte de ressources commercialement exploitables susceptibles de permettre une exploitation présente un caractère non hypothétique et suffisamment probable pour justifier la réparation de ce chef de préjudice.

195. Il relève en premier lieu que la Demanderesse a démontré sa capacité à mener des opérations pétrolières dans le cadre des travaux qu'elle a effectués en exécution des Contrats litigieux. Répondant aux questions du Tribunal arbitral à l'audience, la Demanderesse a en outre indiqué avoir conservé une participation de 5,87% dans le bloc III du Graben Albertine dont l'exploration est conduite par le géant pétrolier Total[142] et être active en tant qu'opérateur de blocs pétroliers, notamment, en République Centre Africaine. La probabilité que la Demanderesse soit à même de mener à bien les opérations de prospection pétrolière et, le cas échéant, de mobiliser si nécessaire un « major » du secteur pour l'exploitation paraît ainsi suffisamment établie et n'a d'ailleurs pas été contestée par la Défenderesse. Le Tribunal arbitral relève ainsi que le préambule des Contrats litigieux souligne, selon le cas, que la Demanderesse ou le consortium dont elle est l'une des entités a démontré sa capacité technique et financière dans l'exploration et la production pétrolière.[143]

196. Concernant le caractère probable et non hypothétique de découvertes de ressources exploitables au regard du caractère probable et non prouvé des réserves mises en évidence par le Rapport Bertram allégué par la Défenderesse, le Tribunal arbitral constate que Monsieur Bertram a :

(i) adopté une approche probabiliste décrite à l'annexe 10 du Rapport Bertram le conduisant, comme c'est l'usage dans l'industrie pétrolière, à évaluer sur la base de données scientifiques le potentiel pétrolier des blocs concernés selon trois scenarii : le scenario bas (P90), le meilleur scenario (P50) et le scenario haut (P10), auxquels correspondent respectivement des probabilités de 10 %, 50 % et 90 % que les

---

[142] Voir en ce sens également, Rapport Deloitte, Pièces à l'annexe 7, Pièce 7.1, *Hydrocarbures dans le Rift Albertine: opportunités de développement ou risques d'instabilité?* p. 32, **Pièce DM-LVI.**

[143] Contrat de 2007, p.3, **Pièce DM-VIII** ; Contrat de 2008, p.4, **Pièce DM-IX.**

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

volumes de pétrole extraits soient égaux ou supérieurs aux estimations, de sorte que les estimations sont ainsi des estimations minimum ;[144]

(ii) appliqué des facteurs de chances de réussite à chacun des trois scenarios prenant en compte, d'une part, des chances de réussite géologique de 0,23 pour les blocs 8, 23 et 24 de la Cuvette Centrale et de 0,40 pour le bloc 1 du Graben Albertine basées sur une estimation de la qualité de la roche source d'hydrocarbures, de la capacité des hydrocarbures à migrer dans le réservoir de roche approprié et du piégeage relatif et des propriétés de confinement de la roche réservoir[145] et, d'autre part, des chances de réussite commerciale de 0,72 pour les blocs 8, 23 et 24 de la Cuvette Centrale et de 0,76 pour le bloc 1 du Graben Albertine basées sur la viabilité économique, la technologie et la qualité du scénario de développement, la multiplication des facteurs de chance de réussite géologique et de chance de réussite économique permettant de faire ressortir une chance de réussite globale de 0,16 (soit un taux de 16%) pour les blocs 8, 23 et 24 de la cuvette centrale et de 0,30 (soit un taux de 30%) pour le bloc 1 du Graben Albertine ;[146]

(iii) tenu compte des paramètres économiques liés à l'industrie pétrolière qu'il a imputés sur les revenus estimés de l'exploitation pétrolière, à savoir les coûts opérationnels, les coûts d'acheminement du pétrole sur le marché, les dépenses d'investissement sur le champ pétrolier et les coûts de remise en état ;[147]

(iv) retenu, sur la base du meilleur scenario, des <u>ressources potentielles « non risquées »</u> à partir des volumes bruts de ressources pétrolières prospectives de 477 MMbbl pour les blocs 8, 23 et 24 de la cuvette centrale et de 159 MMbbl pour le bloc 1 du Graben Albertine représentant respectivement un revenu brut de 44.694.000.000 USD (44,694 milliards) et de 14.240.000.000 USD (14,240

---

[144] Rapport d'expert d'Anthony Charlton (Deloitte), 30 mars 2018, para. 4.38, **Pièce DM-LV** ; Rapport d'expert de Robin G. Bertram (Deloitte), 29 mars 2018, tableaux sous le paragraphe 2.2, **Pièce DM-LVII**.

[145] Le Tribunal arbitral relève que ce taux de succès géologique permet de tenir compte, notamment, de l'éventualité évoquée par la Défenderesse à l'Audience selon laquelle on ne pouvait exclure la possibilité d'un forage conduisant à un puits sec. L'éventualité d'un puits sec n'exclut pas en effet qu'au cours de la période de prospection de la ZERE d'autres forages puissent mener à la découverte de ressources commercialement exploitables conduisant à la délivrance d'un permis d'exploitation.

[146] Rapport d'expert de Robin G. Bertram (Deloitte), 29 mars 2018, paras. 5.1 à 5.38, **Pièce DM-LVII**.

[147] Rapport d'expert de Robin G. Bertram (Deloitte), 29 mars 2018, section 7, paras. 7.1 à 7.26, **Pièce DM-LVII**.

milliards) dont 25.719.000.000 USD (25,719 milliards) et 4.713.000.000 USD (4,713 milliards) et des ressources potentielles « risquées » prenant en compte les taux de réussite respectifs de 16 % et de 30 % précédemment estimés, le conduisant à estimer la part de la Demanderesse à 44,5 MMbbl et 15,4 MMbbl représentant respectivement pour la Demanderesse un revenu net de 4.115.000.000 USD (4,115 milliards) et de 1.414.000.000 USD (1.414 milliards).[148]

197. Concernant la Cuvette Centrale, la Défenderesse, « *tout en reconnaissant, la nature géologique et géophysique des travaux entrepris dans les blocs 8, 23 et 24 de la Cuvette Centrale et 1 du Graben Albertine est susceptible de permettre l'identification des ressources pétrolières, se réserve quant à leur quantité, et leur taux de récupération, en l'absence de forage d'appréciation et de développement.* »[149]

198. Elle souligne qu'au regard des travaux pétroliers entrepris dans la Cuvette Centrale qui n'ont pas été au-delà des forages stratigraphiques ayant pour but de procéder à la reconnaissance géologique d'un bassin par l'identification des formations sous-jacentes, « *il y a lieu de conclure que les réserves en hydrocarbures* […] *sont encore au stade des ressources dont la quantité reste encore à confirmer.* »[150] Le Tribunal arbitral constate que la Défenderesse ne conteste pas le volume de réserves probables retenues par Monsieur Bertram non plus que le taux de réussite de 16 % qu'il leur a appliqué, considérant au contraire que cet expert a été prudent « *en ne retenant pas l'hypothèse la plus haute afin de refléter le fait qu'une partie du pétrole n'est pas susceptible d'être récupérée.* »[151] La probabilité que des ressources en hydrocarbures de la Cuvette Centrale soient exploitables est ainsi établie et ne peut pas être considérée comme hypothétique.

199. Concernant le bloc 1 du Graben Albertine, la Défenderesse indique que la société *Oil of DRC*, nouvel opérateur pour le compte des sociétés Caprikat et Foxwhelp, a entrepris la sismique et déclaré par voie de presse avoir découvert des réserves probables de 3000

---

[148] Rapport d'expert de Robin G. Bertram (Deloitte), 29 mars 2018, section 5, para. 2.5, **Pièce DM-LVII**.

[149] Mémoire complémentaire, 12 juin 2018, para 25. La Défenderesse précise que « *après un premier **forage d'exploration** qui donne des indications sur la zone et présente des données intéressantes sur le plan géologique et commerciale (sic) plusieurs autres **forages d'évaluation** (appraisal drilling) sont effectués pour circonscrire l'étendue du gisement renforcé. C'est seulement encaissé seulement ensuite effet de **forage de développement,** c'est-à-dire consistant à extraire les hydrocarbures sous-sol.* » (Mémoire complémentaire, le 12 juin 2018, para 28).

[150] Réponse au Mémoire complémentaire, 12 juin 2018, paras. 24 à 26.

[151] Réponse au Mémoire complémentaire, 12 juin 2018, para. 27.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION

milliards de barils.[152] Le procès-verbal de la réunion qui s'est tenue le 15 août 2014 entre les représentants du Ministère des Hydrocarbures et de la société *Oil of DRC* renseigne que :

> *Lors du* [Comité d'Opération Mixte du 8 avril 2014, Oil of DRC (« ***OofDRC*** »)] *avait présenté au Ministère des Hydrocarbures un rapport détaillé sur les résultats de deux (2) campagnes d'acquisitions sismiques faite sur le bloc I et II. A cette occasion, OofDRC avait également informé le Ministère des Hydrocarbures des conclusions faisant état de l'identification de sept Prospects et de trois Leads avec une estimation respective d'une valeur de 1.609.58 Mldbbl pour les Prospects et de 1.284.43 Mldbbl pour les Leads ce qui fait un total approximatif de 2.900 Mldbbl (OIIP), exactement mentionné par Reuters.*[153]

200. Le Tribunal arbitral relève que, bien que cette estimation des « réserves probables » qui constituent des « données non risquées » porte sur les blocs 1 et 2 du Graben Albertine, elles se situent à un niveau bien supérieur à celui retenu par le Rapport Bertram qui pour le seul bloc 1 est de 159 milliards de barils dans l'hypothèse du meilleur scénario et de 451 milliards de barils dans l'hypothèse du scénario haut. Il note également que la Défenderesse elle-même reconnait que Monsieur Bertram a été prudent en ne retenant pas l'hypothèse la plus haute.[154] La probabilité que les ressources en hydrocarbures du bloc 1 du Graben Albertine soient exploitables est ainsi établie et présente bien un caractère non hypothétique.

201. De manière plus générale, le Rapport Bertram souligne que « *le risque est une mesure subjective et il peut varier en fonction de l'évaluateur de réserves qualifié. C'est pourquoi des données non risquées sont communément présentées dans les rapports réserves.* »[155]

202. Le Tribunal arbitral note que la Défenderesse trouve « *inopportune la production d'un autre rapport d'expertise, les parties et le tribunal pouvant en effet tirer leurs propres conclusions à partir des éléments techniques contenus dans le rapport Deloitte.* »[156] Il relève également que la Défenderesse a choisi de ne pas faire entendre ses propres experts et, notamment, les experts du Ministère des Hydrocarbures qui disposent de tous les éléments techniques et des ressources d'analyse les mettant en mesure de contredire ou nuancer les analyses du Rapport Bertram et de fournir au Tribunal arbitral leur propre

---

[152] Réponse au Mémoire complémentaire, 12 juin 2018, paras. 31 à 34.

[153] Procès-verbal de la huitième réunion extraordinaire du Comité d'Opérations du CPP des blocs I et II du Graben Albertine, 15 août 2014, **Pièce DM-L**.

[154] Réponse au Mémoire complémentaire, 12 juin 2018, para. 23.

[155] Rapport d'expert de Robin G. Bertram (Deloitte), 29 mars 2018, para. 2.6, **Pièce DM-LVII**

[156] Réponse au Mémoire complémentaire, 12 juin 2018, para. 23.

estimation du risque de réussite. La Défenderesse ne présente donc au Tribunal arbitral aucun élément concret d'appréciation lui permettant de remettre en cause les taux de réussite de 16% pour les blocs de la Cuvette Centrale et de 30 % pour le bloc 1 du Graben Albertine retenus par le Rapport Bertram, qui, non contestés par la Défenderesse, apparaissent au demeurant, fondés sur des éléments scientifiques et techniques et une analyse sérieuse conforme aux usages de l'industrie pétrolière.

203. Le Tribunal arbitral constate donc que l'aléa que constitue le caractère probable des réserves ne paraît pas sous-estimé et qu'il a été très largement pris en compte par le Rapport Bertram. Le caractère probable et non hypothétique de ressources exploitables est ainsi établi et, dès lors, le Rapport Bertram a pu constituer une base technique sérieuse à l'évaluation financière objet du Rapport Charlton.

204. Le Rapport Charlton estime la perte économique subie par la Demanderesse en déterminant d'une part, la valeur de marché de chacun des projets relatifs, respectivement, au bloc 1 du Graben Albertine (le « ***Projet Albertine*** ») et aux blocs 8, 23 et 24 de la Cuvette Centrale (le « ***Projet Cuvette*** ») dont la Demanderesse a été privée du fait des manquements de la Défenderesse à ses obligations contractuelles, et, d'autre part, les dépenses engagées et les paiements effectués par la Demanderesse dans le cadre du Contrat de 2008 et du Contrat de 2007, en distinguant celles qui aurait été engagées dans le cadre d'une conduite normale des activités de celles engagées du fait du non-respect par la Défenderesse de ses obligations contractuelles.[157]

205. Il a appliqué la méthode des flux de trésorerie actualisés ou *discounted cash flow* (« DCF ») qui est une méthode reconnue et communément utilisée dans le monde de la finance pour l'évaluation de projets et d'entreprises, écartant, d'une part, l'approche analogique qui se fonde sur le principe de substitution selon lequel un investisseur prudent ne paierait pas plus pour un actif que le coût d'un actif équivalent avec la même utilité en raison du manque d'information publique disponible sur de telles transactions et, d'autre part, l'approche patrimoniale qui revient à estimer séparément les différents actifs, divisions ou filiales de l'entreprise et à en soustraire la valeur de l'endettement net qui est plus adaptée à l'évaluation d'une holding ou d'une société foncière mais ne permet pas de prendre en compte les éléments immatériels (*goodwill*), rappelant à cet égard qu'il ne cherche pas

---

[157] Rapport d'expert d'Anthony Charlton (Deloitte), 30 mars 2018, para. 1.13, **Pièce DM-LV**.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

estimer la valeur de la Demanderesse en tant que telle mais la valeur du Projet Albertine et du Projet Cuvette. La méthode des DCF permet d'estimer la valeur d'un actif sur la base des flux de trésorerie générés sur la durée du projet, actualisés au taux moyen de rendement pour ramener la valeur nette de ce projet à la date d'évaluation retenue du 31 décembre 2017.[158] L'application de cette méthode n'est pas critiquée par la Défenderesse qui souligne que « *les rapports sont structurés conformément aux standards internationaux* »[159] En l'espèce, s'agissant de l'évaluation d'un préjudice futur et d'un projet à long terme, elle paraît effectivement constituer la méthode la plus adéquate.

206. Monsieur Charlton a ensuite conduit son analyse en quatre étapes principales, récapitulées sous le paragraphe 4.49 du Rapport Charlton comme suit :

(i) détermination du revenu (volume de pétrole extrait en MMbbl x prix annuel moyen du BRENT sur la base de prévisions de prix actualisées au 31 décembre 2017) à prendre en compte à partir des éléments correspondant aux trois scénarios « non risqués » du rapport Bertram ;

(ii) déduction de la *Royalty* et du *Profit Oil* tels que prévus aux Contrats litigieux ;

(iii) déduction des coûts comprenant les paramètres économiques liés à l'industrie pétrolière pris en compte par le Rapport Bertram, des paiements contractuels à effectuer par la Demanderesse (bonus et contributions) et des coûts fixes et de structure qui n'avaient pas été pris en compte par Monsieur Bertram ;

(iv) application au résultat des facteurs de réussite de 16 % pour le Projet Cuvette et de 30 % pour le Projet Albertine retenus par le Rapport Bertram et d'un coefficient d'actualisation de 18,8%.

207. Le manque à gagner de la Demanderesse correspond à sa part dans la valeur de chacun des projets et a été évaluée sur la base de la moyenne pondérée des valeurs déterminées dans le cadre des scénarios haut, meilleur et bas dans une proportion de 30%, 40% et 30% respectivement (moyenne Swanson). La part de la Demanderesse calculée par Monsieur Charlton s'élève au 31 décembre 2017 à 230,2 millions d'USD pour le Projet Cuvette et 361,5 millions d'USD pour le projet Albertine pris individuellement. La valeur combinée du Projet Albertine et du Projet Cuvette estimée à 597,8 millions USD est néanmoins supérieure à la somme des valeurs individuelles ci-dessus du fait des économies d'échelle

[158] Rapport d'expert d'Anthony Charlton (Deloitte), 30 mars 2018, paras. 4.20 à 4.24, **Pièce DM-LV**.

qui permettent de répartir la moitié des coûts fixes ou de structure à chaque projet.[160] Cette approche est conforme aux usages en matière pétrolière et n'est pas contestée par la Défenderesse.

208. La Demanderesse souligne que Monsieur Charlton a comparé le prix du baril retenu pour son évaluation du manque à gagner – 1,27 USD le baril – avec le prix du baril retenu pour la vente récente par *Tullow Oil* à *Total E&P Ouganda B.V.* de ses intérêts dans les blocs 1, 1A, 2 et 3A du côté au ougandais du bassin du Graben Albertine, le prix de cette transaction ayant été calculée sur la base d'un baril à 3,48 USD,[161] de sorte que le calcul du manque à gagner sur la base d'un prix de 1,27 USD est tout à fait prudent et raisonnable. Elle se prévaut également de l'avis de Monsieur Philip Dimmock, spécialisé dans les évaluations pétrolières[162], qui considère que le Rapport Charlton (i) prend en compte pour les trois blocs de la Cuvette Centrale, des valeurs négatives, ce qui fait baisser les moyennes alors que les valeurs négatives n'apparaissent habituellement pas dans le calcul des moyennes,[163] (ii) retient un pourcentage de succès de 40 % pour le bloc 1 du Graben Albertine alors qu'il est déjà établi que le pourcentage de succès oscille entre 86 et 87% pour les blocs du Graben Albertine situés en Ouganda[164] et (iii) retient un taux d'actualisation de 18,8 % alors que le taux habituel dans l'industrie pétrolière est plutôt de 15 %.

209. La Défenderesse, quant à elle, reconduit à propos du calcul du manque à gagner les observations qu'elle a formulées concernant le caractère probable des réserves et souligne que « *c'est à juste titre que l'expert a été prudent* » concernant les coûts car « *ils doivent être estimés en tenant compte du fait qu'il n'y a pas eu exploration et exploitation à l'exception des campagnes d'aéromagnétique et de gravimétrie* ».[165] Elle fait valoir :

---

[159] Réponse au Mémoire complémentaire, 12 juin 2018, para. 23.

[160] Rapport d'expert d'Anthony Charlton (Deloitte), 30 mars 2018, paras. 4.69 à 4.77, **Pièce DM-LV**.

[161] Courrier de Monsieur Philip Dimmock, 30 avril 2018 **Pièce DM-LVIII** et sa traduction libre en français, **Pièce DM-LIX**.

[162] Courrier de Monsieur Philip Dimmock, 30 avril 2018 **Pièce DM-LVIII** et sa traduction libre en français, **Pièce DM-LIX**.

[163] Le calcul de la moyenne Swanson pour les trois blocs de la Cuvette Centrale fait effectivement apparaître des valeurs négatives (Rapport Charlton, para. 4.73).

[164] Bien que cela ne soit pas précisé, le Tribunal arbitral relève qu'il s'agit du pourcentage de succès géologique et non du pourcentage de réussite qui est de 30%.

[165] Réponse au Mémoire complémentaire, 12 juin 2018, paras. 36 à 45.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

> *En définitive, le chiffre de 597.800.000 USD est sujette* (sic) *d'évolution vers le bas* ***vers le haut,*** *à la suite d'autres travaux de forage, d'évaluation et de développement qui seront effectuées* (sic) *et des dépenses, coûts et risques opérationnels attendus.*[166]

210. Le Tribunal arbitral note, par ailleurs, que les trois points relevés par Monsieur Dimmock et rapportés au paragraphe 209 ci-dessus peuvent expliquer que les prétentions initiales de la Demanderesse aient été bien supérieures à celles retenues par Monsieur Charlton. La quantification de sa demande a été réduite par la Demanderesse après qu'elle ait pu recueillir les premières analyses de son consultant puis lors la communication par la Demanderesse du Rapport Charlton. Le Tribunal arbitral n'a ainsi relevé aucun élément concret lui permettant de critiquer et de s'écarter de l'évaluation de Monsieur Charlton en le justifiant autrement que de manière arbitraire.

*(b) La perte subie*

211. Monsieur Charlton a évalué les dépenses effectuées par la Demanderesse dans le cadre des Contrats litigieux à la somme de 19.552.884 USD, la liste de chaque dépense supportée par la Demanderesse figurant en annexe 13 au Rapport Charlton. Ces dépenses comprennent la totalité des dépenses contractuelles et opérationnelles prise en compte dans le calcul du manque à gagner, de sorte qu'elles ont pu être maintenues dans le calcul de la perte subie sans risque de double indemnisation ainsi que les dépenses engagées dans le cadre du litige.[167] L'expert s'est fait remettre pour chaque dépense (i) la preuve que la dépense est liée aux Contrats litigieux, (ii) la facture et (iii) la preuve de paiement, dont la liste figure en annexe 2 du Rapport Charlton. Il a ensuite classé les dépenses en deux catégories : (i) les dépenses dites de « Niveau I », pour lesquelles il obtenu a une facture <u>et</u> une preuve du paiement <u>et</u> a pu établir que la dépense a été engagée dans le cadre du Projet Albertine du Projet Cuvette, s'élèvent à 18.690.786 USD et (ii) les dépenses dites de « Niveau II », pour lesquelles il a reçu une facture <u>ou</u> une preuve de paiement <u>et</u> a pu établir un lien avec les Contrats litigieux, s'élèvent à 862.098 USD.[168] Cette dernière catégorie tient compte du temps écoulé, de l'environnement économique et de l'environnement juridique dans lequel la Demanderesse opérait au lancement des projets.[169] Il a appliqué un taux de conversion

---

[166] Réponse au Mémoire complémentaire, 12 juin 2018, para. 47.

[167] Rapport d'Anthony Charlton (Deloitte), 30 mars 2018, para. 5.2, **Pièce DM-LV**.

[168] Rapport d'Anthony Charlton (Deloitte), 30 mars 2018, Tableau 5.5 sous le paragraphe 5.87, page 59, **Pièce DM-LV**.

[169] Rapport d'Anthony Charlton (Deloitte), 30 mars 2018, paras. 5.4 à 5.9, **Pièce DM-LV**.

en USD lorsque la dépense était libellée en une autre monnaie[170] et un taux d'intérêt sur la base d'une composition annuelle des intérêts afin de déterminer la valeur des dépenses engagées par la Demanderesse à la date du 31 décembre 2017.[171]

212. La Défenderesse s'en remet à la sagesse du Tribunal arbitral pour l'appréciation et l'authenticité des preuves des dépenses de Niveau I et considère par contre que les dépenses de Niveau II devraient être rejetées, toute dépense qui ne serait pas documentée au motif que le mode de paiement en RDC se ferait en espèces, sans trace de paiement, ne pouvant pas être pris en compte et devant être écartées.[172]

213. La Demanderesse souligne que « *si les dépenses de niveau II ne correspondent pas aux standards applicables au sein du groupe Deloitte pour les retenir dans le niveau I, il ressort de l'annexe13.12 du rapport de l'expert Charlton (DM LV) que la réalité de ces dépenses est suffisamment établie en regard du droit applicable par la production pour chacune de ces dépenses d'une facture ou d'une preuve de paiement en lien avec les contrats de 2007 et 2008* » et que « *de nombreuses dépenses pour un montant supérieur à 6 millions de dollars américains, ne sont pas documentées au moyen d'une facture ou d'une preuve de paiement en raison de la réalité économique en République Démocratique du Congo* » et « *ont été rejetées par l'expert Charlton* » de sorte que « *le montant réel de la perte subie* [par la Demanderesse est] *largement supérieur au montant calculé par l'expert Charlton* ».[173]

214. Le Tribunal arbitral relève, en premier lieu, que Monsieur Charlton a rejeté de nombreuses dépenses comme ne présentant pas un lien suffisant avec les Contrats litigieux, les prétentions de la Demanderesse à cet égard ayant été initialement quantifiées à 23.882.537 USD.[174] Par ailleurs, la Défenderesse ne conteste pas être débitrice de la perte subie au titre des dépenses de Niveau I. Ayant examiné les dépenses concernées et interrogé à l'Audience Monsieur Charlton qui a confirmé avoir reçu et vérifié toutes les factures, les preuves de paiement et les contrats relatifs aux dépenses engagées détaillées en annexe 13.1 à 13.12 à son rapport, le Tribunal arbitral considère que toutes ces dépenses de Niveau I

---

[170] Rapport d'Anthony Charlton (Deloitte), 30 mars 2018, para 5.10, **Pièce DM-LV**.
[171] Rapport d'Anthony Charlton (Deloitte), 30 mars 2018, paras. 5.10, **Pièce DM-LV**.
[172] Réponse au Mémoire complémentaire, 12 juin 2018, paras. 52 à 54.
[173] Réponse au Mémoire complémentaire, 12 juin 2018, para. 266-271.
[174] Acte de mission, 29 août 2017, para74.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

sont clairement établies comme étant effectivement supportées par la Demanderesse en lien avec les Contrats litigieux, de sorte qu'il y a lieu de les inclure dans la perte subie.

215. Concernant les dépenses de Niveau II, la Défenderesse a été mise en mesure de contester chaque poste de dépense retenu par l'Expert dans l'annexe 13.12. Ces dépenses concernent certaines études de géosciences, des frais de conseil, dépenses marketing, des frais de déplacement, dépenses d'hébergement et des dépenses juridiques en lien avec le litige. Monsieur Charlton décrit les éléments dont il a pu disposer qui montrent que, dans chaque cas, il a disposé soit d'une facture, soit d'une preuve de paiement, et a pu établir un lien avec les Contrats litigieux. La Défenderesse était ainsi en mesure de critiquer chaque dépense, poste par poste, et s'est abstenue de le faire, se limitant à une critique de principe sans réelle justification.

216. Le Tribunal arbitral considère donc que les dépenses de Niveau II sont suffisamment documentées et qu'il convient de les inclure dans la perte subie.

217. En conséquence, la Défenderesse doit payer à la Demanderesse la somme de 597.847.994 USD en compensation du manque à gagner résultant de la perte d'exploitation au titre des Contrats litigieux et de 19.552.884 USD au titre des dépenses qu'elle a engagées dans le cadre des Contrats litigieux.

### E. LES COÛTS DE L'ARBITRAGE

218. La Demanderesse considère qu'il y a lieu de condamner la Défenderesse au paiement des entiers frais et coûts de l'Arbitrage s'élevant à la somme de 2.043.972,21 USD à augmenter des intérêts au taux calculé de rendement des obligations du Trésor américain à horizon de 20 ans majoré de 2 % à compter de la date du prononcé de la sentence à intervenir jusqu'à la date du complet paiement.[175] La Défenderesse, quant à elle, s'en remet à la sagesse du Tribunal arbitral indiquant qu'elle « *ne pourra supporter que les frais dont elle est réellement redevable.* »[176]

219. Conformément à l'Ordonnance de procédure No.5 du 2 juillet 2018, les Parties ont soumis leurs demandes chiffrées sur le remboursement des frais exposés pour leur défense et les justificatifs de ces coûts.

---

[175] Note d'observations sur les remboursements des frais et coût de l'arbitrage, 31 août 2018, page 10.
[176] Réponse au Mémoire complémentaire, 12 juin 2018, para 58.

220. Le Tribunal arbitral déterminera ci-dessous les règles applicables à la question des frais de l'arbitrage (1) avant de décider à quelle Partie le paiement en incombe ou dans quelle proportion ils sont partagés entre elles (2).

**1. Les règles applicables aux frais de l'arbitrage**

221. Conformément à l'article 37.4 du Règlement,

> *La sentence finale du tribunal arbitral liquide les frais de l'arbitrage et décide à quelle partie le paiement en incombe ou dans quelle proportion ils sont partagés entre elles.*

222. Selon l'article 37.1 du Règlement,

> *Les frais de l'arbitrage comprennent les honoraires et frais des arbitres et les frais administratifs de la CCI fixés par la Cour, conformément au tableaux de calcul en vigueur au moment de l'introduction de l'arbitrage, les honoraires et frais des Experts nommés par le Tribunal arbitral ainsi que les frais raisonnables exposés par les Parties pour leur défense à l'occasion de l'arbitrage.*

223. L'article 37.5 du Règlement précise en outre que :

> *Lorsqu'il se prononce sur les frais, le tribunal arbitral peut tenir compte des circonstances qu'il estime pertinentes y compris dans quelles mesures chacune des Parties a conduit l'arbitrage avec célérité et efficacité en termes de coûts.*

224. Il résulte des dispositions précitées des articles 37.4 et 37.5 du Règlement que le Tribunal arbitral dispose d'une large marge d'appréciation quant à la répartition des frais de l'arbitrage.

225. Cette marge d'appréciation n'est encadrée par aucune disposition législative impérative du lieu de l'arbitrage que le Tribunal arbitral serait tenu d'appliquer, ni par aucune stipulation contractuelle qui viendrait modifier les dispositions précitées du Règlement ou y déroger.

226. En exerçant sa discrétion, le Tribunal arbitral peut prendre en compte, notamment, deux approches généralement suivies en la matière, l'une consistant à répartir les coûts en fonction de la manière dont chaque Partie a prévalu dans ses prétentions, l'autre considérant que chaque Partie devrait supporter la charge de ses propres coûts. En outre, le Tribunal arbitral peut avoir une approche différente pour les frais fixés par la Cour, d'une part, et pour les frais de défense, d'autre part. En effet, alors que les premiers sont fixés par la Cour de manière extérieure aux Parties en fonction du tableau de calcul, les seconds dépendent des moyens qu'elles mettent en œuvre pour leur défense et seuls ceux présentant un caractère raisonnable sont visés par l'article 37.1 du Règlement comme étant susceptibles d'être recouvrés. Cette distinction peut par ailleurs être comparée, en procédure française du lieu de l'arbitrage, à la différence entre les dépens, d'une part, et les frais irrépétibles, d'autre part.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

### 2 La répartition des frais de l'arbitrage

227. Le Tribunal arbitral examinera successivement les coûts fixés par la Cour (a) et les frais raisonnables exposés par les Parties pour leur défense à l'occasion de l'arbitrage.

*(a) Les coûts fixés par la Cour.*

228. En prévoyant de se soumettre au règlement d'arbitrage de la CCI dans les Contrats litigieux, les Parties ont accepté de supporter le risque de la provision pour frais de l'arbitrage fixée par la Cour, c'est-à-dire les honoraires et frais du Tribunal arbitral ainsi que les frais administratifs de la CCI qu'elles peuvent estimer sur la base du montant total des demandes et du tableau de calcul applicable au moment de l'introduction de l'Arbitrage. Le Tribunal arbitral considère donc que les coûts fixés par la Cour devraient être répartis en fonction de la manière dont chaque Partie a prévalu dans ses prétentions.

229. En l'espèce, la provision d'arbitrage a été calculée sur la base d'un montant en litige de 617.400.878 USD[177] et son montant a été fixé par la Cour à la somme de 760.000 USD qui a été intégralement payée par la Demanderesse.[178]

230. Le Tribunal arbitral relève que la Demanderesse a prévalu dans toutes ses prétentions, y compris le montant des dommages intérêts sollicités sur la base desquels la provision d'arbitrage a été calculée, alors même que ses prétentions initiales se situaient à un niveau bien supérieur de 5 milliards de dollars américains, de sorte que la diminution des demandes n'a pas eu d'incidence sur le calcul de la provision.

231. Les frais et honoraires des membres du Tribunal arbitral et les frais administratifs de la CCI ont été fixés par la Cour lors de sa session du 25 octobre 2018 à la somme de 691.437 EUR.[179]

232. Ces frais ayant été supportés intégralement par la Demanderesse, la Défenderesse doit rembourser à la Demanderesse la somme de 760.000 USD dont elle a fait l'avance.

*(b) Les frais exposés par les Parties pour leur défense*

---

[177] Le tableau financier du 16 juillet 2018 montre que la provision d'arbitrage a été réévaluée sur la base d'un montant en litige de USD 617.400.878. Le fait que la demande ait été initialement quantifiée à USD 5 milliards puis à USD 2 milliards avant d'être rabaissée à USD 617.400.878 après la communication par la Demanderesse du Rapport Charlton, n'a donc pas eu d'incidence sur le montant de la provision.

[178] Tableau financier du 14 septembre 2018.

[179] Tableau financier du 29 octobre 2018.

233. Dans sa Note d'observations sur les coûts transmise au tribunal arbitral le 31 août 2018 la Demanderesse fait état de frais pour un montant total de **2.043.972,21 USD** se décomposant comme suit :

| | | |
|---|---|---|
| (a) | provision pour frais d'arbitrage | 760.000,00 USD |
| (b) | frais de réservation des salles audience | 5.238,68 USD |
| (c) | de frais d'interprétariat | 9.911,96 USD |
| (d) | frais de conseils juridiques | 648.272,71 USD |
| (e) | frais de conseils techniques | 620.548,86 USD |

234. La lettre de la Défenderesse du 15 septembre 2018 fait apparaître des frais pour un montant total de **160.500 USD** se répartissant comme suit :

| | | |
|---|---|---|
| (a) | honoraires d'avocats | 150.000 USD |
| (b) | frais de vacations et de séjour (Conférence No.1) | 7.500 USD |
| (c) | frais de vacations et de séjour (Audience) | 3.000 USD |

235. Le Tribunal arbitral examinera si les catégories de coûts dont le remboursement est réclamé sont recouvrables avant de déterminer ceux qui peuvent être considérés comme raisonnables et de les répartir entre les Parties.

236. *Les coûts susceptibles d'être réclamés*. Outre les coûts fixés par la Cour, c'est-à-dire les honoraires et frais des arbitres et les frais administratifs de la CCI, conformément à l'article 37 du Règlement, les Parties sont admises à réclamer dans le cadre du Règlement les frais raisonnables exposés pour leur défense « *à l'occasion de l'arbitrage* ». Il est généralement considéré que les frais exposés par les parties pour leur défense comprennent les frais de conseil et les débours des parties et de leurs conseils pour des audiences et des réunions, le coût des experts commis par les parties, des témoins, des traducteurs et interprètes y compris leurs frais de voyage et de séjour pour des audiences ou des réunions avec les conseils. Par ailleurs, les frais de l'arbitrage couvrent également les frais exposés pour l'organisation de l'audience, comprenant les frais de sténotypie et de réservation de salles pour l'audience et services associés.

237. Le Tribunal arbitral constate que les coûts soumis par les Parties rentrent dans les catégories de coûts susmentionnées et peuvent être considérées comme susceptibles d'être recouvrés.

238. Le Tribunal arbitral note toutefois que les frais de conseils juridiques de la Demanderesse comprennent, notamment, les honoraires de deux conseils spécialisés en « *droit pétrolier et*

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

*industrie pétrolier en Afrique* », Madame Stacey Kivel et Monsieur Ian Levit, pour des montants respectifs de 189.486,71 USD et 19.129,09 USD.[180]

239. Madame Stacey Kivel, conseil habituel de la Demanderesse, était présente à l'audience, et ses prestations sont l'objet de trois factures de montants respectifs chacune de 59.336,71 USD, 85.825,00 USD et 44.325,00 USD.[181] Or les deux premières factures ont été prises en compte par le Rapport Deloitte au titre des dépenses de niveau II que le Tribunal arbitral a inclus dans le calcul de la perte subie. La Demanderesse n'est donc pas fondée à solliciter le remboursement de ces deux factures au titre des frais de l'arbitrage et, en conséquence, seule la somme de 44.325,00 USD sera prise en compte.

240. Monsieur Ian Levit n'est pas apparu dans la procédure et c'est à l'adresse de ce conseil qu'est localisé le siège de la Demanderesse.[182] Le Tribunal arbitral constate que des factures de ce conseil entre le 28 avril 2017 et le 28 février 2018 figurent parmi les dépenses de niveau II pour un montant total de 19.242 USD et que la facture 28 mars 2018 d'un montant équivalent de 19.129,09 USD est une facture pro forma pour « *work done – legal advice ICC arbitration Divine Inspiration Group (Pty) Ltd vs the Democratic Republic of Congo with (ref. 22370/DDA) – monthly retainer.* » Le Tribunal arbitral considère que cette facture pro forma n'est accompagnée d'aucune précision lui permettant d'apprécier le bien-fondé des prestations rendues, de sorte que ce montant ne sera pas retenu.

241. En conséquence les frais de conseils juridiques susceptibles d'être recouvrés sont ramenés à la somme de 483.981,91 USD (648.272,71 USD – 164.290,80 USD).

242. Par ailleurs, la Défenderesse s'oppose au remboursement des frais d'une expertise qui n'a pas été ordonnée par le Tribunal arbitral.[183] Ces frais s'élèvent en ce qui concerne Deloitte à 570.000 USD auxquels s'ajoutent les frais de divers consultants techniques.

243. Le Tribunal arbitral relève que l'article 25 du Règlement, intitulé « *instruction de la cause* », prévoit pour le Tribunal arbitral deux possibilités non exclusives l'une de l'autre qui peuvent le conduire à décider (i) d'entendre des experts commis par les parties en leur

---

[180] Note d'observations sur les coûts, 31 août 2018, para. 10.
[181] Note d'observations sur les coûts, 31 août 2018, Annexes No. 9, 10 et 11.
[182] Certificats d'enregistrement de la société DIGOil, **Pièce DM-I**.
[183] Réponse au Mémoire complémentaire 12 juin 2018, para. 57.

présence ou celles-ci dûment convoquées[184] et/ou (ii) après avoir consulté les parties, de nommer un ou plusieurs experts en donnant le cas échéant la possibilité aux parties d'interroger celui-ci à l'audience.[185] En l'espèce, Monsieur Charlton a été entendu à l'audience sur le Rapport Deloitte qui a fourni au Tribunal arbitral des éléments d'analyse sérieux et utiles qui n'ont pas rendu nécessaire de recourir à un expert nommé par le Tribunal arbitral. Il paraîtrait ainsi inéquitable de laisser à la charge de la Demanderesse le coût de cette expertise au seul motif que celle-ci n'a pas été ordonnée par le Tribunal arbitral. Il convient en effet de relever que telles que formulées dans l'Acte de mission, les demande visaient à la désignation d'un expert par le Tribunal arbitral aux fins d'évaluation du préjudice de la Demanderesse.[186] Le recours à un expert commis par la Demanderesse, dont la demande a été formulée dès le Mémoire en réplique du 30 décembre 2017, a permis des gains d'efficience puisque la procédure a pu progresser en évitant de la scinder en deux phases et en maintenant l'audience à la date qui avait été initialement fixée.

244. Le Tribunal arbitral considère donc que les frais d'expertise sont susceptibles d'être recouvrés par la Demanderesse au regard du sérieux du Rapport Deloitte et de son utilité pour la détermination du litige, lesquelles ne sont d'ailleurs pas contestées.

245. Les frais de conseils techniques comprennent aussi :

(i) une facture d'Ackermann Exploration du 18 décembre 2017 pour un montant de 2.500 GBP soit 3.329 USD.[187] Or, cette facture a été prise en compte par le Rapport Deloitte au titre des dépenses de Niveau I pour la part payée de 793,83 GBP et des dépenses de Niveau II pour le solde de 2.286 USD. Comme le Tribunal arbitral a inclus les dépenses de Niveau II dans son évaluation de la perte subie, la Demanderesse n'est donc pas fondée à en solliciter le remboursement au titre des frais de l'arbitrage. En conséquence, cette facture ne sera pas ici prise en compte.

(ii) Une facture de London Security Group du 13 mars 2018[188] pour un montant de 5000 GBP soit 6.418,79 USD. Or cette facture a été prise en compte par le Rapport Deloitte au titre des dépenses de Niveau I pour la part payée de 1.250 GBP et des

---

[184] Règlement d'arbitrage de la CCI article 23.3
[185] Règlement d'arbitrage de la CCI article 23.4
[186] Acte de mission, 29 août 2017, para. 50.
[187] Note d'observations sur les coûts, 31 août 2018, annexe No. 29.
[188] Note d'observations sur les coûts, 31 août 2018, annexe No. 30.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

dépenses de niveau II pour le solde de 5.246 USD. Comme le Tribunal arbitral a inclus les dépenses de Niveau II dans le calcul de la perte subie, la Demanderesse n'est donc pas fondée à en solliciter le remboursement au titre des frais de l'arbitrage. En conséquence, cette facture ne sera pas ici prise en compte.

246. Les frais de conseils techniques s'élèvent donc à la somme de 610.801,07 USD (620.548,86 USD – 9747,79 USD) ;

247. Le total des frais susceptibles d'être recouvrés par la Demanderesse au titre des frais exposés pour sa défense à l'occasion de l'arbitrage s'élève donc à la somme de 1.109.933,62 USD.

248. *Le caractère raisonnable des coûts*. Il y a une grande disparité entre les catégories de coûts dont le remboursement est réclamé par les Parties et une grande différence dans leur montant. Cette disparité reflète cependant leurs comportements respectifs dans la conduite de l'arbitrage et le montant élevé des coûts supportés par la Demanderesse, comparés à ceux de la Défenderesse s'explique, notamment, par le fait que celle-ci a dû supporter intégralement le financement de la provision d'arbitrage et faire établir par un expert un rapport dont le sérieux a été reconnu par la Défenderesse elle-même.

249. Les frais ainsi supportés par la Demanderesse n'apparaissent pas disproportionnés par rapport à la provision pour frais d'arbitrage et au montant en litige et le Tribunal arbitral considère qu'ils sont raisonnables, comme le sont également les frais de conseils et débours avancés par la Défenderesse.

250. *La répartition des frais exposés par les Parties pour leur défense*. Le Tribunal arbitral considère que l'intégralité des frais exposés par la Demanderesse pour sa défense que le Tribunal arbitral a considérés comme recouvrables et raisonnables doit être mise à la charge de la Défenderesse.

251. Il y lieu, en effet, de relever que la Demanderesse a tout fait pour éviter d'avoir recours à la procédure d'arbitrage qui seule lui a permis de faire valoir ses droits. Elle a ainsi, dès le début du différend qui l'a opposée à la Défenderesse, adopté une démarche tendant à obtenir le règlement amiable du litige et formulé une proposition économiquement avantageuse pour la Défenderesse en ce que, par un mécanisme de compensation en nature, elle évitait de grever le budget de l'État de lourdes sommes. La Demanderesse a maintenu cette démarche de résolution amiable du litige pendant six années au cours desquelles la Défenderesse n'a que très partiellement en œuvre le mécanisme de compensation en nature,

prenant argument, successivement, de l'introduction de la Loi de 2015 puis de ses décrets d'application, et enfin du fait que la délivrance de l'ordonnance présidentielle d'approbation du Contrat de 2007 pourrait toujours intervenir et serait imminente. Ces circonstances apparaissent pertinentes au Tribunal arbitral pour sa décision sur l'allocation des frais exposés par les Parties pour leur défense.

252. Il paraîtrait ainsi inéquitable que la Demanderesse ait à supporter les coûts raisonnables qu'elle a exposés pour sa défense et qui seront donc mis à charge de la Défenderesse, laquelle en revanche doit conserver à sa charge ses propres frais de défense.

253. En conséquence, la Défenderesse est condamnée à payer à la demanderesse les sommes de 760.000 USD et de 1.109.933,62 USD, soit la somme totale de 1.869.933,62 USD.

### F. Les Intérêts

254. La Demanderesse sollicite du Tribunal arbitral qu'il assortisse toute condamnation prononcée d'un intérêt calculé au taux de rendement des obligations du Trésor américain à horizon de 20 ans, majoré de 2 %, et ce dès le prononcé de la sentence à intervenir et jusqu'à complet paiement des sommes dues par la Défenderesse à la Demanderesse. Elle souligne qu'une condamnation assortie du paiement d'un tel intérêt de retard participe de la réparation intégrale de son préjudice et ne peut pas porter préjudice à la Défenderesse qui ne sera redevable d'aucun si elle exécute promptement la sentence, de sorte que les intérêts de retard ne constituent pas une pénalité mais sont uniquement destinés à maintenir la valeur de l'argent au fur et à mesure de l'écoulement du temps.[189]

255. La Défenderesse considère qu'elle « *ne saurait payer les intérêts de retard qui ne seraient pas prévus* » dans les Contrats litigieux.[190]

256. Le Tribunal arbitral note que la Défenderesse n'allègue pas que de tels intérêts de retard seraient prohibés en droit congolais. Par ailleurs, la demande d'intérêts de retard ne porte pas sur des retards de paiements contractuels mais sur le montant de l'indemnité évaluée par le Tribunal arbitral et vise à préserver la valeur de l'argent au fil du temps qui s'écoule. Elle présente donc un caractère indemnitaire et participe à la réparation intégrale du préjudice dont le principe est bien établi en droit congolais.

---

[189] Réponse au Mémoire complémentaire, 12 juin 2018, paras. 280 à 282.

[190] Réponse au Mémoire complémentaire, 12 juin 2018, para. 57.



257. Le Tribunal arbitral relève ainsi que, telle que formulée par la Demanderesse, la demande de condamnation aux intérêts de retard constitue une mesure accessoire à l'indemnisation du préjudice. En effet, ainsi que cela a été débattu à l'audience, le Tribunal arbitral note que le procès-verbal de la réunion des 9 au 17 décembre 2018 fait état d'un intérêt sur le HSEQ de 30%[191] sur deux ans ce qui correspondrait à un taux de 15% l'an. Par ailleurs, le taux de rendement des obligations du Trésor américain à horizon de 20 ans demandé est un taux sans risque[192] bien inférieur et cohérent avec le dollar américain qui est la devise prévue aux Contrats litigieux et celle des condamnations prononcées. La majoration de deux points permet en outre de se rapprocher des taux pratiqués en Afrique du Sud et dans une moindre mesure en République Démocratique du Congo. Ce taux majoré de deux points a été pris en compte par l'Expert pour l'estimation au 31 décembre 2017 de la valeur nette des dépenses engagées et n'a pas été critiqué en tant que tel par la Défenderesse. Il peut ainsi être retenu par le Tribunal arbitral.

258. Les intérêts de retard sont donc dus par la Défenderesse au taux demandé. Ils commenceront à courir à compter la date de la Sentence finale et resteront dus jusqu'à complet paiement.

259. En conséquence, le Tribunal arbitral décide que les décisions pécuniaires prononcées dans le cadre de cette Sentence finale seront augmentées des intérêts calculés au taux de rendement des obligations du Trésor américain à horizon de 20 ans, majoré de 2 % à compter de la date de la Sentence finale et jusqu'à complet paiement.

---

[191] Procès-verbal de la République Démocratique du Congo (Ministère des Hydrocarbures) des travaux sur la compensation à opérer par l'Etat Congolais en faveur de Divine Inspiration Group du 9 au 17 décembre 2010, conclusions, page 3, deuxième sous paragraphe **Pièce DM-XXII**.

[192] Ce taux s'élevait au 31 décembre 2017 à 2,6 %. Rapport d'Anthony Charlton (Deloitte), 30 mars 2018, annexe 11, paras 1.19 à 1.21, **Pièce DM-LV**.

## VIII. DISPOSITIF

260. Pour les raisons exposées ci-dessus, le Tribunal arbitral :

(a) DONNE ACTE à la Défenderesse du retrait de son moyen d'irrecevabilité tiré de la qualité à agir de la société Divine Inspiration Group (PTY) et du retrait de sa demande reconventionnelle ;

(b) DIT POUR DROIT que la République Démocratique du Congo a commis une faute en ne délivrant pas à la société Divine Inspiration Group (PTY) Ltd., l'ordonnance présidentielle d'approbation (i) du Contrat de Partage de Production conclu entre la République Démocratique du Congo, d'une part, et, d'autre part, l'Association Divine Inspiration Group (PTY) Ltd. et la Congolaise des Hydrocarbures, Blocs 8, 23 et 24 de la Cuvette Centrale du 14 décembre 2007 et (ii) du Contrat de Partage de Production conclu entre la République Démocratique du Congo, d'une part, et, d'autre part, l'Association Consortium Divine Inspiration Group (PTY) Ltd. Petro SA, H-Oil Congo Limited, la Congolaise des Hydrocarbures, Congo Petroleum and Gas SPRL, Sud Oil SPRL, Bloc 1 du Graben Albertine du 21 janvier 2008 ;

(c) DIT POUR DROIT que la République Démocratique du Congo a commis une faute en prétendant résilier unilatéralement le Contrat de Partage de Production conclu entre la République Démocratique du Congo, d'une part, et, d'autre part, l'Association Consortium Divine Inspiration Group (PTY) Ltd. Petro SA, H-Oil Congo Limited, la Congolaise des Hydrocarbures, Congo Petroleum and Gas SPRL, Sud Oil SPRL, Bloc 1 du Graben Albertine du 21 janvier 2008 ;

(d) PRONONCE la résolution aux torts exclusifs de la République Démocratique du Congo (i) du Contrat de Partage de Production conclu entre la République Démocratique du Congo, d'une part, et, d'autre part, l'Association Divine Inspiration Group (PTY) Ltd. et la Congolaise des Hydrocarbures, Blocs 8, 23 et 24 de la Cuvette Centrale du 14 décembre 2007 et (ii) du Contrat de Partage de Production conclu entre la République Démocratique du Congo, d'une part, et, d'autre part, l'Association Consortium Divine Inspiration Group (PTY) Ltd. Petro SA, H-Oil Congo Limited, la Congolaise des Hydrocarbures, Congo Petroleum and Gas SPRL, Sud Oil SPRL, Bloc 1 du Graben Albertine du 21 janvier 2008 ;

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

(e) DIT POUR DROIT que la République Démocratique du Congo doit indemniser intégralement Divine Inspiration Group (PTY) Ltd. pour tous les dommages qu'elle a subis en raison de la non-exécution et de la résolution du contrat du 14 décembre 2007 et du contrat du 21 janvier 2008 susmentionnés ;

(f) DIT POUR DROIT que la République Démocratique du Congo doit payer à Divine Inspiration Group (PTY) Ltd. la somme de 617.400.178 USD augmentée des intérêts calculés au taux de rendement des obligations du Trésor américain à horizon de 20 ans majoré de 2% à compter de la date de la sentence finale et jusqu'à complet paiement ;

(g) DIT POUR DROIT que la République Démocratique du Congo doit supporter l'intégralité des frais de l'Arbitrage fixés par la Cour à la somme de 691.437 EUR, et les frais exposés par la Demanderesse pour sa défense à hauteur de 1.109.933,62 USD ;

(h) DIT POUR DROIT que la République Démocratique du Congo doit payer à Divine Inspiration Group (PTY) Ltd. les sommes de 760.000 USD et 1.109.933,62 USD augmentées des intérêts calculés au taux de rendement des obligations du Trésor américain à horizon de 20 ans majoré de 2% à compter de la date de la sentence finale et jusqu'à complet paiement ;

(i) REJETTE toutes les autres demandes des Parties

Fait en 10 exemplaires
Lieu de l'Arbitrage : Paris, France

Le 7 novembre 2018

Professeur Grégoire Bakandeja wa Mpungu
Coarbitre

Signature

Madame Ghizlane El Idrissi
Coarbitre

Signature

Madame Christine Lécuyer-Thieffry
Présidente du Tribunal arbitral

Signature

COPIE CERTIFIÉE CONFORME A L'ORIGINAL
PARIS, le 24 avril 2020
Alexander G. FESSAS
Secrétaire Général
Cour Internationale d'arbitrage de la CCI

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DIGOIL,

*Petitioner*,

*v.*

Democratic Republic of Congo,

*Respondent*.

Civil Action No. ___________________

**Declaration of Matthew S. Rozen in Support of Petition to Confirm Arbitral Award**

# EXHIBIT B

**PRODUCTION SHARING AGREEMENT**

**FOR BLOCKS 8, 23 & 24 OF THE CENTRAL CUVETTE**

**BETWEEN**

**THE DEMOCRATIC REPUBLIQUE OF CONGO**

**AND**

**THE ASSOCIATION DIVINE INSPIRATION GROUP (PTY) Ltd.**

**AND**

**LA CONGOLAISE DES HYDROCARBURES**

**December 2007**

## Summary of Contents

**Article 1 – Definitions 4**

**Article 2 - Object of the contract and assignment of the rights 7**

**Article 3 - Scope of application of the Contract-Operator 7**

**Article 4 - Operating Committee 9**

**Article 5 - Good Governance, development and environment protection 11**

**Article 6 - Bank Guarantee 12**

**Article 7 - Minimum Reconnaissance and Exploration Works Program 12**

**Article 8 - Supplemental Work Program s 15**

**Article 9 - Granting, Renewal and Relinquishment of the Exploration Permit 15**

**Article 10 - Discovery of Hydrocarbons and Award of Exploitation Permit 15**

**Article 11 – Abandonment 16**

**Article 12 - Tax Regime, Royalty and Bonus 17**

**Article 13 - Foreign Exchange Regime 18**

**Article 14 - Reimbursement of Oil Production Cost - “Cost Oil” 19**

**Article 15 - Production Sharing - “Profit Oil” 20**

**Article 16 - Valuation of Hydrocarbon 20**

**Article 17 - Transfer of Ownership and Collection of Liquid Hydrocarbons 21**

**Article 18 - Natural Gas 22**

**Article 19 - Ownership of Real & Moveable Property 22**

**Article 20 - Employment-Training of DRC Personnel 22**

**Article 21 - Audit 23**

**Article 22 - Participation of the National Oil Company 24**

**Article 23 - Transfer of Interest 24**

**Article 24 – Information - Confidentiality 25**

**Article 25 - Termination of the Contract 26**

**Article 26 - Force Majeure 27**

**Article 27 - Applicable Law 27**

**Article 28 - Stability of the Mining and Tax Regime 27**

**Article 29 - Supplemental Obligations of DRC 27**

**Article 30 - Arbitration 28**

**Article 31 - Signature 29**

**Article 32- Complete Agreement 29**

**Article 33- Notice 29**

**Article 34- Effective date- Cooperation regime 30**

**Signature Page 31**

BETWEEN:

The Democratic Republic of the Congo validly represented by:

**The Minister of Energy, and the Minister of Finance,**

acting by virtue of the legal power resulting from Ordinance-Law NO. 81-013 of 2nd April 1981 on the general legislation on mines and hydrocarbons, hereinafter referred to as “the DRC”, as first party;

AND

**The Association:**

DIVINE INSPIRATION GROUP (PTY) Ltd., a company registered in the South Africa, having its registered office at 35, Impala Road, Chisleshurston, Johannesburg, South Africa, represented by Mrs. Andrea Brown, Director, acting by virtue of the statutes, as second party;
La Congolaise des Hydrocarbures, having its registered office at 1, Avenue du Comité Urbain, Kinshasa/Gombe, represented by Messrs. Michel LADY LUYA and Jean YEMBELINE KODANGBA, respectively President of the Administration Council, and General Delegated Administrator, hereinafter referred to as “COHYDRO”, as the third party.
The second and the third parties are hereinafter referred to as “Contracting Party”.

**IT HAS BEEN PREVIOUSLY STATED THAT:**

The State exercises its permanent sovereignty, on among others, the Congolese soil, sub-soil, waters and forests, air space, watercourses, lakes and maritime spaces as well as on the Congolese territorial sea and continental shelf;

The economic resources, referred to therein, such as hydrocarbons are referred to as “concessible substances”;

The State wishes to encourage exploration and exploitation of hydrocarbons in the open zone, to exploration in the Central Cuvette of the Democratic Republic of the Congo;

DIVINE INSPIRATION GROUP (PTY) Ltd has demonstrated its technical and financial capacity in the petroleum exploration and production and the Final Report relating to the evaluation and interpretation of the data submitted was conclusive, in accordance with the Memorandum of Understanding executed on 13 September 2007 between DIVINE INSPIRATION GROUP (PTY) Ltd and the Democratic Republic of the Congo;

DIVINE INSPIRATION GROUP (PTY) Ltd and COHYDRO have express the intention to explore, in partnership, the potential oil in the Central Cuvette of which the blocks and coordinates are in Annex 1;

In order to back up this initiative, the State has the intention of granting to the Association specific financial, economic and tax condition for the exercise of the activities referred to in the Contract;

IT HAS BEEN AGREED AS FOLLOWS:

**Article 1 Definitions**

For the purposes of the present Contract, the following terms shall have the definition laid down in the present Article:

1.1 "Calendar Year": a period of twelve (12) consecutive months commencing on the first day of January and ending on the thirty first day of December of each year.

1.2 "Back Costs": the costs incurred by the Operator, including those costs incurred by the Operator on behalf of the Contracting Party, for work associated with this Contract prior to the Effective Date, including but not restricted to redaction costs and expenses of the personnel of the Operator, as well as the financing of visits by representatives of DRC.

1.3 "Barrel": a volume unit equal to 158,98722 litres measured at a temperature of 15 degrees Celsius.

1.4 "Bonus": a premium payable to the State upon the signature of the Contract and/or when the production or the rhythm of production reaches some levels. Such as:

- Signature Bonus: upon the signature of the contract by the parties.
- Exploration Permit Bonus: upon the granting of the Exploration Permit.
- Renewal of the Exploration Permit Bonus: upon renewal of the Exploration Permit.
- Exploitation Permit Bonus: upon the granting of the Exploitation Permit.
- Renewal of the Exploitation Permit: upon renewal of the Exploitation Permit.
- First Production Bonus: upon production of first Barrel.
- Tenth million-barrel Production Bonus: upon the production of tenth million barrel.

1.5 "Budget": the provisional estimate of the cost of a Works Program.

1.6 "Assignment of Interest": any legal operation which leads to the transfer between the Parties or to any entity other than a Party of all or part of the rights and obligations arising under the Contract.

1.7 "Operating Committee": the body mentioned in Article 4 of the Contract.

1.8 "Contracting Party": means the association between DIVINE INSPIRATION GROUP(PTY) Ltd and COHYDRO and any other entity to which an entity of the Contracting Party may transfer an interest in the rights and obligations arising under the Contract.

1.9 "Contract": the present Production Sharing Agreement and the annexes which form an integral part of it, as well as any amendment which may be agreed between the Parties.

1.10 "Joint Operating Agreement": the contract to be concluded between the entities which make up the Contracting Party, and its annexes and amendments, relating to the joint completion of Petroleum Works.

1.11 "Cost Oil": all Back Costs as defined in 1.2, the Bonuses except for the signature bonus, as defined in Article 1.4, as well as all expenses, inter alia, incurred and payable by the Contracting Party as a result of the Petroleum Works, as defined in Article 1.34 below, including all operating costs, management fees, interest on loans, and calculated in accordance with the Accounting Procedures.

1.12    "Effective Date": the date on which the Contract takes effect, as this date is defined in Article 34 of the Contract.

1.13    "Dollar" or "dollar" or "USD": the currency that is the legal tender in the United States of America.

1.14    "The State": The Democratic Republic of the Congo as public entity.

1.15    "Natural Gas": the gaseous hydrocarbons consisting principally of methane and ethane, which at 15 degrees Celsius and at atmospheric pressure are in a gaseous state and which are discovered and/or produced within the Permit.

1.16    "Hydrocarbons": the Liquid Hydrocarbons and Natural Gas discovered and/or produced in the Permit Zone;

1.17    "I.T.I.E.": Initiative for transparency in the management of the proceeds of the extractive industries;

1.18    "Law": means the Ordinance-Law No. 81-013 of 2nd April 1981 on the general legislation on mines and hydrocarbons and Ordinance No.62-416 of 23rd September 1967 dealing with the mining Regulations;

1.19    "Month": a period beginning on the first day of the month and ending on the last day of the same month including the first and last days on the month.

1.20    "Operator": the entity of the Contracting Party charged by the Joint Operating Agreement with the responsibility for carrying out the Petroleum Works under the terms of this Contract, as set out in Article 3 of this Contract.

1.21    "Parties": designates the parties to this Contract, the Democratic Republic of the Congo and the Association between DIVINE INSPIRATION GROUP (PTY) Ltd /COHYDRO as well as any other entities to which an entity of the Contracting Party may transfer an interest in the rights and obligations arising under the Contract.

1.22    "Permit": a Permit relating to a zone of interest located within the Exploration Permit (as defined in Annex 1 of this Contract) and within all resulting Exploitation Permits.

1.23    "Exploration Permit": Administrative title for hydrocarbons granted for a 5 years period, renewable twice, for the purpose of exercising the Exploration activities.  Three titles will be given covering respectively block 8, and two new blocks identified by the Contracting party during the PSA works under the alphabetical designation of block 23 on the North of the River Congo and block 24 on the South of the River Congo. The final geodesic coordinates of the three blocks representing Annex 1 of the present PSA, as well as their nomination will be the object of an Ordinance from the Minister of the Hydrocarbons.

1.24    "Exploitation Permit": Administrative title for hydrocarbons deriving from the Exploration Permit, granted for a 20 years period renewable, for the purpose of exercising production activities.

1.25    "Accounting Procedures": the accounting procedures as defined and notified to the Contracting party  by the Hydrocarbons Administration of the DRC.

1.26    "Profit Oil": The balance of the production after deduction of the Royalty and the Cost Oil to be shared.

1.27    "Works Program": a plan of Petroleum Works to be carried out during a previously determined period as approved at a meeting of the Operating Committee under the conditions stipulated in the Contract.

1.28 "Fixed Price": the price of each quality of Hydrocarbons, as defined at Article 16 of the Contract.

1.29 "Net Production": the total production of Liquid Hydrocarbons less all water and sediments produced and all quantities of Hydrocarbons re-injected into the deposit, used or lost during the Petroleum Works.

1.30 "Taxed Production": Net Production less transportation and storage cost up to the loading terminal.

1.31 "The DRC": the Democratic Republic of the Congo as party to this Contract.

1.32 "Surface Fee": the duty paid by the Contracting party relating to the occupation of lands during the exploration or exploitation period.

1.33 "Affiliated Company":

1.33.1 Any company in which more than fifty per cent (50%) of the voting rights in the ordinary general meetings of shareholders or associates (hereinafter referred to as "the Meetings") are held directly or indirectly by one of the Parties;

1.33.2 Any company which holds, directly or indirectly, more than fifty per cent (50%) of the voting rights in the Meetings of one of the Parties;

1.33.3 Any company whose voting rights in the Meetings are more than fifty per cent (50%) held by a company which itself holds, directly or indirectly, more than fifty per cent (50%) of the voting rights in the Meetings of one of the Parties;

1.33.4 Any company in which more than fifty per cent (50%) of the voting rights in the Meetings are held directly or indirectly by a company or by several companies such as described in sub-paragraphs 1.3.1 to 1.3.3 above.

1.34 "Subcontractor": the person or company witch contracts with the Operator for the execution of petroleum works.

1.35 "Petroleum Works": all activity carried out in order to allow the Contract to be fulfilled within the Permit as per the Contract, particularly the studies, preparation and completion of operations, and the legal, financial and accounting activities. The Petroleum Works shall be divided into Exploration Works, Evaluation and Development Works, Exploitation Works and Abandonment Works.

1.35.1 "Abandonment Works": the Petroleum Works necessary for the restoration of an exploitation site, the abandonment of which is planned by the Operation Committee.

1.35.2 "Evaluation and Development Works": the Petroleum Works associated with the Exploitation Permit relating to the study, preparation and completion of installations such as: drilling, equipping of wells and production tests, the construction and installation of platforms as well as any other operations carried out with a view to producing, transporting, processing, storing and dispatching hydrocarbons at the loading terminals.

1.35.3 "Exploitation Works": the Petroleum Works relating to Exploitation Permits and associated with the development and maintenance of installations for production, processing, storage, transportation and export and sale of Hydrocarbons.

1.36 "Exploration Works": the Petroleum Works associated with the Exploration Permit and carried out with a view to discovering and evaluating one or more deposits of Hydrocarbons, such as geological, geochemical and geophysical operations, drilling and equipping of wells and production tests.

1.37    "Quarter": a period of three (3) consecutive calendar months beginning on the first day of January, April, July and October of any Calendar Year.

1.38    "ZERE": Exclusive Zone of Reconnaissance and Exploration for a five (5) years duration, renewable twice (2).

**Article 2        Object of the Contract**

The object of the contract is the granting by the Democratic Republic of the Congo to the Contracting Party the exclusive rights of reconnaissance and exploration of hydrocarbons and the right to obtain the Exploitation Permit within the limits of ZERE.

**Article 3        Scope of Application of the Contract-Operator**

3.1    The Petroleum Works shall be carried out in the name of and on behalf of the Contracting Party by one of the entities forming it and referred to as the Operator. The Operator shall be nominated by the Contracting Party within the context of the Joint Operating Agreement.

3.2    On behalf of the Contracting Party, the Operator shall have the following specific tasks:

(a)    preparing and submitting to the Operating Committee the projected annual Work Program s, their corresponding Budgets and any amendments to them;

(b)    directing, within the limits of the approved Work Program s and Budgets, the completion of the Petroleum Works;

(c)    preparing, in case of discovering declared commercially exploitable, the Program s of development and exploitation relative to the deposit discovered;

(d)    subject to application of the provisions of Article 3.5 below, negotiating and concluding with all third parties the agreements relating to completing the Petroleum Works;

(e)    keeping the accounting books relative to the Petroleum Works, and preparing and submitting the accounts annually to the DRC in accordance with the provisions of the Accounting Procedures;

(f)    carrying out the Petroleum Works in the most appropriate way and generally implementing all appropriate means for carrying them out, while respecting the professional rules currently being used in the international petroleum industry, with a view to:

(i)    carrying out Work Program s in the best technical, safety, environmental and economic conditions;

(ii)    maximising production while properly conserving the deposits exploited.

3.3    During the completion of the Petroleum Works, the Operator must, on behalf of the Contracting Party:

(a)    carry out all operations diligently, in accordance with the practices generally followed in the petroleum industry; comply with the professional regulations relating to oil fields and civil engineering, and complete these operations in an efficient and economic manner. All operations shall be carried out in accordance with the terms of the Contract.

(b)    supply the staff necessary for the Petroleum Works, while taking account of the provisions of Article 20 below.

(c)    Subject to Article 51 and following of the Law, allow, within reasonable limits, representatives of the DRC to have periodic access to the place where the Petroleum Works are being carried out, and with the right to observe some or all of the operations

being carried out there. The DRC may, through its representatives or duly authorised employees, examine some or all of the Operator's data relating to the Petroleum Works, including geological, geochemical, geophysics, drilling data and any other data on the oil production operation. The Operator shall keep a copy of all these data in the Democratic Republic of Congo and shall supply a copy of it to the DRC. Nevertheless, for the samples and documents requiring particular conditions of storage or conservation, they will be kept on behalf of the State in a place chosen by the Operator, under the responsibility of the Operator, and to which the DRC shall have right of access. The Operator shall have the right to retain copies of all such data, documents and samples outside of the Democratic Republic of Congo at its own cost.

(d) purchase and maintain all insurance cover of the kind and amounts which comply with petroleum industry practice and the regulations currently in force in the Democratic Republic of Congo.

(e) pay, in good time, all costs and expenses incurred in the course of the Petroleum Works.

3.4 The Contracting Party must complete each Work Program within the limits of the corresponding Budget and may not undertake any operation which is not be included in an approved Work Program or incur expenses which would exceed the amounts written in the Budget, subject to the following:

(a) If an expenditure beyond the agreed Budget turns out to be necessary in order for an approved Works Program to be completed, the Contracting Party is allowed to pay expenses which exceed the accepted Budget to a limit of fifteen per cent (15 %) of the Budget. The Operator must report on this over expenditure to the Operating Committee as soon as possible.

(b) During each Calendar Year, the Contracting Party is also allowed to pay, within the context of the Petroleum Works, unforeseen expenses not included in a Work Program (but connected therewith) and not written in a Budget, but within a limit totaling five hundred thousand (500.000) Dollars or the equivalent value thereof in another currency. However, these expenses must not be made in order to reach objectives which have up until then been refused by the Operating Committee, and the Operator must submit a report relating to these expenses to the Operating Committee as soon as possible. When these expenses have been approved by the Operating Committee, the authorised total shall once again be set at five hundred thousand (500.00) Dollars or the equivalent value thereof in any other currency, the Contracting Party always having the power to spend this amount under the conditions laid down above.

(c) In the event of an emergency arising from the Petroleum Works, the Operator may incur such immediate expenses as it judges necessary for the preservation of life, property and the environment, and the Operator must report to the Operating Committee on the circumstances of this emergency and the expenses as soon as possible.

3.5 Unless the Operating Committee decides otherwise, the Contracting Party must make invitations to tender for materials and services the cost of which is estimated to be greater than one million (1.000.000) Dollars, by invitation to tender for Exploration Works and at two millions (2.000.000) Dollars for Evaluation, Development and Exploitation works. The entities which make up the Contracting Party may bid in the context of these invitations to tender. The above referred procedure will not apply for geological and geophysics studies, interpretation of seismic data, simulations and deposit studies, analysis of wells, their correlation and interpretation, analysis of petroleum rocks, petrophysics and geochemical analysis, the supervision and engineering of Petroleum Works, acquisition of software and relating work requiring access to confidential information when the Contracting Party will have the opportunity to provide services from its personal means or those of Affiliated Companies.

3.6     The totals amounts defined in Articles 3.4 and 3.5 above, valid for the year 2007, (including the Oil Costs) shall be updated every year by applying the inflation index which will be released each year by the Central Bank of Congo.

3.7     The Contracting Party will only be liable for direct damages suffered by the DRC arising through intentional fault on the part of the Contracting Party, having reference to international petroleum industry practice. It is expressly agreed that the Contracting Party shall be held liable for any indirect or consequential damage or economic loss suffered by the DRC, howsoever caused and arising in connection with this Contract.            In any case, including in case the limitation of the responsibility mentioned above cannot be applied for whatever reason, the total amount that the Contracting Party can be made to pay within the borders of its responsibility shall be determined in accordance with the regulations in force in DRC.

3.8     Without prejudice to what has been mentioned above, the Contracting Party shall carry out, for the duration of the Exploration Permit and for any period of renewal, the Minimum Recognition and Exploration Works Program  provided at Article 7 of the Contract.

3.9     Within six (6) months following the effective date of this Contract, the Contracting Party must constitute a Congolese public limited liability company in accordance with Article 80 of the Law.

**Article 4          Operating Committee**

4.1     As soon as possible after the effective date, an Operating Committee, consisting of representatives of the Contracting Party and representatives of the DRC, shall be formed for the Permit. The DRC and the Contracting Party shall each nominate three representatives for a period of two years. The representative of DRC will come from the Ministry of Hydrocarbons. The Contracting Party shall have the right to replace its representatives at any moment, advising the DRC of the replacement. The DRC and the Contracting Party may ask a reasonable number of their staff to participate, without voting rights, in the meetings of the Operating Committee.

4.2     The Operating Committee shall study any questions on its agenda relative to directing, planning and monitoring the completion of the Petroleum Works. In particular it shall study the Work Program s and Budgets, which are the subject of approval, and shall monitor the completion of the said Work Program s and Budgets.In order to complete the Work Program s and meet the Budgets approved, the Operator, for the Contracting Party, shall take all decisions necessary for completing the Petroleum Works in accordance with the terms of the Contract.

4.3     The decisions of the Operating Committee shall be taken by applying of the following rules:

(a)     for the Exploration Works, the Operator shall present to the Operating Committee, on behalf of the Contracting Party, the directions and Work Program s which he intends completing. The Operating Committee may make any recommendations which it deems necessary and in consideration of which the Contracting Party will take useful decisions;

(b)     for the Evaluation, Development and Exploitation Works, the Operator shall present to the Operating Committee, on behalf of the Contracting Party, the directions, Work Program s and Budgets which it is proposing for approval. The decisions of the Operating Committee on these proposals shall be taken by unanimity of the representatives present, appointed by DRC and the Contracting Party.

(c)     for Abandonment Works, all decisions taken by the Operating Committee shall be by unanimous vote of all six representatives appointed pursuant to Article 4.1.

(d)     In the event that any question to be determined pursuant to this Contract or otherwise by the Operating Committee cannot be unanimously decided by the six representatives or their deputies nominated pursuant to Article 4.1 at an Operating Committee meeting

or if the DRC's representatives fail to attend such meeting, the examination of the question shall be referred to a second meeting of the Operating Committee which shall be held, upon written notice from the Operator, at least ten (10) days after the date of the first meeting. During this time the DRC and the Contracting Party shall consult together and the Operator shall supply all information and explanations demanded of it by the DRC. It is understood that if during this second meeting the DRC and the Contracting Party do not reach an agreement concerning the decision to be taken or the DRC's representatives fail to attend such meeting, it shall be up to the Contracting Party to take the decision as long as the entities making up the Contracting Party will not have recovered all the Oil Costs associated with the initial development phase. As to the additional developments under the same Exploitation Permit, the unanimous agreement between the DRC and the Contracting Party must be sought.

4.4    The decisions of the Operating Committee should not be capable of undermining the rights and obligations arising for the Contracting Party from the Contract and the Permits.

4.5    The Operating Committee shall meet on each occasion that the Operator requests it, after notice sent fifteen (15) days in advance. The Operator shall send to the DRC, within the same period, the Operating Committee meeting file. The DRC and the Contracting Party will each choose the number of representatives to send to the meeting. This number will be between one and three. In addition, the notice shall contain the proposed agenda and the date, time and place of the said meeting. The DRC may at any moment request the Operator to convene a meeting in order to deliberate over previously determined questions which will thus form part of the agenda for the said meeting. The Operating Committee must meet at least twice every Calendar Year in order to discuss and approve the Work Program  and Budget and to hear the Operator's report on the execution of the Budget relative to the previous Calendar Year. The Operating Committee may not give a ruling on any question which does not feature in the agenda for the meeting, unless the DRC's and the Contracting Party's representatives make a unanimous decision to the contrary.

4.6    The Operating Committee shall be presided over by the DRC's nominatedrepresentative who shall act as chairman for the meetings. The Operator's nominated representative shall act as secretary of the meetings. In the event of any dispute the chairman shall not have a casting vote.

4.7    The Operator shall prepare a written report on every meeting and shall send a copy of the report to the DRC within fifteen (15) days from the date of the meeting, for approval or comments within thirty (30) days from the date of receipt. In addition, the Operator shall draw up and submit for signature to the DRC's and Contracting Party's representatives, before the conclusion of each meeting of the Operating Committee, a list of questions which have been the subject of a vote and a summary of the stands taken at each vote.

4.8    Any question may be submitted for a decision by the Operating Committee without a formal meeting being held, on condition that this question be sent in writing to the DRC by the Operator. In the event that such a submission is made, the DRC must, within ten (10) days after reception, communicate its vote in writing to the Operator, unless the question which is the subject of the vote requires a decision in a shorter time for reasons of urgency, in which case the DRC must communicate its vote within the time period stipulated by the Operator, however this period must not be less than forty-eight (48) hours. In the absence of a reply from the DRC within the time period required, the Operator's proposal shall be considered to have been accepted. Any question receiving an affirmative vote under the conditions laid down in Article 4.7 above shall be deemed to have been adopted as if a meeting had been held.

4.9    The Operating Committee may decide to listen to any person for whom the DRC or the Contracting Party requests a hearing. In addition the DRC or the Contracting Party may, at their expense, be assisted at the meetings of the Operating Committee by experts chosen by them, on condition that they obtain a pledge of confidentiality from the said experts, being understood that the experts assisting the DRC must not have any links with oil companies who are competing against the entities making up the Contracting Party.

4.10 The Operating committee may also meet, at the request of one of the Parties to the Contract, in case of:

- intentional breach of clauses of the Contract by one of the Parties;

- change of the economic circumstances which alter the balance of the performance wanted by the Parties.

**Article 5 Good Governance, Development and Environment Protection**

5.1 The DRC and the Contracting Party accept the application of the principle and criteria of the "I.T.I.E" within the frame of the execution of the contractual obligations.

5.2 Seminaries, workshops and conferences will be organised by the Contracting Party to inform its personnel with respect to the following texts:

- Law no. 05/006 of 29 March 2005 modifying and completing the decree of 30 January 1940 re the Criminal Code and referred to as "Anti -Corruption Law";

- Law no. 04/016 of 19 July 2004 re the fight against money laundering and terrorism financing;

- Current and future legislation on Environment protection.

5.3 The Contracting Party will allocate annually, per bloc, an amount of one hundred thousand US dollars (USD 100,000), during the Exploration phase, and one hundred fifty thousand US dollars (USD 150,000), during the Production phase, for social intervention to the benefit of the local populations surrounding the petroleum sites according to a Program discussed with the Ministry of Hydrocarbons. Those interventions will concern area such as health, education and culture. The related amounts are part of the Oil Costs and are repayable.

5.4 The Contracting Party will prepare a Mitigation and Rehabilitation Plan (MRP) within six (6) months of the first period of the ZERE, followed by an Environmental Impact Study and an Environment Management Plan of the Project (EIS/EMPP) for the production phase

The terms of reference, including processing fees, of the various obligations will be provide by the Ministry of Environment which will approve final versions as being integral part of this Contract

The Ministry of Environment will give to this effect an Environmental opinion and will deliver an Exploitation Permit.

Without prejudice to Article 3.3 (c), an annual environmental audit is provided for, at the charge of the Contracting Party.

5.5 5.5 In the follow up of the execution of the Mitigation and Rehabilitation Plan, of the Environmental Management Plan of the Project and the environment audit, the Contracting Party will participate annually with an amount of fifty thousand US dollars (USD 100,000) per bloc.

5.6 The exploration and production works must be undertaken in conformity with the rules pertaining to the protected areas.

**Article 6 Article 6 - Bank Guaranty**

6.1 Within four months following the Effective Date of the Contract, the Contracting Party will provide to the Operating Committee an irrevocable bank guaranty in favour of the DRC issued by a first rank bank for an amount of one hundred and fifty thousand US dollars (USD 150.000) per bloc.

6.2 This guaranty will be cashed in case of non-execution by the Contracting Party of the Minimum Work Program of the first relating sub-period as defined in Article 7.1.1.1 and in accordance with the modalities of the said guaranty.

6.3 It is mandatory for the guaranty to contain the following stipulations

The Effective Date of the Contract;

The duration of one year.

6.4 It is noted however that it is the completion of the Minimum Work Program of the first period of one year as defined in Article 7 that the Contracting Party agreed to do and not the expenses corresponding to estimated costs of this work which will determined that the Contracting Party has fulfilled its obligations set for in the Contract.

6.5 Without prejudice to Article 26 of the Contract, the DRC can use the bank guaranty issued in its favour in the following hypothesis

The Contracting Party notifies in writing that it has no intention to realise or to finalize the works subject to the guaranty. In any of these hypothesis, the guaranty will be du in whole;

A request for payment by the Ministry of Hydrocarbons with copy to the Contracting Party accompanied with a written certificate of the Ministry of Hydrocarbons attesting that the Contracting Party has receive two default notices within a month but it has never taken the necessary steps to do the works within the deadline set for in the Contract.

The Ministry of Hydrocarbons will renounce to the Guaranty once it forwards to the bank a certificate attesting that the Contracting Party has fully completed the Minimum Works Program for the First sub-period as defined in Article 7, object of the said Guaranty.

**Article 7 Minimum Recognition and Exploration Works Program**

7.1 In discharge of its obligation to carry out the Exploration Works in the ZERE, the Contracting Party, in accordance with the provisions of this Article, will carry out the following Minimum Work Program within the time periods specified.

7.1.1 First Term of the ZERE: duration five years

7.1.2 First Sub-Period: 12 months

Collecting all available regional data, including geological, seismic, geochemical, satellite, as well as drilling data.

Digitalisation, factorisation, retreatment, interpretation and evaluation of all data obtained and realized from the mapping of all the areas to identified eventual prospects.

Contribute to the setting up of the data bank of the secretary General for Hydrocarbons and to the training of the personnel for the management of this data bank for an annual amount of fifty thousand dollars.

Collecting on the field of indices on surfaces with the participation of experts from the administration of Hydrocarbons, for their analysis and sample rocks in outcrop for petrographic, bio-stratigraphic study and geochemical analysis and interpretation.

Conducting aeromagnetic and aero-gravimetric high-resolution studies.

Production of high-resolution geochemical studies.

Contributing to the effort of the Exploration of the Cuvette Central Basin for an annual amount of one hundred thousand dollars (USD100,000) at the exploration phase and of one hundred and fifty thousand dollars (USD 150,000) at the exploitation phase.

Provisional estimated amount: fifteen millions US dollars (USD 15,000,000).

7.1.3    Second Sub-Period (18 months)

Acquisition, treatment and interpretation of 500 km of 2D seismic per bloc;

Based on results of previous studies, drilling of stratigraphical well to reach the shelf of each bloc;

Provisional estimated amount: ninety millions US dollars (USD 90,000,000)

7.1.4    The Third Sub-Period of the ZERE (12 months)

Treatment, evaluation and interpretation of ground data coming from the wells drilled;

Mapping of the structures identified;

Leads determination;

Acquisition, treatment and interpretation of 500km of 2D seismic and 500 km2 of 3D seismic on important structure;

New seismic acquisition 2D and 3D for each bloc on the structures considered important.

Provisional estimated amount: one hundred twenty seven millions US dollars (USD 127,000,000)

7.1.5    The fourth Sub-Period (12 months)

Treatment, evaluation and interpretation of results;

Based on results of last works, drilling of additional well per bloc.

Provisional estimated amount: thirty millions US dollars (USD30,000,000.00).

7.1.6    7.1.5 The fifth Sub-period (six months)

Elaboration of final report of all works

Presentation of all commercial discoveries

Presentation of the first exploitation planning

Realization of first exploitation program

Provisional estimated amount: one million US dollars (USD 1,000,000)

Total provisional estimated amount: two hundred and sixty-three millions US dollars (USD 263,000,000)

7.2       The Contracting Party will pay to the DRC all fines provided for by the law in case of failure to execute the Minimum Recognition and Exploration Work Program.

7.3 The Contracting Party will contribute to the setting up of the data bank of the secretary General for Hydrocarbons and to the training of the personnel for the management of this data bank for an annual amount of fifty thousand dollars (USD 50,000).

7.4 The Contracting Party will contribute to the effort of exploration of the Central Cuvette for an annual amount of one hundred thousand dollars (USD100,000) at the exploration phase and of one hundred and fifty thousand dollars (USD150,000) at the exploitation phase.

7.5 The Contracting Party will participle to the DRC contribution on APPA for an annual amount of one fifty thousand dollars (USD50,000) at the exploration phase and of seventy and five thousand dollars (USD75,000) at the exploitation phase.

**Article 8 Article 8 - Supplemental Work Program**

8.1 During the technical evaluation of all the Sub-period of the ZERE, if the Contracting Party undertakes supplemental work beside the Minimum Program of Work, the supplemental work will be taken into consideration as satisfying the fulfilment of the Minimum Work Program of the next sub-period of the ZERE.

8.2 On behalf of the Contracting Party, the Operator should present to the DRC, within thirty (30) days following the technical evaluation, the Supplemental Work Program which it intends to perform during the relating sub-period, as well as the corresponding draft Budget.

8.3 Each Budget will include a detailed estimation of the cost of the petroleum works provided in the Supplemental Work Program. The Supplemental Work Program and the relating Budget can be revised and amended any time during the year by the Operating Committee.

8.4 Within thirty (30) days following the end of Supplemental Works, the Operator should presented to the DRC a report on the execution on the Supplemental Work and the Budget.

**Article 9 Granting, Renewal and Relinquishment of the Exploration Permit**

9.1 Without prejudice to the provision of Ordinance no. 67-016 of 23 September 1967 on the mining regulation and at the request of the Contracting Party, after the adaptation of the ZERE to the conditions of the legislation in force, the Ministry of Hydrocarbons grants to the Contracting Party an Exploration Permit for a duration of 5 years, renewal twice. Each renewal is for a period of five years.

9.2 9.2 If the Minimum Work Program obligations have been satisfactorily fulfilled, the Contracting Party may during the technical evaluation and after giving a thirty (30) days' notice in writing, elect to either:

(a) renew the Exploration Permit and commence the second period of the ZERE.

(b) relinquish the Exploration Permit.

9.3 The following mandatory relinquishment provisions shall apply:

(a) If the Contracting Party applies for renewal of the Exploration Permit, upon completion of the First Period of the ZERE, the Contracting Party shall relinquish a total area constituting not less than fifty per cent (50%) of the original area of the Exploration Permit, the location of such area being decided by the Contracting Party.

(b) If the Contracting Party applies for renewal of the Permit, upon completion of the Second Period of the ZERE, the Contracting Party shall relinquish a total area constituting not less than fifty per cent (50%) of the remaining area of the Exploration Period, the location of such area being decided by the Contracting Party.

**Article 10 Discovery of Hydrocarbons and Award of Exploitation Permit**

10.1 As soon as a discovery of Hydrocarbons, judged by the Contracting Party as commercially employable, is made, the Operator shall inform the DRC on behalf of the Contracting Party. As soon as possible, and in any case not later than thirty (30) days after the completion and testing of the discovery well is finished, the Contracting Party shall present to the Operating Committee an initial discovery report on the level(s) encountered which could be considered productive, the estimated size of the deposit, and an estimation of works to be undertaken in the following three (3) months.

10.2 Not later than during the Calendar Year that follows the communication of the discovery report, the Contracting Party shall submit to the Operating Committee:

(a) a detailed Report on the discovery;

(b) a provisional Work Program and Budget necessary for delineating the Deposit, including in particular additional works to be carried out and the number of delineating wells to be drilled;

After examination of and possible changes to the Contracting Party's proposals by the Operating Committee, the decision rules defined in Article 4.3 above shall apply.

10.3 At the end of the delineation works, the Contracting Party shall submit a Report to the Operating Committee on the possibility of putting into production the field so defined. After examination of this Report by the Operating Committee, if the Contracting Party establishes the commercial nature of the Deposit in accordance with its evaluation criteria, the DRC shall, at the Contracting Party's request, grant an Exploitation Permit to the Contracting Party.

10.4 Each Exploitation Permit awarded to the Contracting Party by the DRC shall be granted for an initial period of twenty (20) years, renewable, from the date on which the award of the said Exploitation Permit is granted, unless at an earlier date and in accordance with Article 11 of this Contract, the Contracting Party elects to implement Abandonment Works and accordingly relinquish the Exploitation Permit.

**Article 11 Abandonment**

11.1 When the Operator estimates that in total 85% of the proved reserves of an Exploitation Permitarising from the Exploration Permit (which forms the subject of the present Contract) should have been produced by the end of the next Calendar Year, it shall submit to the DRC, on behalf of the Contracting Party, and not later than the fifteenth (15th) day of November of the current Calendar Year, the Program of Abandonment Works which it proposes carrying out under this Permit, with a site restoration plan, a timetable of anticipated works and a detailed estimate of all costs connected with these Abandonment Works.

11.2 In the event that the Contracting Party determines that continued Petroleum Works are no longer commercially viable and wishes to implement Abandonment Works, the DRC has the right to acquire full responsibility of all the Petroleum Works, for no consideration to the Contracting Party, it being understood that the Contracting Party shall bear no further liability for any past or future costs associated with the Abandonment Works.

11.3 In order to allow recovery of the Oil Costs in accordance with the provisions of Article 14.2.3 below by the entities making up the Contracting Party, in the form of provisions for restoring the site, the Operator shall determine, not later than the fifteenth (15th) day of November in the current Calendar Year, the amount (expressed in Dollars per Barrel) of the provision. This amount shall be equal to the estimated total amount of the Abandonment Works divided by the volume of the proven reserves remaining to be produced, according to its estimates on the Permit.

11.4     Not later than the fifteenth (15th) day of December in the same Calendar Year, the Operating Committee shall adopt for the Permit the program of the Abandonment Works, and the corresponding overall Budget for the period up until the completion of the Abandonment Works. On the same day, the Operating Committee shall also approve the amount of the provision that the Contracting Party is required to make up for each Barrel of Liquid Hydrocarbons waiting to be produced. Each member entity of the Contracting Party shall in consequence charge to the Oil Costs for each subsequent Calendar Year a sum equal to the amount of the provision to be made up per Barrel awaiting production, multiplied by the portion of the Liquid Hydrocarbon production attributable to it in respect of the Calendar Year considered on the Permit.

11.5     If necessary, not later than the fifteenth (15th) day of November in each Calendar Year, the Operator shall present to the DRC any changes that he agrees to make to the estimation of the reserves remaining and to the cost of Abandonment Works anticipated. According to these new estimations of reserves still awaiting production and the new estimates of costs of Abandonment Works, the Operator shall determine where necessary, taking account of the provisions already made in this respect, the new total in Dollars of provisions to be made up for all the Calendar Years to come until cessation of production, for each Barrel of Liquid Hydrocarbon to be produced. The Operating Committee shall approve this total not later than the fifteenth (15th) day of December in the same year.

**Article 12        Tax Regime, Royalty and Bonuses**

12.1         12.1     The Royalty shall be paid by the Contracting Party to the DRC and shall be calculated at a rate of rate of twelve and half per cent (12.5%) applicable to the Taxed Production.

12.2         12.2     The DRC shall receive the Royalty in kind or in cash. The Minister having hydrocarbons among its attributions will notify the Contracting Party in writing of the DRC's choice at least ninety (90) days in advance. If such notification is not made, the Royalty should be collected in kind at the point of collection In that case, if the DRC did not collect all or part of its portion of the production on the referred month, it will be deemed to have renounced to receive all or part of its portion of the production which it did not collect and therefore this portion will be replaced by a cash payment. The money of reference of any transaction in this Contract is dollar.

12.3     The portion of Liquid Hydrocarbons allocated to the Contracting Party as a result of the allocation and partitioning defined in Articles 14 and 15 below shall be net of all taxes, fees or levies of any kind.

12.4     The portion of hydrocarbons allocated to the State, as well as the Royalty and the surface fee, and the Bonuses, represent the global taxes on the PSA, such that all activities of the Contracting Party and all contractor companies in the performance involved in the Petroleum Works shall be exempt from any company taxes in the Democratic Republic of the Congo, except for:

During the exploration phase:

50% tax on the gain made in case of transfer of interest;

remunerative tax. During the exploration phase:

40% tax on the gain made in case of the transfer of interest;

tax on the turnover on service provision set at 5%;

tax on the internal turnover on local sales set at 5%);

25% exceptional taxes on the remuneration of expatriated personnel.

12.5 Non-taxable certificates covering all exempted taxations referred above will be given to the referred entities, including affiliates, consultants, employees, directors and subcontractors, by the tax authority of the Democratic Republic of the Congo.

12.6 The Permit is exempted from any land tax.

12.7 The Contracting Party will pay to the DRC per block the following rights:

- A Signature Bonus upon signature of this Contract: USD1,000,000 non- recoverable;
- Exploration Permit, at the award of the Permit: USD 250,000
- Renewal of the Exploration Permit, at the renewal: USD 125,000
- Exploitation Permit, at the award of the Permit: USD 250,000
- Renewal of the Exploitation Permit, at the renewal: USD 125,000
- Production Bonus upon production of first barrel: USD 1,000,000
- Production Bonus of the tenth million barrel: USD 2,000,000

12.8 An annual Surface Fee equivalent to two (2) dollars per $Km^2$ on an Exploration Permit and to five hundred dollars (USD500) per $Km^2$ on the Exploitation Permit is due by the Contracting Party to the DRC.

**Article 13 Exchange Regime**

13.1 The DRC guarantees to the Contracting Party and to any physical or legal person working for it, within the frame of this Contract, the benefit of all most favorable legislative or regulation provisions, in terms of foreign exchange, which will be granted to another company exercising a similar activity in the Democratic Republic of the Congo. Subject to the following provision, the DRC guarantees to the Contraction Party the right of transfer abroad in the original currency of the investment:

(a) External contribution to the share capital, in case of liquidation or assignment of all or part of the investment, or on capital loan, at the contractual maturity of the repayment of the loans;

(b) Capital revenues, both on the remuneration of the share capital and on the loan interest.

13.2 Notwithstanding any contrary provision contained in regulatory provisions enforcing the legislation on the exchange control, the Contracting Party may retain abroad the proceeds resulting from external contributions and exportation of the production, provided that the Contracting Party has the obligation of:

(a) To provide in priority for the need of currency financing of the activities referred to in this Contract, especially investment and production, by the means of its external funds, the transfer right mentioned in the previous paragraph could not in case of a total or partial

liquidation of participation or repayment of a loan be exercised through means held in DRC unless the means held abroad are insufficient;

(b) Repatriate to DRC all amounts necessary to the company treasury for the purpose of the payment of royalties, taxes and levies as to the Congolese State.

13.3 13.3 The control of the fulfilment of the provision of this clause is vested with the Central Bank of Congo.

13.4 13.4 The Contracting Party is subject to the modalities of execution provided by this institution, especially payment of the exchange control fee, in accordance with this Contract and communicated by it to the Contracting Party.

**Article 14 Article 14 - Reimbursement of Oil Production Cost - "Cost Oil"**

14.1 The Contracting Party shall ensure the full financing of the Oil Costs.

14.2 The Oil Costs of the Permit will be reimbursed. To this effect, a portion of the Liquid Hydrocarbons production originating from the Exploitation Permit during each Calendar Year shall be effectively allocated to the reimbursement of Oil Costs (hereinafter referred to as "Oil Costs") as follows:

14.2.1 As soon as production of Liquid Hydrocarbons starts under the Exploitation Permit, each entity making up the Contracting Party shall commence recovering its portion of the Oil Costs (updated in accordance with Article 3.6 and indexed as provided above) relating to the Permit, by receiving each Calendar Year a quantity of Liquid Hydrocarbons, the "Cost Oil", equal to sixty per cent (60%) of the total Net Production under the Exploitation Permit(s) arising from the Exploration Permit, multiplied by the percentage of interest which it holds in the Exploitation Permit(s). The amount to be reimbursed by the Cost Oil shall include all Oil Costs, updated in accordance with Article 3.6. If during any particular Calendar Year, the Oil Costs capitalized and indexed not yet recovered by an entity forming part of the Contracting Party exceed the value of the amount of Liquid Hydrocarbons which that entity may retain as indicated above, the surplus which cannot be recovered in the Calendar Year under consideration shall be carried forward into subsequent Calendar Years until full recovery occurs or the Contract expires.

14.2.2. The value of "Cost Oil", shall be determined by using the Fixed Price for each quality of Liquid Hydrocarbons as defined in Article 14.

14.2.3. The reimbursement of the Oil Costs for each Calendar Year in respect of the Exploitation

Permits shall be carried out in accordance with the following order of priorities:

(a) Back Costs

(b) Bonuses, save signature bonus;

(c) Exploitation Work costs;

(d) Evaluation and Development Work costs;

(e) Exploration Work costs;

(f) Social expenses provided for in Article 5.3;

(g) Expenses on training of personnel;

(h) Provisions decided upon for covering Abandonment Work costs

(i) Cost related to the follow up to the execution of the Environmental Management Plan of the Project and Environmental Audit.

Oil Costs shall be reclassified with the categories of Petroleum Works above categories according to their nature.

14.3    When they are reimbursed, the Oil Costs incurred but not recovered shall be updated with effect from their date of payment by applying an inflation index as specified in Article 3.6 above and according to the provisions laid down in the Accounting Procedures.

**Article 15        Production Sharing - "Profit Oil"**

15.1    The Net Production on an Exploitation Permit, with a deduction made for the "Royalty" in accordance with the provisions of Article 12 and for the quantity allocated for reimbursement of the Oil Costs, in accordance with the provisions of Article 14 above, shall be shared as follows:

| Gross consolidated Production (BBLS) | Contracting Party (%) | State (%) |
|---|---|---|
| <20.000.000 | 65 | 35 |
| 20.000.001-50.000.000 | 55 | 45 |
| >50.000.000 | 45 | 55 |

15.2    To divide the "Profit-Oil" between the DRC and each entity making up the Contracting Party as indicated above, the portions of each quality of Liquid Hydrocarbon to be received by the DRC and by each entity making up the Contracting Party shall be proportional to the ratio between the Net Production of each of these liquid Hydrocarbons allocated to the "Profit-Oil" and to the sum of Net Production of liquid Hydrocarbons allocated to the "Profit-Oil".

**Article 16        Valuation of Hydrocarbons**

16.1    For the purposes of recovering the Oil Costs, of determining the amounts to be paid in respect of collection of the Royalty in Dollars, the price of liquid Hydrocarbons shall be the Fixed Price. The Fixed Price shall reflect the value of liquid Hydrocarbons of each quality, FOB loading terminal from an international maritime export point, on the international market determined in Dollars per Barrel. In the event of liquid Hydrocarbons not being exported to a maritime port, the DRC and the Contracting Party will agree to a price based on the quality of the oil and the prince on the international markets.

16.2    For each Month, the Fixed Price shall be determined equally by the DRC and the entities making up the Contracting Party. To this end, the entities making up the Contracting Party shall send the necessary information to the DRC in accordance with the provisions laid down in the Accounting Procedures.

16.3    In the Month following the end of each Quarter, the DRC and the entities making up the Contracting Party shall meet in order to determine, by common agreement, the Fixed Price for each quality of Liquid Hydrocarbons produced for each Month of the Quarter just past. On this occasion each entity making up the Contracting Party shall submit to the DRC information specifically mentioned in Article 16.2 above and every item of information relevant to the situation and to the development of Liquid Hydrocarbon prices on the international markets. If during this meeting unanimous agreement cannot be reached, the Parties shall meet again, bringing any useful additional information relative to the development of prices for liquid Hydrocarbons of similar quality, in order to obtain a unanimous decision before the end of the second Month following the end of the Quarter under consideration.

16.4    For the purposes of the present Contract, the Contracting Party shall determine, asneeds dictate, a provisional monthly price for each quality of liquid Hydrocarbon, which shall apply until the Fixed Price for the Calendar Month under consideration is finally determined. This provisional price shall be brought to the DRC's attention.

16.5    In the event of continued disagreement between the Parties over the determination of the Fixed Price, one party or the other may submit the disagreement to arbitration under the conditions laid down in Articles 30.5 and 30.6 of the Contract.

16.6    In the event of exploitation of a deposit of Natural Gas, the DRC and the Contracting Party shall consult together to fix the price of the Natural Gas in accordance with the provisions of Article 18.

**Article 17        Transfer of Ownership and Collection of Liquid Hydrocarbons**

17.1    The Liquid Hydrocarbons produced shall become the sole property of the DRC and ofthe Contracting Party (in accordance with Article 15) once they reach the head of the production wells.

17.2    Ownership of the portion of the Liquid Hydrocarbons allocated to the DRC and to each entity making up the Contracting Party in application of Articles 12, 14 and 15 shall be transferred to them when they come out of the storage sites. In the case of dispatch by oil tanker, the point of transfer of ownership and of collection shall be the point of connection between the ship and the loading installations.

17.3    The DRC shall also take delivery at the same collection point(s) of the proportion of Liquid Hydrocarbons allocated to it.

17.4    Each entity making up the Contracting Party, as well as its customers and transporters, shall have the right to collect freely, at the collection point chosen for this, the portion of liquid Hydrocarbons allocated to it in application of Articles 12, 14 and 15.

17.5    The Parties agree that, according to the real technical properties of the Deposits discovered,  several collection points may be established for the purposes of fulfilling the Contract.

17.6    All expenses incurred in connection with transportation, storage and dispatch of liquid

17.7    Hydrocarbons up to the collection point shall form part of the Oil Costs.

17.8    The Parties shall collect their respective portion of liquid Hydrocarbons, FOB loading terminal, as regularly as possible, it being understood that each of them may, within reasonable limits, take more or less the proportion allocated to them on the day of collection, on condition however that an excess or shortfall in collection does not undermine the rights of any other party and is compatible with the rate of production, the storage capacity and the properties of the ships.

17.9    The Parties shall consult regularly in order to establish a provisional collection program on the basis of the principles mentioned above.

17.10   The Parties shall draw up, before the commencement of any commercial production within the Permit, a collection procedure laying down the methods for applying the present Article.

17.11   Except where the law states otherwise, the Contracting Party is not required to sell liquid Hydrocarbons to the internal markets of the Democratic Republic of Congo. The Contracting Party shall use its reasonable endeavors to maximize the value of the Hydrocarbons on the international markets.

**Article 18 Article 18 - Natural Gas**

18.1 In the event of a discovery of Natural Gas, the DRC and the Contracting Party shall consult as soon as possible in order to examine the possibility of commercially exploiting the discovery and, if possible, to envisage the legal, economic and tax-related changes that will have to be made to the Contract.

18.2 The Contracting Party may use Natural Gas, associated or not, for the needs of the Petroleum Works, and may carry out any Natural Gas re-injection operation aimed at improving the recovery of liquid Hydrocarbons. The quantities of Natural Gas used in this way shall not be submitted to any kind of right, taxed or fees.

18.3 All associated Natural Gas produced or non-used directly to Petroleum Works, must be allocated with priority to projects using gas put in place by the Contracting Party. Flare use is conditioned by the necessary administrative authorizations.

**Article 19 Article 19 – Ownership of Real and Moveable Property**

19.1 The ownership of real and moveable property of all kind purchased by the Contracting Party for the Petroleum Works will be automatically transferred to the DRC after complete reimbursement of the relative Cost Oil. However, after ownership transfer, the Contracting Party could continue to use it freely and in an exclusive manner until the end of the Contract; in case of transfer or selling of these goods, the proceeds will be in their entirety returned to DRC.

19.2 In the event that the goods mentioned above is the subject of security granted to a third party in the context of financing the Petroleum Works, the transfer of ownership of this goods to the DRC hall only be made after the Contracting Party has made a full refund of the loans thus guaranteed and the security has lapsed.

19.3 The above provisions do not apply to equipment belonging to third parties and hired out to the Contracting Party.

**Article 20 Employment and Training of the DRC Personnel**

20.1 From the beginning of the First Exploration period, in accordance with Article 8.1.1 of this Contract, the Operator should implement the training of the personnel in the fields of Exploration, Exploitation and Marketing of hydrocarbons, of which the annual Budget is fixed to one hundred thousand dollars (USD 100,000) during the Exploration period and hundred fifty thousand dollars (USD 150,000) during the Exploitation period. The training Program and the Budget will be prepared by the Ministry of Hydrocarbons and presented to the Contracting Party for its execution. The training will concern technical and administrative personnel of the services involved in the management of the petroleum contract and will be conducted by means of internships in the DRC or abroad, or by the granting of scholarships for study abroad. The trained personnel will retain their original statutes and remain in the pay roll of the department to which they were originally attached.

20.2 All expenses incurred in connection with the training Program shall constitute Oil Costs, and therefore shall be recoverable.

20.3 The Operator shall ensure, with equal qualification, that employment of personnel that are nationals of the Democratic Republic of Congo in its establishments and sites situated in the Democratic Republic of Congo is given priority. In so far as it is not possible to find nationals of the Democratic Republic of Congo with the necessary qualifications for occupying the posts to be provided, the Operator may hire foreign personnel after consultation with the Ministry of Labor and the Ministry of Hydrocarbons. However, the Operator should provide training for its Congolese personnel in the above referred qualification fields.

**Article 21        Audit**

21.1    The Contracting Party's accounting books and reports relating to the Petroleum Works shall be submitted for checking and periodic inspection by the DRC or by its representatives without the number of inspections being less than four per year.

21.2    After informing the Contracting Party in writing, and by giving at least fifteen (15) days' prior notice, the DRC shall exercise the right of verification, either through government personnel or through an independent internationally recognised independent consultant nominated by them and approved by the Contracting Party. The Contracting Party's approval shall not be refused without a valid reason.

21.3    For a given Calendar Year, the DRC shall have available a period of one year from the date of depositing of final accounts with the DRC to carry out, in one instant, these examinations and checks.

21.4    Expenses incurred in connection with these checks shall be borne by the Contracting Party and shall be part of the Cost Oil.

21.5    When checking is not carried out by government personnel, the independent consultant approved by the DRC and by the Contacting Party shall carry out its task while respecting the terms of reference laid down by the DRC for examining the application of rules laid down in the Accounting Procedures for determining the Oil Costs and their recovery. The said terms of reference shall be advised to the Contracting Party before the said consultant becomes involved. The final report on this verification process shall be sent to the Contracting Party as soon as possible.

21.6    The accounts of Companies Affiliated to the Operator, who are charged with giving their assistance to the Contracting Party will not be subject to the above checks. If requested to do so, the Operator shall supply a certification from the international consultant responsible for checking the accounts of the said Affiliated Companies. This consultant must certify that the assistance costs allocated to the Oil Costs have been calculated in a fair and non-discriminatory manner. This provision shall not apply to Affiliated Companies subject to the law of the Democratic Republic of Congo that may be created for the purposes of fulfilling the Contract.

21.7    In case of any contradiction, error or anomaly found during the inspections and checks, the DRC may communicate their objections to the Contracting Party in writing and with reasonable detail within sixty (60) days after the end of the said inspections and checks.

21.8    For the Permit, the expenses allocated to Cost Oil, and the calculations relating to the sharing of the Net Production during the said Calendar Year, shall be considered as having been definitively approved if the DRC does not raise any objection to them within the time limits mentioned above.

21.9    Any objection, dispute or complaint reasonably raised by the DRC shall be the subject of a meeting with the Operator. The Operator shall correct the accounts as soon as possible in accordance with the agreements that shall be made, in this particular occasion, with the auditor commissioned by the DRC. Any difference of opinion that may arise shall be brought to the attention of the Operating Committee before possibly being subjected to arbitration in accordance with the provisions of Article 30 of the Contract.

21.10   The registers and accounting books showing the progress of the Petroleum Works shall be kept by the Operator in the French language and expressed in Dollars. The registers shall be used to determine the share of Cost Oil and of production allocated to each of the entities making up the Contracting Party, for the purposes of their calculating the quantity of Hydrocarbons allocated to them under Articles 12 and 13 of the Contract.

21.11   During currency conversion or any other exchange operation relative to Petroleum Works occurs, the Contracting Party does not realise neither a gain nor a loss on the Cost Oil.

21.12 The methods relating to these operations are specified in the Accounting Procedures.

**Article 22 Participation of the National Oil Company**

22.1 COHYDRO shall be awarded an equity interest of fifteen percent (15%) in the Contract.

22.2 COHYDRO's equity interest as set out in Article 22.2 is carried by the other entities than COHYDRO, MAKING UP THE Contracting Party, which will take into account all Cost Oil (hereinafter referred to as the "Carried Costs").

The Carried Costs are deducted on behalf of COHYDRO from a loan account (hereinafter referred to as the "Loan Account") whose creditors shall be the other entities of the Contracting Party. The Loan Account shall generate interest at a LIBOR rate of plus two per cent (2%).

22.3 The other entities of the Contracting Party shall recover the funds loaned to COHYDRO from the Loan Account, plus interest, by utilising one hundred per cent (100%) of the Cost Oil and fifty per cent (50%) of the Profit Oil allocated to COHYDRO.

**Article 23 Transfer of Interest**

23.1 In case of Transfer or Assignment of rights or obligations to an Affiliated Company orany other entities of the Contracting Party, the Contracting Party must inform the DRC in writing within thirty (30) days. In case of an assignment of interest to a non-affiliated company, the Contracting Party must inform the DRC for approval within sixty (60) days during which the DRC can invoke its pre-emptive right.

23.2 Except for an assignment of interest which would lead to a total withdrawal of one entity of the Contracting Party and if that transfer of interest creates plus value, and after all documentation of that assignment are at the disposal of the DRC, that assignment of interest does not carry any obligation from the Contracting Party to pay DRC.

23.3 Upon transfer of interest of this Contract, the transferor must be entirely discharged from its obligations with regard to this Contract as long as such obligations are being taken over by the transferee.

**Article 24 Information and Confidentiality**

24.1 The Petroleum Works (Exploration, Exploitation, transportation and storage) are subject in accordance with the Law in effect in the DRC and Article 3.3 (c) of the Contract, to the follow up and control by the experts of the Administration of Hydrocarbons. The relating expenses are included in the Cost Oil.

24.2 Without prejudice to the mining regulations, the Operator shall supply to the DRC a copy of the following reports and documents:

24.2.1 weekly reports on the drilling activities

24.2.2 weekly reports on geophysical activities;

24.2.3 reports on geological studies as well as the maps which refer to these;

24.2.4 reports on geophysical measurements, studies and interpretations, maps, profiles, sections and other documents which refer thereto, as well as, at the request of DRC, copies of the originals of seismic recording tapes;

24.2.5 drilling commencement and completion reports for each of the wells as well as a complete set of recorded petrophysical digraphies;

24.2.6 reports on production tests or trials carried out as well as any study establishing flow from a well or putting a well into production;

24.2.7 reports concerning analysis carried out on cores;

24.2.8 monthly production reports.

24.3 All maps, sections, profiles, logs and other geological or geophysical documents shall be supplied on a transparent medium or, where necessary, on a magnetic medium which is adequate for purposes of subsequent reproduction.

24.4 A representative portion of cores and drill cuttings removed from each well, as well as samples of fluid produced during production tests or trials, shall also be sent to the DRC within a reasonable time period.

24.5 When the Contract expires, for whatever reason, the copies of the original documents and samples relating to the Petroleum Works, including magnetic tapes if these are requested, shall be sent to the DRC.

24.6 The DRC may at any time read the Operator's reports on the Petroleum Works, of which at least one copy of these being kept in the Democratic Republic of Congo.

24.7 The Contract, its Annexes and all information relating to the completion of the Contract or information obtained from another Party as a result of the Contract, shall be treated as confidential by the Parties vis-à-vis third parties. This obligation does not apply to:

(i) information which is in public ownership;

(ii) information which is already known by one Party before it is communicated to that Party in the context of the Contract; and

(iii) information obtained legally from third parties which have themselves obtained it legally and which is not the subject of any restriction concerning disclosure or any confidentiality agreement.

24.8 Article 24.6 does not prevent communication, as needs dictate:

(i) to their supervising or financing authorities, if they are legally or contractually obliged to do so; or

(ii) to the legal or arbitral authorities in the context of legal or arbitral proceedings if they are legally or contractually obliged to do so; or

(iii) to an Affiliated Company, it being understood that the Affiliated Company will keep the information confidential;

(iv) to banks and financial organisations in the context of financing the Petroleum Works, on condition that the banks and financial organisations undertake to keep the information confidential.

24.9 The Operator may also communicate information to third-party suppliers, businesspeople and providers of services who became involved in the context of the Contract, on condition however that such a communication is necessary for completing the Petroleum Works and that the third parties in question undertake to keep the information confidential.

24.10 The entities making up the Contracting Party may also communicate information to third parties with a view to transferring interests, in so far as the third parties in question sign a confidentiality agreement.

**Article 25 Termination of the Contract**

25.1 The Contract shall terminate at the occurrence of one of the following events:

(i) when the Exploration Permit will expire and will not be renewed in accordance with the legislation of the DRC;

(ii) when the Exploitation Permit will expire or will not be renewed in accordance with the legal provisions;

(iii) for each entity of the Contracting Party, in case of voluntary or involuntary withdrawal in accordance with the provisions laid down in the Association Agreement.

Termination of the Contract: the State should terminate this Contract in the following case:

- if the Contracting Party does not respect the legislation and regulations in force;
- if the Contracting Party fails to execute the Minimum Program approved by the Operating Committee during the referred sub-period;
- if the Contracting Party gravely breaches the provisions of the Contract;
- if the Contracting Party is in bankruptcy or in judiciary liquidation.

However, this termination will take place only after notice to the Contracting Party by the DRC. Following this notice, the Parties should consult for the purpose of settling the dispute within a month. If after this negotiation and explanation phase, the Contracting Party did not take measures to solve the problem at the origin of the notice within three months after consultation, the DRC can commence the procedure for terminating the Contract.

25.2 If an entity forming part of the Contracting Party wishes to withdraw voluntarily in accordance with the Association Agreement, the Contracting Party shall inform the Operating Committee with a seventy-five (75) days prior notice. The remaining entities of the Contracting Party shall have the right to acquire the interest of that entity, however, in the event that this does not occur then the DRC and the Contracting Party shall consult with regard to transferring the participation of that entity.

25.3 In the event that the Contract is terminated as per Article 25.1 or 25.2:

(a) Subject to the provisions of Article 17 above, the Contracting Party shall liquidate all work in progress and the assets acquired under the Contract and send a report of this liquidation to the Operating Committee. The costs of this liquidation shall be borne by the Contracting Party.

(b) The Contracting Party shall settle all charges the payment of which is incumbent upon it under the terms of the Contract.

**Article 26 Force Majeure**

26.1 No delay or default on the part of any Party in fulfilling any of the obligations arising under the Contract shall be considered as a breach of the said Contract if such delay or default is due to force majeure which would mean a sudden, unforeseeable, irresistible, insurmountable event outside the control of the Party invoking it.

It includes, without it being an exhaustive list, insurrection, riot, war, strikes, labour disturbances, fire or floods.

26.2 If as a result of circumstances of a Force Majeure Event, the fulfilment of any obligation under the Contract is delayed, the duration of the resulting delay, increased by the time which will be required for repairing damages caused during the said delay and for resuming Petroleum Works, shall be added to the time period laid down in the Contract for fulfilling the said obligation.

26.3 When a Party considers that it is being prevented from fulfilling any of its obligations by virtue of circumstances of a Force Majeure Event, it must notify this without delay to the other Parties, specifying the events which have brought about the Force Majeure Event, and take, in agreement with the other Parties, all helpful and necessary measures to allow the fulfilment of obligations affected to be resumed as soon as the event constituting the circumstances of Force Majeure Event.

26.4 The obligations non- affected by a Force Majeure event should continue to be fulfilled in accordance with the provision of the Contract.

**Article 27 Applicable Law**

The interpretation and performance of this Contract shall be governed by the Laws of the Democratic Republic of Congo.

**Article 28 Stability of the Mining and Tax Regime**

Without prejudice to Article 84 of the Law, the DRC guaranties to the Contracting Party throughout the duration of this Contract the stability of the general, legal, financial, petroleum, tax, customs and economic conditions in which each entity exercises its activities, as these conditions result from the legislation and regulation in effect at the date of the signature of the Contract.

Accordingly, the rights of each entities making up the Contracting Party will not be subject in any manner to a worsening measure with respect to the regime defined in the above paragraph.

It has been understood however that each entity making up the Contracting Party can benefit from any favourable measure with respect to the regime defined above.

**Article 29 Supplemental Obligations of the DRC**

The DRC will take all necessary measure to facilitate the performance of the activity of the Contracting Party and its Sub-Contractors. Upon the request of one or another, the assistance referred to a above will concern, without being an exhaustive list, the following fields:

- obtaining authorisation for the use and installation of means of transportation and communication;
- obtaining the required customs and import-export authorisations;
- obtaining visa, work permit or resident card and any other administrative authorisation necessary for the execution of the Contract for the personnel working in the DRC and members of their families;
- obtaining required authorisation for sending abroad, if need be, documents, data or samples for analysis or processing related to the need of the petroleum operations;
- facilitating the relationship with the Administration and the local administrative authorities;
- obtaining necessary approvals for conducting petroleum operations to the extent that such applications have been made in accordance with the legislation in effect in the DRC;
- any other kind of assistance from the DRC, in particular in the field of safety and operations within the framework of the existing legislation and regulation.

The DRC guaranties to the Contracting Party, to each entity making up the Contracting Party and to the assignees of the Contracting Party non-discriminatory application of the legislative or regulatory provisions with respect to any other company exercising petroleum operation in the DRC.

**Article 30        Arbitration**

30.1    Any dispute arising under the Contract, with the exception of those mentioned at paragraphs 30.5 and 30.6 below, which would occur between the DRC on the one hand and the entities making up the Contracting Party on the other hand, and which cannot be settled amicably, shall be resolved as final by arbitration in accordance with the Rules of the Paris International Chamber of Commerce (ICC).

30.2    The DRC on the one hand and the entities making up the Contracting Party on the other hand, shall nominate an arbitrator and shall endeavour to reach agreement on the nomination of a third-party arbitrator who shall be the president of the tribunal. If an arbitrator is not nominated, or agreement concerning the third-party arbitrator is not reached, the ICC provisions shall apply.

30.3    The arbitration shall take place in Paris, France or at an alternative location agreed by all the Contracting Party and the DRC. The proceedings shall be conducted in the French languages. In construing and interpreting this Contract the arbitrator shall apply the generally accepted customs and usages of the international petroleum industry.

30.4    The DRC renounces irrevocably hereby to take advantage of any immunity in proceedings relative to the execution of any arbitral sentence taken by a Arbitration Tribunal appointed in accordance with the present Article 27, including, without limitation, any immunity with regard to notifications, jurisdiction, and any immunity from execution with regard to its assets, except for the public assets of the Democratic Republic of Congo.

30.5    If the DRC and one of the entities making up the Contracting Party are in disagreement over determining the price of Liquid Hydrocarbons in the context of Article 16, the DRC or the entity in question may request the President of the Institute of Petroleum in London, Great Britain, to nominate a qualified international expert to whom the dispute shall be submitted. If the President of the Institute of Petroleum does not nominate an expert, each of the Parties involved in the dispute may request the International Expertise Centre at the International Chamber of Commerce in Paris to make this nomination. The DRC and the entity in question shall supply them with any information which they judge necessary or which the expert may reasonably request.

30.6    Within thirty (30) days from the date of his nomination, the expert shall advise the DRC and the entity Party in question of the price which, in his opinion, must be used in application of Article 14. This price shall be binding upon the Parties and shall be deemed reputable after being fixed by common agreement between them. Expenses and fees payable to the Institute of Petroleum in London or to the International Chamber of Commerce, as well as to the expert, shall be shared equally between the DRC and the said entity. The expert shall not be an arbitrator, and the arbitration procedures shall not be applicable.

**Article 31        Article 31 – Signature**

This Contract is prepared in four (4) originals in French and each such counterpart shall be deemed an original and authentic Contract when wholly executed by the Parties.

**Article 32        Article 32 - Complete Agreement**

Following the definitions of this Contract, this Contract comprises the full agreement of the Parties and supersedes and cancels all previous communications, undertakings and agreements between the Parties, whether written or oral, expressed or implied.

**Article 33 Article 33 - Notice**

33.1 All notices given under this Contract shall be in writing and sent to the Parties by registered post, personal delivery or at the following addresses:

(a) For the DRC:

Monsieur le Ministre des Hydrocarbures

Immeuble COHYDRO

1, Avenue Comité Urbain

Commune de la Gombe

Kinshasa,

Republique Democratique du Congo.

For COHDYRO:

Managing Director

La Congolese des Hydrocarbures (COHYDRO)

1, Avenue Comite Urbain,

Commune de la Gombe

Kinshasa

République Démocratique du Congo

a) For DIVINE INSPIRATION GROUP (PTY) Ltd : 35, Impala Road,

Chislehurston, Johannesburg,

South Africa

33.2 The modification of the above details by one Party must be notified to the other by 15 days' notice and by following the procedure in art 33.1.

33.3. In the absence of receipt but in the case of personal delivery any notice given under this Contract shall be deemed to have been duly given as follows:

33.3.1 if delivered personally, at the time of delivery;

33.3.2 if sent by airmail, on the sixth business day after the date of posting.

**Article 34 Effective Date – Cooperation Regime**

34.1 The present Production Sharing Agreement shall enter into force at the date of its approval by Order of the President of the Republic.

34.2    Any revisions or amendments to the Contract can only be made with the common consent of all Parties by the way of amendment.

**SIGNATURE PAGE**

IN WITNESS WHEREOF, the duly authorised representatives of the entities of the Contracting Party and of the DRC have caused this Agreement to be executed on 2007.

On behalf of the government of the Democratic Republic of the Congo

The Minister of Hydrocarbons

Lambert MENDE OMALANGA

The Minister of Finance

Athanase MTENDA KYELU

On behalf of the Partnership :

LA CONGOLAISE DES HYDROCARBURES

Christophe BITASIMWA BAHII Jean YEMBELINE KODAGBA

KANGUNDU

Technical Director Managing Director

DIVINE INSPIRATION GROUP (PTY) Ltd”

Andrea Brown Director

# CONTRAT DE PARTAGE DE PRODUCTION

ENTRE

LA REPUBLIQUE DEMOCRATIQUE DU CONGO

ET

L'ASSOCIATION

DIVINE INSPIRATION GROUP (PTY) Ltd

ET

LA CONGOLAISE DES HYDROCARBURES

## BLOCS 8,23& 24

## DE LA CUVETTE CENTRALE

DECEMBRE 2007



## TABLE DES MATIERES


| | |
|---|---|
| Article 1 - Définitions | 3 |
| Article 2 - Objet du Contrat et Cession de Droits | 8 |
| Article 3 - Champ d'application du Contrat - Opérateur | 8 |
| Article 4 - Comité d'Opérations | 11 |
| Article 5 - De la Bonne Gouvernance, du Développement et de la Protection de l'Environnement | 15 |
| Article 6 - Garantie Bancaire | 16 |
| Article 7 - Programme Minimal des Travaux de Reconnaissance et d'Exploration | 17 |
| Article 8 - Programme des Travaux complémentaires | 19 |
| Article 9 - Attribution, Renouvellement et Renonciation du Permis d'Exploration | 20 |
| Article 10 - Découverte des hydrocarbures et Attribution du Permis d'Exploitation | 21 |
| Article 11 - Abandon | 22 |
| Article 12 - Régime Fiscal, Royalty et Bonus | 23 |
| Article 13 – Régime de change | 25 |
| Article 14 - Remboursement des Coûts Pétroliers - « Cost Oil » | 26 |
| Article 15 - Partage de la Production - « Profit Oil » | 27 |
| Article 16 - Valorisation des Hydrocarbures | 28 |
| Article 17 - Transfert de Propriété et enlèvement des Hydrocarbures Liquides | 29 |
| Article 18 - Gaz Naturel | 30 |
| Article 19 - Propriété des Biens Mobiliers et Immobiliers | 30 |
| Article 20 - Emploi - Formation du Personnel de la RDC | 31 |
| Article 21 - Audit | 32 |
| Article 22 - Participation de l'Entreprise Pétrolière Nationale | 33 |
| Article 23 - Cessions d'Intérêts | 34 |
| Article 24 - Informations - Confidentialité | 34 |
| Article 25 - Fin du Contrat | 36 |
| Article 26 - Force majeure | 37 |
| Article 27 - Droit applicable | 38 |
| Article 28 - Stabilisation du Régime Minier et Fiscal | 38 |
| Article 29 - Obligations complémentaires de la RDC | 39 |
| Article 30 - Arbitrage | 39 |
| Article 31 - Signature | 41 |
| Article 32 - Accord Complet | 41 |
| Article 33 - Notification | 41 |
| Article 34 - Entrée en Vigueur- Régime de Coopération | 42 |
| Page de Signatures | 43 |
| Annexe I | 44 |

ENTRE :

La **République Démocratique du Congo**, dûment et valablement représentée par :

- Le Ministre des Hydrocarbures, et
- Le Ministre des Finances

agissant en vertu des pouvoirs légaux tels qu'ils résultent de l'Ordonnance-Loi n° 81-013 du 2 avril 1981 portant Législation Générale sur les Mines et les Hydrocarbures, ci-après désignée « **La RDC** » de première part ;

ET

L'Association :

- **DIVINE INSPIRATION GROUP (PTY) Ltd,** Société de droit sud africain, 35, Impala Road, Chislehurston, Johannesburg, Afrique du Sud, représentée par Andrea BROWN, Directeur, agissant en vertu des pouvoirs statutaires, ci-après dénommée, de deuxième part ;

- **LA CONGOLAISE DES HYDROCARBURES** dont le siège social se trouve au numéro 1 de l'avenue du Comité Urbain dans la Commune de la Gombe à Kinshasa, en République Démocratique du Congo, représentée par Messieurs **Michel LADY LUYA** et **Jean YEMBELINE KODANGBA**, respectivement Président du Conseil d'Administration, et Administrateur Délégué Général a.i, ci-après dénommée «**COHYDRO**» de troisième part.

Les parties de deuxième et de troisième part sont ci-dessous dénommées le «**Contractant**».

AYANT ETE PREALABLEMENT EXPOSE QUE :

- L'Etat exerce une souveraineté permanente, notamment sur le sol, le sous-sol, les eaux et les forêts, sur les espaces aérien, fluvial, lacustre et maritime congolais ainsi que sur la mer territoriale congolaise et sur le plateau continental ;

- Les ressources économiques, telles que les hydrocarbures qui y sont contenues sont désignées « Substances concessibles » ;

- L'Etat désire encourager l'exploration et l'exploitation des hydrocarbures dans la zone ouverte à l'exploration dans la Cuvette Centrale de la République Démocratique du Congo ;

- **DIVINE INSPIRATION GROUP (PTY) Ltd** a démontré sa capacité technique et financière dans l'exploration et la production pétrolières et le Rapport Final d'évaluation et d'interprétation des données déposé a été concluant, en exécution du Protocole d'Accord signé le 27 septembre 2007 entre « **DIVINE INSPIRATION GROUP (PTY) Ltd** » et la République Démocratique du Congo ;

- DIVINE INSPIRATION GROUP (PTY) Ltd et «COHYDRO», en association, ont fait part de leurs intentions d'explorer le potentiel du pétrole de la Cuvette Centrale dont les Blocs et coordonnées constituent l'Annexe 1 ;

- A l'effet de soutenir pareille initiative, L'Etat a l'intention d'accorder à l'Association des conditions financières, économiques et fiscales spécifiques pour l'exercice des activités précisées dans le présent Contrat de Partage de Production.

IL A ETE CONVENU CE QUI SUIT :

**Article 1 - Définitions**

Aux fins du présent Contrat, les termes suivants auront la signification fixée au présent Article :

1.1 ***«Année Civile»***: période de douze (12) mois consécutifs commençant le premier janvier et se terminant le 31 Décembre de chaque année.

1.2 ***«Back Costs»***: les coûts engagés par l'Opérateur, y compris les coûts engagés par l'Opérateur au nom du Contractant, pour les travaux en relation avec le Contrat avant la Date d'entrée en Vigueur, incluant les coûts de rédaction, les dépenses de personnel de l'Opérateur, ainsi que le financement des visites des représentants de « **La RDC** ».

1.3 ***«Baril»*** : unité de volume égale à 158,98722 litres, mesurés à la température de 15 degrés Celsius.

1.4 ***«Bonus»***: prime payable à l'Etat lors de la signature du contrat et/ou lorsque la production ou le rythme de production atteint certains seuils. Il s'agit de:

- Bonus de signature : à la signature du contrat par les parties ;
- Bonus du Permis d'Exploration : à l'octroi du Permis d'Exploration ;
- Bonus de renouvellement du Permis d'Exploration : au renouvellement du Permis d'Exploration ;

- Bonus du Permis d'Exploitation : à l'octroi du Permis d'Exploitation ;
- Bonus de renouvellement du Permis d'Exploitation : au renouvellement du Permis d'Exploitation ;
- Bonus de première production : à la production du premier Baril ;
- Bonus de production du dix millionième Baril : à la production du dix millionième Baril.

1.5 *«Budget»*: l'estimation prévisionnelle du coût d'un Programme des Travaux.

1.6 *«Cession d'Intérêts »* : toute opération juridique aboutissant au transfert entre les Parties ou à toute autre entité, autre qu'une Partie, de tout ou partie des droits et obligations découlant du Contrat.

1.7 *«Comité d'Opérations»*: l'organe visé à l'Article 4 du Contrat.

1.8 *«Contractant»*: désigne l'Association **«Divine Inspiration Group (Pty) Ltd»- «COHYDRO»** ainsi que toute autre entité à laquelle l'Association pourrait céder un intérêt dans les droits et obligations du Contrat.

1.9 *«Contrat»*: le présent contrat de partage de production, ses annexes qui en font partie intégrante, ainsi que tout avenant qui serait conclu entre les parties.

1.10 *«Contrat d'Association »* ou *« Joint Operating Agreement »*: le Contrat à conclure entre les entités constituant le Contractant, ses annexes et ses avenants, pour la réalisation en association des Travaux Pétroliers.

1.11 *« Coûts Pétroliers »* ou *« Cost Oil »*: tous les Back Costs tels que définis à l'article 1.2, les Bonus sauf le bonus de signature, comme défini à l'article 1.4 ci-dessus, ainsi que toutes les dépenses, entre autres, encourues et payables par le Contractant du fait des Travaux Pétroliers, comme défini en 1.34 ci-dessous, y compris tous les frais d'exploitation, les frais de gestion, intérêts sur prêts, et calculées conformément à la Procédure Comptable.

1.12 *« Date d'entrée en vigueur »*: la date de prise d'effets du Contrat, telle que cette date est définie à l'Article 34 du Contrat.

1.13 *« Dollar »* ou *« dollar » ou « USD »* : la monnaie ayant cours légal aux Etats Unis d'Amérique.

1.14 *« L'Etat »*: La République Démocratique du Congo en tant que pouvoir public.

1.14 *« Gaz Naturel »*: les hydrocarbures gazeux comprenant principalement du méthane et de l'éthane qui, à 15 degrés Celsius et à la pression

atmosphérique, sont à l'état gazeux, et qui sont découverts et/ou produits dans le cadre du Permis.

1.15 « ***Hydrocarbures*** »: les Hydrocarbures Liquides et le Gaz Naturel découverts et/ou produits sur la zone de Permis.

1.16 « ***I.T.I.E.*** » : Initiative pour la Transparence dans la gestion des recettes des Industries Extractives.

1.17 « ***Loi*** » : l'Ordonnance-Loi n°81-013 du 2 avril 1981 portant Législation Générale sur les Mines et les Hydrocarbures.

1.18 « ***Mois*** »: une période commençant le premier jour d'un mois et se terminant le dernier jour de ce mois, incluant le premier et le dernier jour du mois.

1.19 «***Opérateur***»: l'entité du Contractant chargée aux termes du Contrat d'Association de la responsabilité de la conduite des Travaux Pétroliers conformément au Contrat comme indiqué à l'article 3 du Contrat.

1.20 « ***Parties***»: les parties au Contrat de Partage de Production, à savoir la République Démocratique du Congo et l'Association « **Divine Inspiration Group (pty Ltd» «CoHYDRO»** ainsi que toute autre entité à laquelle une des entités du Contractant pourrait céder un intérêt dans les droits et obligations du Contrat de Partage de Production.

1.21 « ***Permis*** »: un permis relatif à la zone d'intérêt qui se situe dans le cadre du Permis d'Exploration (comme défini à l'Annexe 1 du présent Contrat de Partage de Production) et tous les Permis d'Exploitation en découlant.

1.22 « ***Permis d'Exploration*** »: Titre administratif pour hydrocarbures octroyé pour une durée de cinq ans renouvelable deux fois, en vue de l'exercice de l'activité d'Exploration. Trois Titres seront octroyés, couvrant respectivement le Bloc 8, et deux nouveaux Blocs identifiés par le Contractant lors des travaux du CPP sous la désignation alphabétique de Bloc « 23 » au Nord du Fleuve Congo et Bloc « 24» au Sud de Fleuve Congo.

Les coordonnées géodésiques définitives des trois Blocs constituant l'Annexe I au présent CPP ainsi que leur nomination feront l'objet d'un Arrêté du Ministre des Hydrocarbures.

1.23 «***Permis d'Exploitation***»: Titre administratif pour hydrocarbures découlant du Permis d'Exploration, octroyé pour une durée de vingt ans renouvelable, en vue de l'exercice de l'activité de production.

1.24 *«Procédure Comptable»*: la procédure comptable telle que définie et Communiquée au Contractant par l'Administration des Hydrocarbures de la RDC.

1.25 *« Profit Oil »* : le solde de la production après déduction de la Royalty et du Cost Oil destiné à être partagé.

1.26 *«Programme des Travaux»*: le plan des Travaux Pétroliers devant être effectué durant une période déterminée préalablement, tel qu'approuvé par le Comité d'Opérations dans les conditions stipulées au Contrat de Partage de Production.

1.27 *«Prix Fixé»*: le prix de chaque qualité des Hydrocarbures, tel que défini à l'Article 16 du Contrat de Partage de Production.

1.28 *«Production Nette»*: la production totale des Hydrocarbures Liquides diminuée de toutes eaux et de tous sédiments produits, de toutes quantités des Hydrocarbures réinjectées dans le gisement, utilisées ou perdues au cours des Travaux Pétroliers.

1.29 *«Production Fiscalisée»* : la production nette diminuée des coûts de transport et stockage jusqu'au point d'enlèvement.

1.30. *« La RDC »* : la République Démocratique du Congo en tant que partie au présent Contrat de Partage de Production.

1.31 *«Redevance Superficiaire»* : le droit payé à l'Etat par le «Contractant» relatif à l'occupation des terres pendant la période d'exploration et pendant la période d'exploitation.

1.32 *« Société Affiliée »*.

1.32.1 Toute société dans laquelle plus de cinquante pour cent (50%) des droits de vote dans les assemblées générales ordinaires des actionnaires ou associés (ci-après désignées les «Assemblées») sont détenus directement ou indirectement par l'une des Parties ;

1.32.2 Toute société qui détient directement ou indirectement, plus de cinquante pour cent (50 %) des droits de vote dans les Assemblées de l'une des Parties;

1.32.3 Toute société dont les droits de vote dans les Assemblées sont détenus pour plus de cinquante pour cent (50 %) par une société qui détient elle-même directement ou indirectement, plus de cinquante pour cent (50 %) des droits de vote dans les Assemblées de l'une des Parties;

1.32.4 Toute société dans laquelle plus de cinquante pour cent (50 %) des droits de vote dans les Assemblées sont détenus directement ou indirectement par une société ou par plusieurs sociétés telles que décrites aux sous - paragraphes 1.32.1 à 1.32.3 ci-dessus.

1.33 *« Sous Traitant »* : personne physique ou morale à laquelle l'Opérateur fera appel dans le cadre de l'exécution des Travaux Pétroliers.

1.34 *«Travaux Pétroliers»* les activités conduites pour permettre la mise en oeuvre du Contrat dans le cadre du Permis conformément au Contrat, notamment les études, les préparations et les réalisations des opérations, les activités juridiques, comptables et financières. Les Travaux Pétroliers se répartissent entre les Travaux d'Exploration, les Travaux d'Evaluation et de Développement, les Travaux d'Exploitation et les Travaux d'Abandon.

1.34.1 *«Travaux d'Abandon »* les Travaux Pétroliers nécessaires à la remise en état d'un site d'exploitation dont l'abandon est programmé par le Comité d'Opérations.

1.34.2 *«Travaux d'Evaluation et de Développement»* les Travaux Pétroliers associés aux Permis d'Exploitation relatifs à l'étude, la préparation et la réalisation des installations tels que forages, équipements de puits et essais de production, constructions et pose des plates-formes ainsi que toutes autres opérations réalisées en vue de la production, du transport, du traitement, du stockage et de l'expédition des Hydrocarbures aux terminaux de chargement.

1.34.3 *«Travaux d'Exploitation»* les Travaux Pétroliers relatifs aux Permis d'Exploitation et associés à l'exploitation et à l'entretien des stations de production, de traitement, de stockage, de transport, d'exportation et de vente des Hydrocarbures.

1.35 *«Travaux d'Exploration»* : les Travaux Pétroliers liés au Permis d'Exploration et réalisés dans le but de découvrir et d'apprécier un ou plusieurs gisements des Hydrocarbures telles que les opérations de géologie, de géochimie, de géophysique, de forage, d'équipement de puits et d'essais de production.

1.36 *«Trimestre»* une période de trois (3) mois consécutifs commençant le premier jour de janvier, d'avril, de juillet et d'octobre de toute Année Civile.

1.37 « ***ZERE*** » : Zone Exclusive de Reconnaissance et d'Exploration pour une durée de cinq (5) ans, renouvelable deux (2) fois.

**Article 2 - Objet du Contrat**

L'objet du Contrat consiste en l'attribution au «**Contractant**», par la République Démocratique du Congo, des droits exclusifs de reconnaissance et d'exploration des hydrocarbures ainsi que le droit d'obtention des Permis d'Exploitation dans les limites des ZERE.

**Article 3 - Champ d'application du Contrat - Opérateur**

3.1 Les Travaux Pétroliers seront réalisés au nom et pour le compte du «**Contractant**» par une des entités composantes de celui-ci et dénommée « l'Opérateur ». L'Opérateur est désigné par le «**Contractant**» dans le cadre du Contrat d'Association.

3.2 Pour le compte du «**Contractant**», l'Opérateur aura les tâches spécifiques suivantes :

(a) Préparer et soumettre au Comité d'Opérations les projets de Programmes des Travaux annuels, les Budgets correspondants et leurs modifications éventuelles ;

(b) Diriger, dans les limites des Programmes de Travaux et Budgets approuvés, l'exécution des Travaux Pétroliers ;

(c) Préparer, en cas de découverte déclarée commercialement exploitable, les programmes de développement et d'exploitation relatifs au gisement découvert ;

(d) Sous réserve de l'application des dispositions de l'Article 3.5 ci-après, négocier et conclure avec tout tiers les contrats relatifs à l'exécution des Travaux Pétroliers ;

(e) Tenir la comptabilité des Travaux Pétroliers, préparer et soumettre annuellement à la RDC les comptes, conformément aux dispositions de la Procédure Comptable ;

(f) Conduire les Travaux Pétroliers de la manière la plus appropriée et, d'une façon générale, mettre en oeuvre tous moyens appropriés en respectant les règles de l'art en usage dans l'industrie pétrolière internationale, en vue de :

(i)    l'exécution des Programmes des Travaux dans les meilleures conditions techniques, sécuritaires, environnementales et économiques ;

(ii)    l'optimisation de la production dans le respect d'une bonne conservation des gisements exploités.

3.3    Dans l'exécution des Travaux Pétroliers, l'Opérateur devra, pour le compte du «**Contractant**» :

(a)    Conduire avec diligence toutes les opérations conformément aux pratiques généralement suivies dans l'industrie pétrolière, se conformer aux règles de l'art en matière de champs pétrolifères et de génie civil et accomplir ces opérations d'une manière efficace et économique. Toutes les opérations seront exécutées conformément aux termes du Contrat.

(b)    Fournir le personnel nécessaire aux Travaux Pétroliers en tenant compte des dispositions de l'Article 20 ci-après.

(c)    Sous réserve des articles 51 et suivants de la Loi, permettre dans les limites raisonnables aux représentants de la RDC d'avoir un accès périodique aux lieux où se déroulent les Travaux Pétroliers avec le droit d'observer tout ou partie des opérations qui y sont conduites. La RDC pourra, par l'intermédiaire de ses représentants ou employés dûment autorisés, examiner tout ou partie des données de l'Opérateur se rapportant aux Travaux Pétroliers, y compris les données géologiques, géochimiques, géophysiques, de forage et toutes autres données des opérations de production pétrolière.

L'Opérateur conservera une copie représentative de toutes ces données en République Démocratique du Congo et en fournira une copie à « **La RDC** ».Toutefois, en ce qui concerne les échantillons et documents exigeant des conditions particulières de stockage ou de conservation, ceux-ci seront conservés pour le compte de l'Etat dans un lieu choisi par l'Opérateur, sous la responsabilité de l'Opérateur, et auxquels « **La RDC** » aura droit d'accès. L'Opérateur aura le droit de garder les copies de toutes les données, tous documents et échantillons en-dehors de la République Démocratique du Congo, à ses propres frais.

(d)    Mettre en place et maintenir en vigueur toutes les couvertures d'assurances de types et montants conformes aux usages dans l'industrie pétrolière et à la réglementation en vigueur en République Démocratique du Congo.

(e) Payer ponctuellement tous les frais et dépenses encourus au titre des Travaux Pétroliers.

3.4 Le **«Contractant»** devra exécuter chaque Programme des Travaux dans les limites du Budget correspondant et ne pourra entreprendre aucune opération qui ne serait pas comprise dans un Programme des Travaux approuvé, ni engager des dépenses qui excéderaient les montants inscrits au Budget, sous réserve de ce qui suit :

(a) Si une dépense au-delà du Budget s'avère nécessaire pour l'exécution d'un Programme des Travaux approuvé, le **«Contractant»** est autorisé à faire des dépenses excédant le Budget adopté, dans la limite de quinze pour cent (15%) du Budget. L'Opérateur devra rendre compte de cet excédent de dépenses au Comité d'Opérations dès que possible.

(b) Au cours de chaque Année Civile, le **«Contractant»** est aussi autorisé à effectuer, dans le cadre des Travaux Pétroliers, des dépenses imprévues non incluses dans un Programme des Travaux (mais qui y sont liées) et non inscrites dans un Budget, dans la limite cependant d'un total de cinq cent mille (500.000) Dollars ou leur contre-valeur dans une autre monnaie. Toutefois, ces dépenses ne doivent pas être effectuées pour atteindre des objectifs jusqu'alors refusés par le Comité d'Opérations et l'Opérateur devra présenter aussitôt que possible un rapport relatif à ces dépenses au Comité d'Opérations. Lorsque ces dépenses auront été approuvées par le Comité d'Opérations, le montant autorisé sera à nouveau porté à cinq cent mille (500.000) Dollars ou leur contre-valeur dans toute autre monnaie, le Contractant ayant en permanence le pouvoir de dépenser ce montant aux conditions fixées ci-dessus.

(c) En cas d'urgence due aux Travaux Pétroliers, l'Opérateur pourra engager les dépenses immédiates qu'il jugera nécessaires pour la protection des vies, des biens et de l'environnement, et l'Opérateur devra faire part aussitôt que possible au Comité d'Opérations des circonstances de ce cas d'urgence et de ces dépenses.

3.5 Sauf décision contraire du Comité d'Opérations, le **«Contractant»** devra faire des appels d'offres pour les matériels et services dont le coût estimé est supérieur à un million (1.000.000) de Dollars par appel d'offres pour les Travaux d'Exploration et à deux millions (2.000.000) de Dollars pour les Travaux d'Evaluation, de Développement et d'Exploitation. Les entités

composant le «**Contractant**» pourront soumissionner dans le cadre de ces appels d'offres. La procédure ci-dessus ne s'appliquera pas pour les études géologiques et géophysiques, l'interprétation des données sismiques, les simulations et études de gisements, l'analyse des puits, leur corrélation et interprétation, l'analyse des roches pétrolifères, l'analyse pétrophysique et géochimique, la supervision et l'ingénierie des Travaux Pétroliers, l'acquisition de logiciels et les travaux nécessitant l'accès à des informations confidentielles, lorsque le «**Contractant**» aura la possibilité de fournir les prestations à partir de ses moyens propres ou de ceux de ses Sociétés Affiliées.

3.6    Les montants définis aux Articles 3.4 et 3.5 ci-dessus, valables pour l'année 2007, (y compris les Coûts Pétroliers), seront actualisés chaque année par application d'un indice d'inflation qui sera communiqué chaque année par la Banque Centrale du Congo.

3.7    Le «**Contractant**» ne pourra être tenu responsable que pour les dommages directs subis par « **La RDC** » résultant d'une faute délibérée de la part du «**Contractant**» par référence aux usages de l'industrie pétrolière internationale. Il est expressément convenu que le «**Contractant**» sera tenu responsable de tout dommage indirect, éventuel ou induit ainsi que de toute perte économique que pourrait supporter « **La RDC** », quelle qu'en soit la cause et qui pourrait être en relation avec ce Contrat.

En tout état de cause, y compris dans le cas où la limitation de responsabilité mentionnée ci-dessus ne pourrait être appliquée pour quelque raison que ce soit, le montant total que le «**Contractant**» pourrait être amené à verser dans le cadre de la mise en jeu de sa responsabilité sera déterminée conformément aux dispositions réglementaires en vigueur en République Démocratique du Congo.

3.8    Sans préjudice de ce qui précède, le «**Contractant**» exécutera, pendant la durée du Permis d'Exploration et toute période de renouvellement, le Programme Minimal des Travaux de Reconnaissance et d'Exploration prévu à l'Article 7 du Contrat.

3.9    Dans les six (6) mois qui suivent la date d'entrée en vigueur du Contrat, le « **Contractant** » devra constituer une Société par Actions à Responsabilité Limité de droit Congolais conforme à l'article 80 de la Loi.

## Article 4 - Comité d'Opérations

4.1    Aussitôt après la date d'entrée en vigueur de ce Contrat, il sera constitué, pour le Permis, un Comité d'Opérations composé de représentants du «**Contractant**» et de ceux de « **La RDC** ». « **La RDC** » et le «**Contractant**»

nommeront chacun trois représentants pour un mandat de deux ans. Les représentants de « **La RDC** » proviendront du Ministère des Hydrocarbures. Le «**Contractant**» aura le droit de remplacer à tout moment ses représentants en avisant « **La RDC** » du remplacement. « **La RDC** » et le «**Contractant**» pourront faire participer, sans droit de vote, aux réunions du Comité d'Opérations un nombre raisonnable de membres de leur personnel.

4.2 Le Comité d'Opérations examine toutes questions inscrites à son ordre du jour relatives à l'orientation, à la programmation et au contrôle de la réalisation des Travaux Pétroliers. Il examinera notamment les Programmes des Travaux et les Budgets qui feront l'objet d'une approbation et il contrôlera l'exécution desdits Programmes des Travaux et Budgets.

Pour l'exécution de ces Programmes des Travaux et la réalisation des Budgets approuvés, l'Opérateur, pour le compte du «**Contractant**», prendra toutes les décisions nécessaires pour la réalisation des Travaux Pétroliers conformément aux termes de ce Contrat.

4.3 Les décisions du Comité d'Opérations sont prises en application des règles suivantes :

(a) Pour les Travaux d'Exploration, l'Opérateur présentera, pour le compte du «**Contractant**», au Comité d'Opérations, les orientations et les Programmes des Travaux qu'il entend réaliser. Le Comité d'Opérations formulera éventuellement les recommandations qu'il jugera nécessaires et en considération desquelles le «**Contractant**» prendra les décisions utiles.

(b) Pour les Travaux d'Evaluation et de Développement et les Travaux d'Exploitation, l'Opérateur présentera, pour le compte du «**Contractant**», au Comité d'Opérations, les orientations, les Programmes des Travaux et les Budgets qu'il propose pour approbation. Les décisions du Comité d'Opérations sur ces propositions sont prises à l'unanimité des représentants présents désignés par « **La RDC** » et le «**Contractant**».

(c) Pour les Travaux d'Abandon, toute décision du Comité d'Opérations sera prise à l'unanimité des six représentants désignés conformément à l'Article 4.1.

(d) Au cas où une question devant être décidée conformément au Contrat ou autrement par le Comité d'Opérations, ne pourrait pas recueillir l'unanimité des six représentants ou leurs suppléants désignés conformément à l'Article 4.1. lors d'une réunion du Comité

d'Opérations, ou si les représentants de la RDC n'assistaient pas à cette réunion, l'examen de la question sera reporté à une deuxième réunion du Comité d'Opérations qui se tiendra, sur convocation écrite de l'Opérateur, dix (10) jours au moins après la date de la première réunion. Pendant ce délai, « **La RDC** » et le «**Contractant**» se concerteront et l'Opérateur fournira toutes informations et explications qui lui seront demandées par « **La RDC** ».

Il reste entendu que si au cours de cette deuxième réunion « **La RDC** » et le Contractant ne parviennent pas à un accord sur la décision à prendre ou si les représentants de « **La RDC** » n'assistent pas à cette réunion, la décision appartiendra au «**Contractant**» tant que les entités composant le «**Contractant**» n'auront pas récupéré l'intégralité des Coûts Pétroliers liés à la phase initiale de développement.

S'agissant des développements complémentaires sur un même Permis d'Exploitation, l'accord unanime de « **La RDC** » et du «**Contractant**» devra être recherché.

4.4 Les décisions du Comité d'Opérations ne devront pas être susceptibles de porter atteinte aux droits et obligations résultant, pour le «**Contractant**», de ce Contrat et des Permis.

4.5 Le Comité d'Opérations se réunira chaque fois que l'Opérateur le demandera, sur convocation adressée quinze (15) jours à l'avance. L'Opérateur transmettra à « **La RDC** » dans le même délai le dossier relatif à la réunion du Comité d'Opérations. « **La RDC** » et le «**Contractant**» choisiront chacun le nombre de représentants qu'ils souhaitent envoyer à la réunion du Comité d'Opérations. Ce nombre sera compris entre un et trois. En outre, la convocation contiendra l'ordre du jour proposé, la date, l'heure et le lieu de ladite réunion. « **La RDC** » pourra à tout moment demander que l'Opérateur convoque une réunion pour délibérer sur des questions préalablement déterminées qui feront alors partie de l'ordre du jour de ladite réunion. Le Comité d'Opérations devra se réunir au moins deux fois au cours de chaque Année Civile pour discuter et approuver le Programme des Travaux et le Budget et pour entendre le rapport de l'Opérateur sur l'exécution du Budget afférent de l'Année Civile précédente. Le Comité d'Opérations ne peut statuer sur une question qui ne figure pas à l'ordre du jour de la réunion, sauf décision contraire unanime des représentants de « **La RDC** » et du «**Contractant**».

4.6 Le Comité d'Opérations est présidé par le représentant nommé de « **La RDC** » qui doit agir en tant que président lors des réunions. Le représentant nommé par le «**Contractant**» assure le secrétariat de ces réunions. En cas de désaccord, le Président n'a pas de voix prépondérante.

4.7 L'Opérateur préparera un procès-verbal écrit de chaque séance et en enverra copie à « **La RDC** » dans les quinze (15) jours de la date de la réunion, pour approbation ou remarques dans les trente (30) jours à compter de la date de réception. En outre, l'Opérateur établira et soumettra à la signature des représentants de « **La RDC** » et du «**Contractant**», avant la fin de chaque séance du Comité d'Opérations, une liste des questions ayant fait l'objet d'un vote et un résumé des positions adoptées à l'occasion de chaque vote.

4.8 Toute question pourra être soumise à la décision du Comité d'Opérations sans que soit tenue une séance formelle, à la condition que cette question soit transmise par écrit par l'Opérateur à « **La RDC** ». Dans le cas d'une telle soumission, « **La RDC** » devra, dans les dix (10) jours suivant réception communiquer son vote par écrit à l'Opérateur, sauf si la question soumise au vote requiert une décision dans un délai plus bref en raison de l'urgence, auquel cas « **La RDC** » devra communiquer son vote dans le délai stipulé par l'Opérateur, ce délai ne pouvant toutefois être inférieur à quarante huit (48) heures. En l'absence de réponse de « **La RDC** » dans le délai imparti, la proposition de l'Opérateur sera considérée comme adoptée. Toute question qui reçoit le vote affirmatif dans les conditions prévues à l'Article 4.7 ci-dessus sera réputée adoptée comme si une réunion avait été tenue.

4.9 Le Comité d'Opérations peut décider d'entendre toute personne dont l'audition est demandée par « **La RDC** » ou le «**Contractant**». En outre, « **La RDC** » ou le «**Contractant**» peut, à ses frais, se faire assister aux réunions du Comité d'Opérations par des experts de son choix, à condition d'obtenir un engagement de confidentialité desdits experts, étant entendu que les experts assistant « **La RDC** » ne devront présenter aucun lien avec des sociétés pétrolières concurrentes des entités composant le «**Contractant**».

4.10 Le Comité d'Opérations pourra également se réunir, sur demande de l'une des parties au Contrat, en cas de :

- Violation intentionnelle des clauses du contrat par l'une ou l'autre des parties.
- Changement des circonstances économiques qui bouleverse l'équilibre des prestations voulues par les parties.

**Article 5 - De la Bonne Gouvernance, du Développement et de la Protection de l'Environnement.**

5.1. « **La RDC** » et le «**Contractant**» acceptent l'application des principes et critères de l'« I.T.I.E. » dans le cadre de l'exécution des obligations contractuelles.

5.2. Des séminaires, des ateliers ainsi que des conférences seront organisés par le «**Contractant**» pour informer son personnel notamment au sujet des textes ci-après :

- La Loi n° 05/006 du 29 Mars 2005 modifiant et complétant le décret du 30 janvier 1940 portant code pénal dite « Loi Anti-Corruption » ;
- La Loi n° 04/016 du 19 Juillet 2004 portant lutte contre le blanchiment des capitaux et le financement du terrorisme ;
- La législation actuelle et future sur la protection de l'Environnement.

5.3 Le «**Contractant**» allouera annuellement, par bloc, un montant de Cent Mille Dollars (USD 100.000) en phase d'Exploration et Cent Cinquante Mille Dollars (USD 150.000) en phase de Production, au titre d'interventions sociales au profit des populations locales environnant les sites pétroliers suivant un programme concerté avec le Ministère des Hydrocarbures. Ces interventions toucheront notamment le domaine de la Santé, de l'Education et de la Culture. Les montants y réservés font partie des Coûts Pétroliers et sont donc récupérables.

5.4 Le «**Contractant**» élaborera un Plan d'Atténuation et de Réhabilitation (PAR) dans les six (6) mois de la première période de la ZERE, suivi d'une Etude d'Impact Environnemental et le Plan de Gestion Environnemental du Projet (EIE/PGEP) pour la phase de production.

Les termes de référence, en ce compris les frais d'instruction et ceux de suivi d'exécution du PGEP, de ces différentes obligations seront fournis par le Ministère de l'Environnement qui approuvera les versions finales faisant partie intégrante du présent Contrat.

Le Ministère de l'Environnement donnera à cet effet un avis environnemental et délivrera un Permis d'Exploitation.



Sans préjudice de l'Article 3.3(c), un audit environnemental annuel est prévu, à charge du «**Contractant**».

5.5. Pour le suivi de l'exécution du Plan d'Atténuation et de Réhabilitation, du Plan de Gestion Environnemental du projet et de l'audit environnemental, le «**Contractant**» participe annuellement pour un montant de Cinquante Mille Dollars (USD 100.000) par bloc.

5.4. Les travaux d'exploration- production devront être menés dans le respect des normes relatives aux aires protegées.

**Article 6 - Garantie Bancaire**

6.1. Dans les quatre mois suivant l'entrée en vigueur du présent Contrat, le «**Contractant**» fournira au Comité d'Opérations, une Garantie bancaire irrévocable en faveur de « **La RDC** » émise par une Banque de premier ordre d'un montant de Cent Cinquante Mille Dollars (USD 150.000) par Bloc.

6.2. La Garantie ainsi constituée est mise à encaissement en cas de non exécution imputable au «**Contractant**» du Programme Minimal des Travaux de la Première Période tel que définie à l'Article 7.1.1.1 qu'elle couvre et selon des modalités précisées à ladite garantie.

6.3. La garantie doit obligatoirement contenir les stipulations suivantes :

- La date d'entrée en vigueur effective ;
- La durée d'un an.

6.4. Il est toutefois précisé que c'est la réalisation du Programme Minimal des Travaux de la Première Sous-Période d'un an tel que défini à l'Article 7.1.1.1 que le «**Contractant**» s'est engagé à réaliser et non les dépenses correspondant aux coûts estimés de ces travaux qui déterminent que le «**Contractant**» a réalisé ses obligations prévues dans le Contrat.

6.5. Sans préjudice de l'Article 26 du Contrat, « **La RDC** » sera en mesure de faire appel à la Garantie Bancaire constituée à son profit dans les deux hypothèses suivantes :

- Le «**Contractant**» notifie par écrit qu'il n'a pas l'intention de réaliser ou d'achever les travaux faisant l'objet de la Garantie. Dans l'une ou l'autre hypothèse, la Garantie est due en totalité ;

- Une demande de paiement par le Ministère des Hydrocarbures avec copie au Contractant accompagnée d'une attestation écrite par le Ministère des Hydrocarbures certifiant que le «**Contractant**» a reçu deux mises en demeure endéans un mois pour sa défaillance, mais n'a pas entrepris les démarches nécessaires pour achever les travaux dans les délais stipulés dans ce Contrat.

Le Ministère des Hydrocarbures renoncera à la Garantie une fois qu'il expédie à la Banque une attestation certifiant que le «**Contractant**» a achevé entièrement le Programme Minimal des Travaux de la Première sous période tel que défini à l'Article 7.1.1.1 , objet de ladite Garantie.

Article 7 – Programme Minimal des Travaux de Reconnaissance et d'Exploration

7.1 Le « **Contractant** », en acquittement de son obligation de réaliser les travaux d'Exploration sur la ZERE, conformément au présent article, mènera à bien les Programme Minimal des travaux suivants dans les délais impartis.

**7.1.1. <u>Première période de la ZERE durée cinq ans</u>**

**7.1.1.1. La première sous période : 12 mois**

- Collecte de toute les données géologiques régionales disponibles tant les données géologiques, sismiques, géochimique, satellitaires que des données des travaux de forage.

- Digitalisation, vectorisation, retraitement, interprétation et évaluation de toutes les données reçues et réalisées de la cartographie de toutes les zones à éventuels prospects identifiés.

- Participation à la mise en place de la banque des données du secrétariat Général aux Hydrocarbures et à la formation du personnel à la gestion de cette banque de données, pour un montant de cinquante mille dollars.

- Collecte sur terrain d'indices de surfaces avec la participation des experts de l'administration des Hydrocarbures, pour leur analyse et d'échantillon de roches en affleurement pour leur étude pétrographique, bio-stratigraphique et analyses géochimiques et interprétation.



- Réalisation des études aéromagnétiques et aérogravimètriques à haute résolution.
- Réalisation des études géochimique à haute résolution.

- Participer à l'effort d'exploration du bassin de la cuvette centrale pour un montant annuel par bloc de 100.000 USD en phase d'exploration et un montant annuel par bloc de 150.000 USD en phase de production.
- Montant prévisionnel de travaux de 15.000.000 USD (quinze millions de dollars).

**7.1.1.2. Deuxième sous période (An 1- An 2*An 3 =18 mois)**

- Acquisition, retraitement et interprétation de 500km de sismique 2D par bloc

- Forage d'un puits stratigraphique atteignant le socle dans chaque bloc sur base des résultats des travaux précédents.

- Montant prévisionnel des travaux 90.000.000 $ quarte- vingt- dix millions de dollars.

**7.1.1.3. Troisième sous période : 12 mois.**

- Traitement, évaluation et interprétation de toutes les données de surfaces provenant des puits forés.
- Cartographier les structures identifiées
- Détermination des leads
- Nouvelles acquisition sismique 2D (500km) et 3D (500km²) pour chaque bloc sur les structures jugées importantes.

Montant prévisionnel : cent vingt –sept millions de dollars (127.000.000$)

**7.1.1.4. Quatrième sous période : 12 mois**

- Traitement, évaluation, interprétation des résultats.
- Forage d'un puit d'exploration additionnel par blocs sur base des résultas des travaux précédant.

Montant prévisionnels (30.000.000 USD) trente million de dollars.



**7.1.1.5. Cinquième sous période : 6 mois**

- Elaboration du rapport final de tous les travaux
- Présentation de toutes les découvertes commerciales
- Présentation d'une planification de la première exploitation
- Réalisation des programmes de la première exploitation

Montant prévisionnel 1.000.0000 USD (un million de dollars)

Montant prévisionnel total : 263.000.000 USD (deux cents soixante et trois millions de dollars.

7.2. Le "Contractant" paiera à "La RDC" les amendes prévues par la législation en la matière en cas de non exécution du Programme Minimal des Travaux de Reconnaissance et d'Exploration.

7.3.Le Contractant participera à la mise en place de la Banque de Données du Secrétariat Général aux Hydrocarbures et formera du personnel à la gestion de cette Banque de données pour un montant annuel de cinquante mille Dollars (50.000 USD) par bloc ;

7.4.Le Contractant participera à l'effort d'exploration des bassins sédimentaires de la République Démocratique du Congo pour un montant annuel par bloc de cent mille dollars (100.000 USD) en phase d'exploration et un montant annuel de cent cinquante mille dollars (150.000 USD) en phase de production.

7.5. Le Contractant participera à la contribution de la RDC aux cotisations de l'APPA pour un montant annuel par bloc de cinquante mille dollars (50.000 USD) pendant la phase d'exploration et de soixante quinze mille dollars ( 75.000 USD) en phase de production.

**Article 8 - Programmes des Travaux Complémentaires**

8.1 Lors de l'Evaluation Technique de toute Sous-période de la ZERE, si le «**Contractant**» réalise des travaux en supplément du Programme Minimal des Travaux, les travaux excédentaires seront pris en compte comme satisfaisant à la réalisation du Programme Minimal des Travaux de la Sous-Période de la ZERE suivante.

8.2 Pour le compte du «**Contractant**», l'Opérateur soumettra à « **La RDC** », dans les trente (30) jours qui suivent l'évaluation technique, le Programme

des Travaux Complémentaires qu'il se propose de réaliser pendant la Sous-Période considérée, ainsi que les projets de Budgets correspondants.

8.3 Chaque Budget contiendra une estimation détaillée des coûts des Travaux Pétroliers prévus dans le Programme de Travaux Complémentaires. Le Programme des Travaux Complémentaires et le Budget y afférent seront susceptibles d'être révisés et modifiés par le Comité d'Opérations à tout moment de l'année.

8.4 Dans les trente (30) jours qui suivent la fin des travaux complémentaires, l'Opérateur devra présenter à « **La RDC** » un rapport sur l'exécution du Programme des Travaux Complémentaires ainsi que sur le Budget.

**Article 9 - Attribution, Renouvellement et Renonciation du Permis d'Exploration**

9.1 Sans préjudice des dispositions de l'Ordonnance n°67- 416 du 23 Septembre 1967 portant règlement minier et à la demande du Contractant, après la matérialisation de la ZERE aux conditions de la législation en vigueur, le Ministère des Hydrocarbures octroie au **«Contractant»** un Permis d'Exploration pour une durée de cinq ans, renouvelable deux fois. Chaque renouvellement a une durée de cinq ans.

9.2 Si les obligations du Programme Minimal des Travaux ont été accomplies de façon satisfaisante, le **«Contractant»** peut lors de l'Evaluation Technique et après avoir donné un préavis de trente (30) jours par écrit, choisir :

(i) Soit de renouveler le Permis d'Exploration et donc de commencer la deuxième période de la ZERE,

(ii) Soit de renoncer au Permis d'Exploration.

9.3. Les dispositions suivantes de renonciation obligatoire sont applicables :

(i) Si le **«Contractant»** demande le renouvellement du Permis d'Exploration, lors de la fin de la première Période de la ZERE, le Contractant renoncera à toute une zone qui ne fera pas moins de cinquante pour cent (50 %) de la zone d'origine du Permis d'Exploration, la localisation de cette zone étant décidée par le **«Contractant»**.

(ii) A la fin de la deuxième Période de la ZERE, si le **«Contractant»** demande le renouvellement du Permis d'Exploration, le **«Contractant»** renoncera à une Zone qui ne représentera pas moins de cinquante pour cent (50 %) de la partie restante du Permis d'Exploration, la localisation de cette zone étant décidée par le **«Contractant»**.

**Article 10 - Découverte des Hydrocarbures et Attribution du Permis d'Exploitation**

10.1 Dès qu'une découverte des Hydrocarbures, jugée par le **«Contractant»** comme étant commercialement exploitable, est mise en évidence, pour le compte du **«Contractant»**, l'Opérateur en informe **« La RDC »**. Dès que possible et au plus tard dans les trente (30) jours qui suivent l'achèvement de la réalisation et des tests relatifs au puits de découverte, le **«Contractant»** présente au Comité d'Opérations un premier rapport de découverte sur le ou les niveaux rencontrés qui peuvent être considérés comme producteurs, l'importance approximative du gisement et une estimation des travaux à entreprendre dans les trois (3) mois suivants.

10.2 Au plus tard dans l'Année Civile qui suit la communication du rapport de découverte, le **«Contractant»** soumet au Comité d'Opérations :

i) Un Rapport détaillé sur la découverte ;

ii) Un Programme des Travaux et le Budget prévisionnel nécessaire à la délinéation du gisement comprenant notamment les travaux complémentaires à effectuer et le nombre de puits de délinéation à forer ;

Après examen et modifications éventuelles des propositions du **«Contractant»** par le Comité d'Opérations, les règles de décision définies à l'Article 4.3 ci-dessus s'appliquent.

10.3 A l'issue des travaux de délinéation, le **«Contractant»** soumet un Rapport au Comité d'Opérations sur les possibilités de mise en production du champ ainsi délimité.

Après examen de ce Rapport par le Comité d'Opérations si le **«Contractant»** établit le caractère commercial du gisement en fonction de ses critères d'évaluation, **« La RDC »**, à la demande du **«Contractant»**, devra accorder un Permis d'Exploitation au **«Contractant»**.

10.4 Chaque Permis d'Exploitation attribué au **«Contractant»** par **« La RDC »** sera accordé pour une période initiale de Vingt (20) ans à partir de la date d'attribution dudit Permis d'Exploitation, à moins qu'à une date antérieure et conformément à l'Article 11 du présent Contrat de Partage de Production, le **«Contractant»** ne décide de commencer les Travaux d'Abandon et par conséquent de renoncer au Permis d'Exploitation.

**Article 11 – Travaux d'Abandon**

11.1 Lorsque l'Opérateur estimera qu'au total 85 % des réserves prouvées d'un Permis d'Exploitation découlant du Permis d'Exploration (qui forme l'objet du Contrat) devraient avoir été produites à la fin de l'Année Civile qui suivra, il soumettra à **« La RDC »**, pour le compte du **«Contractant»**, au plus tard le quinze (15) Novembre de l'Année Civile en cours, le Programme des Travaux d'Abandon qu'il se propose de réaliser sur ce Permis avec un plan de remise en état du site, un calendrier des travaux prévus et une estimation détaillée de l'ensemble des coûts liés à ces Travaux d'Abandon.

11.2 Au cas où le **«Contractant»** conclut que les Travaux pétroliers continus ne sont plus rentables et qu'il souhaite mettre en place les Travaux d'Abandon, **« La RDC »** a le droit de devenir l'entité entièrement responsable de tous les Travaux Pétroliers, sans contrepartie pour le **«Contractant»**, étant entendu que le **«Contractant»** ne sera plus tenu à aucun engagement de prendre en charge tous les frais ou futurs liés aux Travaux d'Abandon.

11.3 Pour permettre la récupération de ces Coûts Pétroliers conformément aux dispositions de l'Article 14.2.3 ci-après par les entités composant le **«Contractant»**, sous la forme de provisions pour la remise en état du site, l'Opérateur déterminera, au plus tard le quinze (15) Novembre de l'Année Civile en cours, le montant (exprimé en Dollars par Baril) de la provision. Ce montant sera égal au montant total estimé des Travaux d'Abandon divisé par le volume des réserves prouvées restant à produire selon ses estimations sur le Permis.

11.4 Au plus tard le quinze (15) décembre de la même Année Civile, le Comité d'Opérations adoptera, pour le Permis le programme des Travaux d'Abandon, et le Budget global correspondant, pour la période allant jusqu'à la fin de la réalisation des Travaux d'Abandon. A la même date, le Comité d'Opérations approuvera également le montant de la provision que

le **«Contractant»** sera tenu de constituer pour chaque Baril d'Hydrocarbures Liquides restant à produire. Chaque entité membre du **«Contractant»** imputera en conséquence sur les Coûts Pétroliers de chacune des Années Civiles suivantes une somme égale au montant de la provision à constituer par Baril restant à produire multipliée par la part de la production d'Hydrocarbures Liquides lui revenant au titre de l'Année Civile considérée en application du Permis.

11.5 Si besoin est, au plus tard le quinze (15) Novembre de chaque Année Civile, l'Opérateur présentera à **« La RDC »** les modifications qu'il est d'accord d'apporter à l'estimation des réserves restant à exploiter et au coût des Travaux d'Abandon prévus. En fonction de ces nouvelles estimations de réserves restant à produire et des nouvelles estimations de coûts des Travaux d'Abandon, l'Opérateur déterminera le cas échéant, compte tenu des provisions déjà effectuées à ce titre, le nouveau montant en Dollars des provisions à constituer pour l'ensemble des Années Civiles à venir jusqu'à l'arrêt de la production, sur chaque Baril d'Hydrocarbures Liquides qui sera produit. Le Comité d'Opérations approuvera ce montant le quinze (15) Décembre de la même année au plus tard.

**Article 12 - Régime Fiscal, Royalty et Bonus**

12.1 La Royalty sera payée par le **«Contractant»** à la RDC et sera calculée au taux de douze et demi pourcent (12,5 %) s'appliquant à la Production Fiscalisée.

12.2 **« La RDC »** recevra la Royalty en nature ou en espèces. Le Ministre ayant les hydrocarbures dans ses attributions notifiera par écrit au **«Contractant»** le choix de **« La RDC »** au moins quatre vingt dix (90) jours à l'avance. Si une telle notification n'est pas faite, la Royalty sera alors prélevée en nature au point d'enlèvement.
Dans ce cas, si **« La RDC »** n'a pas pris livraison de tout ou partie de sa part de production pour un mois considéré, elle sera réputée avoir renoncé à recevoir le prélèvement en nature pour tout ou partie de sa production dont il n'aura pas pris livraison et dès lors celle-ci sera remplacée par sa contre valeur en espèces. La monnaie de référence de toute transaction dans le présent contrat est le Dollar Américain.

12. 3 La part d'Hydrocarbures Liquides revenant au **«Contractant»** à l'issue des affectations et des partages définis aux Articles 14 et 15 ci-dessous sera nette de tout impôt, droit ou cotisation de quelque nature que ce soit et prévues par les lois et législations, passées, présentes et futures, de la République Démocratique du Congo.

12.4 La part d'hydrocarbures revenant à l'Etat, ainsi que la Royalty et la redevance superficiaire, ainsi que les Bonus, représentant la fiscalité globale au titre du Contrat de Partage de Production, de sorte que toutes les activités du Contractant et de tous les prestataires impliqués dans les Travaux Pétroliers sont exonérés de tous impôts et taxes afférents aux sociétés en République Démocratique eu Congo, hormis ce qui suit :

- En phase d'exploration :
  1. Impôt de 50% sur la plus-value réalisée en cas de cession d'intérêt ;
  2. Taxe rémunératoire ;
- En phase de production :
  1. Impôt de 40% sur la plus-value réalisée en cas de cession d'intérêt ;
  2. Impôt sur le Chiffre d'Affaires sur les prestations des services stabilisé au taux de 5%.
  3. Impôt sur le Chiffre d'Affaires à l'intérieur sur les ventes locales stabilisé au taux de 3%.
  4. Impôt Exceptionnel sur les rémunérations du personnel expatrié stabilisé au taux de 25%.

12.5 Des Attestations de non-imposition couvrant les impôts exonérés ci-dessus seront fournies auxdites entités, y compris les filiales, consultants, employés, administrateurs et Prestataires, par les autorités fiscales de la République Démocratique du Congo

12.6 Le Permis est exonéré de tout impôt foncier.

12.7 Le **«Contractant»** payera à **« La RDC »** par bloc, les droits ci-après :

- Un Bonus de Signature dès la signature du présent Contrat: 1.000.000 USD non récupérable ;
- Permis d'Exploration: à l'octroi du Permis d'Exploration: 250.000 USD ;
- Renouvellement du Permis d'Exploration: au renouvellement du Permis d'Exploration: 125.000 USD ;
- Permis d'Exploitation: à l'octroi du Permis d'Exploitation: 250.000 USD ;
- Renouvellement du Permis d'Exploitation: au renouvellement du Permis d'Exploitation: 125.000 USD ;

- Bonus de production: à la production du premier Baril:1.000.000 USD ;
- Bonus de production du dix millionième Baril: à la production du dix millionième Baril : 2.000.000 USD.

12.8 Une Redevance Superficiaire annuelle équivalent à Deux Dollars (USD 2) par $Km^2$ sur Permis d'Exploration et à cinq cents Dollars (USD 500) par $Km^2$ sur le Permis d'Exploitation est due par le Contractant à « **La RDC** ».

**Article 13 : Régime de Change**

13.1 « **La RDC** » garantit au «**Contractant**» ainsi qu'à toute personne physique ou morale travaillant pour elle, dans le cadre de la présente Convention, le bénéfice de toutes dispositions législatives ou réglementaires plus favorables, en matière de change, qui seraient accordées à une autre entreprise exerçant une activité similaire en République Démocratique du Congo. Sous réserve des dispositions ci-après, « **La RDC** » garantit au «**Contractant**» le droit de transfert à l'étranger dans les devises d'origine des investissements :

a) Des apports extérieurs au capital de participation, en cas de liquidation ou de cession de tout ou partie de l'investissement, ou en capital d'emprunt, aux échéances contractuelles de remboursement des emprunts ;

b) Des revenus du capital, tant en ce qui concerne la rémunération du capital de participation que les intérêts des emprunts.

13.2 Nonobstant toute disposition contraire contenue dans les dispositions réglementaires pris en exécution de la législation relative au contrôle de change, le «**Contractant**» peut conserver à l'étranger les avoirs provenant des apports extérieurs et de l'exportation de la production, étant entendu que le «**Contractant**» a l'obligation :

a) De pourvoir par priorité au besoin de financement en devise des activités prévues par le présent contrat, notamment de l'investissement et de la production, au moyen de ses avoirs détenus à l'étranger, le droit au transfert prévu au point précédent ne pourra dans le cas d'une liquidation totale ou partielle de participation ou de remboursement d'emprunt s'exercer au moyen d'avoirs détenus en République Démocratique du Congo que dans la mesure où les avoirs détenus à l'étranger seraient insuffisants ;

b) De rapatrier en République Démocratique du Congo les montants qui seraient nécessaires à la trésorerie de l'entreprise pour effectuer le

payement des redevances, taxes et impôts revenant à l'Etat Congolais.

13.3 Le contrôle de l'exécution des dispositions du présent point est confié à la Banque Centrale du Congo.

13.4 Le **«Contractant»** se soumet aux modalités d'exécution établies par cette institution, notamment le paiement de la redevance de contrôle de change, en conformité avec la présente convention et communiquée par elle au Contractant.

**Article 14 - Remboursement des Coûts Pétroliers - « Cost Oil »**

14.1 Le **«Contractant»** assurera le financement de l'intégralité des Coûts Pétroliers.

14.2 Les Coûts Pétroliers du Permis seront remboursés. A cet effet, une part de la production d'Hydrocarbures Liquides provenant du Permis au cours de chaque Année Civile sera effectivement affectée au remboursement des Coûts Pétroliers comme suit :

14.2.1 Dès le démarrage de la production d'Hydrocarbures Liquides sur un Permis d'Exploitation, chaque entité composant le **«Contractant»** commencera à récupérer sa part des Coûts Pétroliers (actualisés, conformément à l'article 3.6 et indexés comme indiqué ci-dessus) relatifs au Permis en recevant chaque Année Civile une quantité d'Hydrocarbures Liquides, le « Cost Oil », au plus égale à soixante cinq pour cent (65 %) du total de la Production Nette du ou des Permis d'Exploitation découlant du Permis d'Exploration multipliée par le pourcentage d'intérêt qu'elle détient dans ce ou ces Permis d'Exploitation. Le montant remboursé par le Cost Oil doit correspondre à tous les Coûts Pétroliers actualisés conformément à l'Article 3.6.

Si au cours d'une quelconque Année Civile, les Coûts Pétroliers capitalisés et indexés non encore récupérés par une entité composant le **«Contractant»** dépassent la valeur de la quantité d'Hydrocarbures Liquides pouvant être retenue par cette entité comme indiqué ci-dessus, le surplus ne pouvant être récupéré dans l'Année Civile considérée sera reporté sur les Années Civiles suivantes jusqu'à récupération totale ou expiration du Contrat.

14.2.2 La valeur du « Cost Oil » sera déterminée en utilisant le Prix Fixé pour chaque qualité d'Hydrocarbures Liquides tel que défini à l'Article 14.

14.2.3 Le remboursement des Coûts Pétroliers pour chaque Année Civile au titre des Permis Exploitation s'effectuera selon l'ordre de priorité suivant :

a) Back Costs ;
b) Les Bonus, à l'exception du Bonus de signature;
c) Les coûts des Travaux d'Exploitation ;
d) Les coûts des Travaux d'Evaluation et de Développement ;
e) Les coûts des Travaux d'Exploration;
f) Les dépenses sociales prévues à l'article 5.3
g) Les dépenses de formations de personnels ;
h) Les coûts liés au suivi de l'exécution du Plan d'Atténuation et de Réhabilitation, du Plan de Gestion Environnementale du Projet et de l'audit environnemental.

Les Coûts Pétroliers sont reclassés dans les catégories de Travaux Pétroliers ci-dessus selon leur nature.

14.2.4 Au moment de leur remboursement les Coûts Pétroliers encourus et non récupérés seront actualisés à compter de leur date de paiement par application de l'indice d'inflation visé à l'Article 3.6 ci-dessus et selon les dispositions prévues à la Procédure Comptable.

**Article 15 - Partage de la Production «Profit Oil»**

15.1 La Production Nette sur un Permis d'Exploitation, déduction faite de la Royalty conformément aux dispositions de l'Article 12 et de la quantité affectée au remboursement des Coûts Pétroliers, conformément à l'Article 14 ci-dessus, sera partagée comme suit :

| Production Nette Cumulée (BBLS) | Contractant (%) | Etat (%) |
|---|---|---|
| <20.000.000 | 65 | 35 |
| 20.000.001 – 50.000.000 | 55 | 45 |
| >50.000.000 | 45 | 55 |

15.2 Pour la répartition du « Profit-Oil » du Permis entre « **La RDC** » et chaque entité composant le «**Contractant**» prévue ci-dessus, les parts de chaque qualité d'Hydrocarbures liquides à recevoir par « **La RDC** » et par chaque entité composant le «**Contractant**» sont proportionnelles au rapport entre la Production Nette de chacune de ces qualités d'Hydrocarbures liquides affectées au « Profit-Oil » et la somme des Productions Nettes des Hydrocarbures liquides affectées au « Profit-Oil».

**Article 16 - Valorisation des Hydrocarbures**

16.1 Aux fins de la récupération des Coûts Pétroliers, de la détermination des montants à verser au titre de la perception en Dollars de la Royalty, le prix des Hydrocarbures liquides sera le Prix Fixé. Le Prix Fixé reflètera la valeur des Hydrocarbures Liquides de chaque qualité, FOB terminal de chargement à partir d'un point d'exportation maritime international, sur le marché international déterminée en Dollars par Baril. Au cas où les hydrocarbures liquides ne sont pas exportés au port, « **La RDC** » et le «**Contractant**» s'accorderont sur un prix basé sur la qualité du pétrole et sur les prix des marchés internationaux.

16.2 Pour chaque Mois, le Prix Fixé sera déterminé paritairement par « **La RDC** » et les entités composant le «**Contractant**». À cet effet, les entités constituant le «**Contractant**» communiqueront à « **La RDC** » les informations nécessaires conformément aux dispositions prévues à la Procédure Comptable.

16.3 Dans le Mois suivant la fin de chaque Trimestre, « **La RDC** » et les entités composant le «**Contractant**» se rencontreront afin de déterminer d'un commun accord, pour chaque qualité d'Hydrocarbures Liquides produite, le Prix Fixé pour chaque Mois du Trimestre écoulé. A cette occasion, chaque entité composant le «**Contractant**» soumettra à « **La RDC** » les informations visées à l'Article 16.2 ci-dessus et tout élément pertinent se rapportant à la situation et à l'évolution des prix des Hydrocarbures liquides sur les marchés internationaux. Si, au cours de cette réunion, un accord unanime ne peut pas être obtenu, les Parties se rencontreront de nouveau en apportant toute information complémentaire utile relative à l'évolution des prix des Hydrocarbures liquides de qualités similaires, afin d'obtenir une décision unanime avant la fin du deuxième Mois suivant la fin du Trimestre considéré.

16.4 Pour les besoins du Contrat, le «**Contractant**» déterminera en tant que de besoin un prix mensuel provisoire, pour chaque qualité d'Hydrocarbures liquides, qui s'appliquera jusqu'à la détermination définitive pour le Mois considéré du Prix Fixé. Ce prix provisoire sera porté à la connaissance de « **La RDC** ».

16.5 En cas de désaccord persistant des Parties sur la détermination du Prix Fixé, l'une ou l'autre Partie pourra soumettre le différend à l'arbitrage dans les conditions prévues à aux Articles 30.5 et 30.6 du Contrat.

16.6 En cas d'exploitation d'un gisement de Gaz Naturel, « **La RDC** » et le «**Contractant**» se concerteront pour fixer le prix du Gaz Naturel conformément aux dispositions de l'Article 18 ci-dessous.

**Article 17 - Transfert de Propriété et enlèvement des Hydrocarbures Liquides**

17.1 Les Hydrocarbures liquides produits deviendront la propriété du «**Contractant**» (conformément à l'Article 15) au passage à la tête des puits de production.

17.2 La propriété de la part des Hydrocarbures liquides revenant à « **La RDC** » et à chaque entité composant le «**Contractant**» en application des Articles 12, 14 et 15 sera transférée à celles-ci à la sortie des installations de stockage. Dans le cas d'une expédition par navire pétrolier, le point de transfert de propriété et d'enlèvement sera le point de raccordement entre le navire et les installations de chargement.

17.3 « **La RDC** » prendra également livraison au(x) même(s) point(s) d'enlèvement de la part d'Hydrocarbures liquides lui revenant.

17.4 Chaque entité composant le «**Contractant**», ainsi que ses clients et transporteurs, aura le droit d'enlever librement au point d'enlèvement choisi à cet effet, la part des Hydrocarbures liquides lui revenant en application des Articles 12, 14 et 15.

17.5 Les Parties conviennent que, en fonction de la réalité technique d'exploitation des gisements découverts, il pourra être établi plusieurs points d'enlèvement pour les besoins du Contrat.

17.6 Tous les frais relatifs au transport, au stockage et à l'expédition des Hydrocarbures liquides jusqu'au point d'enlèvement feront partie des Coûts Pétroliers.

17.7 Les Parties enlèveront leur part respective d'Hydrocarbures liquides, FOB terminal de chargement, sur une base aussi régulière que possible, étant entendu que chacune d'elles ne pourra, dans des limites raisonnables, enlever plus ou moins que la part lui revenant au jour de l'enlèvement à condition toutefois qu'un tel sur-enlèvement ou sous-enlèvement ne porte pas atteinte aux droits de tout autre Partie et soit compatible avec le taux de production, la capacité de stockage et les caractéristiques des navires.

Les Parties se concerteront régulièrement pour établir un programme prévisionnel d'enlèvement sur la base des principes ci-dessus.

Les Parties arrêteront, avant le début de toute production commerciale dans le cadre du Permis, une procédure d'enlèvement fixant les modalités d'application du présent Article.

17.8 Sauf dans les cas prévus par la loi, le Contractant n'est en aucun cas tenu de vendre une quantité d'Hydrocarbures liquides aux marchés internes de la République Démocratique du Congo. Le Contractant devra consacrer des efforts raisonnables pour maximiser la valeur des Hydrocarbures sur les marchés internationaux.

**Article 18 - Gaz Naturel**

18.1 En cas de découverte de Gaz Naturel, « **La RDC** » et le «**Contractant**» se concerteront dans les plus brefs délais pour examiner la possibilité d'une exploitation commerciale de cette découverte et, si elle est possible, envisager les aménagements juridiques, économiques ou fiscaux qui devront être apportés au Contrat.

18.2 Le «**Contractant**» pourra utiliser le Gaz Naturel, associé ou non, pour les besoins des Travaux Pétroliers, et procéder à toute opération de réinjection de Gaz Naturel visant à améliorer la récupération des Hydrocarbures liquides. Les quantités de Gaz Naturel ainsi utilisées ne seront soumises à aucun droit, impôt ou cotisation de quelque nature que ce soit.

18.3 Tout Gaz Naturel associé produit et non utilisé directement pour les Travaux Pétroliers devra prioritairement être affecté à des projets d'utilisation du gaz mis en place par le «**Contractant**». Le recours à la torchère est subordonné aux autorisations administratives nécessaires.

**Article 19 - Propriété des Biens Mobiliers et Immobiliers**

19.1 La propriété des biens mobiliers et immobiliers de toute nature acquis par le «**Contractant**» dans le cadre des Travaux Pétroliers sera automatiquement transférée à « **La RDC** » dès complet remboursement au «**Contractant**» des Coûts Pétroliers correspondants. Toutefois, après le transfert de propriété, le «**Contractant**» pourra continuer à utiliser lesdits biens immobiliers et mobiliers gratuitement et de manière exclusive pendant toute la durée du Contrat ; en cas de cession ou de vente des biens ainsi transférés, les produits obtenus seront en totalité versés à « **La RDC** ».

19.2 Dans le cas où les biens mentionnés ci-dessus seraient l'objet de sûretés consenties à des tiers dans le cadre du financement des Travaux Pétroliers, le transfert de la propriété de ces biens à « **La RDC** » n'interviendra

qu'après complet remboursement par le «Contractant» des emprunts ainsi garantis et après que les sûretés soient devenues caduques.

19.3 Les dispositions ci-dessus ne sont pas applicables aux équipements appartenant à des tiers et qui sont loués au «Contractant».

**Article 20 - Emploi et Formation du Personnel de « La RDC »**

20.1 Dès le début de la Première Période d'Exploration, conformément à l'Article 8.1.1. du présent Contrat, l'Opérateur mettra en oeuvre un programme de formation de personnel dans les domaines d'Exploration, de l'Exploitation et de la commercialisation des hydrocarbures, dont le budget annuel est fixée à Cent Mille Dollars (USD 100.000) par bloc pendant la période d'Exploration et Cent Cinquante Mille Dollars (USD 150.000) par bloc pour la période d'Exploitation. Les programmes de formation et les budgets susvisés seront préparés par le Ministère ayant les Hydrocarbures dans ses attributions et présentés au «Contractant» pour exécution. Les actions de formation concerneront les personnels techniques et administratifs des services intervenant dans la gestion des contrats pétroliers et seront conduites au moyen soit de stages en République Démocratique du Congo ou à l'Étranger, soit d'attribution de bourses d'études à l'Étranger. Le personnel en formation restera sous son statut d'origine et restera rémunéré par son Organisme originel de rattachement.

20.2 Les dépenses correspondant aux actions de formation constitueront des Coûts Pétroliers et par conséquent seront récupérables.

20.3 L'Opérateur assurera, à qualification égale, l'emploi en priorité dans ses établissements et installations situés en République Démocratique du Congo, du personnel de nationalité Congolaise. Dans la mesure où il ne serait pas possible de trouver des ressortissants Congolais ayant les qualifications nécessaires pour occuper les postes à pourvoir, l'Opérateur pourra embaucher du personnel étranger après avis du Ministère du Travail et Prévoyance sociale et de celui ayant les Hydrocarbures dans ses attributions. Cependant, l'Opérateur fera alors en sorte que son personnel Congolais reçoive une formation dans les domaines de qualification sus-visés.

## Article 21 - Audit

21.1 Sans préjudice des dispositions légales, les livres et écritures comptables du «**Contractant**» se rapportant aux Travaux Pétroliers seront soumis à vérification et à inspection périodique de la part de « **La RDC** » ou de ses représentants sans que le nombre de contrôle ne soit inférieur à quatre par an.

21.2 Après avoir informé le «**Contractant**» par écrit, et moyennant un préavis d'au moins quinze (15) jours, « **La RDC** » exercera ce droit de vérification pour un exercice donné, ou bien par du personnel de l'Administration ou bien par un cabinet indépendant internationalement reconnu, désigné par lui et agréé par le «**Contractant**». L'agrément du «**Contractant**» ne sera pas refusé sans motif valable.

21.3 Pour une Année Civile donnée, « **La RDC** » disposera d'une période d'un an à compter de la date de dépôt des comptes définitifs auprès de « **La RDC** » pour effectuer en une seule fois ces examens et vérifications.

21.4 Les frais afférents à cette vérification seront pris en charge par le «**Contractant**» et feront partie des Coûts Pétroliers.

21.5 Lorsque la vérification n'est pas réalisée par le personnel de l'Administration, le cabinet indépendant agréé par « **La RDC** » et le «**Contractant**» exercera sa mission dans le respect des termes de référence établis par « **La RDC** » pour l'examen de l'application des règles définies dans la Procédure Comptable pour la détermination des Coûts Pétroliers et de leur récupération. Lesdits termes de référence seront communiqués au «**Contractant**» avant l'intervention dudit cabinet. Le rapport final de cette vérification sera communiqué dans les plus brefs délais au «**Contractant**».

21.6 Les comptes des Sociétés Affiliées de l'Opérateur, qui sont chargées de fournir en particulier leur assistance au «**Contractant**» ne sont pas soumis à la vérification susvisée. Sur demande, l'Opérateur fournira un certificat du cabinet international chargé de certifier les comptes desdites Sociétés Affiliées. Ce cabinet devra certifier que les charges d'assistance imputées aux Coûts Pétroliers ont été calculées de manière équitable et non discriminatoire. Cette disposition ne s'applique pas aux Sociétés Affiliées sujettes au droit de la République Démocratique du Congo qui pourraient être créées pour les besoins de l'exécution du Contrat.

21.7 Pour toutes contradictions, erreurs ou anomalies relevées lors des inspections et vérifications, « **La RDC** » pourra présenter ses objections au



**«Contractant»** par écrit et de manière raisonnablement détaillée, dans les soixante (60) jours suivant la fin de ces examens et vérifications.

21.8 Pour le Permis, les dépenses imputées en Coûts Pétroliers et les calculs relatifs au partage de la Production Nette dans ladite Année Civile seront considérés comme définitivement approuvés si « **La RDC** » n'a pas opposé d'objection dans les délais visés ci-dessus.

21.9 Toute objection, contestation ou réclamation raisonnablement soulevée par « **La RDC** » fera l'objet d'une concertation avec l'Opérateur. L'Opérateur rectifiera les comptes dans les plus brefs délais en fonction des accords qui seront intervenus à cette occasion avec le vérificateur mandaté par « **La RDC** ». Les différends qui pourraient subsister seront portés à la connaissance du Comité d'Opérations avant d'être éventuellement soumis à l'arbitrage conformément aux dispositions de l'Article 30 du Contrat.

21.10 Les registres et livres de comptes retraçant les Travaux Pétroliers seront tenus par l'opérateur en langue française et libellés en Dollars. Les registres seront utilisés pour déterminer la quote-part des Coûts Pétroliers et de la production revenant à chacune des entités composant le **«Contractant»** aux fins du calcul par celles-ci des quantités d'Hydrocarbures leur revenant au titre des Articles 12 et 13 du Contrat.

21.11 A l'occasion de la conversion de devises et de toutes autres opérations de change relatives aux Travaux Pétroliers, le **«Contractant»** ne réalise ni gain ni perte sur les Coûts Pétroliers.

21.12 Les modalités relatives à ces opérations seront précisées dans la Procédure Comptable.

## Article 22 - Participation de l'Entreprise Pétrolière Nationale

22.1 Une part d'intérêt dans le Contrat de Quinze pour cent 15 % sera attribuée à "COHYDRO ".

22.2 La part d'intérêt de "COHYDRO ", défini à l'article précédent sera prise en charge par les entités autres que "COHYDRO ", composant le **«Contractant»**, qui prendra en compte tous les Coûts Pétroliers (ci-après les " Coûts Différés").

Les Coûts Différés sont déduits de la part de "COHYDRO " d'un compte avance (ci-après le "Compte Avance") dont les créanciers sont les autres entités formant le **«Contractant»**. Le Compte d'Avance générera un intérêt au taux LIBOR plus deux pour cent (2%).

22.3 Les entités autres que "COHYDRO " formant le **«Contractant»** doivent récupérer les fonds prêtés à "COHYDRO " par l'intermédiaire du Compte d'avance, plus intérêt, en utilisant cent pour cent (100 %) du Cost Oil et cinquante pour cent (50 %) du Profit Oil attribué à "COHYDRO ".

**Article 23 - Cessions d'Intérêts**

Dans le cas d'un transfert ou d'une cession de droits ou d'obligations à une Société Affiliée ou entre entités du **«Contractant»**, le **«Contractant»** doit informer « **La RDC** », par écrit, dans un délai de 30 jours.

La même forme est requise dans le cas d'une cession d'intérêts en faveur d'une société non affiliée où le **«Contractant»** doit informer « **La RDC** » pour approbation dans un délai de 60 jours pendant lequel « **La RDC** » se réserve un droit de préemption.

23.2 Sauf en cas de Cession d'Intérêts ayant pour conséquence le retrait total d'une des entités du **«Contractant»** et si cette Cession d'Intérêts génère une plus value, et après avoir mis à disposition de « **La RDC** » toute la documentation sur les opérations de cession, la cession d'intérêt n'emporte aucune obligation pour le **«Contractant»** de payer « **La RDC** ».

23.3 Lors du transfert d'intérêt de ce Contrat, le cédant doit être entièrement relevé, de ses obligations aux termes des présentes, dans la mesure où de telles obligations sont prises en charge par le cessionnaire.

**Article 24 - Informations et Confidentialité**

24.1 Les Travaux Pétroliers (Exploration, Exploitation, transport et stockage) sont soumis conformément à la loi en vigueur en « **La RDC** » et l'article 3.3 (c) de ce Contrat, au suivi et au contrôle par les experts de l'Administration des Hydrocarbures. Les dépenses y afférentes constituent des Coûts Pétroliers.

24.2 Sans préjudice du règlement minier, l'Opérateur fournira à « **La RDC** » une copie des rapports et documents suivants :

24.2.1 Rapports hebdomadaires sur les activités de forage ;

24.2.2 Rapports hebdomadaires sur les activités de géophysique ;

24.2.3 Rapports d'études de synthèses géologiques ainsi que les cartes afférentes;

24.2.4 Rapports de mesures, d'études et d'interprétation géophysiques, des cartes, profils, sections ou autres documents afférents, ainsi que, sur demande de « **La RDC** », les copies des bandes magnétiques originales sismiques enregistrées ;

24.2.5 Rapports d'implantation et de fin de sondage pour chacun des forages ainsi qu'un jeu complet des diagraphies de pétrophysique enregistrées ;

24.2.6 Rapports des tests ou essais de production réalisés ainsi que de toute étude relative à la mise en débit ou en production d'un puits ;

24.2.7 Rapports concernant les analyses effectuées sur carotte ;

24.2.8 Rapports mensuels de production.

24.3 Toutes les cartes, sections, profils, diagraphies et autres documents géologiques ou géophysiques seront fournis sur un support transparent ou, le cas échéant, sur un support électronique adéquat pour reproduction ultérieure.

24.4 Une portion représentative des carottes et des déblais de forage prélevés dans chaque puits ainsi que des échantillons des fluides produits pendant les tests ou essais de production seront également fournis à « **La RDC** » dans des délais raisonnables.

24.5 À l'expiration de ce Contrat pour quelque raison que ce soit, les copies des documents originaux et échantillons relatifs aux Travaux Pétroliers, y compris en cas de demande, les informations sur support électroniques, seront remises à « **La RDC** ».

24.6 « **La RDC** » pourra à tout moment prendre connaissance des rapports de l'Opérateur sur les Travaux Pétroliers, dont au moins une copie sera conservée en République Démocratique du Congo.

24.7 Ce Contrat ainsi que ses Annexes et toutes les informations relatives à l'exécution de ce Contrat ou toutes informations obtenues d'une autre Partie à l'occasion de ce Contrat sont vis-à-vis des tiers, traités comme confidentiels par les Parties. Cette obligation ne concerne pas :

(i) les informations relevant du domaine public,

(ii) les informations déjà connues par une Partie avant qu'elles ne lui soient communiquées dans le cadre du Contrat, et

(iii) les informations obtenues légalement auprès des tiers qui les ont eux-mêmes obtenues légalement et qui ne font l'objet d'aucune restriction de divulgation ni d'engagement de confidentialité.

24.8 L'Article 24.6 n'empêche en rien les communications selon les besoins :

(i) A leurs autorités de tutelle ou à des autorités boursières, si elles y sont légalement ou contractuellement obligées, ou

(ii) Aux instances judiciaires ou arbitrales dans le cadre de procédures judiciaires ou arbitrales, si elles y sont légalement ou contractuellement obligées, ou

(iii) A la Société Affiliée, étant entendu que la Société Affiliée gardera l'information confidentielle, ou

(iv) Aux banques et organismes financiers dans le cadre du financement des Travaux Pétroliers, sous réserve que ces banques et organismes s'engagent à les tenir confidentielles.

24.9 L'Opérateur peut également communiquer les informations aux tiers fournisseurs, entrepreneurs et prestataires de services intervenant dans le cadre du Contrat, à condition toutefois qu'une telle communication soit nécessaire pour la réalisation des Travaux Pétroliers et que lesdits tiers s'engagent à les tenir confidentielles.

24. 10 Les entités composant le «**Contractant**» peuvent également communiquer des informations à des tiers en vue d'une cession d'intérêts pour autant que ces tiers souscrivent un engagement de confidentialité.

**Article 25 - Fin du Contrat**

25.1 Le Contrat pourra prendre fin à la survenance de l'un des événements ci-après :

lorsque le Permis d'Exploration arrivera à terme et ne sera pas renouvelé en vertu de la législation en RDC ;

Lorsque le Permis d'Exploitation aura expiré ou ne sera pas renouvelé conformément aux dispositions légales,

pour chaque entité du «**Contractant**», en cas de retrait volontaire ou involontaire conformément aux dispositions prévues au Contrat d'Association.

la résiliation du contrat : l'Etat aura le droit de résilier le présent contrat dans les cas suivants :

- Si le «**Contractant**» ne se conforme pas à la législation et à ses règlements en vigueur ;



- Si le **«Contractant»** a failli gravement dans l'exécution du programme minimal des travaux voté au Comité d'Opérations au terme de la sous-période considérée ;
- Si le **«Contractant»** contrevient gravement aux dispositions du contrat ;
- Si le **«Contractant»** fait faillite ou passe en liquidation judiciaire.

Toutefois, cette résiliation ne pourra intervenir qu'après une mise en demeure du **«Contractant»** par « **La RDC** ». Suite à cette mise en demeure les parties doivent se concerter pour trouver une solution au différend dans un délai d'un mois. Si après cette phase de négociation et d'explications, le **«Contractant»** n'a pas pris de mesures pour pallier au problème à l'origine de la mise en demeure dans un délai de trois mois après concertation, « **La RDC** » pourra alors commencer une procédure de résiliation du Contrat.

25.2 Si une entité du **«Contractant»** souhaite se retirer volontairement conformément au Contrat d'Association, le **«Contractant»** en informera le Comité d'Opérations avec un préavis de soixante quinze (75) jours. Les entités restantes du **«Contractant»** ont le droit d'acquérir l'intérêt de l'entité qui se retire, mais au cas où cela n'a pas lieu, « **La RDC** » et le **«Contractant»** se concerteront pour le transfert de la participation de cette entité.

25.3 En cas de Fin de Contrat telle que prévue aux Articles 25.1 et 25.2:

(a) Sous réserve des dispositions de l'Article 17 ci-dessus, le **«Contractant»** liquidera les opérations en cours et les actifs acquis au titre du Contrat et rendra compte de cette liquidation au Comité d'Opérations.
Les frais de cette liquidation seront supportés par le **«Contractant»**.

(b) Le **«Contractant»** réglera toutes les charges dont le paiement lui incombera aux termes du Contrat.

**Article 26 - Force Majeure**

26.1 Aucun retard ou défaillance d'une Partie à exécuter l'une quelconque des obligations découlant de ce Contrat ne sera considéré(e) comme une violation au dit Contrat si ce retard ou cette défaillance est dû(e) à un cas de force majeure, c'est-à-dire à un événement soudain, imprévisible, irrésistible, insurmontable et indépendant de la volonté de la Partie qui l'invoque.
Cela comprend, sans que cette liste soit exhaustive, des faits d'insurrection, d'émeutes, de guerre, de grèves, d'émeutes des employés, d'incendie ou d'inondations.

26.2 Si, par suite d'un Cas de Force Majeure, l'exécution de l'une quelconque des obligations du Contrat était différée, la durée du retard en résultant, augmentée du temps qui pourrait être nécessaire à la réparation des dommages causés pendant ledit retard et à la reprise des Travaux Pétroliers, serait ajoutée au délai prévu au Contrat pour l'exécution de ladite obligation.

26.3 Lorsqu'une Partie considère qu'elle se trouve empêchée de remplir l'une quelconque de ses obligations en raison d'un Cas de Force Majeure, elle doit le notifier par lettre recommandée avec accusé de réception dans les 48 heures à l'autre Partie en spécifiant les éléments de nature à établir le Cas de Force Majeure, et prendre, en accord avec l'autre Partie, toutes les dispositions utiles et nécessaires pour permettre la reprise normale de l'exécution des obligations affectées dès la cessation de l'événement constituant le Cas de Force Majeure.

26.4 Les obligations autres que celles affectées par le Cas de Force Majeure devront continuer à être remplies conformément aux dispositions du Contrat.

**Article 27 - Droit applicable**

L'interprétation et l'exécution de ce Contrat seront soumises au droit de la République Démocratique du Congo.

**Article 28 - Stabilisation du Régime Minier et Fiscal**

Sans préjudice de l'article 84 de la Loi, pendant toute la durée du Contrat, « **La RDC** » garantit au «**Contractant**», la stabilité des conditions générales, juridiques, financières, pétrolières, fiscales, douanières et économiques dans lesquelles chaque entité exerce ses activités, telle que ces conditions résultent de la législation et de la réglementation en vigueur à la date de la signature de ce Contrat.
En conséquence les droits de chacune des entités composant le «**Contractant**» ne seront en aucun cas soumis en quelque domaine que ce soit à une mesure aggravante par rapport au régime définit au paragraphe ci-dessus.

Il est toutefois entendu que chaque entité composant le «**Contractant**» pourra bénéficier de toute mesure qui lui serait favorable par rapport au régime défini ci-dessus.

**Article 29 - Obligations Complémentaires de « La RDC »**

« **La RDC** » prend toutes les mesures nécessaires destinées à faciliter le déroulement des activités du «**Contractant**» et de ses Sous-Traitants. Sur la demande de l'un ou l'autre, l'assistance dont il est question ci-dessus portera sur le domaine suivant, sans que cette liste soit limitative :

- l'obtention des autorisations pour l'utilisation et l'installation des moyens de transport et de communication ;
- l'obtention des autorisations requises en matière des douanes et d'importation – exportation ;
- l'obtention des visas, permis de travail ou cartes de résidents et toutes autres autorisations administratives nécessaires pour l'exécution du Contrat en faveur du personnel travaillant en « **La RDC** » ainsi que les membres de leur famille ;
- l'obtention des autorisations requises pour l'expédition à l'étranger, le cas échéant des documents, données ou échantillons aux fins d'analyse ou de traitement pour le besoin des opérations pétrolières ;
- la facilitation des relations avec l'Administration et les autorités administratives locales ;
- l'obtention des approbations nécessaires à la conduite des opérations pétrolières, dans la mesure où les demandes auront été formulées conformément à la législation en vigueur en « **La RDC** » ;
- tout autre sujet qui se prête à l'assistance de « **La RDC** », notamment en matière de sécurité et d'opérations dans le cadre de la législation et de la réglementation en vigueur.

« **La RDC** » garantit au «**Contractant**», à chaque entité constituant le «**Contractant**» ainsi qu'aux cessionnaires du «**Contractant**» la non discrimination à leur égard dans l'application des dispositions législatives ou réglementaires par rapport à tout autre société exerçant des opérations pétrolières en République Démocratique du Congo.

**Article 30 - Arbitrage**

30.1 Tous les différends découlant du Contrat, à l'exception de ceux visés aux paragraphes 30.5 et 30.6 ci-dessous, qui surgiront entre « **La RDC** » d'une part, et les entités du «**Contractant**» d'autre part, qui ne pourront pas être résolus à l'amiable, seront tranchés définitivement par arbitrage conformément aux Règlements d'Arbitrage de la Chambre de Commerce Internationale de Paris.

30.2 « **La RDC** » d'une part et le «**Contractant**» d'autre part nommeront un arbitre et s'efforceront de se mettre d' accord sur la désignation d'un tiers arbitre qui sera le président du tribunal. A défaut de désignation d'un arbitre ou d'un accord sur le tiers arbitre, les dispositions de la Chambre de Commerce Internationale de Paris s'appliqueront.

30.3 L'arbitrage aura lieu à Paris, en France, ou en tout autre endroit décidé par le «**Contractant**» et « **La RDC** ». La procédure se déroulera en langue française. L'interprétation de ce Contrat par l'arbitre doit correspondre aux us et coutumes acceptés en général dans l'industrie pétrolière internationale.

30.4 « **La RDC** » renonce irrévocablement par les présentes à se prévaloir de toute immunité lors de la procédure relative à l'exécution de toute sentence arbitrale rendue par un Tribunal Arbitral constitué conformément au présent Article 27, y compris sans limitation toute immunité concernant les significations, toute immunité de juridiction et toute immunité d'exécution quant à ses biens, sauf les biens d'ordre public de la République Démocratique du Congo.

30.5 Si « **La RDC** » et une des entités du «**Contractant**» sont en désaccord sur la détermination du prix des Hydrocarbures Liquides dans le cadre de l'Article 16, « **La RDC** » ou ladite entité pourra demander au Président de l'Institute of Petroleum à Londres, Grande Bretagne, de désigner un Expert international qualifié, à qui le différend sera soumis. Si le Président de l'Institute of Petroleum ne désigne pas d'Expert qualifié, chacune des parties au différend pourra demander au Centre International d'Expertise de la Chambre de Commerce International de Paris de procéder à cette désignation. « **La RDC** » et ladite entité fourniront à celui-ci toutes les informations qu'ils jugeront nécessaires ou que l'expert pourra raisonnablement demander.

30.6 Dans les trente (30) jours de la date de sa désignation, l'expert communiquera à « **La RDC** » et à ladite Partie le prix qui à son avis, doit être utilisé en application de l'Article 14. Ce prix liera les parties et sera réputé avoir été arrêté d'un commun accord entre celles-ci. Les frais et honoraires de l'Institute of Petroleum à Londres ou de la Chambre de Commerce International de Paris, ainsi que les experts seront partagés également entre « **La RDC** » et ladite entité. L'Expert ne sera pas un arbitre, et l'arbitrage ne sera pas applicable en pareil cas.

**Article 31 - Signature**

Ce contrat est établi en quatre (4) originaux en langue française et chaque double sera considéré comme une version originale et authentique lorsqu'il sera dûment signé par les Parties.

**Article 32 - Accord Complet**

Suivant les définitions de ce Contrat, ce Contrat comprend l'accord complet des Parties et remplace et annule tous communications, engagements et accords précédents entre les Parties, qu'ils soient écrits ou oraux, exprimés ou tacites.

**Article 33 - Notification**

33.1 Toutes notifications ayant rapport à ce Contrat doivent être adressées par écrit aux Parties par lettre avec accusé de réception, par remise à personne ou aux adresses suivantes :

a) Pour «La RDC» :
Ministère des Hydrocarbures
Monsieur le Ministre des Hydrocarbures
1, Avenue du Comité Urbain
Commune de la Gombe
Kinshasa,
République Démocratique du Congo

b) Pour «COHYDRO» :
COHYDRO
Monsieur l'Administrateur Directeur Général,
1, Avenue du Comité Urbain
Comune de la Gombe
Kinshasa
République Démocratique du Congo

c) Pour **DIVINE INSPIRATION GROUP (PTY) Ltd** :
35, Impala Road,
Chislehurston, Johannesburg,
Afrique du Sud

33.2 La modification des coordonnées opérées par une des Parties doit être notifiée à l'autre avec un préavis de 15 jours et suivant la procédure prévue à l'article 33.1 ci-dessus.

33.3 En cas d'absence de reçu, mais en cas de remise à personne, toute notification effectuée dans le cadre du présent Contrat de Partage de Production sera réputée comme valablement effectuée.

33.3.1. Si remise personnellement, au moment de la livraison ;

33.3.2. Si envoyée par avion, au sixième jour ouvrable la date de la poste faisant foi ;

## Article 34 - Entrée en Vigueur - Régime de Coopération

34.1 Le présent Contrat de Partage de Production entrera en vigueur à la date son approbation par Ordonnance du Président de la République.

34.2 Toutes révisions ou amendements au présent Contrat de Partage de Production peuvent intervenir que d'un commun accord de toutes les Parties et ce par voie d'Avenant.

---



## PAGE DE SIGNATURES

EN FOI DE QUOI, les représentants dûment mandatés des entités composant le «**Contractant**» et « **La RDC** » ont signé le présent Contrat.

Signé, le 14 DEC 2007

**Au nom du Gouvernement de la République Démocratique du Congo :**

**Le Ministre des Hydrocarbures :**

***Lambert MENDE OMALANGA***

**Le Ministre des Finances :**

***Athanase MATENDA KIELU***

**Pour l'Association :**

**1. COHYDRO :**

***Michel LADY LUYA***
Président du Conseil d'Administration

***Jean YEMBELINE KODANGBA***
Administrateur Délégué Général, a.i.

**2. DIVINE INSPIRATION GROUP (PTY) Ltd**

*Andrea BROWN*

Directeur

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DIGOIL,

*Petitioner*,

*v.*

Democratic Republic of Congo,

*Respondent*.

Civil Action No. ___________________

**Declaration of Matthew S. Rozen in Support of Petition to Confirm Arbitral Award**

# EXHIBIT C

# JOINT PRODUCTION AGREEMENT

BETWEEN

THE DEMOCRATIC REPUBLIC OF CONGO

AND

THE ASSOCIATION:

- **CONSORTIUM DIVINE INSPIRATION GROUP (PTY) AND PETRO SA**
- **H-OIL CONGO LIMITED**
- **LA CONGOLAISE DES HYDROCARBONS**
- **CONGO PETROLEUM AND GAS SPRL**
- **SUD OIL SPRL**

**BLOC 1 GRABEN ALBERTINE**

**JANUARY 2008**

TABLE OF CONTENTS

Article 1 - Definitions 5
Article 2 - Object of the contract 8
Article 3 – Scope of application of the contract- Operator 8
Article 4 - Committee of operations 11
Article 5 - Good governance, development and protection of the environment
article 6 – Bank Guarantee 14
Article 7 – Minimum Program of Works of Reconnaissance and Exploration 15
Article 8 – Program of Complementary Works 16
Article 9 – Granting, Renewal and Waiver of Permit of Exploitation 18
Article 10 –Discovery of Hydrocarbons and Granting of Exploitation Permit 19
Article 11 –Abandonment Works 19
Article 12 -Fiscal, Royalty and Bonus Regime 21
Article 13 –Exchange Regime 22
Article 14 –Reimbursement of Oil Costs -Cost Oil 23
Article 15 –Sharing in Production -« Profit Oil » 24
Article 16 –Valuation of Hydrocarbons 25
Article 17 – Transfer and Property of extracted Liquid Hydrocarbons 26
Article 18 – Natural Gas 27
Article 19 – Property of Real Estate and Goods 28
Article 20 – Employment, training of DRC staff 28
Article 21 -Audit 29
Article 22 - Participation of the National Oil Company 29
Article 23 – Transfer of Interests 31
Article 24 - Information - Confidentiality 31
Article 25 – Finalisation of the Contract 32
Article 26 - Force majeure 33
Article 27 – Applicable Law 34
Article 28 - Stabilisation of Mining and Fiscal Regime 35
Article 29 – Complementary Obligations of DRC 34
Article 30 – Arbitration 35
Article 31 - Signature 36
Article 32 – Full Agreement 37
Article 33 - Notification 37
Article 34 – Effective date - Cooperation Regime Page of Signatures 37
38
Appendix 1 Maps and data on ZERE 39

Appendix 2 Mandate of the CONSORTIUM DIVINE INSPIRATION GROUP (PTY) Ltd,

Appendix 3 Mandate of H OIL CONGO LTD

Appendix 4 Mandate of CONGO PETROLEUM AND GAS SPRL,

Appendix 5 Mandate of Compagnie Pétrolière SUD OIL SPRL

BETWEEN

The Democratic Republic of Congo, legally represented by:

The Minister of Hydrocarbons,
and

The Minister of Finance

Acting by virtue of the legal authority granted to them under Law Decree No. 81-013 dated 2 April 1981 on the General Legislation on Mines and Hydrocarbons, hereafter referred to as "DRC" as the first party;

AND

The Association made up of:

1. **CONSORTIUM DIVINE INSPIRATION GROUP (PTY) Ltd**, a company of South African law, 35, impala Road, Chislehurst, Johannesburg, South Africa, hereafter referred to as **"DIVINE"- Petro SA**, acting only as a technical partner, a State Company of South African law, 151 Frans Conradie Drive Parow 7500, Private bag X5, -arow 7499, South Africa, represented by **Madame ANDREA BROWN**, Director, with full power of attorney whose copy is attached to annex 2, as the second party;

2. **H-OIL CONGO LTD**., a company of British law under number 1004728, with address at 197 Main Street, P.O 3540, Road Town Tortola, British Islands, represented by Mr. Jacques Hachuel, President, acting under statutory powers whose copy is attached to annex 3, hereafter referred to as "**H OIL",** as the third party,

3. **LA CONGOLAISE DES HYDROCARBONS** headquartered at number 1, Avenue du Comité Urbain in the Community of Gombe at Kinshasa, in the Democratic Republic of Congo, represented by **Mr. TSHIBAMBE NDJIBU Zéphyrin** and **YOLO YELI Jacques**, respectively President of the Board, and Delegated General Manager, hereafter referred to as **"COHYDRO"**, as the fourth party;

4. **CONGO PETROLEUM AND GAS SPRL**, a company registered under Congolese law at NRC: KG/2179/M, ID NAT 01-9-N49369Q, with address at n° 109 de l'Avenue Wagenia at Kinshasa in the community of Gombe, represented by **Mr. MUAKA KHONDE,** General Manager fully authorised with copy attached to annex 4, hereafter referred to as "**CONGO PETROLEUM AND GAS"** as the fifth party;

5. **Compagnie Pétrolière SUD OIL SPRL**, a company registered under Congolese law at NRC: 64.019, ED NAT 102448, with address at n° 191 Avenue de l'Equateur 7th. Floor at Kinshasa Community of Gombe, represented by **Mr. Pascal KINDUELO LUMBU,** President Director General, fully authorised with copy attached to annex 5, hereafter referred to as "SUD OIL" as the sixth party.

The second, third, fourth, fifth and sixth parties are hereby referred to as **"The Contractor".**

HAVING PREVIOUSLY STATED THAT:

- The state exercises a permanent sovereignty over the soil, sub soil, waters and forests, over air space, rivers, shores and maritime coast of Congo as well as over the territorial waters and over the continental platform;
- The economic resources such as hydrocarbons that are contained therein are referred to as "Concessible Substances";
- The state wishes to encourage exploration and exploitation of hydrocarbons in the area open to exploration in the Graben Albertine of the Democratic Republic of Congo;
- The consortium **"DIVINE"/Petro SA** has demonstrated its technical and financial capacity in oil exploration and production and the Final Report of evaluation and interpretation of the filed data has been conclusive, in execution of the Memorandum of Understanding signed on 23 August 2007 between **"DIVINE"** and the Democratic Republic of Congo;
- By letter dated 21 December 2007, Petro SA has notified "DRC" of its desire to provide technical assistance required for the performance of work related to this contract;
- The consortium is governed by an agreement of technical cooperation;
- **"H OIL"** has demonstrated its technical and financial capacity in oil exploration and production and the Final Report of evaluation and interpretation of data has been conclusive, in execution of the Memorandum of Understanding signed on 13 October 2007 between the Democratic Republic of Congo and "**H OIL"**;
- **"DIVINE-Petro SA"** and **"H OIL"** have concluded an agreement with "**COHYDRO**" outlining the terms of their cooperation;
- **"DIVINE-Petro SA", "H OIL",** "**Congo Petroleum And Gas", "Sud Oil"** and **"COHYDRO",** in association, have indicated their intentions of exploring the potential oil of Graben Albertine of which Bloc I and the coordinates are contained in annex 1;
- The state has indicated its agreement to grant the Association the financial, economic, and fiscal conditions specified for the exercise of activities outlined under this contract in order to support this initiative.
- By interministerial decree N° 012/MIN-HYDRO/LMO/2007 and N°062/MIN-FINANCE/AMK/2007 dated 17 October 2007 regarding the reopening of exploration of the Bloc I of Graben Albertine, the Government of the DRC has indicated its willingness to stabilise the hydrocarbon sector.

IT HAS BEEN AGREED AS FOLLOWS:

**Article 1 - Definitions**

As regards this contract, the following terms will have the significance established in this article:

*1.1* ***"Civil year":*** period of twelve consecutive (12) months commencing on 1 January and finalising on 31 December every year.

*1.2* ***"Back Costs":*** the costs paid by the Contractor, including expenses incurred by the Operator on behalf of the Contractor, for work related to the contract before its Effective Date, including text preparation costs, Operator's staff as well as financing of visits of representatives of "DRC".

*1.3* ***"Barrel":*** unit volume equal to 158,987.22 litres, measured at a temperature of 15 degrees Celsius.

*1.4* ***"Bonus":*** premium payable to the state at the signing of the contract and/or when the rate of production reaches certain levels as follows:

- Bonus signature: upon signature of the contract by the parties;
- Exploration Permit Bonus: upon granting of the exploration permit;
- Renewal Bonus of the Exploration Permit: at renewal of the Exploration Permit;
- Exploitation Permit Bonus: at the signing of the Exploitation Permit;
- Renewal Bonus of the Exploitation Permit: at renewal of the Exploitation Permit;
- First production Bonus: at production of the first barrel;
- Bonus for production of the tenth million Barrel: at production of the ten million Barrel;

*1.5* ***"Budget":*** provisional estimate of the cost of one Program of Works.

*1.6* ***"Transfer of interests":*** any legal transaction ending in the transfer between the parties, or any other entity other than a party, of part or all the rights and obligations derived from the contract.

*/. 7* ***"Operations Committee":*** the entity referred to under Article 4 of the Contract.

*1.8* *"**Contractor":*** refers to the Association formed by "DIVINE"/ Petro SA, H OIL, COHYDRO, CONGO PETROLEUM AND GAS SPRL and SUD OIL as well as any other organisation to which the Association may transfer an interest within the rights and obligations of the Contract.

*1.9* ***"Contract":*** the present production sharing agreement, its annexes that form an integral part of it as well as any amendment agreed to by the Parties.

*1.10* ***"Contract of Association"*** or "***Joint Operating Agreement"****:* the Contract entered into between the entities making up the Contractor and its amendments and annexes for the performance in association of the oil works.

1.11 ***"Oil Costs"* or *"Cost Oil"*:** all Back Costs such as defined under article 1.2, the Bonuses except for the signature and added value Bonus on the transfer of interest as defined in articles 1.4 and 12.5, as well as all expenses, among others, incurred and payable by the Contractor arising from oil works as defined in 1.34 hereunder, including all operational, administration, interest on loans costs as calculated in accordance with the Accounting Procedure.

1.12 ***"Effective Date":*** the date of entry into force of the Contract, as this date is defined in Article 34 of the Contract.

**1.13** ***"Dollar"* or *"dollar" or "USD"*:** the currency of legal tender in the United States of America.

/. 14 ***"The State"*:** The Democratic Republic of Congo as a public authority.

/. 15 ***"Natural Gas"*:** gaseous hydrocarbons including mainly methane and ethane which at 15 degrees Celsius and at the atmospheric pressure are in gas form and that are discovered and/or produced within the scope of the Permit.

1.16 ***"Hydrocarbons"*:** Liquid Hydrocarbons and Natural Gas discovered and/or produced within the Permit area.

1.17 ***"I.T.I.E"*:** Initiative for Transparency in the Administration of Revenues of Extraction Industries.

1.18 ***"Law"*:** Regulation Decree N° 081-013 dated 2 April 1981 on the General Legislation on Mines and Hydrocarbons as well as Regulation No. 67416 dated 23 September 1967 on the Mining Regulation.

1.19 ***"Month"*:** a period commencing the first day of a month and ending the last day of that month including the first and last days.

1.20 ***"Operator"*:** the entity of the Contractor responsible under the terms and conditions of the Contract of Association for the performance of Oil Works in accordance with the Contract as indicated in article 3 of the Contract.

1.21 ***"Parties":*** The parties to the Contract, i.e. The Democratic Republic of Congo and the Consortium "DIVINE"/Petro SA, "H OIL", "COHYDRO", "Congo Petroleum and Gas" and "Sud Oil" as well as any other entity to which the entities of the Contractor may transfer an interest in the rights and obligations of the Contract.

1.22 ***"Permit"*:** a permit regarding the area of interest located within the Exploration Permit (as defined in Annex 1 to this Contract) and all Exploitation Permits emanating there from.

1.23 ***"Exploration Permit"*:** Administrative Title for hydrocarbons granted for a duration of 5 years renewable two times as a result of exploration activities in Bloc I as defined in the Annex 1 to this Agreement.

1.24 ***"Exploitation Permit"*:** Administrative Title for hydrocarbons arising from

Exploration Permit granted for duration of 20 years, renewable, for the exercise of production activities.

*1.25* ***"Accounting Procedure":*** the accounting procedure such as defined in the Notification to the Contractor by the Hydrocarbon Administration of the DRC.

*1.26* ***"Profit Oil"*:** the balance of the production after deduction of the Royalty and the Cost Oil destined to be shared.

*1.27* ***"Program of Works":*** the plan of Oil Works that must be performed during a specific period of time previously agreed, as approved by the Operations Committee under the conditions established in the Contract.

*1.28* ***"Fixed Price"****:* the price of each quality of Hydrocarbons. as defined in Article 16 of the Contract.

*1.29* ***"Net Production":*** the total production of Liquid Hydrocarbons minus all water and sediment produced, of all quantities of Hydrocarbons reinjected in the oil deposit, used or lost during the Oil Works.

*1.30* ***"Taxed Production"****:* the net production minus transportation costs and stocking up to the location of delivery.

*1.31* ***"The DRC":*** the Democratic Republic of Congo as a party to this contract.

*1.32* ***"Surface Fee":*** the Right paid to the State by the Contractor regarding the occupation of land during the period of exploration or exploitation.

*1.33* ***"Affiliated Company":*** Every company in which more than 50 % of the vote rights in the ordinary general meetings of shareholders or associates (hereafter referred to as "Meetings") are held directly or indirectly by one of the Parties;

*1.33.1* Any company that directly or indirectly holds more than fifty (50) percent of the rights to vote in the Meetings of one of the parties.

l.33.2 Any company whose rights to vote in the Meetings are held by more than 50 % by a company which holds directly or indirectly more than 50 % of the rights to vote in the Meetings of one of the Parties.

1.33.3. Any company in which more than 50 % of the rights of vote in Meetings are held directly or indirectly by a company or several companies such as described in sub paragraphs 1.33.1 to 1.33.3 hereunder.

*L34* ***"Sub Contractor":*** physical or moral person which the Operator will call upon within the scope of execution of the Oil Works.

*1.35* ***"Oil Works":*** *the* activities taken to enable the performance of

the Contract within the scope of the Permit in accordance with the Contract, i.e. preparation and performance of operations, legal activities, accounting and financial activities. The Oil Works will be divided between Exploration, Evaluation, Development, Exploitation, and Abandonment Works.

*1.36* ***"Abandonment Works"*****:** the Oil Works necessary to repair the state of an exploration site whose abandonment is programmed by the Operations Committee.

*1.37* ***"Evaluation and Development Works":*** Oil Works associated with the Exploitation Permit regarding the study, preparation, and installations such as drilling, well equipment and production tests, construction and platform rig installation as well as all other operations carried out for the production, transportation, processing, storage and expedition of Hydrocarbons to the loading terminals.

*1.38* ***"Exploitation Works":*** Oil Works related to the Exploitation Permit and associated with exploitation and maintenance of production stations, processing, storing, export and sale of Hydrocarbons.

*1.39* ***"Exploration Works":*** Oil Works linked to the Exploration Permit and carried out with the objective of discovering and evaluating one or more Hydrocarbon fields such as operations of geology, geochemistry, geophysics, drilling well equipment and production tests.

*1.40* ***"Quarter":*** a period of three (3) consecutive months beginning the first day of January, April, July an October every Civil Year.

*1.41* ***"ZERE"*****:** Exclusive Zone of Reconnaissance and Exploration for a period of five (5) years, renewable two (2) times.

**Article 2 - Object of the Contract**

The object of the Contract is the awarding by the Democratic Republic of Congo to the Contractor of exclusive rights of recognition and exploration of Hydrocarbons, as well as the right to obtain concessions of exploitation in the area of Bloc 1.

**Article 3 – Scope of application of the Contract - Operator**

3.1 The Oil Works are performed in the name and for the account of the **"Contractor"** by one of its the entities and referred to as "The Operator", who is appointed by The Contractor within the scope of the Association Contract.

3.2 On account of the **Contractor,** the operator will be responsible for the following specific tasks:

(a) Prepare and submit to the Operations Committee the projects of the annual Work Programs, the corresponding Budgets, and any subsequent modifications;

(b)   Direct, within the limits of the Works Programs and approved Budgets, the execution of the Oil Works.

(c)   Prepare, in the event of a discovery considered as commercially viable, the development programs and exploitation regarding the field discovered;

(d)   Subject to the application of the terms under Article 3.5 hereafter, negotiate and conclude related contracts with third parties for the execution of the Oil Works.

(e)   Keep accounting books on the Oil Works, prepare, and submit the accounts to DRC in accordance with the Accounting Procedure.

(f)   Conduct the Oil Works in the most appropriate manner and, in general, make available all means that are appropriate respecting the rules of art and custom in the international oil industry with the aim of:

   (i) The execution of Works Programs under the best technical, security, environmental and economic conditions.

   (ii)  The optimisation of production with consideration to proper conservation of exploited deposits.

3.3   In the execution of Oil Works, the Operator must, on account of the Contractor:

(a)   Conduct with diligence all the operations in accordance with the practices generally followed in the oil industry, conform itself to the rules of art in the oil fields and civil works and complete all operations efficiently and economically. All operations will be executed in accordance with the terms of this Contract.

(b)   Supply the necessary staff for the Oil Works considering the terms of Article 20 hereunder.

(c)   Subject to articles 51 and the following of the Law, allow within reasonable limits to the representatives of the DRC to access periodically the sites where Oil Works are performed with the right to observe part or all operations carried out. DRC may, through representatives or employees duly authorised, examine part or all of the data regarding the Oil Works including geological, geochemical, geophysical, drilling, and any other data on oil production.

   The operator will maintain a representative copy of this data in

the Democratic Republic of Congo and will provide a copy to DRC. Notwithstanding, samples and documents requiring special conditions of storage or conservation will be maintained on account of the State in a location selected by the Operator under its responsibility and to which DRC will have access. The Operator will also have the right to keep copies of all data, documents, and samples outside the DRC at their own expense.

(d) Take out and maintain insurance of the kind and amounts of usual use in the oil industry and in accordance with the regulations in force in the Democratic Republic of Congo.

(e) Pay promptly all costs and expenses incurred on the Oil Works.

3.4. **The Contractor** must execute each Work Program within the limits of the Budget and cannot initiate any operation not included under the Works Program nor assume expenses that exceed those amounts unless as follows:

(a) If an expense is beyond the budget limit, and it is necessary for the execution of the Works Program that has been approved, the Contractor is authorised to incur costs within a limit not exceeding 15 % of the Budget. The operator must account for this amount in excess as soon as possible to the Operating Committee.

(b) During each civil year, the Contractor is also authorised to incur expenses within the scope of Oil Works that are unforeseen and not included in a Work Program (but related) and Budget within a limit of five hundred thousand dollars (USD500.000) or its equivalent in another currency. Nevertheless, these expenses must not be made to carry out work not authorised by the Operating Committee and the Operator must submit a report as soon as possible to the Operating Committee. When these expenses are approved by the Operating Committee, the amount will again be reinstated at 500,000 or its equivalent in another currency, the Contractor always having the power to spend this amount under the conditions provided hereunder.

(c) In case of urgency of the Oil Works, the Operator may incur an immediate expense that it judges necessary for the protection of life, goods, or the environment and it must advise the Operating Committee as soon as possible of the circumstances and amount of expenses.

3.5. Except as otherwise decided by the Operating Committee, the Contractor must call for tenders on all material and services whose estimated cost is to exceed one million dollars (USD1, 000,000) by call for tenders for the Exploration Works and at two million dollars (USD 2, 000,000) for

Evaluation, Development and Exploitation Works. Entities forming part of the Contractor may submit proposals to the tender. The procedure hereunder will not apply for geological, and geophysical studies, interpretation of seismic data, simulations and studies of fields, well analysis, their correlation and interpretation, analysis of oil rocks, petro-physic or geochemical analysis, supervision and engineering of Oil Works, acquisition of software and for work which necessitates access to confidential information whilst the Contractor will have the possibility to supply these services out of its own resources or those of its Affiliate Companies.

3.6.     The amount defined in Articles 3.4 and 3.5 hereunder, valid for 2007, (including Oil Costs) shall be updated each year by an inflation index that will be notified by the Central Bank of Congo.

3.7.     **The Contractor** can be made responsible only for direct damages suffered by DRC as a result of a deliberate fault on the part of the Contractor by using international oil practices. It is expressly agreed that the Contractor will be held responsible for all indirect damages or economic loss incurred by the DRC whatever the nature and related to this contract if their responsibility is determined in a court of law.

In any event, including when the limitation of liability mentioned herein cannot be established for any reason, the total amount that the Contractor can be held liable for will be determined by the extent of its liability in accordance with the regulations in effect in the DRC.

3.8.     Without prejudice to the preceding paragraph, **the Contractor** will execute, during the Exploration Permit and any subsequent period, the Minimum Recognition and Exploration Work Program provided for under Article 7 of the Contract.

3.9.     Within six (6) months following the effective date of the contract, the Contractor will establish a Limited Liability Company under Congolese Law in accordance with article 80 of the Law.

**Article 4 – Operating Committee**

4.1     As soon as possible after the effective date of this contract, for Permit purposes, an Operating Committee will be formed, made up of representatives of the Contractor and the DRC. The **DRC** and the **Contractor** will each appoint three representatives with a mandate of two years. The representatives of the DRC will come from the Ministry of Hydrocarbons. The Contractor will have the right to replace its representatives at any time by advising the DRC. The DRC and the Contractor may have a reasonable number of their employees participate in the meetings, without a voting right.

4.2   The Operating Committee examines all questions on the order of the day regarding the orientation, programming, and control of the Oil Works. It will examine most importantly the Work Programs and the Budgets that will be the object of an approval and it will control the execution of said Work Programs and Budgets.
For the execution of these Work Programs and execution of the approved Budgets, the Operator, on account of the Contractor, will make all necessary decisions for the performance of the Oil Works in accordance with the terms of this Contract.

4.3   The decisions of the Operating Committee are taken by applying the following rules:

(a)   For the Exploration Works, the Operator will submit on account of the **Contractor**, to the Operating Committee the orientations and Work Programs it intends to carry out. The Operating Committee will issue recommendations as required and in its judgement necessary, in consideration of which the Contractor will decide.

(b)   For Evaluation and Development Works and Exploitation Works, the Operator will submit on account of the Contractor to the Operating Committee, the orientations, Work Programs and Budgets that it proposes for approval. The decisions of the Operating Committee shall be taken unanimously by the representatives present as appointed by DRC and the Contractor.

(c)   For Abandonment Works, all decisions of the Operating Committee shall be taken unanimously by six representatives appointed in accordance with Article 4.1.

(d)   In the event of a question that must be decided in accordance with the Contract or other way by the Operating Committee that could not obtain a unanimous decision of six representatives or their replacements appointed in accordance with article 4.1. during a meeting of the Operating Committee or if the representatives of DRC are not present, the examination of this issue will be postponed to a second meeting that will take place by written notification at least ten days following the date of the first one. During this interval DRC and the Contractor will meet and the Operator shall provide all information and explanations requested by DRC. It is agreed that if during the course of this second meeting DRC and the Contractor do not reach a decision or if the representatives of the DRC do not attend, the decision will belong to the Contractor as long as the entities forming part thereof have not recovered all costs linked to the initial phase of development. For complementary developments, under a same Exploitation Permit, a unanimous agreement must be sought by DRC and the Contractor.

4.4   The decision taken by the Operating Committee must not lead to a breach of the rights and obligations resulting for the Contractor under this Contract and the Permits.

4.5   The Operating Committee shall meet each time the Operator makes a request upon notification of 15 days in advance. The Operator will forward the file of the meeting to the DRC within the same time frame.  The DRC and the Contractor shall select the number of representatives they wish to send. This number shall be between one and three. In addition, the summon shall contain the proposed agenda, the time and date of the meeting. DRC may at any time request that the Operator call a meeting to discuss preagreed issues that will form part of the agenda of that meeting.  The Operating Committee must meet at least twice each Calendar Year to discuss and approve the Work Program and the Budget and to hear the Operator's report on the Budget execution for the previous year. The Operating Committee cannot decide on any question that does not appear on the agenda, except if a decision to the contrary is made by DRC and the Contractor.

4.6   The Operating Committee is presided over by a representative appointed by DRC who must act as president during the meetings. The representative appointed by the Contractor ensures the secretariat of the meetings. In the event of disagreement, the president does not have a deciding vote.

4.7   The Operator shall prepare the minutes in writing of each meeting and shall send a copy to DRC within 15 days from the day of the meeting, for approval or remarks to be sent back within a further 15 days from receipt. In addition, the Operator will draw up and submit to the signature of the representatives of DRC and the Contractor a list of questions subject to a vote and a summary of the position adopted for each vote.

Any question may be submitted to the Operating Committee without there being a formal meeting, on the condition that it is submitted in writing by the Operator to DRC. In the event of any such submission DRC must within 10 days of receipt communicate its vote in writing to the Operator, except if the issue raised for voting requires a decision in a smaller period of time because it is urgent.  In such cases, the DRC shall communicate their vote within the timeframe stipulated by the Operator. This timeframe can, in no case, exceed 48 hours. In absence of a response from the DRC the operator will consider the vote in favour. Any issue that receives an affirmative vote under the conditions outlined hereunder will be considered and adopted as if a meeting had taken place.

4.8   The Operating Committee can decide to hear any person requested by DRC or the Contractor. In addition, DRC or the Contractor may, at their expense be assisted in meetings by experts of their choice if they obtain a confidentiality commitment

from these experts, it being understood that they must not have any link with the oil companies competing with the entities forming part of the Contractor.

4.9 The Operating Committee may also meet at the request of one of the Parties to the Contract in case of:

- Intentional violation of the contract clauses by one or other of the parties.

- Change in the economic circumstances that cause an imbalance in the services required by the parties.

**Article 5 – Good Governance, Development and Protection of the Environment.**

**5.1** **DRC and the Contractor** accept the application of principles and criteria of I.T.I.E. within the framework of the execution of their contractual obligations.

5.2 Seminars, workshops as well as conferences will be organised by the **Contractor** to inform staff primarily on the following**:**

- Law No. 05/0*06* of 29 March 2005 modifying and completing the decree dated 30 January 1940 regarding the penal code called Anti-Corruption Law;

- Law No. 04/016 of 19 July 2004 regarding the fight against money laundering and financing of terrorism.

- The legislation on the protection of the Environment.

5.3 The **Contractor** will annually allocate an amount of two hundred and fifty thousand dollars (USD 250,000) at the Exploration phase and three hundred thousand dollars (USD 300,000) at the Production phase as social contributions towards local populations living around the sites following a program agreed to with the Ministry of Hydrocarbons. This amount will be assigned mainly to Public Health, Education, and Culture. They will form part of Oil Costs and are therefore recoverable.

5.4 The **Contractor** will prepare a Mitigation and Rehabilitation Plan (PAR) within six months (6) of the first ZERE period, followed by an impact study on the environment and an Environmental Administration Plan of the Project (EIE/PGEP) for the production phase.

The terms of reference including the instruction costs of these obligations will be submitted to the Ministry of the Environment who will approve the final versions that will form part of this contract. The Ministry will to this effect issue an environmental notice and deliver an Exploitation Permit. Without prejudice to Article 3.3(c), an annual environmental audit is planned, paid by the Contractor**.**

5.5 The exploration – production works must be carried out respecting the norms relative to protected areas.

**5.6** The **Contractor** will be responsible for the execution of the Mitigation and Rehabilitation Plan, Environmental Administrative Plan and the continuous supervision of the environment as well as maintenance of the initial State of ZERE and its surroundings in accordance with current standards. It will perform the execution of recommendations by State Services responsible for the elaboration of these standards especially as regards Health, Safety, Environment, and Quality (HSEQ), for an amount of USD1.500.000 at the signing of this PSA. The annual contribution is equal to:

* USD150.000 at the exploration phase;

* USD250.000 at the production phase.

**Article 6 – Bank Guarantee**

6.1 Within four months following the effective date of this contract the **Contractor** will provide the Operating Committee with an irrevocable bank Guarantee in favour of DRC issued by a first rank Bank in an amount of one hundred and fifty thousand dollars (USD150.000).

6.2 The guarantee shall be called into effect in the event of non-performance at Contractor's fault perform the Minimum Works Program for the First Sub Period as defined at Article 7.1.1.1 that it covers and as per the terms of the said guarantee.

6.3 The guarantee must contain the following stipulations:

- The effective date.
- The duration of one year.

6.4 It is nevertheless provided that the performance of Minimum Works Program of the First Period as defined under Article 7 that the **Contractor** agrees to perform and not the expenses corresponding to the estimated costs of these works that determine that the Contractor has effectively performed the duties foreseen in the Contract.

6.5 Without prejudice to Article 26 of the Contract, DRC can call the guarantee in its favour under the following hypothetical situations:

- **The Contractor** notifies in writing that it does not have the intention of carrying out or finalize the works object of the Guarantee. In one or the other case, the Guarantee is due in total;

- A request of payment made by the Ministry of Hydrocarbons to the Contractor accompanied by a written testimony by the Ministry certifying that the **Contractor** has received two notices of delay within one month but has not

taken the necessary measures to carry out the work within the delay indicated in this Contract.

The Ministry of Hydrocarbons will release the Guarantee once it has sent the bank a notice certifying that the **Contractor** has completed the Minimum Works as defined in Article 7, object of said Guarantee.

**Article 7 – Minimum Program of Recognition and Exploration Work**

7.1 The **Contractor**, in accordance with its obligation to complete the Exploration works in the ZERE, in accordance with this article, will complete the Minimum Works Program as follows and within the period established.

7.1.1 **First Period of ZERE (Duration five years)**
Commencing on the effective date and finalising five years after the last day of this period of five years for a global amount of seventy million dollars (USD70.000.000).

7.1.1.1 **First Sub Period of the ZERE (twelve months)**
Commencing on the effective date and finalising twelve months later, the last day of this period.

a) Minimum Works Program:

1. Acquisition of all regional data including geological, seismic, drilling, geochemical, magnetic, gravimetrics, etc.

2. Land geological studies: structural evaluation, collection of outcrops samples and oil and gas surface indexes.

3. Interpretation of all data and evaluation of the prospects.

**The estimated cost of the first sub period is of five million dollars (USD5.000.000).**

**7.1.1.2. Second Sub Period of the ZERE (twelve months)**

Commencing the day after the last day of the first sub period as defined above and finalising one year later on the last day.

Minimum Works Program:

1. Continuation of geological studies of the land;
2. Geochemical analysis of the samples collected;
3. Impact studies of exploration activities on the environment;
4. Re-evaluation of the prospects and proposal of a seismic valuation.

**The estimated cost for the second sub period is five million dollars**

**(USD 5.000.000)**

7.1.1.3. **Third Sub Period of the ZERE (twelve months)**

Commencing on the last day of the second Sub Period of the ZERE as defined above and finalising twelve months later, on the last day.

Minimum Works Program:

1. Acquisition, processing and interpretation of 200 Km of 2D seismic;
2. Drilling of the first exploration wells.

**The estimated cost for the third sub period is twenty-five million dollars (USD 25.000.000).**

**7.1.1.4. Fourth sub period of the ZERE (twelve months)**

Commencing on the last day of the third Sub Period of the ZERE as defined above and finalising twelve months later, on the last day.

Minimum Works Program:

1) Continue with drilling and dwell tests;
2) Acquisition, processing, and interpretation of 200 Km of complementary 2D seismic or 200 Km of 3D seismic.

**The estimated cost for the fourth sub period is fifteen million dollars (USD 15.000.000).**

**7.1.1.5. Fifth pub period (twelve months)**

Commencing on the last day of the fourth Sub Period of the ZERE as defined above and finalising twelve months later, on the last day.

Minimum Works Program:

1) Drilling of exploration wells

**The estimated cost for the fourth sub period is twenty million dollars (USD 20.000.000).**

.

7.1.2. The Contractor will participate in setting up of a database for the General Secretariat of Hydrocarbons and will train staff in the administration of the database at an annual cost of fifty thousand Dollars (USD50.000)

7.1.3. The Contractor will participate in the exploration efforts of sediment basins of the Democratic Republic of Congo for an annual amount of

one hundred thousand dollars (USD100.000) at the exploration phase and an annual amount of one hundred and fifty dollars (USD150.000) at the production phase.

7.1.4.  The Contractor will participate in the contribution of DRC towards the dues for APPA (Association of African Oil Producing Countries) in an annual amount of fifty thousand dollars (USD50,000) during the exploration phase and seventy-five thousand dollars (USD75,000) during the production phase.

7.1.5.  The **Contractor** will pay to the State the fines provided for under legislation in the event of non- execution of the Minimum Recognition and Exploration Works Program; it is to be understood that the fines will only be applied to the failure to perform the program and not on the corresponding expenses of estimated costs.

7.2.  The exploration wells must be drilled at the location determined by the Operating Committee and be of a depth considered necessary to evaluate a sedimentary section that will have been established following available data and as being one of the most profound formation objectives in the eyes of the Contractor and in accordance with oil industry practices, unless at least one of the following events impedes this:

a)  The formation expected is reached;

b)  A deeper well could in the view of the Contractor, create a risk of danger that could not be reasonably contained;

c)  Impenetrable formations;

d)  Meeting substantial hydrocarbon formations that must be protected, which prevent reaching the depth required.

Under such circumstances drilling of all wells must stop and terminate at a lesser depth, and this will be considered as satisfying the criteria of minimum depth required and agreed between the DRC and the Contractor.

7.3.  At the end of each sub period of exploration the Contractor may choose not to pursue the Minimum Works Program as provided for under article 7, in terms of a technical evaluation and after having given 30 days written notification to the DRC. In such a case, the contract terminates without penalties.

**Article 8 – Complementary Works Program**

8.1  During the technical evaluation of every Sub Period of the ZERE, if the **Contractor** performs complementary work in addition to the Minimum Works Program, these will be taken into consideration as satisfactory to   the performance of the Minimum Works Program for the next Sub  Period  of  the ZERE.

8.2 On behalf of the **Contractor,** the Operator shall submit to the DRC within 30 days following the technical evaluation, the Complementary Works Program that it intends to conduct during the Sub Period considered as well as the corresponding Budgets.

8.3 Each Budget will contain a detailed estimate of the cost of Oil Works under the Complementary Works Program. The Complementary Works Program and its Budget can be modified and revised by the Operating Committee at any time during the year.

8.4 Within 30 days following the finalisation of complementary works, the Operator must present DRC with a report on the works executed as well as on the Budget.

**Article 9 - Attribution, Renewal and Waiver of the Exploration Permit**

Without prejudice the contents in Decree No. 67-416 dated 23 September 1967 on the mining Regulation, and at the request of the Contractor, the Ministry of Hydrocarbons grants the **Contractor** an Exploration Permit for a duration of five years renewable twice, after the materialisation of the ZERE, by the relevant State services and assumed by the Contractor.

9.1 If the obligations under the Minimum Works Program have been completed satisfactorily the **Contractor** may, at the time of the technical evaluation and having given 30-day notice select to:

(i) Either renew the Exploration Permit and therefore commences the second period of the ZERE;

(ii) Waive the Exploration Permit.

9.2 The following terms of mandatory waiver apply:

(i) If the **Contractor** requests a renewal of the Exploration Permit at the end of the first period of the ZERE, the Contractor will waive an area that is no less than fifty percent (50%) of the original area of the Exploration Permit, such area being decided by the **Contractor.**

(ii) At the end of the second period of the ZERE, if the **Contractor** requests a renewal then the **Contractor** will waive an area no less than fifty percent (50 %) of the remaining area of the Exploration Permit, this area being decided by the **Contractor.**

**Article 10 – Discovery of Hydrocarbons and Attribution of Exploitation Permits**

10.1 As soon as discovery of Hydrocarbons takes place, and judged by the C**ontractor** as being commercially exploitable, on behalf of the Contractor,

the Operator will inform DRC. As soon as possible, and no later than 30 days following completion of tests on the discovered deposit, the **Contractor** will present to the Operating Committee a first report on the discovery on the levels found that can be considered productive, the approximate importance of the deposit and an estimation of the work to be undertaken within the next three (3) months.

10.2 Not later than the following Calendar Year from sending the notification regarding the discovery, the **Contractor** will submit to the Operating Committee:

i) A detailed report on the discovery;
ii) A Work Program and provisional Budget necessary for the delineation of the deposit, including the complementary work to be performed and the number of wells to be drilled.

After analysis and any modifications to the proposal of the Contractor by the Operating Committee, the decision rules outlined in Article 4.3 herein will be applied.

10.3 Upon commencement of delineation works, the **Contractor** shall submit a Report to the Operating Committee on the possibilities of production in the field.
Following an analysis of this report by the Operating Committee, if the Contractor shall determine the commercial nature of the field according to its evaluation criteria, the DRC, at the request of the **Contractor,** must grant a Exploitation Permit.

10.4 Each Exploitation Permit granted to the **Contractor by the DRC** will be given for an initial period of twenty (20 years effective on the date of granting of the Permit, unless on previous date and in accordance with Article 11 of the Contract, the Contractor decides to commence Abandonment Works and consequently waives the Permit.

**10.5** If the Contractor estimates that one or more discoveries of hydrocarbons are part one side and part on the other side of the border separating the DRC and Uganda, and must be exploited jointly, using production equipment, processing, storage and transportation, it may request the DRC to negotiate with Uganda within shortest possible time the cooperation and unity agreements regarding the exploitation area.

Thus, in the event that such agreements were to be reached, the obligations of the Contractor contained in article 14 herein will be applied only to the part of hydrocarbons produced and sold but coming from the fields on the contractual area given by DRC.

If the performance of the Minimum Works Program by the Contractor is delayed as a result of negotiations on the agreement of cooperation, the minimum work programme will be extended accordingly.

10.6  Within the framework of execution of contractual obligations regarding the transportation and export of hydrocarbons, the Contractor will be entitled to build alone or with a third party, the installation required for the transportation and export of hydrocarbons subject to this not being interpreted as an obligation of the Contractor. The Contractor will have the right to use the said installations for transportation and export of hydrocarbons from the neighbouring countries or the area granted. The Congolese State will put in place a facilities mechanism for consular and administrative matters required by neighbouring countries in order to enable the Contractor to transport and export the hydrocarbons emanating from its activates.

**Article 11- Abandonment Works**

11.1  When the operator estimates that in all 85 % of proven reserves of an Exploitation Permit  arising from an Exploration Permit (forming part of the object of the contract) must be produced by the end of the next Calendar Year it will submit to DRC on account of the Contractor, no later than 15 November of the current Calendar Year the program for works of abandonment it proposes to perform with a plan to close the site, a calendar of work anticipated and a detailed estimate of all costs related to these Abandonment Works.

11.2  In the event that the **Contractor** concludes that the continuation of Oil Works is not profitable and it wishes to proceed to Abandonment Works, DRC has the right to become the responsible party of all Oil Works with no participation from the Contractor, being understood that the Contractor will no longer have any further responsibility for future costs related to the Abandonment Works.

11.3  In order to enable the recuperation of these Oil Costs, in accordance with the terms of Article 14.2.3 hereafter, by the entities of the **Contractor,** under the form of refurbish of the site, the Operator will determine, no later than 15 November of the current Calendar Year, the amount (in dollars / barrel) of the provision. This amount will be equal to the total amount estimated for the abandonment works divided by the volume of proved reserves to be produced according to the Permit estimates.

11.4  No later than 15 December of the same Calendar Year, the Operating Committee will adopt, for the Permit, the Abandonment Works program and the corresponding global Budget for the remaining period

of the Abandonment Works. On the same date the Operating Committee will also approve the amount of the provision that the Contractor must establish for each Barrel of Liquid Hydrocarbons to be produced. Each member of the Contractor will consequently debit on the Oil Works of each following Calendar Years, an amount equal to that of the provision to be done by Barrel left to be produced, multiplied by the part of the production of Liquid Hydrocarbons belonging to it on behalf of the Calendar Year ensuing in application of the Permit.

11.5 If required, and no later than 15 November of each Calendar Year, the Operator will present DRC with the modifications it agrees to make to the estimates on reserves to be exploited and the Abandonment Works to be carried out. Depending on these new estimates of reserves and Abandonment Works to be carried out, the Operator will determine, considering the provisions already made, the new amount in Dollars for provisions to be made for all years to come until the end of production, on each barrel of Liquid Hydrocarbons to be produced. The Operating Committee will approve this amount no later than 15 December of the same year.

**Article 12 – Fiscal Regime, Royalty and Bonus**

12.1 The Royalty will be paid by the Contractor to DRC and is calculated at the rate of twelve and a half percent (12.5 %) applied on the Fiscalised Production.

12.2 **DRC** will have the right to receive the Royalty in kind or its equivalent value in cash. The Ministry of Hydrocarbons will notify the Contractor of the choice by the DRC at least 90 days in advance. If the notification is not made, the Royalty will be paid in kind at the place of extraction. In this case, if the DRC has not taken delivery of all or part of its share of production for a given month it will be considered to have waived it and its part replaced by cash. The currency of all transactions will be in US dollars.

12.3 The share of Liquid Hydrocarbons due to the Contractor after the portions and shares defined in article 14 and 15 hereunder will be net of all taxes, rights or contributions of any nature whatsoever.

12.4 All the Contractors' activities and its sub-Contractors involved in the Oil Works are exempt from all companies' taxes operating in Congo.

12.5 There is a bonus of 40 % of the added value made on the interest concession of the association during the period of exploration and 20 % during exploitation. This bonus is not refundable.

12.6 All foreign staff (those who are not Congolese citizens) employed by the Contractor or sub-Contractors involved in the works in the DRC are subject to

the professional tax on income and those regarding obtaining an administrative document or provision of a service.

Within the scope of execution of the Oil Works the Contractor and its sub-Contractors are subject to the payment of taxes on internal income at the rate of 3% on services and 5% on local sales as well as the exceptional surtax on expatriates of 25 %. Nevertheless, the Contractor will not be subject to these taxes during the period of production.

All import and exports made by the Contractor and sub-Contractors of material and services from and to the DRC within the scope of Oil Works are exempt from all taxes, rights or customs duties.

12.7   Certificates of exemption on these taxes will be supplied to these entities including their affiliates, consultants, employees, administrators and sub-Contractors by the fiscal authorities of DRC.

12.8   The Permit is exempt from property tax.

12.9   The Contractor will pay DRC the following rights:

- A bonus at the time of the signing of the contract in an amount of two million five hundred thousand dollars 2.500.000 USD non-recoverable.

- Exploration Permit: upon the granting of the permit: USD250.000;
- Renewal of the Exploration Permit:  upon renewal of the permit: USD125.000;
- Exploitation Permit: upon granting of the permit: USD 250.000 per concession;
- Renewal of the Exploitation of Permit: upon renewal of the permit:  USD125.000 per concession;
- Bonus of production: upon production of the first Barrel: USD1.000.000;
- Bonus of production of the tenth millionth Barrel: at production of the tenth millionth Barrel:  USD5.000.000.

12.10   An annual Surface Fee equivalent to two dollars /sq. km. on the Exploration Permit and five cents of a dollar / sq. km. on Exploitation Permit is due by the Contractor to DRC.

**Article 13: Exchange regime**

13.1 DRC guarantees to the Contractor as well as to any physical or moral person working for them within the scope of this Agreement the benefit in terms of legislative and regulative terms on all matters regarding exchange rates, that will be granted to another company exercising similar activities in Congo. Subject to the terms hereafter, DRC guarantees the Contractor the right to transfer abroad in original investment currency the following:

a) Foreign capital investments in participations, in the event of transfers or liquidation of all or part of the investment, or in borrowed capital, at the contractual maturities.

b) Capital income, as relates to remuneration of participation capital income and on loan interests.

13.2 Notwithstanding anything to the contrary contained herein regarding legislation on exchange controls, the Contractor may retain abroad the income coming from foreign investment and from production exports, it being understood that the Contractor is obligated to the following:

a) To use in priority for financing purposes of the activities provided for under this Contract, especially investment and production, through its assets hold abroad.

b) To repatriate to DRC the amount necessary for company's cash flow in order to pay taxes and duties due to DRC.

13.3 The control over the execution of regulations on this matter is entrusted to the Central Bank of Congo.

13.4 The **Contractor** agrees to respect the modes of execution established by this institution mainly in respect of the payment of exchange control fees, in accordance with this Agreement and notified to the Contractor.

**Article 14 – Reimbursement of Oil Costs - Cost Oil**

14.1 The Contractor will ensure the financing of all Oil Costs.

14.2 The Oil Costs of the permit will be reimbursed. To this effect a part of the production of Liquid Hydrocarbons arising from the Permit during each Calendar Year will be used for reimbursement of Oil Costs as follows:

14.2.1 As soon as it starts the production of Liquid Hydrocarbons on the Exploitation Permit, each entity of the Contractor will start recovering its portion of Oil Costs (updated, as per article 3.6 and indexed as indicated hereunder) regarding the Permit by receiving each Calendar Year a quantity of Liquid Hydrocarbons, the Cost Oil, equal to 60 % of total Net Production of the Exploitation Permits stemming from the Exploration Permits, multiplied by the percentage interest they hold in that permit. The amount reimbursed by the Cost Oil must correspond to all Oil Costs

updated in accordance with article 3.6.

If during any Calendar Year the Oil Costs capitalised and indexed not yet recovered by an entity of the Contractor exceed the value of the quantity of Liquide Hydrocarbons that can be retained as indicated hereunder, and the surplus cannot be recovered in that Calendar Year, it shall be deferred to the following Calendar Years until full recovery or termination of the Contract.

14.2.2   The value of the Cost Oil will be determined using the Fixed Price for quality of Liquid Hydrocarbons as defined in Article 14.

14.2.3   The reimbursement of Oil Costs for each Calendar Year on the Exploitation Permits will be made according to the following priority:

a)   Back Costs;
b)   All bonuses except the signature bonus and the added value bonus on the interest transferred;
c)   Costs of Exploitation Works;
d)   Costs of Work for Evaluation and Development;
e)   Costs for Exploration Works;
f)   Expenses of a social nature provided for under article 5.3;
g)   Expenses related to staff training;
h)   Costs related to surveillance of the execution of the Mitigation and Rehabilitation Plan, Environmental Administration Project and environmental audit.

Oil Costs are classified in categories of Oil Works hereunder according to their nature.

14.2.4   At the time of their reimbursement, the Oil Costs incurred and not recovered will be updated as from the date of payment by applying the inflationary index defined under article 3.6 herein and according to the provisions in the Accounting Procedure.

**Article 15 – Sharing of Production - Profit Oil**

15.1   The Net Production on the Exploitation Permit, after deducting the Royalty in accordance with Article 12 and the quantity determined for reimbursement of Oil Costs, will be shared between the State and the Contractor in the proportions indicated hereunder. It is otherwise understood that for the determination of the part of the production of hydrocarbons assigned for the remuneration of the State and the Contractor, the parties may proceed to the consolidate of the global net production of the bloc that is the object of this Production Sharing Agreement.

**Sharing of the Profit-Oil**

| **Accumulated Net Production (BBLS)** | **Percentage of the Contractor** | **Percentage of the State** |
|---|---|---|
| **< 20.000.000** | **60** | **40** |
| **20.000.001 - 50.000.000** | **50** | **50** |
| **>50.000.000** | **40** | **60** |

15.2 For the sharing of the Profit-Oil between **DRC** and each entity of the **Contractor** provided for hereunder, the parts of each liquid Hydrocarbon quality to be received by **DRC** and each entity of the **Contractor** are proportional to the rapport between the Net Production of each of this quality of liquid Hydrocarbons apportioned to the Profit-Oil and the sum of the Net Production of the liquid Hydrocarbons apportioned to the Profit-Oil.

15.3 The respective interests of the entities forming part of the Contractor are thus shared as follows:

| *Members of the Contractor's Group* | *Participating Interest* |
|---|---|
| CONSORTIUM DIVINE/PetroSA | 51% |
| H OIL | 37% |
| COHYDRO | 7% |
| CONGO PETROLEUM AND GAZ | 3% |
| SUD OIL | *2%* |

**Article 16 – Valorisation of the Hydrocarbons**

16.1 For recovery purposes of the Oil Costs, the determination of the amounts to be paid as Royalty in Dollars, the price of liquid Hydrocarbons will be the Fixed Price. The Fixed Price will reflect the value of liquid Hydrocarbons of each quality, FOB loading terminal at an international maritime export location on the international market determined in Dollars per Barrel. In the event that the liquid Hydrocarbons are not export at port, **DRC** and the **Contractor** will agree upon a price based on the quality of the oil and the price on the international markets.

16.2 For each month, the Fixed Price will be determined equally by DRC and the entities of the Contractor. To this effect, the entities forming the Contractor will provide **DRC** with the necessary information in accordance with the terms contained in the Accounting procedure.

16.3  In the month following the end of each quarter, DRC and the entities of the Contractor will meet in order to determine by mutual agreement for each quality of liquid Hydrocarbons produced, the fixed price for each elapsed quarter. At this time, the entities of the **Contractor** will submit to the DRC the information provided for under Article 16.2 hereunder and all data that is relevant concerning the situation and evolution of liquid Hydrocarbons prices on international markets. If during this meeting a unanimous agreement is not reached, the parties will meet again bringing complementary information regarding the evaluation of prices until a final determination has been reached before the end of the quarter under consideration.

16.4  For the requirements of the contract, the **Contractor** will determine as needed, a monthly price for each level of quality of liquid Hydrocarbons that will be applied until the final determination of the Fixed Price for the month considered and will advise DRC.

16.5  In case of a disagreement between the parties on the determination of the Fixed Price, one or the other party may submit their difference to arbitration under the conditions provided for in Articles 30.5 and 30.6 of the contract.

16.6  In the event of exploitation of natural gas, **DRC and the Contractor** will agree to determine the price of natural gas in accordance with the terms of Article 18 hereunder.

**Article 17 – Transfer of Property Rights and Pickup of Liquid Hydrocarbons**

17.1  The liquid hydrocarbons produced will become the property of the Contractor (in accordance with Article 15) at the head of the production well.

**17.2**  The property belonging to DRC and each member of the Contractor in application of Articles 12, 14 and 15 will be transferred to them at the exit from the storage points. In the case of a shipment by oil vessel, the point of transfer will be the location and point of attachment between the vessel and the loading installations.

17.3  DRC will also take delivery at the same point of their share of liquid Hydrocarbons.

17.4  Each member of the **Contractor,** as well as its clients and transporters will have the right to freely take possession, elected for this purpose, of the liquid Hydrocarbons belonging to them in application of Articles 12,14 and 15.

17.5  The Parties agree that, depending on the of the technical reality of the exploitation, they can establish several points of delivery to meet the requirement of the Contract.

17.6  All costs relating to transportation, storage and expedition of liquid Hydrocarbons

to the point of retrieval will form part of the Oil Costs.

17.7 The Parties will pick up their shares of liquid Hydrocarbons, FOB loading terminal on as regular a basis as much as possible, it being understood that each one cannot, within reasonable limits, retrieve more or less than its share on the same day, inasmuch as it does not trespass the rights of others and is compatible with the rate of production, storage capacity and vessel characteristics. The Parties will regularly agree as to a program of retrieval on the basis of the principles hereunder. The Parties will decide, before the start of any commercial production within the frame of the Permits, on a procedure to determine the modes of application of this Article.

17.8 Except at the request of the State, the Contractor is in no event obliged to sell a quantity of liquid Hydrocarbons in the internal market of DRC. The Contractor must carry out reasonable efforts to maximise the value of Hydrocarbons on the international markets.

**Article 18 – Natural Gas**

18.1 In the event of a discovery of natural gas, **DRC** and the **Contractor** will meet within the shortest possible time, in order to analyse the possibility of a commercial exploitation and if this is possible, consider the legal, economic and fiscal consideration that must be included in the contract.

18.2 The **Contractor** may use the Natural Gas, associated or not, for the Oil Works' needs, and proceed to any operation of re-injection of natural gas aimed at improving the recovery of liquid Hydrocarbons. The quantities of Natural Gas used in this manner will not be subject to any rights, tax or fee of any nature.

18.3 All associated Natural Gas produced not used directly for the Oil Works must be with priority affected to projects of use of gas use set up by the **Contractor.** The use of torches is subject to the necessary administrative authorisations.

**Article 19 – Property Rights on Movable and Non- Movable Assets**

19.1 The property rights on real estate and goods of any nature acquired by the **Contractor** within the framework of Oil Works will automatically be transferred to DRC, in the event of a withdrawal of the Contractor from its Permit or expiration of the Contract. In the event of a transfer, or sale of the assists, what shall be obtained will be in its entirety given to DRC.

**19.2** In the assets mentioned hereunder are the object of securities given to third parties within the scope of financing agreements of Oil Works, the transfer of property to DRC will only take effect after completion

of the reimbursement by the **Contractor** of the loans guaranteed and after all securities have expired.

19.3 The specifications hereunder are not applicable to equipment belonging to third parties that are leased to the **Contractor.**

**Article 20 – Employment and training of the DRC's staff**

20.1 Starting with the First Period of Exploration and in accordance with Article 8.1.1 of this contract, the Operator will put in place a program for training of staff in the fields of Exploration, Exploitation and commercialisation of hydrocarbons, whose budget is determined at one hundred thousand dollars (USD 100.000) during the period of Exploration and one hundred and fifty thousand Dollars (USD 150.000) for the period of Exploitation. The training programs and budgets will be prepared by the Ministry of Hydrocarbons under its mandate and submitted to the **Contractor** for execution. The training will regard technical and administrative staff of services dealing with the administration of contracts of oil and will be performed through seminars in the DRC or abroad through scholarships. The staff in training will be under its original status and paid by the original employer.

20.2 Expenses corresponding to training will form part of the Oil Costs and therefore recoverable.

20.3 The Operator will ensure, by equal treatment, preferential employment in its establishments located in DRC of Congolese nationals. If it is not possible to find qualified staff in Congo, it may employ foreign staff after advising the Ministry of Labour and Social Security. In any case, they will then ensure that local employees receive the necessary training.

**Article 21 - Audit**

21.1 Notwithstanding legal regulations, the accounting books and records of the **Contractor** regarding the oil works will be subject to verification on a periodic basis by DRC or its representatives not less than four times a year.

21.2 After informing the **Contractor** in writing and with fifteen days notice, DRC will exercise the right to verify a given period by administration staff or an independent consultant internationally recognised appointed by them and agreed to by the **Contractor.** The Contractors' agreement cannot be refused without a valid reason.

21.3 For any given Calendar Year, DRC will have up to one year as

from the submission of final accounts to **DRC** to carry out once only the inspections and verifications.

21.4 All costs relating to this verification will be paid by the **Contractor** and will form part of the Oil Costs.

21.5 When verification is not performed by administrative staff, the independent firm appointed by **DRC** and the **Contractor** will conduct its work respecting the reference terms established by DRC for the inspection and application of regulations outlined under the Accounting Procedure for the determination of Oil Costs and their recovery. These terms of reference will be notified to the **Contractor** before work starts. The final report will be sent in the earliest possible time to the **Contractor.**

21.6 The accounts of the Affiliated Companies of the Operator that are responsible for assisting the Contractor are not subject to verification. Upon request the Operator will provide a certificate from the international company responsible for certifying these accounts.

21.7 The company must certify that the assistance expenses imputed to Oil Costs have been calculated in an equitable and non-discriminatory manner. This condition is not applicable to Affiliated Companies subject to Congolese Law that may be created to meet the needs of the Contract.

21.8 For all contradictions, errors or anomalies arising from their inspections and verifications, DRC may submit objections to the Contractor in writing and in reasonable detail within sixty days following the end of the inspections.

21.9 For the Permits, the expenses imputed under Oil Costs and the calculations regarding the sharing of the Net Production in that Calendar Year will be considered as finally approved if DRC does not submit any opposition within the period herein established.

21.10 Any objection, contestation or claim reasonably submitted by DRC will be the object of a meeting with the Operator. The Operator will rectify the accounts as soon as possible depending on the agreement reached on that occasion with the verifying company mandated by DRC. The differences that may be unresolved will be notified to the Operating Committee before being finally submitted to arbitration in accordance with the contents of Article 30 of the Contract.

21.11 The books and records covering the Oil Works will be kept by the Operator in the French language and in Dollars. The books will be used to determine the share of Oil Costs and production belonging to the entities of the Contractor in order to calculate the quantity of Hydrocarbons apportioned to them under Articles 12 et 13 of the Contract.

21.12 During the currency conversion and all other exchange operations

regarding the Oil Works the **Contractor** will not realise any profit or loss on Oil Costs.

21.13The specifications regarding these operations will be outlined under the Accounting Procedure.

**Article 22 - Participation of the Entreprise Pétrolière Nationale**

22.1 The Entreprise Pétrolière Nationale of the Democratic Republic of Congo known as Congolaise des Hydrocarbons, hereafter "COHYDRO" will form part of the entities of the Contractor.

22.2 An interest share of 7% will be assigned to Cohydro.

The interests of these entities (COHYDRO, Congo Petroleum and Gas SPRL et Sud Oil SPRL), defined in article 15.3, will be taken over by the other entities of the Contractor, at prorata of their interests, taking into consideration all Oil Costs ("Deferred Costs" hereafter). These Deferred Costs will be deducted from COHYDRO by an advance account ("Advance Account") whose creditors are the other entities forming part of the **Contractor.** The Advance Account will generate an interest at LIBOR rate plus 2 %.

22.4 Those entities other than COHYDRO, Congo Petroleum and Gas SPRL et Sud Oil SPRL forming the Contractor must recover the funds lent to companies through the intermediary of the Advance Account plus interest using 100 % of the Oil Cost and 50 % of the Profit Oil allocated to them.

**Article 23 – Transfer of Interests**

23.1 In the event of a transfer of rights or obligations by an associated company or other Contractor entity, the Contractor must advise the DRC in writing within 30 days.

23.2 Notwithstanding the provisions under Article 12.5 herein and in the event of a transfer in favour of a non-affiliated company, the **Contractor** must advise DRC in writing for approval within 60 days during which DRC will reserve the right of pre-emption. If DRC waives its rights of pre-emption, it must verify the technical and financial capacity of the non-affiliated company before giving its agreement also in writing.

23.3 At the time of a transfer of an interest under this contract the ceding party must be totally relieved of its obligations to the degree that these are taken over by the accepting party.

**Article 24 – Information and Confidentiality**

24.1 The Oil Works (Exploration, Exploitation, transport and storage) are subject to the law in force at DRC and article 3.3 (c) of this Contract, to be followed and controlled by experts of the Administration of Hydrocarbons. The costs incurred are part of the Oil Costs.

24.2 Without prejudice to the Mining Regulations, the Operator will provide DRC a copy of the following documents and reports:

24.2.1   Weekly reports on drilling;

24.2.2   Weekly reports on geophysical activities;

24.2.3   Reports on studies of geological summaries as well as maps;

24.2.4   Reports on measures, studies and geological interpretation, profile maps, sections and other related documents as well as, at the request of DRC, copies of original seismic tapes registered;

24.2.5   Reports on implantation and sounding for each well in addition to a complete set of graphic diagrams of petro-physics registered;

24.2.6   Reports on tests or production tests carried out as well as any study relating to the start up or closing of wells production;

24.2.7   Reports regarding analysis made on core samples;

24.2.8   Monthly production reports.

24.3 All maps, sections, profiles, graphics diagrams and other geological or geophysical documents will be supplied on a transparent support or electronically support apt for subsequent reproduction.

24.4 A representative portion of the sampling and drill cuttings taken on each well as well as samples of fluids produced during tests or production runs will also be provided to DRC within reasonable periods of time.

24.5 Upon expiry of the contract for any reason copies of original documents and samples related to Oil Works including as requested, information of electronic support will be sent to DRC.

24.6 DRC may at any time access records of the Operator on Oil Works of which at least one copy must remain in DRC.

24.7 This Contract as well as its Annexes and all information related to the execution of this Contract are, insofar as third parties are concerned, treated as confidential. This does not concern:

(ii)   Information in public domain;

(iii) Information already known by a Party before they are notified under this Contract and

(iv) Information obtained legally from third parties that have also obtained them legally and that are the object of no restriction of distribution or confidentiality.

24.8   Article 24.6 does not prevent communications according to needs:

(i) To their authorities or stock exchange if they are legally or contractually obligated to, or

(il) Legal or arbitration courts if they are legally or contractually obligated, or

(iii) To an associated company it being understood that it will maintain the information confidential, or

(iv) Banks or financial institutions within the scope of financing of Oil Works subject to maintaining confidentiality.

24.9   The Operator may also communicate information to third party suppliers, entrepreneurs and providers of services within the scope of this Contract under the condition that this is necessary to carry out the Oil Works and that confidentiality will be maintained.

24.10 The entities of the **Contractor** may also communicate information to third parties with a view to transferring an interest insofar as these parties sign a confidentiality agreement.

**Article 25 – Termination of the Contract**

25.1 The contract may be terminated under the following circumstances:

(i) When an Exploration Permit expires and will not be renewed as a result of DRC legislation;

(ii) When the Exploitation Permit were to expire or not be renewed in accordance with the law.

(iii) For each entity of the **Contractor,** in the event of voluntary or involuntary withdrawal in accordance with the provisions the Association Agreement;

(iv)  Termination of the contract: The State will have the right to terminate the contract in the following cases:

- If the Contractor has seriously failed to execute the Minimum Works Program voted to by the Operating Committee under the period considered;

- If the Contractor seriously fails to comply with the contract terms;
- If the Contractor fails to respect legislation and regulation in force;
- If the Contractor enter into bankruptcy or legal receivership.

Notwithstanding, this termination cannot be enforced until a notification is sent to the **Contractor** by the **DRC**. Following this notification, the parties must convene to find a solution within a period of one month. If after this period of negotiations and explanations the **Contractor** has not taken any measures aimed at resolving the issue within a period of three months DRC can then commence termination procedures.

25.2 If an entity of the **Contractor** wishes to retire voluntarily in accordance with the Association Agreement, the Contractor will advise the Operating Committee by a 75 days advance notice. The remaining entities have the right to acquire the interest of the departing entity but in case this does not take place, DRC and the Contractor will agree on a transfer of this interest.

25.3 In case of termination of the contract in accordance with Articles 25.1 and 25.2:

(a) Subject to the contents of Article 17 herein, the **Contractor** will liquidate the ongoing operations and the assets acquired under the Contract and will advise the Operating Committee. This liquidation costs will be paid by the **Contractor.**

(b) The **Contractor** will settle all expenses relating to its share under the Contract.

**Article 26 - Force Majeure**

26.1 No delay or fault of a party to execute one or several obligations arising form this contract will be considered as a violation if this is the result of force majeure, i.e. an unforeseen, unexpected, irresistible, sudden, insurmountable, and independent of the will of the party that invoked it event. This includes but is not limited to insurrection, strikes, war, uprisings, fire or flood (a “Case of Force Majeure”).

26.2 If following a Case of Force Majeure, the execution of any obligation is deferred, the duration resulting there from increased by the necessary time required to repair the damages to Oil Works will be added to the term of the Contract.

26.3 When a party considers that it has been prevented from complying with an obligation as a result of Case of Force Majeure, it must notify the other Party by registered mail

with return receipt within 48 hours, specifying the natural elements which constitute the Case of Force Majeure and to take every measure, in agreement with the other Party, useful and necessary to allow normal execution of the obligations affected from the end of the events constituting the Case of Force Majeure.

26.4 The obligations other than those affected by the Case of Force Majeure must continue to be fulfilled in accordance with the terms of the contract.

**Article 27 – Applicable Law**

The interpretation and execution of this Contract will be subject to the laws of the DRC.

**Article 28 - Stabilisation of the Mining and Fiscal Regime**

Without prejudice to the article 84 of the Law, during all the duration of the Contract, DRC guarantees to the **Contractor,** the stability of the general, legal, financial, oil related, fiscal, customs and economic conditions under which it will exercise its activities inasmuch as the conditions result from legislation in force and its regulations at the date of signing of the Contract.

Consequently, the rights of each entity of the **Contractor** will in no event be subjected, in any field, to an aggravating measure in regard to the regime defined at the precedent paragraph.

Nevertheless, it is understood that each member of the Contractor may benefit from any measure that may be favourable to them in regard to the regime as indicated above.

**Article 29 – Complementary Obligations of DRC**

DRC takes all necessary measures to facilitate the performance of the Contractor and its sub-Contractors' activities. At the request of one or the other, any assistance hereunder will be provided but not limited to:

- The obtaining of authorisations for the use and installation of means of transportation and communication;
- The obtaining of authorisations required in terms of customs and import and export;
- The obtaining of visas, work permits or resident permits and any other administrative authorisations necessary for the execution of the contract in favour of the staff working in DRC as well as members of their families.
- The obtaining of authorisations required for sending abroad as the case may be of documents, data or samples for analysis or processing for the requirements of the oil operations;
- Facilitation of relations with the local Administration and Authorities;
- The obtaining of approvals necessary for the performance of oil operations to the extent that these requests are made

in accordance with the legislation in force in DRC;

- Any other matter incumbent upon DRC, especially in terms of security and operation within the scope of legislation and regulations in force.

DRC guarantees to the Contractor, to each entity of the Contractor, as well as to the beneficiary of transfers from the Contractor, the non-discrimination in respect of the law or regulations regarding all other companies operating in the DRC in the oil field.

**Article 30 - Arbitration**

30.1 Any differences arising from the Contract, except for those mentioned in paragraphs 30.5 and 30.6 hereunder, between the DRC on the one part and entities of the **Contractor** on the other part that cannot be resolved amicably will be settled definitively by arbitration in the International Chamber of Commerce in Paris.

30.2 DRC on the one part and the **Contractor** on the other part will appoint an arbitrator and will agree to the nomination of a third arbitrator who will act as president of the tribunal. In case of failure to appoint an arbitrator or to agree on a third one, the provisions of the Paris International Chamber of Commerce will apply.

30.3 The arbitration will take place in Paris, France, or any other location decided by the **Contractor and DRC.** The procedure will be carried out in French. The interpretation of this Contract by the arbitrator must correspond to the usage and customs accepted in general by the international oil industry.

30.4 The DRC hereby irrevocably waives its right to any immunity during the procedures related to the execution of any arbitration award rendered by an Arbitration Tribunal constituted in accordance with Article 27, including without limitation all immunity regarding the notification, immunity of jurisdiction and all immunity from execution of its assets except those of public order.

30.5 If DRC or any entity of the Contractor are in disagreement on the determination of the Liquid Hydrocarbon prices under the scope of article 16, DRC or the said entity may request the President of the Institute of Petroleum in London to appoint an internationally qualified Expert. If the President of the Institute of Petroleum in London does appoint a qualified Expert, each party may request the International Centre of Expertise of the International Chamber of Commerce in Paris to do so. DRC and the entity will provide all information they feel necessary or that can reasonable be expected.

30.6 Within 30 days of its appointment the expert will advise DRC and the said Party of the price that in his view must be used in application of Article 14. This price will bind both parties and will be considered to have been reached by mutual agreement.

The costs and fees of the petroleum institute in London or the Chamber of Commerce will be paid by both parties equally. The Expert will not be an arbitrator, and arbitration will not be applicable in such a case.

**Article 31 - Signature**

This contract is made in four original copies (4) in the French language and each will be considered an original and authentic version when signed by the parties.

**Article 32 – Full agreement**

Following the definitions of this Contract, the Contract implies full agreement by the parties and replaces and cancels all previous communications, agreements and understandings between them, be they written or oral, expressed or implied.

**Article 33 - Notification**

33.1 All notifications regarding this contract must be addressed in writing to the Parties by registered letter at the following addresses:

**a) For DRC:**

Ministère des Hydrocarbons Monsieur
le Ministre des Hydrocarbons 1, Avenue
du Comité Urbain Commune de la
Combe/Kinshasa, République
Démocratique du Congo

**b) For the Contractor**

- For the Consortium **DIVINE INSPIRATION GROUP (PTY) Ltd:**

Madame le Directeur
35, Impala Road, Chislehurston
Johannesburg
Afrique du Sud

- For **COHYDRO**

Monsieur l'Administrateur Délégué Général,
1, Avenue du Comité Urbain
Commune de la Gombe
Kinshasa
République Démocratique du Congo

For **H OIL Congo Ltd**

Monsieur Jacques Hachuel
97,Main Street, P.O 3540
Road Towan Tortola
BRITISH ISLANDS

**For CONGO PETROLEUM AND GAS**

Monsieur MUAKA KHONDE
109, Avenue Wagenia Kinshasa/
Gombe

**FOR SUD OIL**

Monsieur Pascal KINDUELO LUMBU
191, Avenue de l'Equateur
Kinshasa/Gombe

33.2 A part may modify its address by giving prior notice of 15 days to the other Party.

33.3 In absence of a receipt but personally delivered, any notification made regarding this Contract will be considered as valid:

33.3.1. If personally handed, at the time of delivery;

33.3.2. If by air, on the sixth working day from the posting date.

**Article 34 – Effective Date – Cooperation Regime**

34.1 This Contract will not become effective until the date of the signature of an Order by the President of the Republic approving the Contract.

34.2 Any revisions or amendments to this Contract cannot become effective unless by mutual agreement and in writing.

**SIGNATURES**

IN TESTIMONY OF WHICH, the representatives duly authorised from the entities part of the **Contractor** and the **DRC** have signed the present Contract.

Signed, on

**Au nom du Gouvernement de la République Démocratique du Congo (on behalf of the Government of the Democratic Republic of Congo:**

| | |
|---|---|
| Le M | The Minister of Hydrocarbons |
| | **Congo Petrolenm And Gas Sprl** |
| **Lambert MENDE OMALANGA** | MUAKA KHONDE Jean Bosco, |
| Le Ministre des Finances | Director General |
| Athanase MATEÎSIBA KYELU | |

FOR THE ASSOCIATION

**Consortium Divine lnspiration Group (PTY) Ltd**

**ANDREA.BROWN**

Directeur

**H OIL Congo Ltd**

**Jacques Hachuel**

President

**Sud Oil Suri**

**Pascal KINDJ^KCKLUMBU**

President and Managing Director

**La Congolaise**

**des**

**NDJIBU Zéphyrin**

General Deputy Administrator

President of the Management Board

**Hydrocarbons COHYDRO** **YOLO YJiLl**

**Jacques**

# CONTRAT DE PARTAGE DE PRODUCTION

ENTRE

LA REPUBLIQUE DEMOCRATIQUE DU CONGO

ET

L'ASSOCIATION :

- CONSORTIUM DIVINE INSPIRATION GROUP (PTY) LTD ET PETRO SA
- H-OIL CONGO LIMITED
- LA CONGOLAISE DES HYDROCARBURES
- CONGO PETROLEUM AND GAS SPRL
- SUD OIL SPRL

BLOC I GRABEN ALBERTINE

JANVIER 2008

## TABLE DES MATIERES

Article 1 -  Définitions                                                                                          5
Article 2 -  Objet du Contrat                                                                                 8
Article 3 -  Champ d'application du Contrat- Opérateur                                       8
Article 4 -  Comité d'Opérations                                                                            11
Article 5 -  De la Bonne Gouvernance, du Développement et
              de la Protection de l'Environnement                                                14
Article 6 -  Garantie Bancaire                                                                             15
Article 7 -  Programme Minimal des Travaux de Reconnaissance et d'Exploration    16
Article 8 -  Programme des Travaux complémentaires                                     18
Article 9 -  Attribution, Renouvellement et Renonciation du Permis d'Exploitation    19
Article 10 -Découverte des Hydrocarbures et Attribution du Permis d'Exploitation    19
Article 11 -Travaux d'Abandon                                                                          21
Article 12 -Régime Fiscal, Royalty et Bonus                                                     22
Article 13 -Régime de Change                                                                            23
Article 14 -Remboursement des Coûts Pétroliers –Cost Oil                              24
Article 15 -Partage de la Production –« Profit Oil »                                           25
Article 16 -Valorisation des Hydrocarbures                                                       26
Article 17 - Transfert de Propriété et enlèvement des Hydrocarbures Liquides    27
Article 18 - Gaz Naturel                                                                                     28
Article 19 - Propriété des Biens Mobiliers et Immobiliers                                 28
Article 20 - Emploi - Formation du Personnel de la RDC                                 29
Article 21 - Audit                                                                                               29
Article 22 - Participation de l'Entreprise Pétrolière Nationale                          31
Article 23 - Cessions d'Intérêts                                                                        31
Article 24 - Informations - Confidentialité                                                       32
Article 25 - Fin du Contrat                                                                               33
Article 26 - Force majeure                                                                               34
Article 27 - Droit applicable                                                                             35
Article 28 - Stabilisation du Régime Minier et Fiscal                                       34
Article 29 - Obligations complémentaires de la RDC                                      35
Article 30 - Arbitrage                                                                                        36
Article 31 - Signature                                                                                        37
Article 32 - Accord Complet                                                                             37
Article 33 - Notification                                                                                     37
Article 34 - Entrée en Vigueur- Régime de Coopération                                  38
Page de Signatures                                                                                          39

Annexe 1 Cartes et Coordonnées de la ZERE
Annexe 2 Mandat du CONSORTIUM DIVINE INSPIRATION GROUP (PTY) Ltd,

Annexe 3 Mandat de H OIL CONGO LTD

Annexe 4 Mandat de CONGO PETROLEUM AND GAS SPRL,

Annexe 5 Mandat de la Compagnie Pétrolière SUD OIL SPRL

**ENTRE**

**La République Démocratique du Congo,** dûment et valablement représentée par:

Le Ministre des Hydrocarbures, et
Le Ministre des Finances

Agissant en vertu des pouvoirs légaux tels qu'ils résultent de l'Ordonnance-Loi N° 81--013 du 2 avril 1981 portant Législation Générale sur les Mines et les Hydrocarbures, ci-après désignée «**La RDC**» de première part ;

**ET**

**L'Association composée de :**

1. **CONSORTIUM DIVINE INSPIRATION GROUP (PTY) Ltd,** société de droit sud africain, 35, impala Road, Chislehurston, Johannesburg, Afrique du Sud, ci-après dénommée « **DIVINE** »- **PetroSA,** agissant uniquement en sa qualité de partenaire technique, Société d'Etat de droit sud africain,151 Frans Conradie Drive Parow 7500, Private bag X5, -arow 7499, South Africa, représenté par Madame **ANDREA BROWN,** Directeur, muni des pleins pouvoirs ainsi que d'une procuration dont copies en annexe 2, de deuxième part ;

2. **H OIL CONGO LTD.**, Société de droit britannique, numéro d'enregistrement 1004728, domiciliée à 197 Main Street, P.O 3540, Road Town Tortola, British Islands, représentée par Monsieur **Jacques Hachuel**, Président, agissant en vertu des pouvoirs statutaires dont copie en annexe 3, ci-après désignée « **H OIL** » de troisième part ;

3. **LA CONGOLAISE DES HYDROCARBURES** dont le siège social se trouve au numéro 1 de l'avenue du Comité Urbain dans la Commune de la Gombe à Kinshasa, en République Démocratique du Congo, représentée par Messieurs **TSHIBAMBE NDJIBU Zéphyrin** et **YOLO YELI Jacques**, respectivement Président du Conseil d'Administration, et Administrateur Délégué Général, ci-après dénommée «**COHYDRO**» de quatrième part ;

4. **CONGO PETROLEUM AND GAS SPRL,** société de droit congolais, enregistrée au NRC : KG/2179/M, ID NAT 01-9-N49369Q, domiciliée au n° 109 de l'Avenue Wagenia à Kinshasa dans la Commune de la Gombe, représentée par Monsieur **MUAKA KHONDE,** Directeur Général, muni des pleins pouvoirs dont copie en annexe 4, ci-après dénommée « **CONGO PETROLEUM AND GAS** » de cinquième part ;

5. **Compagnie Pétrolière SUD OIL SPRL,** société de droit congolais, enregistré au NRC : 64.019, ID NAT 102448, domicilié au n° 191 Avenue de l'Equateur 7ème étage à Kinshasa Commune de la Gombe, représentée par Monsieur **Pascal KINDUELO LUMBU,** Président Directeur Général, muni des pleins pouvoirs dont copie en

annexe 5 , ci-après dénommée « **SUD OIL** » de sixième part.

Les parties de deuxième, de troisième, de quatrième, de cinquième et de sixième parts sont ci-dessous dénommées le «**Contractant**».

**AYANT ETE PREALABLEMENT EXPOSE QUE:**

- L'Etat exerce une souveraineté permanente, notamment sur le sol, le sous-sol, les eaux et les forêts, sur les espaces aérien, fluvial, lacustre et maritime congolais ainsi que sur la mer territoriale congolaise et sur le plateau continental ;

- Les ressources économiques, telles que les hydrocarbures qui y sont contenues sont désignées « Substances concessibles » ;

- L'Etat désire encourager l'exploration et l'exploitation des hydrocarbures dans la zone ouverte à l'exploration dans le Graben Albertine de la République Démocratique du Congo;

- Le Consortium « **DIVINE** »/**Petro SA** a démontré sa capacité technique et financière dans l'exploration et la production pétrolières et le Rapport Final d'évaluation et d'interprétation des données déposé a été concluant, en exécution du Protocole d'Accord signé en date du 23 août 2007 entre «**DIVINE**» et la République Démocratique du Congo;

- Par sa lettre du 21 décembre 2007, Petro SA a fait part à la RDC de sa volonté d'apporter l'aide technique nécessaire à la réalisation des travaux prévus par le présent Contrat ;

- Le consortium est regi par un accord de collaboration technique.

;

- « **H OIL** » a démontré sa capacité technique et financière dans l'exploration et la production pétrolières et le Rapport Final d'évaluation et d'interprétation des données déposé a été concluant, en exécution du Protocole d'Accord signé en date du 13 octobre 2007 entre la République Démocratique du Congo et « **H OIL** » **;**
- « **DIVINE-Petro SA** » et « **H OIL** » ont conclu avec « **COHYDRO** » un Protocole d'Accord fixant le cadre de leur collaboration ;
- « **DIVINE-Petro SA** », « **H OIL** », « **Congo Pétroleum And Gas** », « **Sud Oil** » et «**COHYDRO** », en association, ont fait part de leurs intentions d'explorer le potentiel du pétrole du Graben Albertine dont le Bloc I et les coordonnées constituent l'Annexe 1 ;
- L'Etat a marqué son accord pour accorder à l'Association des conditions financières, économiques et fiscales spécifiques pour l'exercice des activités précisées dans le présent Contrat, dans le but de soutenir cette initiative.

- Par l'Arrêté Interministériel N° 012/MIN-HYDRO/LMO/2007 et N°062/MIN-FINANCE/AMK/2007 du 17 octobre 2007 portant réouverture à l'exploration du bloc I du Graben Albertine, le Gouvernement de la RDC a manifesté sa volonté d'assainir le secteur des hydrocarbures.

## IL A ETE CONVENU CE QUI SUIT:

### Article 1 – Définitions

Aux fins du présent Contrat, les termes suivants auront la signification fixée au présent Article:

1.1 *«Année Civile»:* période de douze (12) mois consécutifs commençant le premier janvier et se terminant le trente un décembre de chaque année.

1.2 « *Back Costs»:* les coûts engagés par le Contractant, y compris les coûts engagés par l'Opérateur au nom du Contractant, pour les travaux en relation avec le Contrat avant la Date d'entrée en Vigueur, incluant les coûts de rédaction, les dépenses de personnel de l'Opérateur, ainsi que le financement des visites des représentants de « **La RDC** ».

1.3 « *Baril»* : unité de volume égale à 158,98722 litres, mesurés à la température de 15 degrés Celsius.

1.4 « *Bonus»:* prime payable à l'Etat lors de la signature du contrat et/ou lorsque la production ou le rythme de production atteint certains seuils. Il s'agit de:

- Bonus de signature: à la signature du contrat par les parties;
- Bonus du Permis d'Exploration: à l'octroi du Permis d'Exploration;
- Bonus de renouvellement du Permis d'Exploration: au renouvellement du Permis d'Exploration ;
- Bonus du Permis d'Exploitation: à l'octroi du Permis d'Exploitation;
- Bonus de renouvellement du Permis d'Exploitation: au renouvellement du Permis d'Exploitation;
- Bonus de première production: à la production du premier Baril ;
- Bonus de production du dix millionième Baril: à la production du dix millionième Baril ;

1.5 « *Budget* » : l'estimation prévisionnelle du coût d'un Programme des Travaux.

1.6 «*Cession d'Intérêts*» : toute opération juridique aboutissant au transfert entre les Parties ou à toute autre entité, autre qu'une Partie, de tout ou partie des droits et obligations découlant du Contrat.

1.7 « *Comité d'Opérations* »: l'organe visé à l'Article 4 du Contrat.

1.8 « *Contractant* » : désigne l'Association composée du consortium « **DIVINE»/ Petro SA, H OIL, COHYDRO, CONGO PETROLEUM AND GAS SPRL et SUD OIL** ainsi que toute autre entité à laquelle l'Association pourrait céder un intérêt dans les droits et obligations du Contrat.

1.9 «*Contrat*»: le présent contrat de partage de production, ses annexes qui en font partie intégrante, ainsi que tout avenant qui serait conclu entre les Parties.

1.10 « *Contrat d'Association* » ou «*Joint Operating Agreement*»: le Contrat conclu entre les entités constituant le Contractant, ses annexes et ses avenants, pour la réalisation

en association des Travaux Pétroliers.

1.11 «***Coûts Pétroliers*** » ou «***Cost Oil*** »: tous les Back Costs tels que définis à l'article 1.2, les Bonus a l'exception du Bonus de signature et du Bonus sur la plus-value sur la cession d'intérêt, comme défini aux articles 1.4 et 12.5, ainsi que toutes les dépenses, entre autres, encourues et payables par le Contractant du fait des Travaux Pétroliers, comme défini en 1.34 ci-dessous, y compris tous les trais d'exploitation, les frais de gestion, intérêts sur prêts, et calculées conformément à la Procédure Comptable.

1.12 «***Date d'entrée en vigueur***»: la date de prise d'effet du Contrat, telle que cette date est définie à l'Article 34 du Contrat.

1.13 «***Dollar*** » **ou** « ***dollar***» *ou* «***USD***» : la monnaie ayant cours légal aux Etats Unis d'Amérique.

1.14 « ***L'Etat*** »: La République Démocratique du Congo en tant que pouvoir public.

1.15 « ***Gaz Naturel*** »: les hydrocarbures gazeux comprenant principalement du méthane et de l'éthane qui, à 15 degrés Celsius et à la pression atmosphérique, sont à l'état gazeux, et qui sont découverts et/ou produits dans le cadre du Permis.

1.16 « ***Hydrocarbures*** »: les Hydrocarbures Liquides et le Gaz Naturel découverts et/ ou produits sur la zone de Permis.

1.17 « ***I.T.I.E*** »: Initiative pour la Transparence dans la gestion des recettes des Industries Extractives.

1.18 « ***Loi*** » : l'Ordonnance-Loi n° 081-013 du 2 avril 1981 portant Législation Générale sur les Mines et les Hydrocarbures ainsi que l'Ordonnance n° 67-416 du 23 septembre 1967 portant Règlement Minier.

1.19 « ***Mois*** » : une période commençant le premier jour d'un mois et se terminant le dernier jour de ce mois, incluant le premier et le dernier jour du mois.

1.20 « ***Opérateur***»: l'entité du Contractant chargée aux termes du Contrat d'Association de la responsabilité de la conduite des Travaux Pétroliers conformément au Contrat comme indiqué à l'article 3 du Contrat.

1.21 « ***Parties***»*:* les parties au Contrat, à savoir la République Démocratique du Congo et le Consortium « **DIVINE »/Petro SA** , « **H OIL** », «**COHYDRO** », « **Congo Petroleum And Gas » et « Sud Oil ».** ainsi que toute autre entité à laquelle une des entités du Contractant pourrait céder un intérêt dans les droits et obligations du Contrat.

1.22 « ***Permis*** »: un permis relatif à la zone d'intérêt qui se situe dans le cadre du Permis d'Exploration (comme défini dans l'Annexe 1 du présent Contrat) et tous les Permis d'Exploitation en découlant.

1.23 « **Permis *d'Exploration*** »: Titre Administratif pour hydrocarbures octroyé, pour une durée de 5 ans renouvelable deux fois, en vue de l'exercice de l'activité d'exploration sur le Bloc I comme défini dans l'Annexe 1 de cet Accord.

1.24 « ***Permis d'Exploitation***»*:* Titre Administratif pour hydrocarbures découlant du

Permis d'Exploration, octroyé pour une durée de 20 ans renouvelable, en vue de l'exercice des activités de production.

1.25 « ***Procédure Comptable***»: la procédure comptable telle que définie et Communiquée au Contractant par l'Administration des Hydrocarbures de la RDC.

1.26 « ***Profit Oil*** »: le solde de la production après déduction de la Royalty et du Cost Oil destiné à être partagé.

1.27 « ***Programme des Travaux***»: le plan des Travaux Pétroliers devant être effectué durant une période déterminée préalablement, tel qu'approuvé par le Comité d'Opérations dans les conditions stipulées au Contrat.

1.28 « ***Prix Fixé***»: le prix de chaque qualité des Hydrocarbures, tel que défini à l'Article 16 du Contrat.

1.29 « ***Production Nette***»: la production totale des Hydrocarbures Liquides diminuée de toutes eaux et de tous sédiments produits, de toutes quantités des Hydrocarbures réinjectées dans le gisement, utilisées ou perdues au cours des Travaux Pétroliers.

1.30 « ***Production Fiscalisée***» : la production nette diminuée des coûts de transport et stockage jusqu'au point d'enlèvement.

1.31 « ***La RDC***»: la République Démocratique du Congo en tant que partie au présent contrat.

1.32 « ***Redevance Superficiaire***»: le Droit payé à l'Etat par le «Contractant » relatif à l'occupation des terres pendant la période d'exploration ou pendant la période d'exploitation.

1.33 « ***Société Affiliée*** »: Toute société dans laquelle plus de cinquante pour cent (50%) des droits de vote dans les assemblées générales ordinaires des actionnaires ou associés (ci-après désignées les «Assemblées») sont détenus directement ou indirectement par l'une des Parties;

1.33.1 Toute société qui détient directement ou indirectement, plus de cinquante pour cent (50 %) des droits de vote dans les Assemblées de l'une des Parties;

1.33.2Toute société dont les droits de vote dans les Assemblées sont détenus pour plus de cinquante pour cent (50 %) par une société qui détient elle-même directement ou indirectement, plus de cinquante pour cent (50 %) des droits de vote dans les Assemblées de l'une des Parties;

1.33.3. Toute société dans laquelle plus de cinquante pour cent (50 %) des droits de vote dans les Assemblées sont détenus directement ou indirectement par une société ou par plusieurs sociétés telles que décrites aux sous - paragraphes 1.33.1 à 1.33.3 ci-dessus.

1.34 « ***Sous Traitant*** » : personne physique ou morale à laquelle l'Opérateur fera appel dans le cadre de l'exécution des Travaux Pétroliers.

1.35 « ***Travaux Pétroliers***»: les activités conduites pour permettre la mise en œuvre du

Contrat dans le cadre du Permis conformément au Contrat, notamment les études, les préparations et les réalisations des opérations, les activités juridiques, comptables et financières. Les Travaux Pétroliers se répartissent entre les Travaux d'Exploration, les Travaux d'Evaluation et de Développement, les Travaux d'Exploitation et les Travaux d'Abandon.

*1.36* ***«Travaux d'Abandon*** »: les Travaux Pétroliers nécessaires à la remise en état d'un site d'exploitation dont l'abandon est programmé par le Comité d'Opérations.

*1.37* « ***Travaux d'Evaluation et de Développement»:*** les Travaux Pétroliers associés aux Permis d'Exploitation relatifs à l'étude, la préparation et la réalisation des installations tels que forages, équipements de puits et essais de production, constructions et pose des plates-formes ainsi que toutes autres opérations réalisées en vue de la production, du transport, du traitement, du stockage et de l'expédition des Hydrocarbures aux terminaux de chargement.

*1.38* « ***Travaux d'Exploitation»:*** les Travaux Pétroliers relatifs aux Permis d'Exploitation et associés à l'exploitation et à l'entretien des stations de production, de traitement, de stockage, de transport, d'exportation et de vente des Hydrocarbures.

*1.39* ***« Travaux d'Exploration»*** : les Travaux Pétroliers liés au Permis d'Exploration et réalisés dans le but de découvrir et d'apprécier un ou plusieurs gisements des Hydrocarbures telles que les opérations de géologie, de géochimie, de géophysique, de forage, d'équipement de puits et d'essais de production.

*1.40* « ***Trimestre»:*** une période de trois (3) mois consécutifs commençant le premier jour de janvier, d'avril, de juillet et d'octobre de toute Année Civile.

*1.41* « ***ZERE*** »: Zone Exclusive de Reconnaissance et d'Exploration pour une durée de cinq (5) ans, renouvelable deux (2) fois.

**Article 2 – Objet du Contrat**

L'objet du Contrat est l'attribution par la République Démocratique du Congo au **«Contractant»** des droits exclusifs de reconnaissance et d'exploration des hydrocarbures ainsi que le droit d'obtention de(s) concession (s) d'Exploitation dans les limites du Bloc 1.

**Article 3 - Champ d'application du Contrat – Opérateur**

3.1 Les Travaux Pétroliers seront réalisés au nom et pour le compte du **«Contractant»** par une des entités composantes de celui-ci et dénommée «d'Opérateur». L'Opérateur est désigné par le **«Contractant»** dans le cadre du Contrat d'Association.

3.2 Pour le compte du **«Contractant»**, l'Opérateur aura les tâches spécifiques suivantes:

(a) Préparer et soumettre au Comité d'Opérations les projets de Programmes des Travaux annuels, les Budgets correspondants et leurs modifications éventuelles;

(b) Diriger, dans les limites des Programmes des Travaux et Budgets approuvés, l'exécution des Travaux Pétroliers;

(c) Préparer, en cas de découverte déclarée commercialement exploitable, les programmes de développement et d'exploitation relatifs au gisement découvert ;

(d) Sous réserve de l'application des dispositions de l'Article 3.5 ci-après, négocier et conclure avec tout tiers les contrats relatifs à l'exécution des Travaux Pétroliers;

(e) Tenir la comptabilité des Travaux Pétroliers, préparer et soumettre annuellement à la RDC les comptes, conformément aux dispositions de la Procédure Comptable;

(f) Conduire les Travaux Pétroliers de la manière la plus appropriée et, d'une façon générale, mettre en oeuvre tous moyens appropriés en respectant les règles de l'art en usage dans l'industrie pétrolière internationale, en vue de :

(i) l'exécution des Programmes des Travaux dans les meilleures conditions techniques, sécuritaires, environnementales et économiques ;

(ii) l'optimisation de la production dans le respect d'une bonne conservation des gisements exploités.

**3.3** Dans l'exécution des Travaux Pétroliers, l'Opérateur devra, pour le compte du **«Contractant»** :

(a) Conduire avec diligence toutes les opérations conformément aux pratiques généralement suivies dans l'industrie pétrolière, se conformer aux règles de l'art en matière de champs pétrolifères et de génie civil et accomplir ces opérations d'une manière efficace et économique. Toutes les opérations seront exécutées conformément aux termes du Contrat.

(b) Fournir le personnel nécessaire aux Travaux Pétroliers en tenant compte des dispositions de l'Article 20 ci-après.

(c) Sous réserve des articles 51 et suivants de la Loi, permettre dans les limites raisonnables aux représentants de la RDC d'avoir un accès périodique aux lieux où se déroulent les Travaux Pétroliers avec le droit d'observer tout ou partie des opérations qui y sont conduites. La RDC pourra, par l'intermédiaire de ses représentants ou employés dûment autorisés, examiner tout ou partie des données de l'Opérateur se rapportant aux Travaux Pétroliers, y compris les données géologiques, géochimiques, géophysiques, de forage et toutes autres données des opérations de production pétrolière.

L'Opérateur conservera une copie représentative de toutes ces données en

République Démocratique du Congo et en fournira une copie à **«La RDC»**.Toutefois, en ce qui concerne les échantillons et documents exigeant des conditions particulières de stockage ou de conservation, ceux-ci seront conservés pour le compte de l'Etat, dans un lieu choisi par l'Opérateur, sous la responsabilité de l'Opérateur, et auxquels **«La RDC»** aura droit d'accès. L'Opérateur aura le droit de garder les copies de toutes les données, tous documents et échantillons en-dehors de la République Démocratique du Congo, à ses propres frais.

(d) Mettre en place et maintenir en vigueur toutes les couvertures d'assurances de types et montants conformes aux usages dans l'industrie pétrolière et à la réglementation en vigueur en République Démocratique du Congo.

(e) Payer ponctuellement tous les frais et dépenses encourus au titre des Travaux Pétroliers.

3.4. Le **«Contractant»** devra exécuter chaque Programme des Travaux dans les limites du Budget correspondant et ne pourra entreprendre aucune opération qui ne serait pas comprise dans un Programme des Travaux approuvé, ni engager des dépenses qui excéderaient les montants inscrits au Budget, sous réserve de ce qui suit:

(a) Si une dépense au-delà du Budget s'avère nécessaire pour l'exécution d'un Programme des Travaux approuvé, le **«Contractant»** est autorisé à faire des dépenses excédant le Budget adopté, dans la limite de quinze pour cent (15%) du Budget. L'Opérateur devra rendre compte de cet excédent de dépenses au Comité d'Opérations dès que possible.

(b) Au cours de chaque Année Civile, le **«Contractant»** est aussi autorisé à effectuer, dans le cadre des Travaux Pétroliers, des dépenses imprévues non incluses dans un Programme des Travaux (mais qui y sont liées) et non inscrites dans un Budget, dans la limite cependant d'un total de cinq cent mille (500.000) Dollars ou leur contre-valeur dans une autre monnaie. Toutefois, ces dépenses ne doivent pas être effectuées pour atteindre des objectifs jusqu'alors refusés par le Comité d'Opérations et l'Opérateur devra présenter aussitôt que possible un rapport relatif à ces dépenses au Comité d'Opérations. Lorsque ces dépenses auront été approuvées par le Comité d'Opérations, le montant autorisé sera à nouveau porté à cinq cent mille (500.000) Dollars ou leur contre-valeur dans toute autre monnaie, le Contractant ayant en permanence le pouvoir de dépenser ce montant aux conditions fixées ci-dessus.

(c) En cas d'urgence due aux Travaux Pétroliers, l'Opérateur pourra engager les dépenses immédiates qu'il jugera nécessaires pour la protection des vies, des biens et de l'environnement, et l'Opérateur devra faire part aussitôt que possible au Comité d'Opérations des circonstances de ce cas d'urgence et de ces dépenses.

3.5. Sauf décision contraire du Comité d'Opérations, le **«Contractant»** devra faire des appels d'offres pour les matériels et services dont le coût estimé est supérieur à un million de Dollars (USD 1.000.000) par appel d'offres pour les Travaux d'Exploration et à deux millions de Dollars (USD 2.000.000) pour les Travaux

d'Evaluation, de Développement et d'Exploitation. Les entités composant le **«Contractant»** pourront soumissionner dans le cadre de ces appels d'offres. La procédure ci-dessus ne s'appliquera pas pour les études géologiques et géophysiques, l'interprétation des données sismiques, les simulations et études de gisements, l'analyse des puits, leur corrélation et interprétation, l'analyse des roches pétrolifères, l'analyse pétro physique et géochimique, la supervision et l'ingénierie des Travaux Pétroliers, l'acquisition de logiciels et les travaux nécessitant l'accès à des informations confidentielles, lorsque le **«Contractant»** aura la possibilité de fournir les prestations à partir de ses moyens propres ou de ceux de ses Sociétés Affiliées.

3.6. Les montants définis aux Articles 3.4 et 3.5 ci-dessus, valables pour l'année 2007, (y compris les Coûts Pétroliers), seront actualisés chaque année par application d'un indice d'inflation qui sera communiqué chaque année par la Banque Centrale du Congo.

3.7. Le **«Contractant»** ne pourra être tenu responsable que pour les dommages directs subis par «La **RDC**» résultant d'une faute délibérée de la part du **«Contractant»** par référence aux usages de l'industrie pétrolière internationale. Il est expressément convenu que le **«Contractant»** sera tenu responsable de tout dommage indirect, éventuel ou induit ainsi que de toute perte économique que pourrait supporter « La **RDC** », quelle qu'en soit la cause et qui pourrait être en relation avec ce Contrat, si sa responsabilité est clairement établie par les cours et tribunaux.

En tout état de cause, y compris dans le cas où la limitation de responsabilité mentionnée ci-dessus ne pourrait être appliquée pour quelque raison que ce soit, le montant total que le **«Contractant»** pourrait être amené à verser dans le cadre de la mise en jeu de sa responsabilité sera déterminée conformément aux dispositions réglementaires en vigueur en République Démocratique du Congo.

3.8. Sans préjudice de ce qui précède, le **«Contractant»** exécutera, pendant la durée du Permis d'Exploration et toute période de renouvellement, le Programme Minimal des Travaux de Reconnaissance et d'Exploration prévu à l'Article 7 du Contrat.

3.9. Dans les six (6) mois qui suivent la date d'entrée en vigueur du Contrat, le « **Contractant»** devra constituer une Société par Actions à Responsabilité Limité de droit Congolais conforme à l'article 80 de la Loi.

**Article 4 - Comité d'Opérations**

4.1 Aussitôt après la date d'entrée en vigueur de ce Contrat, il sera constitué, pour le Permis, un Comité d'Opérations composé de représentants du **«Contractant»** et de ceux de «La **RDC**». «**La RDC** » et le **«Contractant»** nommeront chacun trois représentants pour un mandat de deux ans. Les représentants de « **La RDC»** proviendront du Ministère des Hydrocarbures. Le **«Contractant»** aura le droit de remplacer à tout moment ses représentants en avisant «**La RDC**» du remplacement. «**La RDC**» et le **«Contractant»** pourront faire participer, sans droit de vote, aux réunions du Comité d'Opérations un nombre raisonnable de membres de leur personnel.

4.2 Le Comité d'Opérations examine toutes questions inscrites à son ordre du jour relatives à l'orientation, à la programmation et au contrôle de la réalisation des Travaux Pétroliers. Il examinera notamment les Programmes des Travaux et les Budgets qui feront l'objet d'une approbation et il contrôlera l'exécution desdits Programmes des Travaux et Budgets.
Pour l'exécution de ces Programmes des Travaux et la réalisation des Budgets approuvés, l'Opérateur, pour le compte du **«Contractant»**, prendra toutes les décisions nécessaires pour la réalisation des Travaux Pétroliers conformément aux termes de ce Contrat.

4.3 Les décisions du Comité d'Opérations sont prises en application des règles suivantes:

(a) Pour les Travaux d'Exploration, l'Opérateur présentera, pour le compte **du «Contractant»**, au Comité d'Opérations, les orientations et les Programmes des Travaux qu'il entend réaliser. Le Comité d'Opérations formulera éventuellement les recommandations qu'il jugera nécessaires et en considération desquelles le **«Contractant»** prendra les décisions utiles.

(b) Pour les Travaux d'Evaluation et de Développement et les Travaux d'Exploitation, l'Opérateur présentera, pour le compte du **«Contractant»**, au Comité d'Opérations, les orientations, les Programmes des Travaux et les Budgets qu'il propose pour approbation.
Les décisions du Comité d'Opérations sur ces propositions sont prises à l'unanimité des représentants présents désignés par **«La RDC»** et le **«Contractant»**.

(c) Pour les Travaux d'Abandon, toute décision du Comité d'Opérations sera prise à l'unanimité des six représentants désignés conformément à l'Article 4.1.

(d) Au cas où une question devant être décidée conformément au Contrat ou autrement par le Comité d'Opérations, ne pourrait pas recueillir l'unanimité des six représentants ou leurs suppléants désignés conformément à l'Article 4.1. lors d'une réunion du Comité d'Opérations, ou si les représentants de la RDC n'assistaient pas à cette réunion, l'examen de la question sera reporté à une deuxième réunion du Comité d'Opérations qui se tiendra, sur convocation écrite de l'Opérateur, dix (10) jours au moins après la date de la première réunion. Pendant ce délai, **«La RDC»** et le **«Contractant»** se concerteront et l'Opérateur fournira toutes informations et explications qui lui seront demandées par **«La RDC»**. Il est entendu que si au cours de cette deuxième réunion « **La RDC**» et le Contractant ne parviennent pas à un accord sur la décision à prendre ou si les représentants de « **La RDC**» n'assistent pas à cette réunion, la décision appartiendra au **«Contractant»** tant que les entités composant le **«Contractant»** n'auront pas récupéré l'intégralité des Coûts Pétroliers liés à la phase initiale de développement. Pour les développements complémentaires sur un même Permis d'Exploitation, l'accord unanime de **«La RDC»** et **du «Contractant»** devra être recherché.

4.4 Les décisions du Comité d'Opérations ne devront pas être susceptibles de porter atteinte aux droits et obligations résultant, pour le **«Contractant»**, de ce Contrat et des Permis.

4.5 Le Comité d'Opérations se réunira chaque fois que l'Opérateur le demandera, sur convocation adressée quinze (15) jours à l'avance. L'Opérateur transmettra à « **La RDC**» dans le même délai le dossier relatif à la réunion du Comité d'Opérations. « **La RDC**» et le **«Contractant»** choisiront chacun le nombre de représentants qu'ils souhaitent envoyer à la réunion du Comité d'Opérations. Ce nombre sera compris entre un et trois. En outre, la convocation contiendra l'ordre du jour proposé, la date, l'heure et le lieu de ladite réunion. « **La RDC**» pourra à tout moment demander que l'Opérateur convoque une réunion pour délibérer sur des questions préalablement déterminées qui feront alors partie de l'ordre du jour de ladite réunion. Le Comité d'Opérations devra se réunir au moins deux fois au cours de chaque Année Civile pour discuter et approuver le Programme des Travaux et le Budget et pour entendre le rapport de l'Opérateur sur l'exécution du Budget afférent de l'Année Civile précédente. Le Comité d'Opérations ne peut statuer sur une question qui ne figure pas à l'ordre du jour de la réunion, sauf décision contraire unanime des représentants de « **La RDC** » et du **«Contractant»**.

4.6 Le Comité d'Opérations est présidé par le représentant nommé de « **La RDC** » qui doit agir en tant que président lors des réunions. Le représentant nommé par le **«Contractant»** assure le secrétariat de ces réunions. En cas de désaccord, le Président n'a pas de voix prépondérante.

4.7 L'Opérateur préparera un procès-verbal écrit de chaque séance et en enverra copie à « **La RDC**» dans les quinze (15) jours de la date de la réunion, pour approbation ou remarques dans les quinze (15) jours à compter de la date de réception. En outre, l'Opérateur établira et soumettra à la signature des représentants de **«La RDC»** et du **«Contractant»**, avant la fin de chaque séance du Comité d'Opérations, une liste des questions ayant fait l'objet d'un vote et un résumé des positions adoptées à l'occasion de chaque vote.

Toute question pourra être soumise à la décision du Comité d'Opérations sans que soit tenue une séance formelle, à la condition que cette question soit transmise par écrit par l'Opérateur à **«La RDC»**. Dans le cas d'une telle soumission, **«La RDC»** devra, dans les dix (10) jours suivant réception communiquer son vote par écrit à l'Opérateur, sauf si la question soumise au vote requiert une décision dans un délai plus bref en raison de l'urgence, auquel cas **«La RDC»** devra communiquer son vote dans le délai stipulé par l'Opérateur, ce délai ne pouvant toutefois être inférieur à quarante huit (48) heures. En l'absence de réponse de **«La RDC»** dans le délai imparti, la proposition de l'Opérateur sera considérée comme adoptée. Toute question qui reçoit le vote affirmatif dans les conditions prévues au présent article sera réputée adoptée comme si une réunion avait été tenue.

4.8 Le Comité d'Opérations peut décider d'entendre toute personne dont l'audition est demandée par « **La RDC**» ou le **«Contractant»**. En outre, « **La RDC**» ou le **«Contractant»** peut, à ses frais, se faire assister aux réunions du Comité d'Opérations par des experts de son choix, à condition d'obtenir un engagement de

confidentialité desdits experts, étant entendu que les experts assistant «La **RDC**» ne devront présenter aucun lien avec des sociétés pétrolières concurrentes des entités composant le «**Contractant**».

4.9   Le Comité d'Opérations pourra également se réunir, sur demande de l'une des parties au Contrat, en cas de :

- Violation intentionnelle des clauses du contrat par l'une ou l'autre des parties.

- Changement des circonstances économiques qui bouleverse l'équilibre des prestations voulues par les parties.

**Article 5 - De la Bonne Gouvernance, du Développement durable et de la Protection de l'Environnement.**

5.1   «La **RDC**» et le «**Contractant**» acceptent l'application des principes et critères de l'« I.T.I.E.» dans le cadre de l'exécution des obligations contractuelles.

5.2   Des séminaires, des ateliers ainsi que des conférences seront organisés par le «**Contractant**» pour informer son personnel notamment au sujet des textes ci-après :

- La Loi n° 05/006 du 29 Mars 2005 modifiant et complétant le décret du 30 janvier 1940 portant code pénal dite «Loi Anti-Corruption» ;

- La Loi n° 04/016 du 19 Juillet 2004 portant lutte contre le blanchiment des capitaux et le financement du terrorisme;

- La législation sur la protection de l'Environnement.

5.3   Le «**Contractant**» allouera annuellement, un montant de deux cent cinquante mille Dollars (USD 250.000) en phase d'Exploration et trois cent mille Dollars (USD 300.000) en phase de Production, au titre d'interventions sociales au profit des populations locales environnant les sites pétroliers suivant un programme concerté avec le Ministère des Hydrocarbures. Ces interventions toucheront notamment le domaine de la Salubrité Publique, de l'Education et de la Culture. Les montants y réservés font partie des Coûts Pétroliers et sont donc récupérables.

5.4   Le «**Contractant**» élaborera un Plan d'Atténuation et de Réhabilitation (PAR) dans les six (6) mois de la première période de la ZERE, suivi d'une Etude d'Impact Environnemental et le Plan de Gestion Environnemental du Projet (EIE/PGEP) pour la phase de production.

Les termes de référence, en ce compris l'évaluation des frais d'instruction, de ces différentes obligations seront fournis par le Ministère de l'Environnement qui approuvera les versions finales faisant partie intégrante du présent Contrat.
Le Ministère de l'Environnement donnera à cet effet un avis environnemental et délivrera un Permis d'Exploitation.
Sans préjudice de l'Article 3.3(c), un audit environnemental annuel est prévu, à charge du «**Contractant**».

5.5 Les travaux d'exploration- production devront être menés dans le respect des normes relatives aux aires protégées.

5.6 Le **«Contractant»** prendra en charge l'exécution du Plan d'Atténuation et de Réhabilitation, du Plan de Gestion Environnemental et de la surveillance continue de l'environnement ainsi que du maintien de l'Etat initial de la ZERE et alentours conformément aux normes en vigueur.
Il prendra en charge l'exécution des recommandations des Services de l'Etat responsables de l'élaboration desdites normes, particulièrement celles relatives au système Health, Safety, Environment and Quality ( HSEQ), pour un montant de 1.500.000 USD à la signature du présent CPP.
La contribution annuelle y relative est de :

- 150.000 USD en phase d'exploration ;
- 250.000 USD en phase de production.

**Article 6 - Garantie Bancaire**

6.1 Dans les quatre mois suivant l'entrée en vigueur du présent Contrat, le **«Contractant»** fournira au Comité d'Opérations, une Garantie bancaire irrévocable en faveur de **«La RDC»** émise par une Banque de premier ordre d'un montant de Cent Cinquante Mille Dollars (USD 150.000).

6.2 La Garantie ainsi constituée est mise à encaissement en cas de non exécution imputable au **«Contractant»** du Programme Minimal des Travaux de la Première Sous Période tel que définie à l'Article 7.1.1.1 qu'elle couvre et selon des modalités précisées à ladite garantie.

6.3 La garantie doit obligatoirement contenir les stipulations suivantes:

- La date d'entrée en vigueur effective;
- La durée d'un an.

6.4 II est toutefois précisé que c'est la réalisation du Programme Minimal des Travaux de la Première Période tel que défini à l'Article 7 que le **«Contractant»** s'est engagé à réaliser et non les dépenses correspondant aux coûts estimés de ces travaux qui déterminent que le **«Contractant»** a réalisé ses obligations prévues dans le Contrat.

6.5 Sans préjudice de l'Article 26 du Contrat, « La **RDC»** sera en mesure de faire appel à la Garantie Bancaire constituée à son profit dans les deux hypothèses suivantes:

- Le **«Contractant»** notifie par écrit qu'il n'a pas l'intention de réaliser ou d'achever les travaux faisant l'objet de la Garantie. Dans l'une ou l'autre hypothèse, la Garantie est due en totalité;

- Une demande de paiement par le Ministère des Hydrocarbures avec copie au Contractant accompagnée d'une attestation écrite par le Ministère des Hydrocarbures certifiant que le **«Contractant»** a reçu deux mises en demeure endéans un mois pour sa défaillance, mais n'a

pas entrepris les démarches nécessaires pour achever les travaux dans les délais stipulés dans ce Contrat.

Le Ministère des Hydrocarbures renoncera à la Garantie une fois qu'il expédie à la Banque une attestation certifiant que le **«Contractant»** a achevé entièrement le Programme Minimal des Travaux tel que défini à l'Article 7, objet de ladite Garantie.

**Article 7 - Programme Minimal des Travaux de Reconnaissance et d'Exploration**

7.1 Le « **Contractant** », en acquittement de son obligation de réaliser les travaux d'Exploration sur la ZERE, conformément au présent article, mènera à bien le Programme Minimal des travaux suivant dans les délais impartis.

7.1.1 **Première Période de la ZERE (Durée de cinq ans)**
Commençant lors de la date d'entrée en vigueur et se terminant cinq ans plus tard, le dernier jour de cette période de cinq ans pour un montant global de septante millions de dollars (70.000.000 USD).

7.1.1.1 **Première Sous-Période de la ZERE (douze mois)**
Commençant lors de la date d'entrée en vigueur et se terminant douze mois plus tard, le dernier jour de cette période de douze mois.

a) Programme minimal des travaux:

1. Acquisition de toutes les données régionales incluant les données géologiques, sismiques, de forage, géochimiques, magnétométriques, gravimétriques, etc.

2. Etudes géologiques de terrain : évaluation structurale, collecte des échantillons d'affleurements et des indices de surface d'huiles et de gaz.

3. Interprétation de toutes les données et évaluation de la prospectivité.

**Le coût estimatif des travaux de la première sous-période est de cinq millions (5.000.000) de Dollars.**

7.1.1.2. **Deuxième Sous-Période de la ZERE (douze mois)**

Commençant le lendemain du dernier jour de la première Sous-Période d'Exploration telle que définie à l'alinéa précèdent et se terminant une année plus tard, le dernier jour de cette période d'un an.

Programme Minimal des Travaux:

1. Poursuite des études géologiques de terrain ;
2. Analyses géochimiques des échantillons collectés ;
3. Etudes de l'impact des activités d'exploration sur l'environnement ;
4. Réévaluation de la prospectivité et proposition d'un levé sismique.

**Le coût estimatif des travaux de la deuxième sous-période est de cinq millions**

**(5.000.000) de Dollars)**

7.1.1.3. **Troisième Sous-Période de la ZERE (Douze mois)**

Commençant le lendemain du dernier jour de la deuxième Sous-Période de la ZERE telle que définie à l'alinéa précèdent et se terminant douze mois plus tard, le dernier jour de cette période de douze mois.

Programme Minimal des Travaux:

1. Acquisition, traitement et interprétation de 200 Km de sismique 2D;
2. Forage du premier puits d'exploration.

**Le coût estimatif des travaux de la troisième sous-période est de vingt cinq millions (25.000.000) de Dollars.**

7.1.1.4. **Quatrième sous-période de la ZERE (Douze mois)**

Commençant le lendemain du dernier jour de la troisième Sous-Période de la ZERE telle que définie à l'alinéa précèdent et se terminant douze mois plus tard, le dernier jour de cette période de douze mois.

Programme Minimal des Travaux:

1) Poursuite du forage et test du puits ;
2) Acquisition, traitement et interprétation de 200 Km de sismique 2D complémentaires ou 200 $Km^2$ de sismique 3D.

**Le coût estimatif des travaux de la quatrième sous-période est de quinze millions (15.000.000) de Dollars.**

7.1.1.5. **Cinquième sous-période (Douze mois)**

Commençant le lendemain du dernier jour de la quatrième Sous-Période de la ZERE telle que définie à l'alinéa précèdent et se terminant douze mois plus tard, le dernier jour de cette période de douze mois.

Programme Minimal des Travaux:

1) Forage d'un puits d'exploration.

**Le coût estimatif des travaux de la cinquième sous-période est de vingt millions (20.000.000) de Dollars.**

7.1.2. Le Contractant participera à la mise en place de la Banque de Données du Secrétariat Général aux Hydrocarbures et formera du personnel à la gestion de cette Banque de données pour un montant annuel de cinquante mille Dollars (50.000 USD) ;

7.1.3. Le Contractant participera à l'effort d'exploration des bassins sédimentaires de la République Démocratique du Congo pour un montant

annuel de cent mille dollars (100.000 USD) en phase d'exploration et un montant annuel de cent cinquante mille dollars (150.000 USD) en phase de production.

7.1.4.   Le Contractant participera à la contribution de la RDC aux cotisations de l'APPA (Association des Pays Producteurs du Pétrole Africains) pour un montant annuel de cinquante mille dollars (50.000 USD) pendant la phase d'exploration et de soixante quinze mille dollars  (75.000 USD) en phase de production.

7.1.5.   Le «**Contractant**» paiera à L'Etat les amendes prévues par la législation en la matière en cas de non exécution du Programme Minimal des Travaux de Reconnaissance et d'Exploration; étant entendu que les amendes porteront uniquement sur la non réalisation du programme et non sur la non réalisation des dépenses correspondant aux coûts estimés.

7.2.   Les puits d'exploration doivent être forés au lieu déterminé par la Comité d'Opérations et avoir une profondeur considérée nécessaire à l'évaluation d'une section sédimentaire qui aura été établie suite aux données disponibles et comme étant l'un des objectifs de formation le plus profond aux yeux du Contractant et en accord avec les pratiques de l'industrie pétrolière, cela à moins que l'un des faits suivants empêche d'atteindre la profondeur mentionnée précédemment:

a)   La formation visée est atteinte ;

b)   Un forage plus poussé pourrait, aux vues du Contractant, créer un danger prévisible qui ne pourra pas être raisonnablement contenu ;

c)   Rencontre de formations impénétrables ;

d)   Rencontre de substantielles formations porteuses d'hydrocarbures qui doivent être protégés, qui par cela empêchent d'atteindre la profondeur requise.

Dans de telles circonstances, le forage de tout puits d'exploration doit cesser et se terminer à une profondeur moindre, et ce puits sera considéré comme satisfaisant les critères de profondeur minimum requise convenus entre le Contractant et la RDC.

7.3.   A la fin de chaque sous-période d'exploration, le Contractant peut choisir de ne pas poursuivre le Programme Minimal des Travaux prévu à l'article 7, au terme d'une évaluation technique, et après avoir donné un préavis écrit de trente jours à la RDC. Dans pareille hypothèse, le Contrat prend fin sans pénalités.

**Article 8 - Programmes des Travaux Complémentaires**

8.1   Lors de l'Evaluation Technique de toute Sous-période de la ZERE, si le «**Contractant**» réalise des travaux en supplément du Programme Minimal des Travaux, les travaux excédentaires seront pris en compte comme satisfaisant à la réalisation du Programme Minimal des Travaux de la Sous-Période de la ZERE suivante.

8.2 Pour le compte du **«Contractant»**, l'Opérateur soumettra à **«La RDC»**, dans les trente (30) jours qui suivent l'évaluation technique, le Programme des Travaux Complémentaires qu'il se propose de réaliser pendant la Sous-Période considérée, ainsi que les projets de Budgets correspondants.

8.3 Chaque Budget contiendra une estimation détaillée des coûts des Travaux Pétroliers prévus dans le Programme de Travaux Complémentaires. Le Programme des Travaux Complémentaires et le Budget y afférent seront susceptibles d'être révisés et modifiés par le Comité d'Opérations à tout moment de l'année.

8.4 Dans les trente (30) jours qui suivent la fin des travaux complémentaires, l'Opérateur devra présenter à **«La RDC»** un rapport sur l'exécution du Programme des Travaux Complémentaires ainsi que sur le Budget.

**Article 9 - Attribution, Renouvellement et Renonciation du Permis d'Exploration**

Sans préjudice des dispositions de l'Ordonnance n° 67-416 du 23 Septembre 1967 portant le Règlement minier et à la demande du Contractant, le Ministère des Hydrocarbures octroie au **«Contractant»** un Permis d'Exploration pour une durée de cinq ans, renouvelable deux fois après matérialisation de la ZERE par les services de l'Etat concernés et prise en charge par le Contractant.

9.1 Si les obligations du Programme Minimal des Travaux ont été accomplies de façon satisfaisante, le **«Contractant»** peut lors de l'Evaluation Technique et après avoir donné un préavis de trente (30) jours par écrit, choisir:

(i) Soit de renouveler le Permis d'Exploration et donc de commencer la deuxième période de la ZERE ;

(ii) Soit de renoncer au Permis d'Exploration.

9.2 Les dispositions suivantes de renonciation obligatoire sont applicables:

(i) Si le **«Contractant»** demande le renouvellement du Permis d'Exploration, lors de la fin de la première Période de la ZERE, le Contractant renoncera à toute une zone qui ne fera pas moins de cinquante pour cent (50%) de la zone d'origine du Permis d'Exploration, la localisation de cette zone étant décidée par le **«Contractant»**.

(ii) A la fin de la deuxième Période de la ZERE, si le **«Contractant»** demande le renouvellement du Permis d'Exploration, le **«Contractant»** renoncera à une Zone qui ne représentera pas moins de Cinquante pour cent (50 %) de la partie restante du Permis d'Exploration, la localisation de cette zone étant décidée par le **«Contractant»**.

**Article 10 - Découverte des Hydrocarbures et Attribution du Permis d'Exploitation**

10.1 Dès qu'une découverte des Hydrocarbures, jugée par le « **Contractant»** comme étant commercialement exploitable, est mise en évidence, pour le compte du

**«Contractant»,** l'Opérateur en informe «**La RDC**». Dès que possible et au plus tard dans les trente (30) jours qui suivent l'achèvement de la réalisation et des tests relatifs au puits de découverte, le **«Contractant»** présente au Comité d'Opérations un premier rapport de découverte sur le ou les niveaux rencontrés qui peuvent être considérés comme producteurs, l'importance approximative du gisement et une estimation des travaux à entreprendre dans les trois (3) mois suivants.

10.2 Au plus tard dans l'Année Civile qui suit la communication du rapport de découverte, le **«Contractant»** soumet au Comité d'Opérations:

i) Un Rapport détaillé sur la découverte;
ii) Un Programme des Travaux et le Budget prévisionnel nécessaire à la délinéation du gisement comprenant notamment les travaux complémentaires à effectuer et le nombre de puits de délinéation à forer;

Après examen et modifications éventuelles des propositions du **«Contractant»** par le Comité d'Opérations, les règles de décision définies à l'Article 4.3 ci-dessus s'appliquent.

10.3 A l'issue des travaux de délinéation, le **«Contractant»** soumet un Rapport au Comité d'Opérations sur les possibilités de mise en production du champ ainsi délimité.
Après examen de ce Rapport par le Comité d'Opérations si le **«Contractant»** établit le caractère commercial du gisement en fonction de ses critères d'évaluation, «**La RDC**», à la demande du **«Contractant»,** devra accorder un Permis d'Exploitation au **«Contractant».**

10.4 Chaque Permis d'Exploitation attribué au **«Contractant»** par «**La RDC**» sera accordé pour une période initiale de vingt (20) ans, renouvelable, à partir de la date d'attribution dudit Permis d'Exploitation, à moins qu'à une date antérieure et conformément à l'Article 11 du Contrat, le **«Contractant»** ne décide de commencer les Travaux d'Abandon et par conséquent de renoncer au Permis d'Exploitation.

10.5 Si le Contractant estime qu'une ou plusieurs découvertes (s) d'hydrocarbures sont de part et d'autre de la frontière séparant la République Démocratique du Congo et la République d'OUGANDA et devraient être exploitées de manière concertée par la mise en commun le cas échéant d'équipements de production, de traitement, de stockage et de transport, il pourra requérir de la République Démocratique du Congo la négociation dans les meilleurs délais avec le Gouvernement de la République d'OUGANDA des accords de coopération et /ou d'Unitization portant sur la zone commune d'exploitation.

Ainsi, au cas où de tels accords sont concluants, les obligations du « Contractant » contenues dans l'article 14 ci-dessus ne porteront uniquement que sur la part des hydrocarbures produit et vendu mais provenant des champs imputables à la zone

contractuelle accordée par la RDC.

Si la réalisation du programme minimal des travaux par le contractant est retardée suite aux négociations sur l'accord de coopération et/ ou d'unitization, la durée du programme minimal des travaux sera prorogée à due concurrence.

10.6 Dans le cadre de l'exécution des obligations contractuelles relatives au transport et l'exportation (voies d'évacuation) des hydrocarbures, « le Contractant » aura le droit d'ériger ou de faire ériger, seul ou avec une personne tierce les installations requises pour le transport et l'exportation des hydrocarbures sous réserve que ce droit ne soit interprété comme une obligation de la part du « Contractant ». Ce dernier aura le droit d'utiliser lesdites installations pour le transport et l'exportation des hydrocarbures à partir des pays avoisinants ou même de la zone lui attribuée. L'Etat congolais mettra en place des mécanismes de facilités consulaires et administratives requises avec les pays frontaliers concernés en vue de permettre « le Contractant » de transporter et exporter les hydrocarbures provenant de ses activités.

**Article 11- Travaux d'Abandon**

11.1 Lorsque l'Opérateur estimera qu'au total 85 % des réserves prouvées d'un Permis d'Exploitation découlant du Permis d'Exploration (qui forme l'objet du Contrat) devraient avoir été produites à la fin de l'Année Civile qui suivra, il soumettra à « **La RDC** », pour le compte du **«Contractant»,** au plus tard le quinze (15) Novembre de l'Année Civile en cours, le Programme des Travaux d'Abandon qu'il se propose de réaliser sur ce Permis avec un plan de remise en état du site, un calendrier des travaux prévus et une estimation détaillée de l'ensemble des coûts liés à ces Travaux d'Abandon.

11.2 Au cas où le **«Contractant»** conclut que les Travaux pétroliers continus ne sont plus rentables et qu'il souhaite mettre en place les Travaux d'Abandon, « La **RDC»** a le droit de devenir l'entité entièrement responsable de tous les Travaux Pétroliers, sans contrepartie pour le **«Contractant»,** étant entendu que **le «Contractant»** ne sera plus tenu à aucun engagement de prendre en charge tous les frais futurs liés aux Travaux d'Abandon.

11.3 Pour permettre la récupération de ces Coûts Pétroliers conformément aux dispositions de l'Article 14.2.3 ci-après par les entités composant le **«Contractant»,** sous la forme de provisions pour la remise en état du site, l'Opérateur déterminera, au plus tard le quinze (15) Novembre de l'Année Civile en cours, le montant (exprimé en Dollars par Baril) de la provision. Ce montant sera égal au montant total estimé des Travaux d'Abandon divisé par le volume des réserves prouvées restant à produire selon ses estimations sur le Permis.

11.4 Au plus tard le quinze (15) décembre de la même Année Civile, le Comité d'Opérations adoptera, pour le Permis le programme des Travaux d'Abandon, et le Budget global correspondant, pour la période allant jusqu'à la fin de la

réalisation des Travaux d'Abandon. A la même date, le Comité d'Opérations approuvera également le montant de la provision que le **«Contractant»** sera tenu de constituer pour chaque Baril d'Hydrocarbures Liquides restant à produire. Chaque entité membre du **«Contractant»** imputera en conséquence sur les Coûts Pétroliers de chacune des Années Civiles suivantes une somme égale au montant de la provision à constituer par Baril restant à produire multipliée par la part de la production d'Hydrocarbures Liquides lui revenant au titre de l'Année Civile considérée en application du Permis.

11.5 Si besoin est, au plus tard le quinze (15) Novembre de chaque Année Civile, l'Opérateur présentera à **«La RDC»** les modifications qu'il est d'accord d'apporter à l'estimation des réserves restant à exploiter et au coût des Travaux d'Abandon prévus. En fonction de ces nouvelles estimations de réserves restant à produire et des nouvelles estimations de coûts des Travaux d'Abandon, l'Opérateur déterminera le cas échéant, compte tenu des provisions déjà effectuées à ce titre, le nouveau montant en Dollars des provisions à constituer pour l'ensemble des Années Civiles à venir jusqu'à l'arrêt de la production, sur chaque Baril d'Hydrocarbures Liquides qui sera produit. Le Comité d'Opérations approuvera ce montant le quinze (15) Décembre de la même année au plus tard.

**Article 12 - Régime Fiscal, Royalty et Bonus**

12.1 La Royalty sera payée par le « Contractant » à la RDC et est calculée au taux de douze et demi pourcent (12,5 %) s'appliquant à la Production Fiscalisée.

12.2 **«La RDC»** aura le droit de recevoir la Royalty en nature ou la contre valeur en espèces. Le Ministre ayant les hydrocarbures dans ses attributions notifiera par écrit au **«Contractant»** le choix de **«La RDC»** au moins quatre vingt dix (90) jours à l'avance. Si une telle notification n'est pas faite, la Royalty sera alors prélevée en nature au point d'enlèvement. Dans ce cas, si **«La RDC»** n'a pas pris livraison de tout ou partie de sa part de production pour un mois considéré, elle sera réputée avoir renoncé à recevoir le prélèvement en nature pour tout ou partie de sa production dont il n'aura pas pris livraison et dès lors celle-ci sera remplacée par sa contre valeur en espèces. La monnaie de référence de toute transaction dans le présent contrat est le Dollar Américain.

12.3 La part d'Hydrocarbures Liquides revenant au **«Contractant»** à l'issue des affectations et des partages définis aux Articles 14 et 15 ci-dessous sera nette de tout impôt, droit ou cotisation de quelque nature que ce soit.

12.4 Toutes les activités du **«Contractant»** et de tous les Sous-Traitants impliqués dans les Travaux Pétroliers sont exonérées de tous impôts et taxes afférents aux sociétés en République Démocratique du Congo.

12.5 Il est perçu un bonus équivalent à Quarante pourcent (40 %) de la plus value réalisée sur la cession d'intérêt de l'association durant la période d'exploration et de vingt pourcent (20 %) durant la période d'exploitation. Ce bonus n'est pas remboursable.

12.6 Tout le personnel expatrié (tous ceux qui ne sont pas citoyens de la République Démocratique du Congo) employé par le **«Contractant»** ou ses Sous-Traitants et impliqué dans les Travaux en République Démocratique du Congo est assujetti à

l'impôt professionnel sur les rémunérations et aux taxes afférentes à l'obtention d'un document administratif ou d'une prestation effective d'un service.

Dans le cadre de l'exécution des travaux pétroliers, le **«Contractant»** et ses Sous-Traitants sont assujettis au payement de l'impôt sur le chiffre d'affaires à l'intérieur au taux de 3% sur les prestations de service et au taux de 5% sur les ventes locales ainsi que l'impôt exceptionnel sur les rémunérations des expatriés au taux de 25%. Toutefois, le Contractant ne sera assujetti aux impôts précités que pendant la phase de production.

Toutes les importations et exportations faites par le **«Contractant»** et ses Sous-Traitants de matériaux et de services à partir et vers la République Démocratique du Congo dans le cadre des Travaux Pétroliers seront exonérées de tous impôts, taxes et droits de douane.

12.7 Des certificats de non-imposition couvrant les impôts exonérés ci-dessus seront fournis auxdites entités, y compris les filiales, consultants, employés, administrateurs et Sous-Traitants, par les autorités fiscales de la République Démocratique du Congo.

12.8 Le Permis est exonéré de tout impôt foncier.

12.9 Le **«Contractant»** payera à « La **RDC** », les droits ci-après:

- Un Bonus de Signature dès la signature du présent Contrat pour un montant de deux millions cinq cent mille dollars 2.500.000 USD non récupérable;
- Permis d'Exploration: à l'octroi du Permis d'Exploration: 250.000 USD
- Renouvellement du Permis d'Exploration: au renouvellement du Permis d'Exploration: 125.000 USD ;
- Permis d'Exploitation: à l'octroi du Permis d'Exploitation: 250.000 USD par concession ;
- Renouvellement du Permis d'Exploitation: au renouvellement du Permis d'Exploitation: 125.000 USD par concession ;
- Bonus de production: à la production du premier Baril: 1.000.000 USD ;
- Bonus de production du dix millionième Baril: à la production du dix millionième Baril: 5.000.000 USD.

12.10 Une Redevance Superficiaire annuelle équivalent à Deux Dollars (USD 2) par Km² sur Permis d'Exploration et à cinq Cents Dollars (USD 500) par Km² sur Permis d'Exploitation est due par le Contractant à « **La RDC** ».

**Article 13 : Régime de Change**

13.1 « **La RDC** » garantit au **«Contractant»** ainsi qu'à toute personne physique ou morale travaillant pour elle, dans le cadre de la présente Convention, le bénéfice de toutes dispositions législatives ou réglementaires plus favorables, en toutes matières de change, qui seraient accordées à une autre entreprise exerçant une activité similaire en République Démocratique du Congo. Sous réserve des dispositions ci-après, **«La RDC »** garantit au **«Contractant »** le droit de transfert à l'étranger dans les devises d'origine des investissements:

a) les apports extérieurs au capital de participation, en cas de liquidation ou de cession de tout ou partie de l'investissement, ou en capital d'emprunt, aux échéances contractuelles de remboursement des emprunts;

b) les revenus du capital, tant en ce qui concerne la rémunération du capital de participation que les intérêts d'emprunts.

13.2 Nonobstant toute disposition contraire contenue dans les dispositions réglementaires pris en exécution de la législation relative au contrôle de change, le **«Contractant »** peut conserver à l'étranger les avoirs provenant des apports extérieurs et de l'exportation de la production, étant entendu que le **«Contractant »** a l'obligation:

a) de pourvoir par priorité au besoin de financement en devise des activités prévues par le présent contrat, notamment de l'investissement et de la production, au moyen de ses avoirs détenus à l'étranger ;

b) de rapatrier en République Démocratique du Congo les montants qui seraient nécessaires à la trésorerie de l'entreprise pour effectuer le payement des redevances, taxes et impôts revenant à l'Etat Congolais.

13.3 Le contrôle de l'exécution des dispositions du présent point est confié à la Banque Centrale du Congo.

13.4 Le **«Contractant»** se soumet aux modalités d'exécution établies par cette institution, notamment le paiement de la redevance de contrôle de change, en conformité avec la présente convention et communiquée par elle au **«Contractant».**

**Article 14 - Remboursement des Coûts Pétroliers – « Cost Oil »**

14.1 Le « Contractant » assurera le financement de l'intégralité des Coûts Pétroliers.

14.2 Les Coûts Pétroliers du Permis seront remboursés. A cet effet, une part de la production d'Hydrocarbures Liquides provenant du Permis au cours de chaque Année Civile sera effectivement affectée au remboursement des Coûts Pétroliers comme suit:

14.2.1 Dès le démarrage de la production d'Hydrocarbures Liquides sur un Permis d'Exploitation, chaque entité composant le **«Contractant»** commencera à récupérer sa part des Coûts Pétroliers (actualisés, conformément à l'article 3.6 et indexés comme indiqué ci-dessus) relatifs au Permis en recevant chaque Année Civile une quantité d'Hydrocarbures Liquides, le « Cost Oil », égale à soixante pour cent (60 %) du total de la Production Nette du ou des Permis d'Exploitation découlant du Permis d'Exploration multipliée par le pourcentage d'intérêt qu'elle détient dans ce ou ces Permis d'Exploitation. Le montant remboursé par le Cost Oil doit correspondre à tous les Coûts

Pétroliers actualisés conformément à l'Article 3.6.

Si au cours d'une quelconque Année Civile, les Coûts Pétroliers capitalisés et indexés non encore récupérés par une entité composant le **«Contractant»** dépassent la valeur de la quantité d'Hydrocarbures Liquides pouvant être retenue par cette entité comme indiqué ci-dessus, le surplus ne pouvant être récupéré dans l'Année Civile considérée sera reporté sur les Années Civiles suivantes jusqu'à récupération totale ou expiration du Contrat.

14.2.2   La valeur du « Cost Oil » sera déterminée en utilisant le Prix Fixé pour chaque qualité d'Hydrocarbures liquides tel que défini à l'Article 14.

14.2.3   Le remboursement des Coûts Pétroliers pour chaque Année Civile au titre des Permis Exploitation s'effectuera selon l'ordre de priorité suivant:

a)   Back Costs ;
b)   Tous les Bonus à l'exception du Bonus de signature et du Bonus sur la plus-value de la cession d'intérêt ;
c)   Les coûts des Travaux d'Exploitation;
d)   Les coûts des Travaux d'Evaluation et de Développement;
e)   Les coûts des Travaux d'Exploration;
f)   Les dépenses sociales prévues à l'article 5.3
g)   Les dépenses de formations de personnels;
h)   Les coûts liés au suivi de l'exécution du Plan d'Atténuation et de Réhabilitation, du Plan de Gestion Environnementale du Projet et de l'audit environnemental.

Les Coûts Pétroliers sont reclassés dans les catégories de Travaux Pétroliers ci-dessus selon leur nature.

14.2.4   Au moment de leur remboursement les Coûts Pétroliers encourus et non récupérés seront actualisés à compter de leur date de paiement par application de l'indice d'inflation visé à l'Article 3.6 ci-dessus et selon les dispositions prévues à la Procédure Comptable.

**Article 15 - Partage de la Production -«Profit Oil»**

15.1   La Production Nette sur le Permis d'Exploitation, déduction faite de la Royalty conformément aux dispositions de l'Article 12 et de la quantité affectée au remboursement des Coûts Pétroliers, conformément aux dispositions de l'Article 14 ci-dessus, sera partagée entre l'Etat et le Contractant dans les proportions indiquées ci-dessous. Il est par ailleurs entendu que, pour la détermination de la part de la production d'hydrocarbures affectée à la rémunération de l'Etat et du Contractant, les parties peuvent procéder à une consolidation de la production nette globale provenant du bloc qui est l'objet du présent Contrat de Partage de Production.

**Partage du Profit-Oil**

| **Production Nette Cumulée (BBLS)** | **Pourcentage du Contractant** | **Pourcentage de l'Etat** |
|---|---|---|
| < 20.000.000 | 60 | 40 |
| 20.000.001 - 50.000.000 | 50 | 50 |
| >50.000.000 | 40 | 60 |

15.2 Pour la répartition du « Profit-Oil » entre « **La RDC**» et chaque entité composant le «**Contractant**» prévue ci-dessus, les parts de chaque qualité d'Hydrocarbures liquides à recevoir par «**La RDC**» et par chaque entité composant le «**Contractant**» sont proportionnelles au rapport entre la Production Nette de chacune de ces qualités d'Hydrocarbures liquides affectées au « Profit-Oil » et la somme des Productions Nettes des Hydrocarbures liquides affectées au « Profit-Oil».

15.3 Les intérêts respectifs des entités formant le Contractant sont repartis ainsi qu'il suit :

| *Membres du Groupe Contractant* | *Intérêts Participants* |
|---|---|
| CONSORTIUM DIVINE/PetroSA | 51 % |
| H OIL | 37 % |
| COHYDRO | 7 % |
| CONGO PETROLEUM AND GAS | 3 % |
| SUD OIL | 2 % |

**Article 16 - Valorisation des Hydrocarbures**

16.1 Aux fins de la récupération des Coûts Pétroliers, de la détermination des montants à verser au titre de la perception en Dollars de la Royalty, le prix des Hydrocarbures liquides sera le Prix Fixé. Le Prix Fixé reflètera la valeur des Hydrocarbures liquides de chaque qualité, FOB terminal de chargement à partir d'un point d'exportation maritime international, sur le marché international déterminé en Dollars par Baril. Au cas où les hydrocarbures liquides ne sont pas exports au port, «**La RDC**» et le « **Contractant** » s'accorderont sur un prix basé sur la qualité du pétrole et sur les prix des marchés internationaux.

16.2 Pour chaque Mois, le Prix Fixé sera déterminé paritairement par « **La RDC** » et les entités composantes le «**Contractant**». A cet effet, les entités constituant le «**Contractant**» communiqueront à «**La RDC**» les informations nécessaires conformément aux dispositions prévues à la Procédure Comptable.

16.3 Dans le Mois suivant la fin de chaque Trimestre, « La RDC » et les entités composant le **«Contractant»** se rencontreront afin de déterminer d'un commun accord, pour chaque qualité d'Hydrocarbures liquides produite, le prix fixé pour chaque mois du trimestre écoulé. A cette occasion, chaque entité composant le **«Contractant»** soumettra à « **La RDC** » les informations visées à l'Article 16.2 ci-dessus et tout élément pertinent se rapportant à la situation et à l'évolution des prix des hydrocarbures liquides sur les marchés internationaux. Si, au cours de cette réunion, un accord unanime ne peut pas être obtenu, les Parties se rencontreront de nouveau en apportant toute information complémentaire utile relative à l'évolution des prix des Hydrocarbures liquides de qualités similaires, afin d'obtenir une décision unanime avant la fin du deuxième mois suivant la fin du trimestre considéré.

16.4 Pour les besoins du Contrat, le **«Contractant»** déterminera en tant que de besoin un prix mensuel provisoire, pour chaque qualité d'Hydrocarbures liquides, qui s'appliquera jusqu'à la détermination définitive pour le Mois considéré du Prix Fixé. Ce prix provisoire sera porté à la connaissance de « **La RDC** ».

16.5 En cas de désaccord persistant des Parties sur la détermination du Prix Fixé, l'une ou l'autre Partie pourra soumettre le différend à l'arbitrage dans les conditions prévues à aux Articles 30.5 et 30.6 du Contrat.

16.6 En cas d'exploitation d'un gisement de Gaz Naturel, **«La RDC»** et le **«Contractant»** se concerteront pour fixer le prix du Gaz Naturel conformément aux dispositions de l'Article 18 ci-dessous.

**Article 17 - Transfert de Propriété et enlèvement des Hydrocarbures Liquides**

17.1 Les Hydrocarbures liquides produits deviendront la propriété du **«Contractant»** (conformément à l'Article 15) au passage à la tête des puits de production.

17.2 La propriété de la part des Hydrocarbures liquides revenant à « La **RDC** » et à chaque entité composant le **«Contractant»** en application des Articles 12, 14 et 15 sera transférée à celles-ci à la sortie des installations de stockage. Dans le cas d'une expédition par navire pétrolier, le point de transfert de propriété et d'enlèvement sera le point de raccordement entre le navire et les installations de chargement.

17.3 **«La RDC»** prendra également livraison au(x) même(s) points(s) d'enlèvement de la part d'Hydrocarbures liquides lui revenant.

17.4 Chaque entité composant le **«Contractant»**, ainsi que ses clients et transporteurs, aura le droit d'enlever librement au point d'enlèvement choisi à cet effet, la part des Hydrocarbures liquides lui revenant en application des Articles 12, 14 et 15.

17.5 Les Parties conviennent que, en fonction de la réalité technique d'exploitation des gisements découverts, il pourra être établi plusieurs points d'enlèvement pour les besoins du Contrat.

17.6 Tous les frais relatifs au transport, au stockage et à l'expédition des Hydrocarbures

liquides jusqu'au point d'enlèvement feront partie des Coûts Pétroliers.

17.7 Les Parties enlèveront leur part respective d'Hydrocarbures liquides, FOB terminal de chargement, sur une base aussi régulière que possible, étant entendu que chacune d'elles ne pourra, dans des limites raisonnables, enlever plus ou moins que la part lui revenant au jour de l'enlèvement à condition toutefois qu'un tel sur-enlèvement ou sous-enlèvement ne porte pas atteinte aux droits de tout autre Partie et soit compatible avec le taux de production, la capacité de stockage et les caractéristiques des navires. Les Parties se concerteront régulièrement pour établir un programme prévisionnel d'enlèvement sur la base des principes ci-dessus. Les Parties arrêteront, avant le début de toute production commerciale dans le cadre du Permis, une procédure d'enlèvement fixant les modalités d'application du présent Article.

17.8 Sauf à la demande de l'Etat, le «**Contractant**» n'est en aucun cas tenu de vendre une quantité d'Hydrocarbures liquides aux marchés internes de la République Démocratique du Congo. Le Contractant devra consacrer des efforts raisonnables pour maximiser la valeur des Hydrocarbures sur les marchés internationaux.

**Article 18 - Gaz Naturel**

18.1 En cas de découverte de Gaz Naturel, «**La RDC**» et le «**Contractant**» **se** concerteront dans les plus brefs délais pour examiner la possibilité d'une exploitation commerciale de cette découverte et, si elle est possible, envisager les aménagements juridiques, économiques ou fiscaux qui devront être apportés au Contrat.

18.2 Le «**Contractant**» pourra utiliser le Gaz Naturel, associé ou non, pour les besoins des Travaux Pétroliers, et procéder à toute opération de réinjection de Gaz Naturel visant à améliorer la récupération des Hydrocarbures liquides. Les quantités de Gaz Naturel ainsi utilisées ne seront soumises à aucun droit, impôt ou cotisation de quelque nature que ce soit.

18.3 Tout Gaz Naturel associé produit et non utilisé directement pour les Travaux Pétroliers devra prioritairement être affecté à des projets d'utilisation du gaz mis en place par le «**Contractant**». Le recours à la torche est subordonné aux autorisations administratives nécessaires.

**Article 19 - Propriété des Biens Mobiliers et Immobiliers**

19.1 La propriété des biens mobiliers et immobiliers de toute nature acquis par le «**Contractant**» dans le cadre des Travaux Pétroliers sera automatiquement transférée à «**La RDC**» en cas de retrait par le « **Contractant** » du Permis et/ou à l'expiration du Contrat. En cas de cession ou de vente des biens ainsi transférés, les produits obtenus seront en totalité versés à « La **RDC** ».

19.2 Dans le cas où les biens mentionnés ci-dessus seraient l'objet de sûretés consenties à des tiers dans le cadre du financement des Travaux Pétroliers, le transfert de la propriété de ces biens à «**La RDC**» n'interviendra qu'après complet



remboursement par le **«Contractant»** des emprunts ainsi garantis et après que les sûretés soient devenues caduques.

19.3 Les dispositions ci-dessus ne sont pas applicables aux équipements appartenant à des tiers et qui sont loués au **«Contractant».**

**Article 20 - Emploi et Formation du Personnel de « La RDC»**

20.1 Dès le début de la Première Période d'Exploration, conformément à l'Article 8.1.1. du présent Contrat, l'Opérateur mettra en œuvre un programme de formation de personnel dans les domaines d'Exploration, de l'Exploitation et de la commercialisation des hydrocarbures, dont le budget annuel est fixé à Cent Mille Dollars (USD 100.000) pendant la période d'Exploration et Cent Cinquante Mille Dollars (USD 150.000) pour la période d'Exploitation. Les programmes de formation et les budgets susvisés seront préparés par le Ministère ayant les Hydrocarbures dans ses attributions et présentés au **«Contractant»** pour exécution. Les actions de formation concerneront les personnels techniques et administratifs des services intervenant dans la gestion des contrats pétroliers et seront conduites au moyen soit de stages en République Démocratique du Congo ou à l'Étranger, soit d'attribution 'de bourses d'études à l'Étranger. Le personnel en formation restera sous son statut d'origine et restera rémunéré par son Organisme originel de rattachement.

20.2 Les dépenses correspondant aux actions de formation constitueront des Coûts Pétroliers et par conséquent seront récupérables.

20.3 L'Opérateur assurera, à qualification égale, l'emploi en priorité dans ses établissements et installations situés en République Démocratique du Congo, du personnel de nationalité Congolaise. Dans la mesure où il ne serait pas possible de trouver des ressortissants Congolais ayant les qualifications nécessaires pour occuper les postes à pourvoir, l'Opérateur pourra embaucher du personnel étranger après avis du Ministère du Travail et de la Prévoyance sociale et de celui ayant les Hydrocarbures dans ses attributions. Cependant, l'Opérateur fera alors en sorte que son personnel Congolais reçoive une formation dans les domaines de qualification susvisés.

**Article 21 - Audit**

21.1 Sans préjudice des dispositions légales, les livres et écritures comptables du **«Contractant»** se rapportant aux Travaux Pétroliers seront soumis à vérification et à inspection périodique de la part de la « **RDC**» *ou* de ses représentants sans que le nombre de contrôle ne soit inférieur à quatre par an.

21.2 Après avoir informé le **«Contractant»** par écrit, et moyennant un préavis d'au moins quinze (15) jours, la « **RDC** » exercera ce droit de vérification pour un exercice donné, ou bien par du personnel de l'Administration ou bien par un cabinet indépendant internationalement reconnu, désigné par lui et agréé par le **«Contractant**:». L'agrément du **«Contractant»** ne sera pas refusé sans motif valable.

21.3 Pour une Année Civile donnée, la **«RDC»** disposera d'une période d'un an à

compter de la date de dépôt des comptes définitifs auprès de la «**RDC**» pour effectuer en une seule fois ces examens et vérifications.

21.4 Les frais afférents à cette vérification seront pris en charge par le «**Contractant**» et feront partie des Coûts Pétroliers.

21.5 Lorsque la vérification n'est pas réalisée par le personnel de l'Administration, le cabinet indépendant agréé par la «**RDC**» et le «**Contractant**» exercera sa mission dans le respect des termes de référence établis par la «**RDC**» pour l'examen de l'application des règles définies dans la Procédure Comptable pour la détermination des Coûts Pétroliers et de leur récupération. Lesdits termes de référence seront communiqués au «**Contractant**» avant l'intervention dudit cabinet. Le rapport final de cette vérification sera communiqué dans les plus brefs délais au «**Contractant**».

21.6 Les comptes des Sociétés Affiliées de l'Opérateur, qui sont chargées de fournir en particulier leur assistance au «**Contractant**» ne sont pas soumis à la vérification susvisée. Sur demande, l'Opérateur fournira un certificat du cabinet international chargé de certifier les comptes desdites Sociétés Affiliées. Ce

21.7 cabinet devra certifier que les charges d'assistance imputées aux Coûts Pétroliers ont été calculées de manière équitable et non discriminatoire. Cette disposition ne s'applique pas aux Sociétés Affiliées sujettes au droit de la République Démocratique du Congo qui pourraient être créées pour les besoins de l'exécution du Contrat.

21.8 Pour toutes contradictions, erreurs ou anomalies relevées lors des inspections et vérifications, la « **RDC** » pourra présenter ses objections au «**Contractant**» par écrit et de manière raisonnablement détaillée, dans les soixante (60) jours suivant la fin de ces examens et vérifications.

21.9 Pour le Permis, les dépenses imputées en Coûts Pétroliers et les calculs relatifs au partage de la Production Nette dans ladite Année Civile seront considérés comme définitivement approuvés si la « **RDC**» n'a pas opposé d'objection dans les délais visés ci-dessus.

21.10Toute objection, contestation ou réclamation raisonnablement soulevée par la « **RDC**» fera l'objet d'une concertation avec l'Opérateur. L'Opérateur rectifiera les comptes dans les plus brefs délais en fonction des accords qui seront intervenus à cette occasion avec le vérificateur mandaté par la « **RDC** ». Les différends qui pourraient subsister seront portés à la connaissance du Comité d'Opérations avant d'être éventuellement soumis à l'arbitrage conformément aux dispositions de l'Article 30 du Contrat.

21.11Les registres et livres de comptes retraçant les Travaux Pétroliers seront tenus par l'opérateur en langue française et libellés en Dollars. Les registres seront utilisés pour déterminer la quote-part des Coûts Pétroliers et de la production revenant à chacune des entités composant le «**Contractant**» aux fins du calcul par celles-ci des quantités d'Hydrocarbures leur revenant au titre des Articles 12 et 13 du Contrat.

21.12A l'occasion de la conversion de devises et de toutes autres opérations de change

relatives aux Travaux Pétroliers, le «**Contractant**» ne réalise ni gain ni perte sur les Coûts Pétroliers.

21.13 Les modalités relatives à ces opérations seront précisées dans la Procédure Comptable.

**Article 22 - Participation de l'Entreprise Pétrolière Nationale**

22.1 L'Entreprise Pétrolière Nationale de la République Démocratique du Congo, connue sous le nom de la Congolaise des Hydrocarbures, ci-après "COHYDRO " fera partie des entités formant le «Contractant».

22.2 Une part d'intérêt dans le Contrat de 7% sera attribuée à Cohydro.

22.3 Les parts d'intérêt des sociétés en portage (COHYDRO, Congo Petroleum and Gas SPRL et Sud Oil SPRL), définies dans l'article 15.3, seront prises en charge par les autres entités composant le «Contractant», au prorata de leurs intérêts respectifs dans le contractant, qui prendra en compte tous les Coûts Pétroliers (ci-après les "Coûts Différés"). Les Coûts Différés sont déduits de la part de "COHYDRO " d'un compte avance (ci-après le "Compte Avance") dont les créanciers sont les autres entités formant le «**Contractant**». Le Compte d'Avance générera un intérêt au taux LIBOR plus deux pour cent (2%).

22.4 Les entités autres que "COHYDRO, Congo Petroleum and Gas SPRL et Sud Oil SPRLformant le «Contractant» doivent récupérer les fonds prêtés aux sociétés en portage par l'intermédiaire du Compte d'avance, plus intérêt, en utilisant cent pour cent (100 %) du Cost Oil et cinquante pour cent (50 %) du Profit Oil leur attribué.

**Article 23 - Cessions d'Intérêts**

23.1 Dans le cas d'un transfert ou d'une cession de droits ou d'obligations à une Société Affiliée ou entre entités du «Contractant», le «Contractant» doit informer la « **RDC** », par écrit, dans un délai de 30 jours.

23.2 Sans préjudice des dispositions de l'article 12.5 ci-dessus et dans le cas d'une cession d'intérêts en faveur d'une société non affiliée, le «**Contractant**» doit informer la « **RDC** », par écrit, pour approbation dans un délai de 60 jours pendant lequel la « **RDC** » se réserve un droit de préemption. Lorsque la « **RDC**» renonce à son droit de préemption, elle devra vérifier la capacité technique et financière de cette société non affiliée, avant d'accorder son approbation par écrit.

23.3 Lors du transfert d'intérêt de ce Contrat, le cédant doit être entièrement relevé, de ses obligations aux termes des présentes, dans la mesure où de telles obligations sont prises en charge par le cessionnaire.

**Article 24 - Informations et Confidentialité**

24.1 Les Travaux Pétroliers (Exploration, Exploitation, transport et stockage) sont soumis conformément à la loi en vigueur en la« **RDC**» et l'article 3.3 (c) de ce Contrat, au suivi et au contrôle par les experts de l'Administration des Hydrocarbures. Les dépenses y afférentes constituent des Coûts Pétroliers.

24.2 Sans préjudice du Règlement Minier, l'Opérateur fournira à la« **RDC**» une copie des rapports et documents suivants:

24.2.1 Rapports hebdomadaires sur les activités de forage;

24.2.2 Rapports hebdomadaires sur les activités de géophysique;

24.2.3 Rapports d'études de synthèses géologiques ainsi que les cartes afférentes;

24.2.4 Rapports de mesures, d'études et d'interprétation géophysiques, des cartes, profils, sections ou autres documents afférents, ainsi que, sur demande de la« **RDC** », les copies des bandes magnétiques originales sismiques enregistrées;

24.2.5 Rapports d'implantation et de fin de sondage pour chacun des forages ainsi qu'un jeu complet des diagraphies de pétrophysique enregistrées;

24.2.6 Rapports des tests ou essais de production réalisés ainsi que de toute étude relative à la mise en débit ou en production d'un puits;

24.2.7 Rapports concernant les analyses effectuées sur carotte;

24.2.8 Rapports mensuels de production.

24.3 Toutes les cartes, sections, profils, diagraphies et autres documents géologiques ou géophysiques seront fournis sur un support transparent ou, le cas échéant, sur un support électronique adéquat pour reproduction ultérieure.

24.4 Une portion représentative des carottes et des déblais de forage prélevés dans chaque puits ainsi que des échantillons des fluides produits pendant les tests ou essais de production seront également fournis à la« **RDC**» dans des délais raisonnables.

24.5 A l'expiration de ce Contrat pour quelque raison que ce soit, les copies des documents originaux et échantillons relatifs aux Travaux Pétroliers, y compris en cas de demande, les informations sur supports électroniques, seront remises à la «**RDC**».

24.6 La« **RDC**» pourra à tout moment prendre connaissance des rapports de l'Opérateur sur les Travaux Pétroliers, dont au moins une copie sera conservée en République Démocratique du Congo.

24.7 Ce Contrat ainsi que ses Annexes et toutes les informations relatives à l'exécution de ce Contrat ou toutes informations obtenues d'une autre Partie à l'occasion de ce Contrat sont vis-à-vis des tiers, traités comme confidentiels par les Parties. Cette obligation ne concerne pas:

(ii) les informations relevant du domaine public ;

(iii) les informations déjà connues par une Partie avant qu'elles ne lui soient communiquées dans le cadre du Contrat, et

(iv) les informations obtenues légalement auprès des tiers qui les ont eux mêmes obtenues légalement et qui ne font l'objet d'aucune restriction de divulgation ni d'engagement de confidentialité.

24.8 L'Article 24.6 n'empêche en rien les communications selon les besoins:

(i) A leurs autorités de tutelle ou à des autorités boursières, si elles y sont légalement ou contractuellement obligées, ou

(ii) Aux instances judiciaires ou arbitrales dans le cadre de procédures judiciaires ou arbitrales, si elles y sont légalement ou contractuellement obligées, ou

(iii) A la Société Affiliée, étant entendu que la Société Affiliée gardera l'information confidentielle, ou

(iv) Aux banques et organismes financiers dans le cadre du financement des Travaux Pétroliers, sous réserve que ces banques et organismes s'engagent à les tenir confidentielles.

24.9 L'Opérateur peut également communiquer les informations aux tiers fournisseurs, entrepreneurs et prestataires de services intervenant dans le cadre du Contrat, à condition toutefois qu'une telle communication soit nécessaire pour la réalisation des Travaux Pétroliers et que lesdits tiers s'engagent à les tenir confidentielles.

24.10Les entités composant le **«Contractant»** peuvent également communiquer des informations à des tiers en vue d'une cession d'intérêts pour autant que ces tiers souscrivent un engagement de confidentialité.

**Article 25 - Fin du Contrat**

25.1 Le Contrat pourra prendre fin à la survenance de l'un des événements ci-après:

(i) lorsque le Permis d'Exploration arrivera à terme et ne sera pas renouvelé en vertu de la législation en RDC ;

(ii) lorsque le Permis d'Exploitation aura expiré ou n'aura pas été renouvelé conformément aux dispositions légales ;

(iii) pour chaque entité du **«Contractant»**, en cas de retrait volontaire ou involontaire conformément aux dispositions prévues au Contrat d'Association ;

(iv) la résiliation du contrat: l'Etat aura le droit de résilier le présent contrat dans les cas suivants:

- Si le **«Contractant»** a failli gravement dans l'exécution du programme minimal des travaux voté au Comité d'Opérations au terme de la sous-période considérée;

- Si le «**Contractant**» contrevient gravement aux dispositions du contrat;
- Si le «**Contractant**» ne se conforme pas à la législation et à ses règlements en vigueur ;
- Si le «**Contractant**» fait faillite ou passe en liquidation judiciaire.

Toutefois, cette résiliation ne pourra intervenir qu'après une mise en demeure du «**Contractant**» par la« **RDC** ». Suite à cette mise en demeure les parties doivent se concerter pour trouver une solution au différend dans un délai d'un mois. Si après cette phase de négociation et d'explications, le «**Contractant**» n'a pas pris de mesures pour pallier au problème à l'origine de la mise en demeure dans un délai de trois mois après concertation, la« **RDC**» pourra alors commencer une procédure de résiliation du Contrat.

25.2 Si une entité du «**Contractant**» souhaite se retirer volontairement conformément au Contrat d'Association, le «**Contractant**» en informera le Comité d'Opérations avec un préavis de soixante quinze (75) jours. Les entités restantes du «**Contractant**» ont le droit d'acquérir l'intérêt de l'entité qui se retire, mais au cas où cela n'a pas lieu, la « **RDC**» et le «**Contractant» se** concerteront pour le transfert de la participation de cette entité.

25.3 En cas de Fin de Contrat telle que prévue aux Articles 25.1 et 25.2:

(a) Sous réserve des dispositions de l'Article 17 ci-dessus, le «**Contractant**» liquidera les opérations en cours et les actifs acquis au titre du Contrat et rendra compte de cette liquidation au Comité d'Opérations.
Les frais de cette liquidation seront supportés par le «**Contractant**».

(b) Le «**Contractant**» réglera toutes les charges dont le paiement lui incombera aux termes du Contrat.

**Article 26 - Force Majeure**

26.1 Aucun retard ou défaillance d'une Partie à exécuter l'une quelconque des obligations découlant de ce Contrat ne sera considéré(e) comme une violation au dit Contrat si ce retard ou cette défaillance est dû(e) à un cas de force majeure, c'est-à-dire à un événement imprévisible, irrésistible, soudain, insurmontable et indépendant de la volonté de la Partie qui l'invoque. Cela comprend, sans que cette liste soit exhaustive, des faits d'insurrection, d'émeutes, de guerre, grèves, feu ou inondations (un« Cas de Force Majeure »).

26.2 Si, par suite d'un Cas de Force Majeure, l'exécution de l'une quelconque des obligations du Contrat était différée, la durée du retard en résultant, augmentée du temps qui pourrait être nécessaire à la réparation des dommages causés pendant ledit retard et à la reprise des Travaux Pétroliers, serait ajoutée au délai prévu au Contrat pour l'exécution de ladite obligation.

26.3 Lorsqu'une Partie considère qu'elle se trouve empêchée de remplir l'une quelconque de ses obligations en raison d'un Cas de Force Majeure, elle doit le notifier par lettre

recommandée avec accusé de réception dans les 48 heures à l'autre Partie en spécifiant les éléments de nature à établir le Cas de Force Majeure, et prendre, en accord avec l'autre Partie, toutes les dispositions utiles et nécessaires pour permettre la reprise normale de l'exécution des obligations affectées dès la cessation de l'événement constituant le Cas de Force Majeure.

26.4 Les obligations autres que celles affectées par le Cas de Force Majeure devront continuer à être remplies conformément aux dispositions du Contrat.

**Article 27 - Droit applicable**

L'interprétation et l'exécution de ce Contrat seront soumises au droit de la République Démocratique du Congo.

**Article 28 - Stabilisation du Régime Minier et Fiscal**

Sans préjudice de l'article 84 de la Loi, pendant toute la durée du Contrat, la« **RDC**» garantit au «**Contractant**», la stabilité des conditions générales, juridiques, financières, pétrolières, fiscales, douanières et économiques dans lesquelles chaque entité exerce ses activités, telle que ces conditions résultent de la législation et de la réglementation en vigueur à la date de la signature de ce Contrat.
En conséquence les droits de chacune des entités composant le «**Contractant**» **ne** seront en aucun cas soumis en quelque domaine que ce soit à une mesure aggravante par rapport au régime défini au paragraphe ci-dessus.

Il est toutefois entendu que chaque entité composant le «Contractant» pourra bénéficier de toute mesure qui lui serait favorable par rapport au régime défini ci-dessus.

**Article 29 - Obligations Complémentaires de la« RDC »**

La« **RDC**» prend toutes les mesures nécessaires destinées à faciliter le déroulement des activités du «**Contractant**» et de ses Sous-Traitants. Sur la demande de l'un ou l'autre, l'assistance dont il est question ci-dessus portera sur le domaine suivant, sans que cette liste soit limitative:

- l'obtention des autorisations pour l'utilisation et l'installation des moyens de transport et de communication;
- l'obtention des autorisations requises en matière des douanes et d'importation-exportation;
- l'obtention des visas, permis de travail ou cartes de résidents et toutes autres autorisations administratives nécessaires pour l'exécution du Contrat en faveur du personnel travaillant en « **RDC** » ainsi que les membres de leur famille;
- l'obtention des autorisations requises pour l'expédition à l'étranger, le cas échéant des documents, données ou échantillons aux fins d'analyse ou de traitement pour le besoin des opérations pétrolières;
- la facilitation des relations avec l'Administration et les autorités
- administratives locales;
- l'obtention des approbations nécessaires à la conduite des opérations pétrolières, dans la mesure où les demandes auront été formulées

conformément à la législation en vigueur en « **RDC** » ;

- tout autre sujet qui se prête à l'assistance de la« **RDC** », notamment en matière de sécurité et d'opérations dans le cadre de la législation et de la réglementation en vigueur.

La« **RDC** » garantit au «Contractant », à chaque entité constituant le «**Contractant** » ainsi qu'aux cessionnaires du «**Contractant** » la non discrimination à leur égard dans l'application des dispositions législatives ou réglementaires par rapport à tout autre société exerçant des opérations pétrolières en République Démocratique du Congo.

**Article 30 - Arbitrage**

30.1 Tous les différends découlant du Contrat, à l'exception de ceux visés aux paragraphes 30.5 et 30.6 ci-dessous, qui surgiront entre la «**RDC**» d'une part, et les entités du «**Contractant** » d'autre part, qui ne pourront pas être résolus à l'amiable, seront tranchés définitivement par arbitrage conformément aux Règlements d'Arbitrage de la Chambre de Commerce Internationale de Paris.

30.2 La «**RDC**» d'une part et le «**Contractant** » d'autre part nommeront un arbitre et s'efforceront de se mettre d'accord sur la désignation d'un tiers arbitre qui sera le président du tribunal. A défaut de désignation d'un arbitre ou d'un accord sur le tiers arbitre, les dispositions de la Chambre de Commerce Internationale de Paris s'appliqueront.

30.3 L'arbitrage aura lieu à Paris, en France, ou en tout autre endroit décidé par le «**Contractant**» et la «**RDC**». La procédure se déroulera en langue française. L'interprétation de ce Contrat par l'arbitre doit correspondre aux us et coutumes acceptés en général dans l'industrie pétrolière internationale.

30.4 La« **RDC** » renonce irrévocablement par les présentes à se prévaloir de toute immunité lors de la procédure relative à l'exécution de toute sentence arbitrale rendue par un Tribunal Arbitral constitué conformément au présent Article 27, y compris sans limitation toute immunité concernant les significations, toute immunité de juridiction et toute immunité d'exécution quant à ses biens, sauf les biens d'ordre public de la République Démocratique du Congo.

30.5 Si la «**RDC**» et une des entités du «**Contractant**» sont en désaccord sur la détermination du prix des Hydrocarbures Liquides dans le cadre de l'Article 16, « La **RDC**» ou ladite entité pourra demander au Président de l'Institute of Petroleum à Londres, Grande Bretagne, de désigner un Expert international qualifié, à qui le différend sera soumis. Si le Président de l'Institute of Petroleum ne désigne pas d'Expert qualifié, chacune des parties au différend pourra demander au Centre International d'Expertise de la Chambre de Commerce International de Paris de procéder à cette désignation. La « **RDC** » et ladite entité fourniront à celui-ci toutes les informations qu'ils jugeront nécessaires ou que l'expert pourra raisonnablement demander.

30.6 Dans les trente (30) jours de la date de sa désignation, l'expert communiquera à la« **RDC**» et à ladite Partie le prix qui à son avis, doit être utilisé en application de l'Article 14. Ce prix liera les parties et sera réputé avoir été arrêté d'un commun

accord entre celles-ci. Les frais et honoraires de l'Institute of Petroleum à Londres ou de la Chambre de Commerce International de Paris, ainsi que les experts seront partagés également entre la « **RDC**» et ladite entité. L'Expert ne sera pas un arbitre, et l'arbitrage ne sera pas applicable en pareil cas.

**Article 31 - Signature**

Ce contrat est établi en quatre (4) originaux en langue française et chaque double sera considéré comme une version originale et authentique lorsqu'il sera dûment signé par les Parties.

**Article 32 - Accord Complet**

Suivant les définitions de ce Contrat, ce Contrat comprend l'accord complet des Parties et remplace et annule tous communications, engagements et accords précédents entre les Parties, qu'ils soient écrits ou oraux, exprimés ou tacites.

**Article 33 - Notification**

33.1 Toutes notifications ayant rapport à ce Contrat doivent être adressées par écrit aux Parties par lettre avec accusé de réception aux adresses suivantes:

**a) Pour la « RDC» :**

Ministère des Hydrocarbures
Monsieur le Ministre des Hydrocarbures
1, Avenue du Comité Urbain
Commune de la Gombe/Kinshasa,
République Démocratique du Congo

**b) Pour le « Contractant »**

- Pour le Consortium **DIVINE INSPIRATION GROUP (PTY) Ltd:**

Madame le Directeur
35, Impala Road, Chislehurston
Johannesburg
Afrique du Sud

- Pour **«COHYDRO»**

Monsieur l'Administrateur Délégué Général,
1, Avenue du Comité Urbain
Commune de la Gombe
Kinshasa
République Démocratique du Congo

Pour **H OIL Congo Ltd**

Monsieur Jacques Hachuel
97,Main Street, P.O 3540
Road Towan Tortola
BRITISH ISLANDS

Pour **CONGO PETROLEUM AND GAS**

Monsieur MUAKA KHONDE
109, Avenue Wagenia
Kinshasa/Gombe

**POUR SUD OIL**

Monsieur Pascal KINDUELO LUMBU
191, Avenue de l'Equateur
Kinshasa/Gombe

33.2 Une Partie peut modifier ses coordonnées en donnant un préavis de 15 jours à l'autre Partie.

33.3 En cas d'absence de reçu, mais en cas de remise à personne, toute notification effectuée dans le cadre de ce Contrat sera considérée comme avoir été valablement effectuée.

33.3.1. Si remise personnellement, au moment de la livraison;

33.3.2. Si envoyée par avion, au sixième jour ouvrable la date de la poste faisant foi;

**Article 34 - Entrée en Vigueur - Régime de Coopération**

34.1 Ce Contrat n'entrera en vigueur qu'à la date de la signature de l'Ordonnance du Président de la République approuvant ce Contrat.

34.2 Toutes révisions ou amendements à ce Contrat ne peuvent intervenir que d'un commun accord de toutes les Parties et ce par voie d'Avenant.

## PAGE DE SIGNATURES

EN FOI DE QUOI, les représentants dûment mandatés des entités composant le «**Contractant**» et la « **RDC**» ont signé le présent Contrat.

Signé, le

**Au nom du Gouvernement de la République Démocratique du Congo:**

Le Ministre des Hydrocarbures

**Lambert MENDE OMALANGA**

Le Ministre des Finances

**Athanase MATENDA KYELU**

**POUR L'ASSOCIATION**

**Consortium Divine Inspiration Group (PTY) Ltd**

**ANDREA BROWN**

Directeur

**H Oil Congo Ltd**

**Jacques Hachuel**

President

**Congo Petroleum And Gas Sprl**

**MUAKA KHONDE Jean Bosco,**

Directeur Général

**Sud Oil Sprl**

**Pascal KINDUELO LUMBU**

Président Directeur Général

**La Congolaise des Hydrocarbures «COHYDRO**

YOLO YELI **Jacques**

Administrateur Délégué Général

**TSHIBAMBE NDJIBU Zéphyrin**

Président du Conseil d'Administration

LA CONGOLAISE DES HYDROCARBURES
COHYDRO
KINSHASA / RDC

# DIVINE INSPIRATION GROUP (PROPRIETARY) LIMITED

**REGISTRATION NUMBER: 2007/003931/07**

**RESOLUTIONS BY THE DIRECTOR OF THE COMPANY DATED 16th January 2008**

**RESOLVED:**

Andrea brown, A director of Divine Inspiration Group Pty Ltd is authorized to sign the Production Sharing Agreement for Block One on behalf of Divine Inspiration Group Pty Ltd.

I, the undersigned director approve the above-mentioned resolutions.

| **DIRECTOR:** | **SIGNATURE:** | **DATE:** |
|---|---|---|
| A BROWN | [signature] | 16th January 2008 |

# POWER OF ATTORNEY

**BY THIS POWER OF ATTORNEY** given on the 16th January 2008 by **H OIL CONGO LTD.** (the "Company") organized and existing under the laws of the organised and existing under the laws of the British Virgin Islands with its registered office at P.O. Box 3540, Road Town, Tortola, British Virgin Islands, HEREBY APPOINTS **Mr Jacques Hachuel**, a Liberian citizen, with a passport number D 0085795-05, date of issue 6 September 2005 and extended date 5 August 2009, as it's a true and lawful Attorney-in-Fact (the "Attorney-in-Fact") so that they may act on behalf of the Company according to the following powers and terms:

1. To sign, execute and deliver (under hand or seal) all such documents, instruments and agreements as he may consider advisable in relation to Licence and Production Sharing Agreement for Blocks 1 and 2 in the Democratic Republic of Congo ("DRC"), between the Company, amongst others, and the Government of the DRC and on such terms and conditions as the Attorney-in-Fact executing the same on behalf of the Company may in his absolute discretion approve and any other oil and gas exploration licenses in the DRC and to agree and execute and do any and all amendments and supplements thereto and any and all documents, acts or things of whatsoever nature and description as may, in the aforesaid documents or the arrangements contemplated thereby or for effectively or expeditiously carrying out the objects herein authorised.

2. The Company hereby ratified and confirms and agrees to ratify and confirm whatsoever the Attorney-in-Fact shall do or purport to do by reason of these presents including whatsoever shall be done between the time of revocation by any means of this Power of Attorney and such revocation becoming known to the said Attorney-in-Fact.

3. This Power of Attorney shall expire on 15th day of January 2009.

**IN WITNESS WHEREOF** the foregoing Power of Attorney is made and executed this 16th day of January, 2008.

Executed by **H OIL CONGO LTD.** according to its statutes.

STAMPED with the COMMON STAMP of **H OIL CONGO LTD.** and signed by Michael Davies, representing **Carina Vera Ltd** as a Director of **H OIL CONGO LTD.** in the presence of Michael Davies representing, **Alpha Secretary Limited,** Company Secretary.

CARINA VERA LTD

Michael Davies - representing Carina Vera Ltd - Director

ALPHA SECRETARY LIMITED

Michael Davies – representing Alpha Secretary Limited - Secretary



PetroSA

The Petroleum
Oil and Gas Corporation
of South Africa (Pty) Ltd
Reg. No. 1970/008130/07

151 Frans Conradie Drive
Parow
7500
Private Bag X5
Parow 7499

Tel: +27 (0)21 929 3000
Fax: +27 (0)21 929 3144

**21st December 2007**

The Minister of Hydrocarbons
His Excellency
Lambert Mende
Kinshasa
Democratic Republic of Congo

**SacOil and PetroSA Technical Partnership**

In April 2007, PetroSA was approached by Divine Inspiration Group (DIG) to assist Divine as a technical partner in its oil exploration activities in the Democratic Republic of Congo (DRC).

In pursuance of this objective PetroSA agreed to work with the Divine Inspiration Group consortium, Encha Group and SacOil to evaluate and pursue exploration and production opportunities in the DRC, specifically in Graben Albertine and offshore DRC.

A delegation from the Ministry of Hydrocarbons undertook a successful visit to the offices of PetroSA in October 2007 for a technical evaluation. In November 2007 a team from PetroSA attended a technical presentation on Graben Albertine on behalf of the consortium in the DRC.

PetroSA is supportive of the progress in the negotiations in the DRC on Block 3 and Block 1, onshore Albertine Graben and has committed to support SacOil as a technical partner in these blocks.

As the South African National Oil Company, PetroSA is supportive of all petroleum initiatives which serve to promote oil and gas exploration and developments in the region and in particular that benefits the DRC government, the South African government, private investors and the surrounding community.

Yours sincerely,

B. R. [signature]

Bradley Cerff

**New Ventures Upstream**
**Regional Manager: East & West Africa**

**Directors:**
Dr P S Molefe (Chairman)
Mr S Mkhize (President and Chief Executive Officer),
Mr N G Nika (Executive), Mr A R Nkuhlu, Ms N Vukuza-Linda,
Mr M Kajee, Prof B Figaji, Mr M B Damane, Mr D R Zihlangu,
Ms C W N Molope, Ms B B Siwisa, Mr M W Mkhize, Ms P S V Ngaba (Company Secretary)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DIGOIL,

*Petitioner*,

*v.*

Democratic Republic of Congo,

*Respondent*.

Civil Action No. ____________________

**Declaration of Matthew S. Rozen in Support of Petition to Confirm Arbitral Award**

# EXHIBIT D

EXTRACT FROM THE RECORDS
OF THE REGISTRY

Enforceable copies
issued to the parties on:

**FRENCH REPUBLIC**
IN THE NAME OF THE FRENCH PEOPLE

**PARIS COURT OF APPEAL**

**International Chamber of Commerce**
**Division 5—Chamber 16**

**RULING OF JANUARY 7, 2020**

(No. 01/2020, 9 pages)

General Directory Registration Number: **RG** [General Register] **No. 19/07260—Portalis No. 35L7-V-B7D-B7VDD**

Decision referred to the Court: Decision of November 7, 2018—PARIS Arbitral Tribunal—

**APPELLANT:**

**DEMOCRATIC REPUBLIC OF THE CONGO**
Represented by the Minister of the State, Minister of Justice, and Attorney General, Mr. Alexis Thambwe Mwamba,
In his offices located at: Ministry of Justice, Palais de Justice, 3rd floor, Place de l'Indépendance, Gombe, Kinshasa—Democratic Republic of the Congo

*Represented by Atty. Michel Pombia, Lawyer at the Paris Bar, cap No.: D2069*

**RESPONDENT:**

**Company DIVINE INSPIRATION GROUP (PTY)**
Created and organized under the laws of South Africa,
Headquartered at: C/o Ian Levitt Attorneys, 19th Floor, Sandton City Office Tower, 2196 Sandton City, Gauteng—South Africa
Its legal representatives, appearing in person,

*Represented by Atty. Charlotte Mochkovitch, Lawyer at the Paris Bar, cap No.: L0056; with trial lawyer Atty. Denis Bensaude, Lawyer at the Paris Bar, cap No.: E0519*

**COMPOSITION OF THE COURT:**

The case was deliberated on November 19, 2019, in a public hearing before the Court, composed of:

Mr. François Ancel, Presiding Judge
Ms. Fabienne Schaller, Judge
Ms. Laure Aldebert, Judge

who took part in the deliberations; a report was presented at the hearing by Mr. François Ancel under the conditions provided for by Article 785 of the Code of Civil Procedure.

**Clerk** during the deliberations: Ms. Clémentine Glemet

**RULING:**

      - CONFLICTING
      - by provision of the ruling to the Registry of the Court, the parties having been previously notified under the conditions laid down in the second subparagraph of Article 450 of the French Code of Civil Procedure.
      - signed by François Ancel, Presiding Judge, and by Clémentine Glemet, Clerk, to whom the record was given by the signing magistrate.

**I: FACTS**

1.  On December 14, 2007, the Democratic Republic of the Congo (hereinafter referred to as the "DRC") and the association formed between the company Divine Inspiration Group (PTY) Ltd. (hereinafter referred to as the "company DIGOil") and La Congolaise des Hydrocarbures [Congolese Hydrocarbons] entered into a production-sharing contract (PSC) for hydrocarbon resources covering Blocks 8, 23, and 24 of the Central Basin (Cuvette Centrale) of the Congo Basin,

2.  On January 21, 2008, the DRC and the consortium association formed between the company DIGOil, the company Petro SA, the company H-Oil Congo Limited, La Congolaise des Hydrocarbures, the company Congo Petroleum and Gas Sprl, and the company Sud Oil Sprl entered into another production-sharing contract (PSC) for hydrocarbon resources covering Block 1 of the Albertine Graben.

3.  Having found that these two production-sharing contracts had not been approved by the President of the DRC and, considering that the DRC had failed to fulfill its commitments by deciding to award the operation of one of the sites (Block 1 of Albertine Graben) to another consortium (the association Caprikat Ltd and Foxwhelp Ltd), the company DIGOil initiated an arbitration procedure.

**II: PROCEDURE**

4.  By an arbitral award rendered in Paris on November 7, 2018, under the auspices of the International Court of Arbitration of the International Chamber of Commerce, the Arbitral Tribunal, composed of Ms. Christine Lécuyer-Thieffry (Presiding Judge), Mr. Grégoire Bakandeja WaMpungu, and Ms. Ghizlane El Idrissi, in particular:

- ruled that the DRC was at fault for failing to issue to the company DIGOil the presidential order approving (i) the production-sharing contract entered into between the DRC, on the one hand, and, on the other hand, the association of the company DIGOil and La Congolaise des Hydrocarbures, and (ii) the production-sharing contract entered into between the DRC on the one hand, and, on the other hand, the consortium association of the company DIGOil, Petro SA, H-Oil Congo Limited, La Congolaise des Hydrocarbures, Congo Petroleum and Gas SPRL, and Sud Oil SPRL;

- ruled that the DRC was at fault for unilaterally claiming to terminate the production-sharing contract entered into between the DRC, on the one hand, and, on the other hand, the consortium association DIGOil, Petro SA, H-Oil Congo Limited, La Congolaise des Hydrocarbures, Congo Petroleum and Gas SPRL, and Sud Oil SPRL, for Block 1 of the Albertine Graben of January 21, 2008;

- pronounced the resolution of the exclusive wrongs of the DRC for the two aforementioned production-sharing contracts;

- ruled that the DRC must fully compensate the company DIGOil for all the damages it suffered as a result of the non-performance and termination of the aforementioned contract of December 14, 2007, and contract of January 21, 2008;

- ruled that the DRC must pay the company DIGOil the amount of USD 617,400,178 plus interest calculated at the rate of return of U.S. Treasury bonds for the next 20 years plus 2% from the date of the final award and until full payment;

- ruled that the DRC must bear all the expenses of the arbitration set by the court in the amount of EUR 691,437, and the costs incurred by the company DIGOil in its defense in the amount of USD 1,109,933.62;

- ruled that the DRC must pay the company DIGOil the amounts of USD 760,000 and USD 1,109,933.62 plus interest calculated at the rate of return of U.S. Treasury bonds for the next 20 years plus 2% from the date of the final award and until full payment;

- dismissed all other requests of the parties.

**5.** The DRC filed an appeal for annulment against this award by declaration of April 2, 2019.

## III: SUBMISSIONS OF THE PARTIES

6. **At the end of its last summary conclusions notified by electronic means on October 10, 2019,** the DRC asked the Court, on the basis, in particular, of Article 150 subparagraph 3 of the former Congolese constitution of the transition of April 2003 and Articles 1518, 1519, 1520 (3), and 1520 (5) of the Code of Civil Procedure, to:

- receive the appellant in its pleadings and rectify its decision;

- rule that the Arbitral Tribunal ruled without complying with its mission;

- rule that the recognition or enforcement of the award would be contrary to international public order;

- annul the arbitral award of November 7, 2018, by the Arbitral Tribunal acting under the auspices of the International Court of Arbitration;

- accordingly, re-open the case and give it a definitive solution;

- order the company Divine Inspiration Group (PTY) Ltd. to pay the Democratic Republic of the Congo the amount of EUR 30,000 for non-recoverable expenses (Article 700 of the Code of Criminal Procedure) and to pay the full legal costs.

7. **At the end of its last summary conclusions notified by electronic means on November 8, 2019,** the company Divine Inspiration Group (Pty) Ltd. asked the Court, on the basis of, in particular, Articles 32-1, 696, 700, 1504, 1520 (3), 1520 (5), and 1527 of the Code of Civil Procedure, to:

- dismiss the DRC's requests, purposes, and conclusions in full;

Accordingly,

- declare that the ICC award of November 7, 2018, in the case CCI 22370/DDA has been granted exequatur and affix it to its certified copy, pursuant to Article 1527 of the Code of Civil Procedure;

- order the DRC to pay EUR 30,000 (thirty thousand euros) to the company Divine

Inspiration Group (PTY) Ltd. for abuse of appeal against the ICC award of November 7, 2018, in the case CCI 22370/DDA, pursuant to Article 32-1 of the Code of Civil Procedure;

- order the DRC to pay EUR 70,000 (seventy thousand euros) to the company Divine Inspiration Group (PTY) Ltd on the basis of Article 700 of the Code of Civil Procedure;

- order the DRC to pay the full legal costs, pursuant to Article 696 of the Code of Civil Procedure.

**IV: PLEAS OF THE PARTIES**

8. In support of its appeal, the DRC considers that the Arbitral Tribunal ruled without complying with the mission entrusted to it and that the recognition or enforcement of the award would be contrary to international public order.

9. It states that the Arbitral Tribunal ruled without complying with the mission entrusted to it since Congolese law was applicable, the Arbitral Tribunal refused to take into account a decision of the former Supreme Court of Justice (now the Council of State) on the discretionary powers of the President of the Republic so that it went beyond the scope of its mission. It states that the Tribunal could not find fault on the part of the DRC for failing to issue the presidential order, whereas the ruling of the Supreme Court of Justice states, on the contrary, that such approval is a matter for the sovereign discretionary power of the President of the Republic.

10. It states that, according to Article 150, subparagraph 3, of the Congolese constitution, courts and tribunals are required to comply with the jurisprudence of the Supreme Court of Justice and that the Tribunal pretended to interpret this jurisprudence in order to better exclude it, since its objective was to interpret Law No. 81/015 of April 2, 1981, on mines and hydrocarbons in its own way, without taking into account the aforementioned ruling of the Supreme Court.

11. The DRC considers that there was no reason for the Arbitral Tribunal not to adopt the same reasoning as that of the Supreme Court of Justice, because although the facts submitted to it were not exactly the same as before the Congolese courts, it nevertheless raised the same questions of law regarding the presidential order.

12. The DRC adds that international public order is constituted by the principles of universal justice considered in the opinion as having absolute international value and that the application by a lower court of precise and clear jurisprudence constitutes a fundamental general principle that is universally recognized. It states that by deciding not to comply with the jurisprudence of the Supreme Court of Justice of the DRC, even though it was obliged to apply Congolese law when considering the case submitted to it, the Tribunal came into conflict with the principles and values of universal justice in such a way that the recognition or enforcement of the award would be contrary to international public order.

13. In response, the company DIGOil argues that the DRC is attempting, under cover of challenging the alleged violations of its mission by the Tribunal, to obtain a review of the merits of the award. It states that, by claiming that the Tribunal did not "comply" with the 2010 ruling, or that it "refused" to apply it, the DRC is merely contesting the Tribunal's interpretation as to the manner in which the stipulations of the contracts, as well as Congolese law and applicable practices, were applied, whereas the Tribunal, on the contrary, as its mission required, applied the contracts, Congolese law and the practices concerned.

14. In that regard, it states that the Arbitral Tribunal, after recalling and examining the respective claims of the parties and the documents submitted by them on that point, and taking into account administrative practice in the DRC, as well as Congolese law, concluded that the DRC had a contractual obligation to make every effort to enable the order to be issued under the conditions laid down by Congolese law, and that this obligation had to be fulfilled within a time limit of up to two years and four months in practice.

15. The company DIGOil adds that, as regards the plea based on Article 1520-5 of the Code of Civil Procedure, the DRC does not invoke in its support any rule of French international public order, nor does it support or demonstrate that the recognition and/or enforcement of the award itself would be manifestly, effectively, and concretely contrary to French international public order.

16. It considers that the arguments raised by the DRC amount to asserting that the relevant provision of the Congolese Constitution and the interpretation by the Supreme Court formulated in the 2010 ruling, and resulting from various facts and questions, would prohibit any interpretation of Congolese law other than that of the **DRC,** and that this interpretation would be binding on the Tribunal, in the name of an international public order unknown to French international arbitration law.

17. The company DIGOil also argues that the award was made in the context of international arbitration and is therefore not subject to appeal or evocation, so that the DRC's request that the Court refer to this case in the event that the award is annulled is therefore inadmissible.

18. Finally, it considers that this appeal is abusive because it is not based on an inaccurate assessment by the DRC of its rights and that it is, in practice, intended to delay the enforcement of the award and aims only to justify a request for a stay of recognition and enforcement of the award outside France, since it makes any procedure for the enforcement of the award outside the seat of arbitration illusory and costly for the company DIGOil until the Paris Court of Appeal has ruled on this appeal, in particular, in the countries that signed the 1958 New York Convention other than France, since Article V.1(e) of that convention provides that a judge hearing a request for enforcement or recognition of such an award made abroad may refuse to grant it if the award has been annulled at the place where it was pronounced.

## V: GROUNDS FOR THE DECISION:

**On the plea alleging the Arbitral Tribunal's violation of its mission;**

19. Pursuant to Article 1520 (3) of the Code of Civil Procedure, an appeal for annulment may be brought if the Arbitral Tribunal ruled without complying with the mission entrusted to it.

20. In this case, it is not disputed that, at the end of the disputed contracts (Article 27), the interpretation and execution of these contracts are subject to the law of the Democratic Republic of the Congo and that the arbitration agreements (Article 30) of each of these contracts refer to the Arbitration Rules of the International Chamber of Commerce of Paris, Article 21 of which stipulates that *"1: The parties are free to choose the rules of law that the Arbitral Tribunal shall apply to the merits of the dispute (...) 2: The Arbitral Tribunal shall take into account the provisions of the contract between the parties, if any, and all relevant trade practices (...)."*

21. It follows from the award of November 7, 2018, that the Arbitral Tribunal based its decision on the law of the Democratic Republic of the Congo, as follows, in particular, from paragraph 113 of the award, which states that *"it follows from the cumulative application of*

*the provisions of Article 189 of the Law of 2015* [Law No. 15/012 on the general regime for hydrocarbons of August 1, 2015] *and the stipulations of Article 28 of the disputed contracts, that the Congolese law applicable to them is the Law of 1981* [Ordinance-Law No. 081-013 of April 2, 1981, on general legislation for hydrocarbons] *and it is in the light of the provisions of the Law of 1981 that the respective claims of the parties must be examined, first of all with regard to the consequences of the non-issuance of the presidential order approving the disputed contracts."*

22. Similarly, in order to assess the consequences of the non-issuance of the presidential order, it should be noted that the Arbitral Tribunal referred to Article 79, subparagraph 5, of the Congolese Law of April 2, 1981, according to which *"oil agreements, although duly signed by the parties, have effect only after they have been approved by an order of the President of the Republic"* (paragraph 114), in order to consider that the non-issuance of the Presidential Order *"has the effect of suspending certain effects of the disputed contracts, the parties remaining bound by the obligations contained therein"* (paragraph 121).

23. Having also noted that, according to *"Article 29 of the disputed contracts, the State is under an obligation to take all necessary measures to facilitate oil activities, in particular, in order to obtain the necessary approvals, including the order of the President of the Republic"* (paragraph 125), it held that *"the issuance of the presidential order approving the disputed contracts does indeed constitute, under Article 29 of the disputed contracts, a commitment by the State, which is the guarantor of the application of its own legislation and from which it can be released only if the conditions laid down by the latter for its issuance are not fulfilled, which now must be determined" (paragraph 126).*

24. The DRC availed itself of supporting its defense of ruling RA.1006 of December 10, 2010, by the Supreme Court of Justice, Administrative Section, sitting in the matter of annulment in the first and last instance, at the end of which the Court was asked to rule on the appeal for annulment brought by an oil company under Dutch law against an interministerial ruling by the Minister for Hydrocarbons dated October 17, 2017, which reopened the exploitation of Block 1 of the Albertine Graben in defiance, according to the oil company, of the production-sharing contract it had entered into. To dismiss the appeal for annulment, the Supreme Court of Justice, in its reasons, *"finds that the production-sharing contract was entered into under a suspensive condition that has not been fulfilled to date, in this case, the approval of the President of the Republic. It also notes that, under Congolese law, the latter does not have a related jurisdiction in this matter that would absolutely oblige him to give his approval; that, on the other hand, it is a discretionary power involving his sovereign assessment in the light of the elements of the case and the interests of the Congolese State, and for the exercise of which he is not bound by any time limit. The Court therefore considers that, in the absence of the presidential order of approval provided for by the previously recalled legal and contractual provisions, since the contract in question has not yet begun to take effect, the plaintiff's action is manifestly premature and therefore inadmissible."*

25. In this regard, it should be noted that the Arbitral Tribunal, after recalling the differing analyses of the parties as to the powers of the President of the Republic to issue an approval order (a mere formality to be obtained, or a discretionary power), expressly relies on this jurisprudence of the Supreme Court of Justice, stating that it *"emphasizes that the power of the President of the Republic is discretionary"* and that this *"power implies his sovereign assessment of the elements of the case and the interests of the Congolese State"* but considers that *"the interests of the State are those derived from the rights of the State on the subsurface of which the President of the Republic is the guarantor under the Constitution and the Law of 1981"* and that *"it is therefore for the President of the Republic to make a sovereign assessment of the extent to which an oil agreement is likely to affect national independence, territorial integrity, national sovereignty, and international treaties and agreements, and, if*

*necessary, refuse to issue the order of approval if he is not satisfied that this is the case"* (paragraph 132).

26. The Arbitral Tribunal notes that not only was the order not issued but that *"no rejection decision by the President of the Republic containing any reasons was produced during the deliberations, nor even its alleged existence"* and it notes from paragraph 150 of the award that *"the situation of the 2008 contract considered here differs from the elements of the case submitted to the Supreme Court in the proceeding that gave rise to its ruling of December 10, 2010,"* in the sense that *"in the light of the elements of the case assessed sovereignly by the President of the Republic, the continuation of this contract could be contrary to the interests of the State"* (paragraph 151), whereas in the case of the 2008 contract, *"no reason of public interest was alleged"* so that, according to the Arbitral Tribunal, *"nothing among the elements in the deliberations therefore allows us to consider that the conditions for the issuance of the presidential order under the law of the DRC would not have been fulfilled by the 2008 contract"* (paragraph 152).

27. Thus, the Arbitral Tribunal considered that *"the fact, as decided by the Supreme Court of Justice of the DRC in its ruling, that the President of the Republic has discretionary power does not mean that this power can be exercised arbitrarily"* (paragraph 153); that *"the non-issuance of the presidential order approving the 2008 contract has the effect of suspending its execution pursuant to Article 79, subparagraph 5, of the Law of 1981, but does not have the effect of releasing the parties from the obligations arising therefrom"* (paragraph 154); and that *"in the absence of an allegation by the defendant of a reason of public interest justifying a refusal to issue the presidential order, the plaintiff argues in a relevant way that the defendant's unilateral decision to assign the rights it held under the 2008 contract to a third party constitutes an 'unlawful act' that contravenes the provisions of Article 33 of the Decree of July 30, 1888, (...)"* (paragraph 159), which provides that *"legally formed agreements shall serve as law for those who have made them. They may be revoked only with their mutual consent or for reasons permitted by law."*

28. The Arbitral Tribunal thus decides in paragraph 167 of the award that *"the defendant was at fault (i) by failing to issue the presidential order approving the disputed contracts and (ii) by reassigning Block 1 of the Albertine Graben to a third party in violation of the stipulations of the 2008 contract, thereby depriving the plaintiff of its exclusive rights under the 2008 contract without consideration."*

29. With regard to the contract of December 14, 2007, the Arbitral Tribunal "finds" in paragraph 171 of its award that *"the action underlying the appeal brought before the Supreme Court was an action for the annulment of an administrative act (the ruling for the annulment of the Tullow Contract) based on an abuse of power on the part of the perpetrator of that act. As it stands, no lessons can be drawn from it in the context of the situation before it, since, as already noted above, unlike the case before the Supreme Court, the 2007 contract has not been annulled and, notwithstanding the non-issuance of the presidential order, the parties remain bound by the obligations that are appropriate"* to conclude in paragraph 174 that *"the defendant was at fault by not issuing the presidential order approving the 2007 contract within a reasonable time limit."*

30. It follows from those reasons that not only did the Arbitral Tribunal offer grounds for its award under Congolese law, but that it also expressly assessed the impact of the Supreme Court of Justice ruling of December 10, 2010, which was alleged by the DRC in support of its defense, noting that it is not for this Court to assess the application of that law, except to engage in a process of revision of the merits of the award, which is not the responsibility of its office.

31. Furthermore, while the Arbitral Tribunal is required to apply the law of the DRC, it does not deviate from its mission by interpreting it.

32. As such, the plea for annulment will be dismissed.

**On the plea alleging the Arbitral Tribunal's violation of international public order:**

33. Pursuant to Article 1520 (5) of the Code of Civil Procedure, an appeal for annulment may be brought if the recognition or enforcement of the award is contrary to international public order, which means the French legal system's conception of it, that is to say, the values and principles of which it cannot be unaware, even in an international context.

34. In this case, by interpreting in the light of the law of the DRC, including a decision of the Supreme Court of that State, the consequences of the failure of the President of the Republic of that State to issue an order approving the disputed production-sharing contracts, even if it deviated from the interpretation given by a ruling of that Supreme Court in otherwise distinct circumstances, the Arbitral Tribunal did not disregard any of the aforementioned values and principles.

35. Accordingly, this plea will be dismissed, together with the request for the annulment of the award.

36. In accordance with Article 1527 of the Code of Civil Procedure, the dismissal of the appeal for annulment grants exequatur to the arbitral award.

**On the request made regarding abuse of process:**

37. Exercising legal action is, in principle, a right and only degenerates into abuse that may give rise to damages in the event of fault liable to incur the civil liability of its perpetrator.

38. In this case, the company DIGOil will have its request on this ground dismissed, on the one hand, in the absence of proof of fault or negligence on the part of the DRC, which may have misunderstood the extent of its rights, and, on the other hand, in the absence of proof of damage other than that suffered as a result of the expenses incurred in its defense.

**On the expenses and legal costs:**

39. The DRC, the losing party, should be ordered to pay the legal costs that will be recovered in accordance with Article 699 of the Code of Civil Procedure.

40. In addition, the DRC must be ordered to pay the company DIGOil, which had to incur non-recoverable expenses to assert its rights, compensation under Article 700 of the Code of Civil Procedure, which it is fair to set at the amount of EUR 30,000.

**VI: MEASURES**

**For these reasons, the Court:**

1. Dismisses the appeal for annulment of the award of November 7, 2018, by the International Court of Arbitration of the International Chamber of Commerce (Case No. 22370/DDA);

2. Grants exequatur to that arbitral award;

3. Dismisses the request made regarding abuse of process;

4. Orders the Democratic Republic of Congo to pay the company Divine Inspiration Group

(PTY) Ltd. the amount of EUR 30,000 under Article 700 of the Code of Civil Procedure;

5. Orders the Democratic Republic of the Congo to pay the legal costs, which shall be recovered in accordance with the provisions of Article 699 of the Code of Civil Procedure.

***The Clerk***

***C. GLEMET***

[signature]

Consequently, the French Republic informs and orders all Court Bailiffs, sought for this requirement, to enforce this ruling; Attorneys General and Public Prosecutors attached to the High Courts, to assist therein; all Commanders and Officers of law enforcement to assist therein whenever they will be legally required to do so.

**[stamp:] PARIS COURT OF APPEAL**

***The Presiding Judge***

***F. ANCEL***

[signature]

Paris Court of Appeal
**Division 5 - Chamber 16**

RULING OF JANUARY 7, 2020
**RG** [General Register] **No. 19/07260 - Portalis No. 35L7-V-B7D-B7VDD -** Page 9



STATE OF NEW YORK )<br>
) ss<br>
COUNTY OF NEW YORK )

**CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from French into English of the attached Extract From the Records of the Registry for Ruling of January 7, 2020.

Lynda Green, Senior Managing Editor<br>
Lionbridge

EXTRAIT DES MINUTES
DU GREFFE

Copies exécutoires délivrées aux parties le :

**RÉPUBLIQUE FRANÇAISE**
AU NOM DU PEUPLE FRANÇAIS

**COUR D'APPEL DE PARIS**

**Chambre commerciale internationale**
**Pôle 5 - Chambre 16**

**ARRÊT DU 07 JANVIER 2020**

(n°01/2020, 9 pages)

Numéro d'inscription au répertoire général : **N° RG 19/07260 - N° Portalis 35L7-V-B7D-B7VDD**

Décision déférée à la Cour : Décision du 07 Novembre 2018 -Tribunal arbitral de PARIS -

**APPELANTE:**

**RÉPUBLIQUE DÉMOCRATIQUE DU CONGO**
Représentée par le Ministre d'Etat, Ministre de la Justice et Garde des Sceaux Monsieur Alexis THAMBWE MWAMBA,
En ses bureaux situés : Ministère de la Justice, Palais de Justice, 3ème étage, Place de l'Indépendance, Gombe, Kinshasa - République Démocratique du Congo

*Représenté par Me Michel POMBIA, avocat au barreau de PARIS, toque : D2069*

**INTIMÉE:**

**Société DIVINE INSPIRATION GROUP (PTY)**
Créée et organisée selon le droit de l'Afrique du Sud,
Ayant son siège social: C/o Ian Levitt Attorneys, 19th Floor, Sandton City Office Tower, 2196 Sandton City, Gauteng- Afrique du Sud
Prise en la personne de ses représentants légaux,

*Représentée par Me Charlotte MOCHKOVITCH, avocat au barreau de PARIS, toque : L0056 ; ayant pour avocat plaidant Me Denis BENSAUDE, avocat au barreau de PARIS, toque : E0519*

**COMPOSITION DE LA COUR :**

L'affaire a été débattue le 19 Novembre 2019, en audience publique, devant la Cour composée de :

M. François ANCEL, Président
Mme Fabienne SCHALLER, Conseillère
Mme Laure ALDEBERT, Conseillère

qui en ont délibéré, un rapport a été présenté à l'audience par Monsieur François ANCEL dans les conditions prévues par l'article 785 du code de procédure civile.

**Greffière**, lors des débats : Mme Clémentine GLEMET

**ARRÊT :**

- CONTRADICTOIRE
- par mise à disposition de l'arrêt au greffe de la Cour, les parties en ayant été préalablement avisées dans les conditions prévues au deuxième alinéa de l'article 450 du code de procédure civile.
- signé par François ANCEL, Président et par Clémentine GLEMET, Greffière à qui la minute a été remise par le magistrat signataire.

## I- FAITS

1. Le 14 décembre 2007 la République Démocratique du Congo (ci-après désignée « la RDC ») et l'association formée entre la société Divine Inspiration Group (PTY) Ltd (ci-après désignée « la société DIGOil ») et la Congolaise des Hydrocarbures, ont conclu un contrat de partage de production (CPP) de ressources en hydrocarbures portant sur les blocs 8, 23 et 24 de la Cuvette Centrale.

2. Le 21 janvier 2008 la RDC et l'association constituée du consortium entre la société DIGOil, la société Petro SA, la société H-Oil Congo Limited, la Congolaise des Hydrocarbures, la société Congo Petroleum and Gas Sprl et la société Sud Oil Sprl ont conclu un autre contrat de partage de production (CPP) de ressources en hydrocarbures portant sur le bloc 1 du Graben Albertine.

3. Ayant constaté que ces deux contrats de partage de production n'avaient pas été approuvés par le président de la RDC et, estimant que la RDC avait manqué à ses engagements en décidant d'attribuer l'exploitation de l'un des chantiers (bloc 1 du Graben Albertine) à un autre consortium (l'association Caprikat Ltd et Foxwhelp Ltd), la société DIGOil a engagé une procédure d'arbitrage.

## II- PROCÉDURE

4. Par une sentence arbitrale rendue à Paris le 7 novembre 2018 sous l'égide de la Cour internationale d'arbitrage de la Chambre de commerce internationale, le Tribunal arbitral, composé de Madame Christine Lécuyer-Thieffry (Présidente), de Monsieur Grégoire Bakandeja WaMpungu et de Madame Ghizlane El Idrissi, a notamment :

- dit pour droit que la RDC avait commis une faute en ne délivrant pas à la société DIGOil, l'ordonnance présidentielle d'approbation (i) du contrat de partage de production conclu entre la RDC, d'une part, et d'autre part, l'association de la société DIGOil et la Congolaise des Hydrocarbures, et (ii) du contrat de partage de production conclu entre la RDC d'une part, et d'autre part, l'association Consortium de la société DIGOil, Petro SA, H-Oil Congo Limited, la Congolaise des Hydrocarbures, Congo Petroleum and Gas SPRL, Sud Oil SPRL ;

- dit pour droit que la RDC avait commis une faute en prétendant résilier unilatéralement le contrat de partage de production conclu entre la RDC, d'une part, et, d'autre part, l'association Consortium DIGOil, Petro SA, H-Oil Congo Limited, la Congolaise des Hydrocarbures, Congo Petroleum and Gas SPRL, Sud Oil SPRL, Bloc 1 du Graben Albertine du 21 janvier 2008 ;

- Prononcé la résolution aux torts exclusifs de la RDC des deux contrats de partage de production précités ;

- Dit pour droit que la RDC doit indemniser intégralement la société DIGOil pour tous les dommages qu'elle a subis en raison de la non-exécution et de la résolution du contrat du 14 décembre 2007 et du contrat du 21 janvier 2008 susmentionnés ;

- Dit pour droit que la RDC doit payer à la société DIGOil la somme de 617 400 178 USD augmentée des intérêts calculés au taux de rendement des obligations du Trésor américain à horizon de 20 ans majoré de 2% à compter de la date de la sentence finale et jusqu'au complet paiement ;

- Dit pour droit que la RDC doit supporter l'intégralité des frais de l'Arbitrage fixés par la Cour à la somme de 691 437 EUR, et les frais exposés par la société DIGOil pour sa défense à hauteur de 1 109 933,62 USD ;

- Dit que la RDC doit payer à la société DIGOil les sommes de 760 000 USD et 1 109 933,62 USD augmentées des intérêts calculés au taux de rendement des obligations du Trésor américain à horizon de 20 ans majoré de 2% à compter de la date de la sentence finale et jusqu'au complet paiement ;

- Rejeté toutes les autres demandes des parties.

5. La RDC a formé un recours en annulation contre cette sentence par déclaration du 2 avril 2019.

## III- PRÉTENTIONS DES PARTIES

6. **Au terme de ses dernières conclusions récapitulatives notifiées par voie électronique le 10 octobre 2019,** la RDC demande à la cour au visa notamment de l'article 150 al. 3 de l'ancienne constitution congolaise de la transition d'avril 2003 et des articles 1518, 1519, 1520-3° et 1520-5° du code de procédure civile, de :

- Recevoir l'appelante dans ses écritures et y faire droit ;

- Dire que le tribunal arbitral a statué sans se conformer à sa mission ;

- Dire que la reconnaissance ou l'exécution de la sentence serait contraire à l'ordre public international ;

- Prononcer l'annulation de la sentence arbitrale rendue le 07 novembre 2018 par le tribunal arbitral agissant sous l'égide de la Cour Internationale d'Arbitrage ;

- En conséquence, évoquer de nouveau l'affaire et lui donner une solution définitive ;

- Condamner la société Divine Inspiration Group (PTY) Ltd à verser à la République Démocratique du Congo la somme de 30 000 euros à titre des frais irrépétibles (article 700 CPP) et aux entiers dépens.

7. **Au terme de ses dernières conclusions récapitulatives notifiées par voie électronique le 8 novembre 2019,** la société Divine Inspiration Group (Pty) Ltd demande à la cour, au visa notamment des articles 32-1, 696, 700, 1504, 1520-3°, 1520-5° et 1527 du Code de procédure civile, de :

- Débouter intégralement la RDC de ses demandes, fins et conclusions ;

En conséquence,

- Constater que l'exequatur est conféré à la sentence CCI rendue le 7 novembre 2018 dans l'affaire CCI 22370/DDA et l'apposer sur sa copie certifiée conforme, en application de l'article 1527 du Code de procédure civile ;

- Condamner la RDC à payer 30 000 euros (trente mille euros) à la société Divine Inspiration Group (PTY) Ltd pour recours abusif à l'encontre de la sentence CCI rendue

le 7 novembre 2018 dans l'affaire CCI 22370/DDA, par application de l'article 32-1 du Code de procédure civile ;

- Condamner la RDC à payer 70 000 euros (soixante-dix mille euros) à la société Divine Inspiration Group (PTY) Ltd sur le fondement de l'article 700 du Code de procédure civile ;

- Condamner la RDC aux entiers dépens, par application de l'article 696 du Code de procédure civile.

## IV- MOYENS DES PARTIES

8. Au soutien de son recours, la RDC considère que le tribunal arbitral a statué sans se conformer à la mission qui lui avait été confiée et que la reconnaissance ou l'exécution de la sentence serait contraire à l'ordre public international.

9. Elle expose que le tribunal arbitral a statué sans se conformer à la mission qui lui avait été confiée puisque le droit congolais étant applicable, le tribunal arbitral a refusé de tenir compte d'une décision de l'ancienne Cour Suprême de Justice (devenue le conseil d'Etat) portant sur les pouvoirs discrétionnaires du président de la République de sorte qu'il a dépassé le cadre de sa mission. Elle précise que le tribunal ne pouvait conclure à une faute de la part de la RDC pour défaut de délivrance de l'ordonnance présidentielle, alors que l'arrêt de la Cour Suprême de Justice affirme, au contraire, qu'une telle approbation ressort du pouvoir discrétionnaire souverain du Président de la République.

10. Elle précise que selon l'article 150 alinéa 3 de la constitution congolaise, les cours et tribunaux sont tenus de se conformer à la jurisprudence de la Cour Suprême de Justice et que le tribunal a fait semblant d'interpréter cette jurisprudence, pour mieux l'écarter, son objectif ayant été d'interpréter à sa manière la loi n°81/015 du 2 avril 1981 sur les mines et les hydrocarbures, sans tenir compte de l'arrêt précité de la Cour suprême.

11. La RDC estime qu'il n'y avait aucune raison pour le tribunal arbitral de ne pas adopter le même raisonnement que celui de la Cour Suprême de Justice, car même si les faits qui lui étaient soumis n'étaient pas exactement les mêmes que devant la juridiction congolaise, il se posait néanmoins les mêmes questions de droit à propos de l'ordonnance présidentielle.

12. La RDC ajoute que l'ordre public international est constitué par les principes de justice universelle considérés dans l'opinion comme dotés de valeur internationale absolue et que l'application par une juridiction inférieure d'une jurisprudence précise et claire constitue un principe général fondamental et universellement reconnu. Elle précise qu'en ayant décidé de ne pas se conformer à la jurisprudence de la cour suprême de justice de la RDC, alors qu'il était tenu d'appliquer le droit congolais dans l'examen de l'affaire qui lui avait été soumise, le tribunal est entré en contradiction avec les principes et valeurs d'une justice universelle de telle sorte que la reconnaissance ou l'exécution de la sentence serait contraire à l'ordre public international.

13. En réponse, la société DIGOil fait valoir que la RDC tente, sous couvert du grief de prétendues violations de sa mission par le Tribunal, d'obtenir la révision au fond de la Sentence. Elle expose qu'en prétendant que le Tribunal ne se serait pas « conformé » à l'arrêt de 2010, ou qu'il aurait « refusé » de l'appliquer, la RDC ne fait que contester l'interprétation comme les modalités d'application par le Tribunal des stipulations des contrats, comme du droit congolais et des usages applicables, alors que le Tribunal a au contraire, comme sa mission l'exigeait, appliqué les Contrats, le droit congolais et les usages concernés.

14. Elle précise à cet égard que le tribunal arbitral, après avoir rappelé et examiné les prétentions respectives des parties comme les pièces soumises par elles sur ce point, et en tenant compte de la pratique administrative en RDC, comme du droit congolais, en a conclu que la RDC avait l'obligation contractuelle de tout mettre en œuvre pour permettre la délivrance de l'ordonnance dans les conditions prévues par la loi congolaise, et que cette obligation devait être exécutée dans un délai pouvant en pratique aller jusqu'à deux ans et quatre mois.

15. La société DIGOil ajoute que s'agissant du moyen fondé sur l'article 1520-5° du code de procédure civile, la RDC n'invoque à son appui aucune règle d'ordre public international français, ne soutient ni ne démontre d'ailleurs que la reconnaissance et/ou l'exécution de la Sentence elle-même, serait manifestement, effectivement et concrètement contraire à l'ordre public international français.

16. Elle considère que les arguments soulevés par la RDC reviennent à affirmer que la disposition visée de la Constitution congolaise et l'interprétation par la Cour Suprême formulée dans l'arrêt de 2010, et résultant de faits et de questions différentes, interdirait toute interprétation du droit congolais autre que celle de la RDC, et que cette interprétation s'imposerait au Tribunal, au nom d'un ordre public international inconnu du droit français de l'arbitrage international.

17. La société DIGOil fait également valoir que la Sentence a été rendue dans le cadre d'un arbitrage international et n'est donc susceptible ni d'appel ni d'évocation, de telle sorte que la demande de la RDC visant à ce que la Cour évoque cette affaire dans l'hypothèse où la Sentence serait annulée, est donc irrecevable.

18. Elle considère enfin que ce recours est abusif car il ne repose pas sur une appréciation inexacte par la RDC de ses droits et qu'il est en pratique destiné à retarder l'exécution de la Sentence et n'a pour objet que de justifier une demande de sursis à la reconnaissance et à l'exécution de la Sentence en dehors de France, car il rend illusoire et coûteux pour la société DIGOil toute procédure d'exécution de la Sentence en dehors du siège de l'arbitrage tant que la cour d'appel de Paris ne se sera pas prononcée sur ce recours, notamment dans les pays signataires de la Convention de New York de 1958 autres que la France, puisque cette convention prévoit en son article V.1(e), que le juge saisi d'une demande d'exécution ou de reconnaissance d'une telle sentence rendue à l'étranger, peut refuser de l'accorder si la sentence a été annulée au lieu de son prononcé.

## V- MOTIFS DE LA DÉCISION

**Sur le moyen tiré de la violation par le tribunal arbitral de sa mission ;**

19. En application de l'article 1520, 3° du code de procédure civile, le recours en annulation est ouvert si le tribunal arbitral a statué sans se conformer à la mission qui lui avait été confiée.

20. En l'espèce, il n'est pas contesté qu'au terme des contrats litigieux (article 27), l'interprétation et l'exécution de ces contrats sont soumises au droit de la République Démocratique du Congo et que les conventions d'arbitrage (Article 30) de chacun de ces contrats renvoient au Règlement d'arbitrage de la Chambre de Commerce Internationale de Paris dont l'article 21 stipule que « *1- Les parties sont libres de choisir les règles de droit que le tribunal arbitral devra appliquer au fond du litige (...) 2- Le tribunal arbitral tient compte des dispositions du contrat entre les parties, le cas échéant, et de tous les usages du commerce pertinents (...)* ».

21. Il ressort de la sentence rendue le 7 novembre 2018 que le tribunal arbitral a fondé sa décision sur le droit de la République Démocratique du Congo ainsi que cela résulte notamment du paragraphe 113 de la sentence qui énonce « *qu'il résulte de l'application*

*cumulées des dispositions de l'article 189 de la loi de 2015* [loi n°15/012 portant régime général des hydrocarbures du 1er août 2015] *et des stipulations de l'article 28 des contrats litigieux, que la loi congolaise qui leur est applicable est la loi de 1981* [Ordonnance-loi n°081-013 du 2 avril 1981 portant législation générale sur les hydrocarbures] *et c'est au regard des dispositions de la loi de 1981 qu'il y a lieu d'examiner les prétentions respectives des parties, en premier lieu relativement aux conséquences de la non-délivrance de l'ordonnance présidentielle d'approbation des contrats litigieux ».*

22. De même, pour apprécier les conséquences de la non-délivrance de l'ordonnance présidentielle, il convient de relever que le tribunal arbitral s'est référé à l'article 79 al.5 de la loi congolaise du 2 avril 1981 précitée selon lequel les « *conventions pétrolières, quoique dûment signées par les parties, n'ont d'effet qu'après avoir été approuvées par une ordonnance du Président de la République* » (paragraphe 114) pour estimer que la non-délivrance de l'ordonnance présidentielle « *a pour effet de suspendre certains effets des contrats litigieux, les parties restant liées par les obligations qu'ils contiennent* » (paragraphe 121).

23. Ayant par ailleurs relevé qu'aux termes de « *l'article 29 des contrats litigieux, l'État a l'obligation de prendre toutes les mesures nécessaires destinées à faciliter les activités pétrolières, notamment, pour l'obtention des approbations nécessaires, en ce compris l'ordonnance du Président de la République* » (paragraphe 125), il a jugé que « *la délivrance de l'ordonnance présidentielle d'approbation des contrats litigieux constitue bien, au titre de l'article 29 des contrats litigieux, un engagement de l'État, garant de l'application de sa propre législation et dont il ne saurait être libéré que si les conditions prévues par celle-ci pour sa délivrance ne sont pas remplies, ce qu'il y a lieu maintenant de déterminer » (paragraphe 126)*.

24. La RDC s'est prévalue au soutien de sa défense d'un arrêt RA.1006 du 10 décembre 2010 de la Cour Suprême de justice, section administrative siégeant en matière d'annulation en premier et dernier ressort, au terme duquel la Cour a été amenée à se prononcer sur le recours en annulation engagé par une société pétrolière de droit hollandais contre un arrêté interministériel du ministre des hydrocarbures en date du 17 octobre 2017 ayant rouvert l'exploitation du bloc 1 du Graben Albertine au mépris, selon la société pétrolière, du contrat de partage de production qu'elle avait conclu. Pour rejeter le recours en annulation, la Cour Suprême de Justice, dans ses motifs, « *constate que le contrat de partage de production a été conclu sous une condition suspensive, non accomplie à ce jour, en l'occurrence l'approbation du Président de la République. Elle note également qu'aux termes de la législation congolaise, ce dernier n'a pas, en la matière, une compétence liée qui l'obligerait absolument à donner son approbation ; qu'il s'agit en revanche d'un pouvoir discrétionnaire impliquant sa souveraine appréciation en considération des éléments de l'espèce ainsi que des intérêts de l'Etat congolais, et pour l'exercice duquel il n'est tenu par aucun délai. La cour considère dès lors qu'en l'absence de l'ordonnance présidentielle d'approbation prévues par les dispositions légales et contractuelle pré-rappelées le contrat suscité n'ayant pas encore commencé à produire ses effets, l'action de la demanderesse est manifestement prématurée, et partant irrecevable* ».

25. A cet égard, il convient d'observer que le tribunal arbitral, après avoir rappelé les analyses divergentes des parties quant aux pouvoirs du Président de la République pour délivrer une ordonnance d'approbation (simple formalité à recueillir, ou pouvoir discrétionnaire), s'appuie expressément sur cette jurisprudence de la Cour Suprême de Justice en précisant qu'elle « *souligne que le pouvoir du Président de la République est discrétionnaire* » et que ce « *pouvoir implique sa souveraine appréciation des éléments de l'espèce ainsi que des intérêts de l'État congolais* » mais considère que les « *intérêts de l'État sont ceux tirés des droits de l'État sur le sous-sol dont le Président de la République est le garant aux termes de la Constitution et de la loi de 1981* » et qu'il « *appartient donc au Président de la République d'apprécier souverainement dans quelle mesure une convention pétrolière est susceptible de porter atteinte à l'indépendance nationale, à l'intégrité du territoire, à la souveraineté nationale et aux traités et accords internationaux*

*et, le cas échéant, de refuser de délivrer l'ordonnance d'approbation s'il n'est pas satisfait que tel soit le cas* » (paragraphe 132).

26. Le tribunal arbitral constate que non seulement l'ordonnance n'a pas été délivrée mais encore qu'« *aucune décision de rejet du Président de la République comportant une quelconque motivation n'a [t-elle] été produite au débat, ni même son existence alléguée* » et il relève au paragraphe 150 de la sentence que « *la situation du contrat de 2008 ici considérée se distingue des éléments de l'espèce soumise à la Cour suprême dans l'instance qui a donné lieu à son arrêt du 10 décembre 2010* » en ce sens que « *au regard des éléments de l'espèce appréciés souverainement par le Président de la République, la poursuite de ce contrat pouvait s'avérer contraire aux intérêts de l'État* » (paragraphe 151) alors que s'agissant du contrat de 2008 « *aucun motif d'intérêt général n'a été allégué* » de sorte que selon le tribunal arbitral « *rien parmi les éléments figurant au débat ne permet donc de considérer que les conditions de délivrance de l'ordonnance présidentielle selon le droit de la RDC n'auraient pas été remplies par le contrat de 2008* » (paragraphe 152).

27. C'est ainsi que le tribunal arbitral a considéré que « *le fait, comme l'a décidé la cour Suprême de Justice de la RDC dans son arrêt, que le PR dispose d'un pouvoir discrétionnaire, ne signifie pas que ce pouvoir puisse s'exercer de manière arbitraire* »(paragraphe 153) ; que « *la non-délivrance de l'ordonnance présidentielle d'approbation du contrat de 2008 a pour effet d'en suspendre l'exécution en application de l'article 79, alinéa 5, de la loi de 1981, mais n'a pas pour effet de libérer les parties des obligations en découlant* » (paragraphe 154) et qu'en « *l'absence d'allégation par la défenderesse d'un motif d'intérêt général justifiant un refus de délivrance de l'ordonnance présidentielle, la demanderesse soutient de manière pertinente que la décision unilatérale de la défenderesse d'attribuer les droits qu'elle détenait au titre du contrat de 2008 à un tiers constitue une « voie de fait » qui contrevient aux dispositions de l'article 33 du décret du 30 juillet 1888 (...)* » (paragraphe 159), lequel dispose que « *les conventions légalement formées tiennent lieu de loi à ceux qui les ont faites. Elles ne peuvent être révoquées que de leur consentement mutuel ou pour les causes que la loi autorise* ».

28. Le tribunal arbitral décide ainsi dans le paragraphe 167 de la sentence que « *la défenderesse a commis une faute (i) en ne délivrant pas l'ordonnance présidentielle d'approbation des contrats litigieux et (ii) en réattribuant le bloc 1 du Graben Albertine à un tiers en violation des stipulations du contrat 2008, dépossédant ainsi sans contrepartie la demanderesse de ses droits exclusifs au titre du contrat 2008* ».

29. S'agissant du contrat du 14 décembre 2007, le tribunal arbitral « constate » au paragraphe 171 de sa sentence que « *l'action à la base du recours porté devant la cour Suprême était une action en annulation d'un acte administratif (l'arrêté d'annulation du Contrat Tullow) fondée sur un excès de pouvoir de l'auteur de cet acte. En l'état, il ne peut en tirer aucun enseignement dans le cadre de la situation qui lui est soumise puisque, ainsi que cela a déjà été relevé ci-dessus, contrairement à l'espèce soumise à la Cour Suprême, le contrat de 2007 n'a pas été annulé et que, nonobstant la non-délivrance de l'ordonnance présidentielle, les parties restent liées par les obligations qu'il convient* » pour conclure au paragraphe 174 que « *la défenderesse a commis une faute en ne délivrant pas l'ordonnance présidentielle d'approbation du contrat de 2007 dans un délai raisonnable* ».

30. Il ressort de ces motifs que non seulement le tribunal arbitral a motivé sa sentence au regard du droit congolais mais qu'il a aussi expressément apprécié l'incidence de l'arrêt du 10 décembre 2010 de la Cour Suprême de Justice allégué par la RDC au soutien de sa défense étant observé qu'il n'appartient pas à la présente Cour de porter une appréciation sur l'application dudit droit, sauf à s'engager dans un processus de révision au fond de la sentence qui ne relève pas de son office.

31. En outre, si le tribunal arbitral est tenu d'appliquer le droit de la RDC, il ne s'écarte pas de sa mission en se livrant à une interprétation de celui-ci.

32. En l'état de ces éléments, le moyen d'annulation sera rejeté.

**Sur le moyen tiré de la violation par le tribunal arbitral de l'ordre public international ;**

33. En application de l'article 1520, 5° du code de procédure civile, le recours en annulation est ouvert si la reconnaissance ou l'exécution de la sentence est contraire à l'ordre public international, lequel s'entend de la conception qu'en a l'ordre juridique français, c'est-à-dire des valeurs et des principes dont celui-ci ne saurait souffrir la méconnaissance même dans un contexte international.

34. En l'espèce, en interprétant à la lumière du droit de la RDC, en ce compris d'une décision de la Cour Suprême de Justice de cet Etat, les conséquences de l'absence de prise par le Président de la République de cet Etat d'une ordonnance d'approbation des contrats de partage de production litigieux, quand bien même il se serait écarté de l'interprétation donnée par un arrêt de cette cour suprême rendu dans des circonstances au demeurant distinctes, le tribunal arbitral n'a méconnu aucune des valeurs et principes précités.

35. Ce moyen sera en conséquence rejeté, et ensemble la demande de voir prononcer l'annulation de la sentence.

36. Conformément à l'article 1527 du code de procédure civile, le rejet du recours en annulation confère l'exequatur à la sentence arbitrale.

**Sur la demande formée au titre de la procédure abusive ;**

37. L'exercice d'une action en justice constitue par principe un droit et ne dégénère en abus pouvant donner naissance à des dommages et intérêts qu'en cas de faute susceptible d'engager la responsabilité civile de son auteur.

38. En l'espèce, la société DIGOil sera déboutée de sa demande à ce titre à défaut pour elle, d'une part, de rapporter la preuve d'une faute ou légèreté blâmable de la part de la RDC, qui a pu se méprendre sur l'étendue de ses droits, et d'autre part, faute d'établir l'existence d'un préjudice autre que celui subi du fait des frais exposés pour sa défense.

**Sur les frais et dépens ;**

39. Il y a lieu de condamner la RDC, partie perdante, aux dépens qui seront recouvrés conformément aux dispositions de l'article 699 du code de procédure civile.

40. En outre, la RDC doit être condamnée à verser à la société DIGOil, qui a dû exposer des frais irrépétibles pour faire valoir ses droits, une indemnité au titre de l'article 700 du code de procédure civile qu'il est équitable de fixer à la somme de 30 000 euros.

**VI- DISPOSITIF**

**Par ces motifs, la cour :**

1- Rejette le recours en annulation de la sentence rendue le 7 novembre 2018 par la Cour internationale d'arbitrage de la chambre de commerce internationale (affaire n°22370/DDA) ;

2- Confère l'exéquatur à cette sentence arbitrale ;

3- Rejette la demande formée au titre de la procédure abusive ;

4- Condamne la République Démocratique du Congo à payer à la société Divine Inspiration Group (PTY) Ltd la somme de 30 000 euros au titre de l'article 700 du code

de procédure civile ;

5- Condamne la République Démocratique du Congo aux dépens qui seront recouvrés conformément aux dispositions de l'article 699 du code de procédure.

*La greffière*

*C. GLEMET*

En conséquence, la République Française mande et ordonne à tous Huissiers de Justice sur ce requis, de mettre le présent arrêt à exécution. Aux Procureurs Généraux, aux Procureurs de la République près des Tribunaux de Grande Instance d'y tenir la main. A tous Commandants et Officiers de la force publique d'y prêter main forte, lorsqu'ils en seront légalement requis.

COUR D'APPEL DE PARIS

*Le président*

*F. ANCEL*